## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| ELIZABETH A. BLACK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CASE NO.:  8:16-cv-02117-SDM-TGW |
| | ) |
| NATIONAL BOARD OF | ) |
| MEDICAL EXAMINERS, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant National Board of Medical Examiners ("NBME") hereby moves for summary judgment on the single claim that Elizabeth Black ("Ms. Black") has asserted in her Amended Complaint (ECF No. 29) ("Am. Comp."). No trial is necessary to resolve this dispute. The grounds for this Motion are set forth in the following Memorandum of Law.[1]

## MEMORANDUM OF LAW

Just as prospective lawyers must pass a bar exam to demonstrate their knowledge of the law, prospective allopathic physicians must pass the United States Medical Licensing Examination ("USMLE") to help demonstrate that they have the minimum knowledge and skills needed to provide safe and effective healthcare. NBME provides for the administration of the USMLE. The question presented in this case is whether NBME acted unlawfully when it denied a request by an examinee for extra testing time on Step 1 of the USMLE.

---

[1]  Defendant's supporting materials are attached, along with an index. Defendant cites to depositions by using the deponent's last name followed by "Dep." and the applicable page citation. Defendant cites to declarations by using the declarant's last name followed by "Decl.". The facts set forth herein that are based upon Plaintiff's assertions are for purposes of summary judgment only. Defendant reserves the right to challenge Plaintiff's assertions should this Motion be denied.

Plaintiff alleges that NBME violated the Americans with Disabilities Act ("ADA") by not allowing her to test with 50% more time than other examinees receive.  *See* Am. Comp. ¶¶ 94-107.  Under standard conditions, Step 1 is a one-day, eight-hour multiple-choice examination.  *Id.* ¶ 32.  Ms. Black wants to take the exam over two days, with 12 hours of testing time.

To be entitled to extra testing time, Ms. Black must demonstrate that she is disabled within the meaning of the ADA and needs extra time in order to take the Step 1 exam in an accessible manner.  *See* 42 U.S.C. § 12189.  An individual is disabled under the ADA if she is substantially limited in her ability to perform one or more major life activities, as compared to most people in the general population.  42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v).  As a matter of law, Ms. Black is not disabled within the meaning of the ADA.

Ms. Black claims to have an Attention Deficit Hyperactivity Disorder ("ADHD").[2]  ADHD is a lifelong impairment that initially manifests itself in childhood and affects multiple facets of a person's life.  Ms. Black, however, was first diagnosed with ADHD in 2009, at age 26, almost four years after she graduated from Princeton University.  The record overwhelmingly demonstrates that she is not substantially limited in any major life activity.  To the contrary, she has performed exceedingly well in all facets of her life – academic, personal and professional – without accommodations.  This includes her performance on other high-stakes standardized exams, which she has taken successfully without extra testing time.

---

[2]  In seeking accommodations from NBME, Ms. Black also asserted that she was entitled to extra testing time based upon a "visual condition."  *See infra* at 14-15.  She does not make that claim here, however.  As reflected in stipulations signed by both parties, Ms. Black's ADA claim "is based solely on her allegation that she has ADHD…; her claim is not based on any medical condition other than ADHD -- mental, physical, psychological, or otherwise."  *See* Stipulation (Mar. 20, 2017) at ¶¶ 6, 7; Stipulation (Apr. 14, 2017), Recitations at ¶ 3.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). To overcome summary judgment, "the nonmoving party must present more than a mere scintilla of evidence supporting her position, and must make a sufficient showing that a jury could reasonably find in her favor." *Doe v. Bibb Cty. Sch. Dist.*, 2017 U.S. App. LEXIS 8854, *6 (11th Cir. 2017).

Where a plaintiff in an ADA case fails to establish that she is substantially limited in a major life activity, summary judgment is warranted in favor of defendant. *See, e.g., Greenberg v. BellSouth Telecomms.*, 498 F.3d 1258, 1264-65 (11th Cir. 2007) (granting summary judgment where plaintiff did not show that he was substantially limited by his alleged impairment, and rejecting plaintiff's argument that "his own testimony and that of his expert witness … created genuine issues of material fact as to whether he is disabled"); *Rodriguez v. HSBC Bank USA, N.A.*, 2015 U.S. Dist. LEXIS 157883, *18-21 (M.D. Fla. 2015) (granting summary judgment where "the evidence -- much of which [plaintiff] himself supplied -- overwhelmingly demonstrates that [plaintiff's impairment] did not limit any of his major life activities").

## STATEMENT OF MATERIAL FACTS

## I.   NBME and the United States Medical Licensing Examination

NBME is a not-for-profit organization whose mission is to protect the health of the public through the development and administration of high-quality examinations. Decl. of Catherine

Farmer ¶ 3 ("Farmer Decl.").  In conjunction with the Federation of State Medical Boards, another non-profit organization, NBME sponsors the USMLE program.  *Id*. ¶ 4.

The USMLE is a standardized examination[3] used to evaluate applicants' competence for medical licensure in the United States and its territories.  *Id.* ¶ 4.  The USMLE is designed to assess an examinee's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.  *Id.* Licensing authorities across the United States rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial license to practice medicine.  *Id*. ¶ 5.

Three "Step" exams make up the USMLE, taken at different times in an individual's graduate medical education process:  Step 1, Step 2 (comprising the Step 2 Clinical Knowledge exam and the Step 2 Clinical Skills exam), and Step 3.  *Id*. ¶ 10.  Ms. Black's complaint relates to the Step 1 exam.  Step 1 assesses whether candidates understand and can apply important science concepts that are basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy.  *See* www.usmle.org/step-1/.

With limited exceptions, all examinees take the USMLE under the same testing conditions, including standard testing time.  The primary exception is for disabled individuals who need accommodations to access examinations.  *Id.* ¶¶ 7-8.

NBME receives hundreds of accommodation requests each year.  *Id*. ¶ 8. It conscientiously evaluates each request and provides accommodations when a candidate has documented a legitimate need.  *Id*.  In all cases, NBME's objective is to ensure that "individuals with *bona fide*

---

[3] "When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized.  Without such standardization, the accuracy and comparability of score interpretations would be reduced.  For tests designed to assess the test taker's knowledge, skills, abilities, or other personal characteristics, standardization helps to ensure that all test takers have the same opportunity to demonstrate their competencies."  *Standards for Educational & Psychological Testing* at 111 (2014).

disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the ... examination.  As administrator of the national exam used by . . . states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it."  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004).

## II.    Ms. Black's Exceptional Academic Background, Employment History, and History of Taking Standardized Tests – All With No Accommodations

Ms. Black took various standardized tests in elementary school.  She did not receive extra testing time on any of these exams.  Black Dep. at 58 (acknowledging that she has not received accommodations on *any* standardized tests that she has taken at any point in her life).  The tests included the Otis-Lemon School Ability Test ("OLSAT") and the Metropolitan Achievement Tests ("MAT").  *See id.*, Exs. 9 & 10.  Her scores on the OLSAT were consistently in the Average or Above Average range in both the verbal and nonverbal categories, *id.*, Ex. 9, and when she took the MAT in the 8th Grade, her performance was "well above average," with scores on all subtests in the 90th percentile or better nationally (*i.e.*, the top 10%), including in Reading Comprehension, *id.*, Ex. 10 (last page); *see also* Black Dep. at 84-86.

Ms. Black attended high school in Pennsylvania.  She did not receive any accommodations. *Id.* at 49, 56.  With the exception of one B in the 9th grade (in an Honors Science course) and two B's her Senior year (in Honors/AP English and Honors/AP Calculus), she was a straight-A student. *See id.*, Ex. 18 at PENN SR-021, PENN SR-024.  All told, 19 of her classes were Honors classes, *id.*, she graduated with a cumulative GPA of 3.941, *id.*, and she finished 4th in a class of roughly 320 students, *see* Black Dep. at 117-20.

Ms. Black achieved these exemplary grades while participating in numerous extra-curricular activities.  She played varsity field hockey all four years of high school, serving as Captain her Senior year and receiving All League and All American honors.  *Id*., Ex. 18 at SR-022.  She also played lacrosse and basketball; ran track; was in the Student Council, where she was an officer during her Junior and Senior years; and was a member of several clubs.  *Id*.

Ms. Black took the SAT college admissions test three times in high school; she also took College Board subject tests in Spanish and Writing.  *See* Black Dep. Ex. 11.  All of these tests were standardized.  *Id*., Ex. 18 at PENN SR-023.  She did not request extra testing time on any of these tests.  Black Dep. at 58.  Her combined scores for Verbal and Math on the SAT ranged from 1240 to 1260, with her highest score being a 650 in Verbal.  *Id*., Ex. 11.  Those scores put her in the top 20% (*i.e*., 80th percentile or better) of students who took the SAT in calendar year 2000.  *See* http://www.fldoe.org/core/fileparse.php/5306/urlt/SATPercent1016.pdf.

On the strength of her academic record, Ms. Black was admitted to Princeton University.  Black Dep. at 120.  Princeton is an academically rigorous Ivy League school that consistently ranks among the best national universities in the country.[4]  Ms. Black graduated from Princeton in four years and achieved mostly A's and B's.  *See id*., Ex. 14.  She achieved those grades while participating all four years as an NCAA Division I athlete on Princeton's nationally-ranked women's field hockey team.  She received All Conference Ivy League recognition and was an All American in 2002 and 2003.  *Id*., Ex. 4 at 2.  She devoted "many hours to the Princeton Field Hockey team," developed "lasting friendships," and confirmed that she is able to "perform successfully … in a pressure situation."  *Id*., Ex. 18 at PENN SR-013.  Her coach described her as

---

[4] *See, e.g*. U.S. News & World Reports, *Best Colleges Rankings* (2017) (ranking Princeton as the number 1 national university in the country, ahead of Harvard, the University of Chicago, Yale and 306 other national universities) (available at www.usnews.com/best-colleges/rankings/national-universities).

having the "commitment, drive, focus and longevity needed to achieve" success at the "highest level in the country." *Id.,* Ex. 18 at PENN SR-066. Ms. Black did not request any accommodations while attending Princeton. Black Dep. at 58.

Ms. Black participated in a university-level study-abroad program in the summer of 2003. She earned an A- in each of her two courses (Advanced Spanish/Mexican Culture and Literature), *id.*, Ex. 15, without any accommodations, *id.*, Black Dep. at 49, 56.

After graduating from college in May 2005, Ms. Black became a Legal Assistant at the law firm Shearman & Sterling in New York City, working on large, commercial real estate transactions. *See id.* at 66-68. For roughly a year, she "[r]eviewed, drafted, revised and organized legal documents, surveys, title policies and general files," and did "environmental research." *Id.*, Ex. 4 at 2. Working at Shearman & Sterling taught her "the various and intricate details of real estate law" and "the ability to manage multiple projects at one time." *Id.*, Ex. 18 at PENN SR-012. She did not receive accommodations while working there (or while working in any other paid or unpaid job she has ever held, *see* Resp. to RFA 16, Pl. Resp. to First Req. for Admissions.

In August 2006, Ms. Black became a Research Assistant at the N.Y. State Psychiatric Institute at Columbia University. She coordinated research studies, recruited subjects for the studies, assisted with grant and manuscript preparations, and analyzed, managed and input research data. Black Dep., Ex. 4 at 1-2. According to one of her supervisors, she performed all of her work "superbly." *Id.*, Ex. 18 at PENN SR-009.

In May 2007, Ms. Black enrolled in a pre-med Post-Baccalaureate Program at another Ivy League school, the University of Pennsylvania ("UPenn"). Black Dep., Ex. 4 at 1. The Program was academically demanding and had a "brutal daily schedule." *Id.*, Ex. 18 at PENN SR-052. Over the course of a year, Ms. Black took nine courses in Biology, Chemistry and Physics and

achieved all A's and B's, including three A+'s. *Id*., Ex. 18 at PENN SR-001, SR-002. In a subsequent recommendation letter, the Pre-Health Programs Adviser described Ms. Black as a "superb student" who "earned an outstanding 3.79 cumulative GPA in our rigorous program," while maintaining "part time research and volunteer positions." *Id*., Ex. 18 at PENN SR-032, SR-33. He also noted her "outstanding interpersonal skills," and described her as "mature, focused and compassionate." *Id.,* Ex. 18 at PENN SR-032-033; *see also id*., Ex. 18 at PENN SR-036 (additional recommendation, noting that Ms. Black was among the top 25% of her class at UPenn). Ms. Black did not receive extra testing time or any other accommodations at UPenn. Black Dep. at 49, 56.

After completing her program at UPenn, Ms. Black moved to the Dominican Republic. *Id*. at 60. She was employed in various jobs for roughly three years, *id*. at 60-61, all of which called for strong communication skills, attention to detail, and focus. She was as an intern for an International Family Aids Program, where she taught classes, developed the curriculum for a school outreach program, and performed administrative tasks. *Id.,* Ex. 4 at 1. She was a high school teacher, teaching science courses and serving as Advisor to the school's National Honor Society members. *Id.* And she did "Logistics and Procurement" work for two international organizations: for the Clinton Health Access Initiative, she "coordinated and prioritized delivery" of medical supplies, fuel and other relief goods to Haiti, while organizing "project finances;" and for Partners in Health, she "coordinated deliveries" for completing a teaching hospital, "procured and organized the logistics of relief goods to Haiti through the Dominican Republic," and maintained project finances. *Id*.; *see also* Black Dep. at 60-64.

Since August 2016, Ms. Black has been employed as a 6th grade teacher. *Id*. 10. She took and passed a qualifying subject-matter exam and did not seek extra testing time. *Id*. 70-72.

## III.   Ms. Black Did Very Well on the MCAT Exam – With No Accommodations

Ms. Black took the Medical College Admission Test twice in 2009, after completing her Post-Baccalaureate Program.  Her score on the first test placed her in the 32% percentile of all individuals who took the MCAT when she did.  Black Dep., Ex. 12.  Ms. Black only had a month to prepare for this test, however, and when she tested again after taking a "more intensive Kaplan [preparation] course," *id*. at 142-43, she did extremely well (73rd percentile), *id.,* Ex. 12.  Her score was in the top 27% of all her fellow examinees.  *Id*. at 91.  She did not receive extra time on the MCAT.  *Id*. at 91-92.

Like the Step 1 exam, the MCAT lasts several hours, contains multiple-choice questions, and is administered on a computer.  It is an extremely challenging test, taken by a highly select group of individuals with exceptional academic credentials.  As Ms. Black explained, MCAT scores are not compared to scores achieved by "the general population," they are compared to other people who take the MCAT.  *See id*. at 90-91.[5]

## IV.   Ms. Black's Enrollment in Medical School

Ms. Black enrolled in the University of South Florida's Morsani College of Medicine in August 2011.  Black Dep. at 147.  Before she began classes, her father completed a form on her behalf which confirmed that Ms. Black does not have "any condition(s) that would require reasonable accommodation" in order for her to satisfy the school's technical standards.  *Id.* at 99-100 and Ex. 17. Those standards include having the ability to "analyze, synthesize, extrapolate, solve problems, and reach diagnostic and therapeutic judgments;" to "communicate the results of [an] examination to the patient and to [one's] colleagues with accuracy, clarity and efficiency;"

---

[5]  According to the Association of American Medical Colleges, which administers the MCAT exam, there were 53,042 applicants to U.S. medical schools for the 2016-17 school year, but only 21,030 matriculants. *See* Table A-1 at 5 and n.1, found at https://www.aamc.org/download/321442/data/factstablea1.pdf.

and to "perform with precise, quick and appropriate actions in emergency situations." *Id*. Ms. Black has testified that the information provided by her father was accurate. *Id*. at 100. According to Ms. Black, she will be able to practice medicine without receiving any accommodations. *See* Resp. to RFA 17, Pl. Resp. to First Req. for Admissions.

Ms. Black took written, time-limited exams during her first year of medical school. Black Dep. at 12-13. She passed all her courses that year and did not request or receive extra testing time. *Id*. at 177-78. She first requested accommodations towards "the end of [her] second year of medical school." *Id*. at 177-79. The school approved her request in March 2013. *Id.*, Ex. 33 (authorizing 50% additional time on exams taken outside of the clinical setting).

## V.   Ms. Black's Requests for Extra Testing Time on the USMLE Step 1 Exam

### A.   First Time Taking Step 1:  No Request for Accommodations

In the ordinary course, Ms. Black would have taken the Step 1 exam in 2013, after completing her second year of medical school. Black Dep. at 41-42. However, she took a lengthy leave of absence from medical school and did not take Step 1 until 2014. *See* Am. Comp. ¶¶ 58, 60; Black Dep. at 41-42, 180-81.

Ms. Black consulted numerous therapists while attending medical school. One of the therapists was Dr. Bob Parrino, to whom she was referred by another psychologist for "counselling services relating to test anxiety that Ms. Black was experiencing in advance of taking Step 1 of the United States Medical Licensing Examination." Decl. of Dr. Bob Parrino ¶ 3. Dr. Parrino had numerous sessions with Ms. Black over a period of six months. *Id.* at ¶ 4. He prepared Progress Notes after each session, "to summarize information provided by Ms. Black" and to note the "studying and preparation strategies that we discussed." *Id*. at ¶ 5. The Progress Notes included the following observations:

- "Some consideration of her sabotaging med. school exam and solving conflict of whether this is something she wishes to do as a profession." (EB-0203)

- "CONFLICT OVER MED SCHOOL OR MORE honorable calling, including work in [Do]minican Republic…. Frequently drifts away from clear decision to finish what she started here at USF." (EB-0204)

- "Elizabeth has opted (once again) to postpone STEP ONE exam…. Feels she can complete preparation and feel comfortable to sit for exam [in] August." (EB-0209).

- "Elizabeth grading her work productivity past week as C+ with some B and even A- level work. Realizing she is down to final 7 days prior to Step exam…has not covered everything once but hopes to arrive at that point today." (EB-0213)

- "Elizabeth has … decided to postpone Step exam another month…. Final practice exam … slight improvement but still falling short of 188 passing score. Realizes that quality of study, fund of knowledge, and interfering levels of anxiety are contributing factors." (EB-0216)

- "Once again we have reviewed the hypothesis, now even more substantiated, that she deliberately does not study to fullest to preserve alibi about her abilities. If her prep is mediocre then her less than flawless outcome is not as threatening." (EB-0225)

- "Brief phone contact session with Eliz….. [S]he has, once again, fallen short of intentions with study for this exam in twenty days." (EB-0227)

- "Elizabeth will be taking her Step exam on the 27 of Dec…. Has drifted from flawless preparation and, once again, does not feel prepared enough to pass." (EB-0238)

*See generally* Parrino Decl. at Ex. A.

Ms. Black did not take Step 1 in December 2013. She again postponed, enrolling instead in a 7-week review course offered by a commercial test prep company. Am. Comp. ¶ 59.

Ms. Black finally took Step 1, for the first time, on July 3, 2014. Farmer Decl. ¶ 11. She did ***not*** request extra testing time. *Id.* She did not achieve a passing score. *Id.* In an email to a school administrator several months later, she said that her "problems with taking Step 1" did not relate to "self-doubt or being afraid to take the exam;" her "problem was actually studying for the exam in a consistent manner." Black Dep. Ex. 40 at EB-0506.

**B.     Second Time Taking Step 1:  Extra Time Requested**

After extending her leave of absence from medical school several additional times, Am. Comp. at ¶ 62,[6] Ms. Black registered to re-take the Step 1 exam.  She submitted her first application for testing accommodations in November 2014, asking for "50% additional testing test time."  *Id*. ¶ 63.  She based her request on a single claimed impairment, ADHD, which she said was diagnosed in 2009 by Dr. Scott Fleischer in Pennsylvania, and in 2014 in an evaluation done by the USF Psychological Services Center.  *Id*. ¶¶ 63, 66.

NBME processed Ms. Black's accommodation request in accordance with its standard policies and procedures.  This included notifying Ms. Black that it needed some additional information, and obtaining input from an external professional with expertise in her claimed impairment.  *See* Farmer Decl. ¶ 13.

NBME sent Ms. Black's accommodation request and all of her supporting documentation to Dr. Kevin Murphy.  *See* Farmer Dep. at 67-68; Dep. of Dr. Kevin Murphy at 55-57 and *id*., Ex. 2.  Dr. Murphy is a nationally recognized expert on diagnosing and treating ADHD.  *See generally* Murphy Dep., Ex. 1 (CV).  He majored in Psychology at Boston College, obtained an M.S. degree in Counseling Psychology from Florida State University, and obtained a Ph.D. in Counseling Psychology from the University of Connecticut.  *Id.* at 1.  He has been the head of an adult ADHD clinic in Massachusetts since 2003.  *Id*.  Prior to that, he was an Associate Professor and ran a "specialty clinic devoted to research, assessment, and treatment of adults with ADHD" at the University of Massachusetts for almost a decade.  *Id*.  He has done extensive research relating to ADHD; he has authored numerous books, book chapters, and journal articles on diagnosing and treating ADHD; he has given more than a hundred presentations on ADHD; and he has been

---

[6] Ms. Black requested at least 15 leaves of absence, or leave extensions.  *See* Black Dep. at 41 and *id*., Ex. 34.

inducted into the "ADHD Hall of Fame" by a non-profit organization that supports individuals with ADHD.  *See id.* at 1-14.

Dr. Murphy serves as an independent external reviewer for numerous organizations that receive requests for accommodations on licensing exams from individuals diagnosed with ADHD. *See id.* at 1-2.  NBME is one such organization.  The Florida Board of Law Examiners is another, as are several other state boards of law examiners.  *Id.*  According to Dr. Murphy, his role as an external reviewer is to "consistently, fairly and objectively review the documentation" and then advise on three issues:  (1) "whether the documentation substantiates the diagnosis;" (2) whether "the diagnosis results in significant functional impairment;" and (3) if so, "whether the requested accommodation is reasonable and appropriate."  Murphy Dep. at 32-33.

In a report dated December 29, 2014, Dr. Murphy informed NBME that, in his opinion, Ms. Black's documentation "does not adequately substantiate an ADHD diagnosis or the existence of a disability and is therefore insufficient to warrant granting her requested accommodation."  *See id.*, Ex. 3 at NBME 00211.  His report noted, among other things, that ADHD is "a developmental disorder with a *childhood* onset that typically results in a chronic and pervasive pattern of functional impairment in academic, social, and vocational arenas, and also in daily adaptive functioning."  *Id.* (original emphasis).  Ms. Black's "documentation and overall history," however, did not reflect "pervasive impairment."  *Id.*  There was no documentation showing that she had actually experienced "a pattern of developmentally deviant historical ADHD-like impairment symptoms in school, work, social, or daily adaptive domains."  *Id.*  There was no documentation of "clinically significant academic or behavioral impairment in childhood."  *Id.* at NBME 00212. Her ADHD diagnosis was based "mostly on self-report, symptom endorsements on a self-administered ADHD rating scale…, and test scores that are not diagnostic of ADHD;" did not

"adequately establish a childhood onset;" "did not adequately explain how Ms. Black performed so well academically and behaviorally for so long if she was struggling with ADHD;" and did not "show any vocational impairment arising from her ADHD symptoms." *Id.* at NBME00212-213; *see also* Murphy Dep. at 63-65 (explaining the basis for his recommendation).

Based upon Dr. Murphy's input and its own review of Ms. Black's documentation, NBME concluded that accommodations were not warranted.  NBME notified Ms. Black of its decision in a letter dated March 2, 2015.  *See* Farmer Decl. ¶ 14 *and* Farmer Dep., Ex. 10 at NBME 00207.

Ms. Black took the Step 1 exam a second time on April 9, 2015, under standard conditions. Am. Comp. ¶ 74.  She did not achieve a passing score.  *Id.*

### C.      Third Time Taking the Step 1 Exam:  No Request for Accommodations

Ms. Black took the Step 1 exam a third time in July 2015.  Farmer Decl. ¶ 15.  She did not request extra testing time.  *Id.*  She did not achieve a passing score.  *Id.*

### D.      Fourth Time Taking Step 1:  Extra Time Requested Based on Two Alleged Impairments (ADHD and "Convergence Insufficiency")

On January 22, 2016, after registering to take Step 1 a fourth time, Ms. Black submitted a second application for accommodations to NBME, and again requested 50% additional testing time with testing over two days.  Am. Comp. 79; Black Dep., Ex. 51 at NBME 00087.  This time she said that accommodations were warranted based upon her claimed ADHD, and because of "convergence insufficiency," a visual condition.  *Id.*, Ex. 51 at NBME 00088.[7]  She submitted additional educational records, letters of support from a high school teacher and her college roommate, a letter from USF's Counseling Center stating that Ms. Black had been seen in the

---

[7]  As noted *supra* at n.2, Ms. Black is no longer claiming that she needed extra time because of a vision impairment.  Accordingly, that claimed impairment is not discussed here.

Center on 83 occasions over a three-year period,[8] records showing that she had been placed on "academic probation" by the medical school, records reflecting her "numerous" leaves of absence from medical school, and letters of support from the psychologist who supervised her 2014 evaluation and from the Director of USF's disability services program.  *See generally* Am. Comp. ¶¶ 79-84.

NBME reviewed all of the documentation that Ms. Black submitted in support of her second request for accommodations.  Farmer Decl. ¶¶ 17-18.  In addition, NBME sent all of her documentation to Dr. Murphy, the external professional who reviewed her initial request, and asked him to reevaluate her request in light of her supplemental documentation.  *Id.* ¶ 17; Murphy Dep. at Ex. 4 (documents provided to Dr. Murphy for his review).

In a report dated Feb 26, 2016, Dr. Murphy stated that, in his opinion, the additional documentation did not show "a history of developmentally deviant impairment that is consistent with ADHD or that she has a magnitude of current impairment that rises to the level of a disability. Therefore, I must continue to recommend denial of her requested accommodations."  Murphy Dep., Ex. 5 at NBME 00078.

Based on Dr. Murphy's input and its own review of Ms. Black's documentation, NBME again denied Ms. Black's request for accommodations.  NBME notified Ms. Black in a letter from Dr. Farmer dated March 28, 2016.  *See* Farmer Dep., Ex. 10.

---

[8] Dated August 19, 2015, the letter stated:  "Per your request …, this letter will confirm that you were seen at the USF Counseling Center for both counseling and psychiatric services on 83 office visits between September 6, 2011 and August 8, 2014 for anxiety related concerns and attentional and academic concerns." Black Dep., Ex. 50.  It also said:  "***Please note***:  *This letter should not be construed to imply or indicate that the USF Counseling Center is recommending any academic or other accommodations be made for you in any student or other life role*."  *Id.* (original emphasis).

VI.     **Diagnosing ADHD**

The Diagnostic and Statistical Manual of Mental Disorders ("DSM") is commonly relied

upon as the authoritative source for the diagnostic criteria for mental impairments.[9]  The current

edition, DSM-5, sets forth the following diagnostic criteria for ADHD:

A. A **persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development**, as characterized by (1) and/or (2):

1. **Inattention**: Six (or more) … symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that **negatively impacts directly on social and academic/occupational activities**….  *Note:* …For older adolescents and adults (age 17 and older), at least five symptoms are required….

2. **Hyperactivity and impulsivity**: Six (or more) … symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that **negatively impacts directly on social and academic/occupational activities**…: *Note:* ….For older adolescents and adults (age 17 and older), at least five symptoms are required.

B.  Several inattentive or hyperactive-impulsive **symptoms were present prior to age 12 years**.

C.  Several inattentive or hyperactive-impulsive **symptoms are present in two or more settings (e.g., at home, school, or work; with friends or relatives; in other activities**).

D.  There is **clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning**.

E.  The symptoms do not occur exclusively during the course of schizophrenia or another psychotic disorder and are not better explained by another mental disorder (*e.g.*, mood disorder, anxiety disorder, dissociative disorder, personality disorder, substance intoxication or withdrawal).

*See* ADHD Diagnostic Criteria, DSM-5 (filed herewith).

According to the organization *Children and Adults with Attention-Deficit/Hyperactivity*

*Disorder* ("CHADD"), which is a national non-profit organization that provides advocacy and

---

[9]  *See, e.g., United States v. Long*, 562 F.3d 325, 334 n.22 (5th Cir. 2009).

support for individuals with ADHD, an evaluation for ADHD should be "comprehensive and multidimensional."[10]  "Although procedures and testing materials may vary, certain protocols are considered essential for a comprehensive evaluation.  These include a thorough diagnostic interview, information from independent sources such as the spouse or other family members, DSM-5 symptom checklists, standardized behavior rating scales for ADHD and other types of psychometric testing as deemed necessary by the clinician."[11]

## VII.  Ms. Black's ADHD Diagnoses

Ms. Black relies upon two ADHD diagnoses to support her claim.  The first was provided by Dr. Scott Fleischer, and the other was provided in a report signed by Dr. Margaret Booth-Jones.  *See* Black Dep. at 24-25.  These diagnoses are discussed below.

### A.  Dr. Fleischer's Diagnosis in 2009

Ms. Black was first diagnosed with ADHD when she was 26 years old.  *Id*. at 142.  The diagnosis was provided by Dr. Scott Fleischer, a psychiatrist in Pennsylvania.  When she went to see Dr. Fleischer she was taking a medication that is used to treat anxiety.  According to Ms. Black, the medication had been prescribed by a "hack of a psychiatrist" who met with her for "five minutes" and said, "'[y]ou should take this drug.'"  *Id.* at 135.  Although she thought he was "terrible," she "decided to take" the drug.  *Id*. at 135-36.

Ms. Black went to see Dr. Fleischer soon thereafter, in March 2009.  *See* Decl. of Scott A. Fleischer, M.D. ¶ 2.  She told Dr. Fleischer that that she was "planning to take the MCAT exam" and "was having some difficulties with her concentration and focus."  *Id*. ¶ 3.

---

[10]  *See* http://www.chadd.org/Understanding-ADHD/For-Professionals/For-Healthcare-Professionals/The-ADHD-Diagnostic-Process.aspx.

[11]  *See* http://www.chadd.org/Understanding-ADHD/For-Professionals/For-Healthcare-Professionals/The-ADHD-Diagnostic-Process/Diagnosis-in-Adults.aspx.

Dr. Fleischer "conducted a consultation and brief psychiatric evaluation" of Ms. Black, "for which she was charged $132." *Id*. ¶ 5.  The primary purpose of the evaluation was to identify "what symptoms she reported experiencing and how those symptoms might respond to medications…." *Id.* ¶ 8.  Her reported symptoms were "consistent with ADD" and she also "reported experiencing anxiety." *Id.* ¶ 7.  Based upon the "information she provided," Dr. Fleischer diagnosed Ms. Black as having two disorders:  "'GAD' (General Anxiety Disorder) and 'ADD' (Attention Deficit Disorder)." *Id*. ¶ 9.  He recommended that she stop taking one of the drugs she was taking, continue taking another drug that she was taking at the time, begin taking Ritalin, and consider taking another drug in the future.  *Id.*

Dr. Fleischer "did not administer any screening tests, ratings scales, continuous performance tests, or neuropsychological measures to Ms. Black during [his] evaluation…." *Id*. ¶ 8.  He did not "review any of her educational or employment records," or "seek information about Ms. Black from third parties."  *Id*.  He did not "attempt to measure the extent of the functional limitations that she reported" experiencing.  *Id*.  He simply conducted "an informal interview of Ms. Black in order to determine whether she was experiencing symptoms that are consistent with ADD, and that might respond positively to appropriate medications."  *Id.* ¶ 7; *see also* Black Dep. at 139 (acknowledging that Dr. Fleischer's evaluation consisted of an informal evaluation and interview, with no testing).

Prior to March 2009, Ms. Black had been able to deal with all facets of her life without taking prescribed stimulants.  Black Dep. at 26-27.

### B.    The USF Psychological Services Center Diagnosis in 2014

In October 2014, Ms. Black was evaluated at the USF Psychological Services Center.  She informed her evaluator that she was "seeking an ADHD evaluation to update her diagnosis documentation so that she may continue receiving her psychostimulant medication from the USF

[Counseling Center]."  Black Dep., Ex. 47 at EB-0112.  The evaluation was conducted by Megan McMurray, a "Clinical Psychology Trainee," under the supervision of Dr. Margaret Booth-Jones. *Id*., Ex. 47 at EB-0119 (evaluation report).

Ms. Black told Ms. McMurray that she had a "lifetime history of difficulty with concentration and staying focused" and had previously been "diagnosed with ADHD by a psychiatrist in 2009."  *Id.* at EB-0112.  She also reported that she was taking Adderall "for her ADHD symptoms," and that she had "received academic accommodations for ADHD, including extended time on exams."  *Id*. at EB-0112, 0113.

Ms. McMurray administered various assessments to Ms. Black as part of the evaluation. *Id*. at EB-0114-0118.  She administered the Wechsler Adult Intelligent Scale-4th Edition to "assess Ms. Black's general intellectual abilities."  *Id.*  Her performance ranged from "Average" to "Very Superior."  *Id*. at EB-0116-117.  This included a performance in Verbal Comprehension at the 98th percentile, and a 70th percentile performance in Processing Speed.  *Id*.

The Conners' Adult ADHD Rating Scales "were used to gather information about Ms. Black's reported inattention symptoms."  *Id.* at EB-0117.  The responses that Ms. Black provided "resulted in clinically significant" findings for "inattention, hyperactivity, and impulsivity."  *Id*. Ms. Black took an "observer" version of the Rating Scales home to her roommate to complete, and her responses "closely mirrored Ms. Black's responses, confirming Ms. Black's self-reported difficulties with inattention, hyperactivity, and impulsivity."  *Id*.

The Conners' Continuous Performance Test-II was "administered to Ms. Black to assess her attention/focus."  *Id*.  The CPT-II "presents individual letters at varying intervals on a computer screen and asks individuals to press a keyboard or mouse button in response to every letter

presented except 'X.'"  Ms. Black's overall performance on the CPT-II was "consistent with patterns typically observed in ADHD populations."  *Id.* at EB-0118.

Stating that "Ms. Black reports symptoms indicative of ADHD symptomology," and that "the current assessment supports a diagnosis of ADHD," Ms. McMurray concluded that Ms. Black "meets DSM-5 criteria for ADHD with combined presentation (inattentive and hyperactive/impulsive presentation." *Id.* at EB-0118-0119.

Ms. McMurray did not assign a level of severity as part of her diagnosis.[12]  Nor did she provide any conclusions regarding Ms. Black's ability to read or process information as compared to most people in the general population (as noted above, Ms. Black's WAIS-IV results showed Verbal Comprehension at the 96th percentile – *i.e.*, better than 96% of everyone in the normed population – and Processing Speed at the 70th percentile).

Ms. Black's Psychological Evaluation report was signed by Ms. McMurray and by Dr. Margaret Booth-Jones, as "Supervising Psychologist."  As the report constitutes Ms. Black's primary support for her claimed entitlement to accommodations on the Step 1 exam, it is helpful to know the context in which it was prepared.  Dr. Booth-Jones testified in her deposition as follows regarding the report:

- The USF Psychological Services Center is a "training clinic" (Dep. at 12)

- Individuals who come to the clinic are assessed by "graduate students" (*Id.*)

- A "licensed clinical psychologist" provides supervision but "never sees the client" (*Id.* at 13)

---

[12]  *See* ADHD Diagnostic Criteria, DSM-5 (filed herewith) (stating that the diagnosing professional should "Specify current severity:  **Mild**:  Few, if any, symptoms in excess of those required to make the diagnosis are present, and symptoms result in only minor functional impairments.  **Moderate**:  Symptoms or functional impairment between "mild" and "severe" are present.  **Severe**:  Many symptoms in excess of those required to make the diagnosis, or several symptoms that are particularly severe, are present, or the symptoms result in marked impairment in social or occupational functioning.")

- 20 -

- Ms. McMurray conducted the evaluation of Ms. Black (*Id.* at 15)

- Ms. McMurray had not yet completed her academic training (to be followed by a one-year clinical psychology internship and a one- or two-year fellowship (*Id.* at 14-15)

- Dr. Booth-Jones is employed by the H. Lee Moffitt Cancer Center but sometimes volunteers at the USF Psychological Services Center (*Id.* at 18)

- She has not written any articles or done any research relating to ADHD and does not consider herself an expert in the diagnosis of ADHD (*Id.* at 22-23)

- She specializes in assessing and supporting "cancer patients" (*Id.* at 19)

- There is a distinction between a "comprehensive" ADHD evaluation and a "reevaluation" (*Id.* at 27)

- Reevaluations are "very common" at the Psychological Services Center, because "the counseling center, which is also part of USF, … [has a] protocol [that] requires we do brief testing just to maintain their ability to prescribe psychostimulants" (*Id.*)

- "[I]t's very common for the psychiatrist at USF counseling – in this case, I think Dr. Phyllis Feldman – to refer over and say just, 'Reduce Fee.  Just get it done so I can … maintain prescribing'" the psychostimulants (*Id.*)

- The clinic conducted a reevaluation of Ms. Black, not a comprehensive evaluation, based upon its understanding that she had already been "diagnosed twice by two different psychiatrists with ADHD" (*Id.* at 27-28) (this was not, in fact, the case)

- They did not "ask for any [academic] records as this was a reevaluation," nor did they do anything else to confirm childhood onset beyond getting Ms. Black's self-report (*Id.* 34, 40-41, 52)

- Dr. Booth-Jones acknowledged that the report did not discuss whether Ms. Black experienced any impairment in the employment setting; that she had any only limited information about how Ms. Black had performed academically; and that Ms. Black did not report that any level of impairment in her social life (*Id.* at 50-52)

- Dr. Booth-Jones has never met Ms. Black in person, nor has she ever spoken to anyone at the medical school regarding Ms. Black; they considered nothing "other than self-report" when evaluating Ms. Black's "history of presenting problems" (*Id.* at 42-43)

- Neither she nor Ms. McMurray saw any documentation of the ADHD diagnosis that Ms. Black reported receiving in 2009 from Dr. Fleischer (*Id.* at 43-44)

- When presented during her deposition with the consultation/evaluation form from Dr. Fleischer's office, she testified that, in her view, a half-hour interview with Ms. Black

would not provide an adequate basis for diagnosing someone with ADHD; she said she "would want to do more" and then said, "Can we leave it at that?"  (*Id*. at 44-47)

- They did not attempt to determine whether Ms. Black was substantially limited within the meaning of the ADA; they were "supporting her request to stay on psychostimulants," as that "was the referral question"  (*Id*. at 30-31)

*See* Deposition of Dr. Margaret Booth-Jones, Ph.D.

## ARGUMENT

I.   **Disability Under the ADA:  Substantial Limitation in a Major Life Activity As Compared to Most People in the General Population**

NBME is subject to § 12189 of the ADA, which provides in relevant part as follows:

Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.  This provision is found in Title III of the ADA.  If a plaintiff establishes a violation of Title III, she may obtain declaratory and injunctive relief.

Pursuant to Section 12819, persons who qualify as disabled under the ADA are entitled to receive reasonable accommodations during test-taking.  Having a diagnosed impairment, however, is not the same thing as being disabled within the meaning of the ADA.  To be disabled under the ADA, a person must have a "a physical or mental impairment that substantially limits one or more major life activities …."  42 U.S.C. § 12102(1).  More specifically, the person must have an impairment that substantially limits the person's ability to perform a major life activity "***as compared* to *most people in the general population***."  28 C.F.R. § 36.105(d)(1)(v) (emphasis added).  If a diagnosis is unwarranted, or if a diagnosed impairment does not result in substantial limitations as compared to most people, the individual is not disabled under the ADA and is not entitled to accommodations under Section 12819.

Ms. Black believes that, in determining whether she is disabled, the Court should compare her to her medical school "peers," not to "the general population." Black Dep. 19-20. She is clearly mistaken regarding what the law requires. Her claimed impairment must be measured against most people in the general population, not against other college graduates or other medical students. *See Singh v. George Washington Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007) (relevant comparison is to the average person in the general population, not to other individuals attending medical school); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 2016 U.S. Dist. LEXIS 48181, *18 (E.D. Pa. 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population") (holding that plaintiff was not disabled within the meaning of the ADA, notwithstanding her dyslexia diagnosis, and therefore was not entitled to extra testing time on a medical licensing exam).[13]

## II.   Ms. Black Is Not Disabled Within the Meaning of the ADA

Here, no reasonable fact-finder could conclude that the ADHD diagnoses that Ms. Black relies upon are consistent with the DSM diagnostic criteria for ADHD. Neither diagnosis resulted from a comprehensive ADHD evaluation, and neither addressed all of the criteria necessary for a proper diagnosis. There is no plausible evidence of childhood onset, no plausible evidence of

---

[13] *See also Bach v. Law Sch. Adm. Council,* 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014) (holding that examinee with ADHD diagnosis needed to be compared "to the general population"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013) (relevant comparison group is "the general population"), *aff'd*, 582 Fed. App'x 114 (3d Cir. 2014) (judgment for defendant); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population.") (judgment for defendant); *Love v. Law Sch. Admin. Council,* 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and thus was not entitled to testing accommodations); *cf. Malone v. Dep't of the Air Force*, 2016 U.S. Dist. LEXIS 39345, *20 (M.D. Ala. 2016) ("The mere fact that Malone may have been diagnosed with ADD is insufficient under the [ADA] to establish that her impairment rises to the level of a disability.") (summary judgment for employer).

impairment across multiple domains of her life (academic, social, and vocational), and no plausible evidence of pervasive functional impairment in her daily living.

However, even if the Court were to accept her diagnoses, NBME is still entitled to judgment as a matter of law.  There are no genuine issues of material fact regarding whether Ms. Black's alleged ADHD substantially limits her ability to read, learn, concentrate, think or perform any other major life activity that is relevant to taking the Step 1 exam.  As reflected in a mountain of evidence regarding her unaccommodated performance in elementary school, middle school, high school, college, and her Post-Baccalaureate Program; on the SAT and the MCAT exams; and in the numerous jobs she has held, Ms. Black is not substantially limited in any major life activity when compared to most people in the general population.

Individuals who perform at the level that Ms. Black has performed – with no extra testing time or other accommodations – do not have a disorder that rises to the level of a disability under the ADA.  *See, e.g., Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 155 (1st Cir. 1998) ("[Plaintiff] never experienced significant academic difficulties, and in fact has excelled academically for most of his years at the Baldwin School."); *Bibber,* 2016 U.S. Dist. LEXIS 48181, at *25 (plaintiff who scored in the "average" range on the GRE (a graduate school admission test) and MCAT without accommodations was not substantially limited compared to most people); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Love,* 513 F. Supp. 2d at 214 (holding that plaintiff had not shown that he was disabled under the ADA and denying testing accommodations on the LSAT, where plaintiff had ACT and SAT scores "within the average range" with no

- 24 -

accommodations and a 3.16 high school GPA, and did well in college without accommodations); *cf. Hetherington v. Wal-Mart, Inc.*, No. 12-13684, 511 Fed. App'x 909, 912 (11th Cir. Mar. 5, 2013) (holding that plaintiff was not substantially limited in his ability to think, learn, or read, where he was able to read "at a junior high level" and had "completed 12 years of school") (affirming summary judgment for defendant employer); *Collins v. Prudential Investment & Retirement Servs*., No: 03-2356, 119 Fed. App'x 371, 378 (3d Cir. Jan. 4, 2005) ("[plaintiff's] testimony about her work, academic [background], and community involvement contradicts her claim that her ADHD/ADD substantially limits her abilities to think, learn, remember and concentrate") (summary judgment for defendant affirmed).

Any number of reasons, unrelated to a disability, may explain why Ms. Black has not yet achieved a passing score on the USMLE Step 1 exam:  poor study habits and inadequate preparation, *e.g*., Parrino Decl. Ex. A at EB-0213, EB-0216, EB-0225, EB-0227, EB-0238; uncertainty about whether she really wants to be a doctor, *id*; Ex. A at EB-0203, EB-0204; test anxiety, Black Dep. at 162-63; her medical school's purported failure to "offer adequate academic support for Step 1 preparation (both prior to [her] first attempt or after [she] didn't succeed)," *id*, Ex. 45 at 2; unhappiness about living in Tampa, which is "not [her] favorite place," *id*. at 149; not having much in common with her medical school classmates, due to their age difference, *id*. at 149-50; or insufficient knowledge of the underlying subject matter, Parrino Decl. Ex. A at EB-0216.

As a matter of law, however, Ms. Black is not disabled within the meaning of the ADA, and she is not entitled to extra testing time on her Step 1 exam.

## CONCLUSION

Summary judgment should be entered in favor of NBME.


Dated:  June 30, 2017                    Respectfully submitted,

                                         /s/ Gregory A. Hearing
                                         GREGORY A. HEARING
                                         Florida Bar No. 817790
                                         ghearing@tsghlaw.com
                                         Thompson, Sizemore, Gonzalez &
                                         Hearing, P.A.
                                         201 N. Franklin Street, Suite 1600
                                         Tampa, Florida 33602
                                         Tel:  (813) 273-0050
                                         Fax:  (813) 273-0072

                                         ROBERT A. BURGOYNE
                                         Admitted *pro hac vice*
                                         robert.burgoyne@nortonrosefulbright.com
                                         Norton Rose Fulbright US LLP
                                         799 9th Street, NW, Suite 1000
                                         Washington, DC 20001-4501
                                         Tel:  (202) 662-4513
                                         Fax:  (202) 662-4643

                                         Attorneys for National Board of Medical
                                         Examiners

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that, on the 30th day of June, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

> Curtis Filaroski
> Anthony J. DePalma
> Megan Collins
> Disability Rights of Florida
> 2473 Care Drive, Suite #200
> Tallahassee, Florida 32308
>
> curtisf@disabilityrightsflorida.org
> tonyd@disabilityrightsflorida.org
> meganc@diabilityrightsflorida.org
>
> Attorneys for Plaintiff

Defendant's counsel has also emailed copies of the foregoing to plaintiff's attorneys.

> /s/  Gregory A. Hearing
>
> Gregory A. Hearing