```
 1    IN THE UNITED STATES
      DISTRICT COURT FOR
 2    THE MIDDLE DISTRICT
      OF FLORIDA
 3    TAMPA DIVISION

 4    CASE NO.:  8:16-cv-2117-T-23TGW

 5

 6

 7

 8    ELIZABETH A. BLACK,

 9              Plaintiff,

10    -vs-

11    NATIONAL BOARD OF MEDICAL EXAMINERS,

12              Defendant.

13    ------------------------------------/

14

15

16

17    DEPOSITION OF:   MARGARET BOOTH-JONES, Ph.D.

18    DATE TAKEN:      May 15, 2017

19    TIME:            8:23 a.m.

20    PLACE:           Thompson, Sizemore,
                         Gonzalez & Hearing, P.A.
21                     201 North Franklin Street, Suite 1600
                       Tampa, Florida  33602

22

23    REPORTED BY:     Michele Coburn
                       Professional Court Reporter

24

25
```

```
 1     APPEARANCES:

 2
       MEGAN COLLINS, ESQUIRE
 3           Disability Rights Florida
             1930 Harrison Street, Suite 104
 4           Hollywood, Florida  33020
             850-488-9071
 5           850-488-8640
             MeganC@DisabilityRightsFlorida.org
 6     -and-
       CURTIS FILAROSKI, ESQUIRE
 7           Disability Rights Florida
             2473 Care Drive, Suite 200
 8           Tallahassee, Florida  32308
             850-488-9071
 9           850-488-8640
             CurtisF@DisabilityRightsFlorida.org
10
                  APPEARING ON BEHALF OF THE PLAINTIFF
11

12     ROBERT A. BURGOYNE, ESQUIRE
             Norton Rose Fulbright US, LLP
13           799 9th Street NW, Suite 1000
             Washington, D.C.  20001-4501
14           202-662-4513
             robert.burgoyne@nortonrosefulbright.com
15
                  APPEARING ON BEHALF OF THE DEFENDANT
16           (Pro Hac Vice)

17
       PATRICK J. McNAMARA, ESQUIRE
18           de la Parte & Gilbert, P.A.
             101 East Kennedy Boulevard, Suite 2000
19           Tampa, Florida  33602
             813-229-2775
20           813-229-2712
             pmcnamara@dgfirm.com
21
                  APPEARING ON BEHALF OF WITNESS
22

23     ALSO PRESENT:

24           Ann Marie Cintron-Siegel,
             Director of Advocacy, Education and Outreach
25           Disability Rights Florida
```

ELIZABETH A. BLACK vs NATIONAL BOARD OF MEDICAL EXAMINERS
MARGARET BOOTH-JONES, PH.D. on 05/15/2017                    Page 3

```
1                          INDEX

2                                              PAGE

3     Direct Examination by Mr. Burgoyne         5

4     Cross-Examination by Ms. Collins          68

5     Certificate of Reporter                   71

6     Oath of Reporter                          72

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        EXHIBITS

2                                                    PAGE

3    Booth-Jones Exhibit 1
         "Notice of Subpoena Duces Tecum"          5
4
     Booth-Jones Exhibit 2
5        2/23/17 Letter To Whom It May
         Concern from Jack Darkes                  5
6
     Booth-Jones Exhibit 3
7        Curriculum Vitae                          5

8    Booth-Jones Exhibit 4
         "The Diagnosis and Neuropsychological
9        Assessment of Adult Attention Deficit/
         Hyperactivity Disorder, Scientific
10       Study and Practical Guidelines"           33

11   Booth-Jones Exhibit 5
         "University of South Florida
12       Psychological Services Center Adult
         Assessment/LD Evaluation Intake Form"     35
13
     Booth-Jones Exhibit 6
14       4/13/17 Letter from Jack Darkes,
         Attaching "Session Notes"                 38
15
     Booth-Jones Exhibit 7
16       "Confidential Psychoeducational
         Evaluation"                               42
17
     Booth-Jones Exhibit 8
18       "Office Consultation/Evaluation"
         by Scott Fleischer, M.D.                  44
19
     Booth-Jones Exhibit 9
20       8/25/15 Letter To Whom It May Concern
         from Margaret Booth-Jones                 60
21

22

23

24

25

1          (Booth-Jones Exhibit 1, Booth-Jones Exhibit 2

2      and Booth-Jones Exhibit 3 marked for

3      identification.)

4              MARGARET BOOTH-JONES, Ph.D.,

5  having been duly sworn, was examined and testified upon

6  her oath as follows:

7          THE WITNESS:  Yes.

8                  DIRECT EXAMINATION

9  BY MR. BURGOYNE:

10     Q    Good morning, Dr. Booth-Jones.

11     A    Good morning.

12     Q    My name is Bob Burgoyne.  I'm an attorney for

13  the National Board of Medical Examiners, and we're here

14  today in connection with the lawsuit Elizabeth Black has

15  brought against NBME.

16          Have you ever been deposed before?

17     A    Yes.

18     Q    So you understand the general format of today's

19  exercise?

20     A    Yes.

21     Q    Yes.

22          How many times have you been deposed?

23     A    Twice as a psychologist and once as a grad

24  student.

25     Q    If I ask you any questions today that you don't

1    understand, will you make a point of asking me to

2    clarify the question?

3        A    Yes.

4        Q    And you're doing a great job so far.  But as

5    you have been, answer with words rather than nods so

6    that we get a nice clean record.

7        A    Yes.

8        Q    Will you do that?

9        A    Yes, I will.

10       Q    You will endeavor.

11            Could you state your full name and your

12    employer and your work address, please?

13       A    Margaret Booth-Jones.

14       Q    And your employer?

15       A    H. Lee Moffitt Cancer Center.

16       Q    And where is that located?

17       A    12902 Magnolia Drive, Tampa, Florida 33612.

18       Q    How long have you worked there?

19       A    As of July 11th, this year will be 20 years.

20       Q    Are you on any medications today?

21       A    No.

22       Q    Any other reason why you might not be able to

23    testify truthfully today?

24       A    No.

25       Q    Just so you know, that's a standard question.

1    Q   And this is the letter he sent to me

2  identifying the documents that were being produced in

3  response to the subpoena.  And I believe these are all

4  the documents you just referenced a moment ago.  Is that

5  correct?

6    A   Correct.  I think the declaration of

7  authenticity was just sent directly to you.

8    Q   Right.

9    A   I don't have a copy of that.

10    Q   Okay.  And this reports that Ms. Black was

11  charged a total of $200 for the October 2014 assessment?

12    A   Correct.

13    Q   Is that a standard fee?

14    A   It's a sliding-scale fee for the USF graduate

15  students.  Correct.  It's a training clinic, so they --

16    Q   Go ahead.

17    A   -- get charged accordingly to their income.

18    Q   Okay.  What do you mean by a "training clinic"?

19    A   The USF Psychological Services Center is a

20  clinic at USF in the building of the clinical psychology

21  program that provides sliding-scale, low-cost services

22  for assessment and therapy to USF students and the

23  community.  And the individuals, whether they're adults

24  or children -- adults or children, are assessed by

25  graduate students.  They're treated by graduate

1    students.   The licensed clinical psychologist never sees

2    the client, and we supervise their work.

3          This is information shared with the prospective

4    client ahead of time so they know what they're getting.

5          And Dr. Darkes stays in the clinic, so there is

6    a licensed clinical psychologist present if there is an

7    emergency of any description.

8        Q    Okay.  Let me hand you Booth-Jones 3.   And this

9    is the CV that was provided to us.

10         I believe you indicated that there may have

11   been some minor changes to this version of the CV?

12       A    Possibly.

13       Q    Okay.

14       A    It's a living, breathing -- I took out the

15   graduate students and fellows that I've supervised in a

16   cleaner -- in a more recent document because I didn't

17   think that was relevant to this.

18       Q    Okay.

19       A    But it's a different type of requirement at

20   Moffitt.

21       Q    All right.   The document that I have is

22   15 pages and dated December 2016.

23       A    Uh-uh.

24       Q    And I don't think we need to see the more

25   current one --

1    A    Right.

2    Q    -- unless there have been any changes relating

3    to any work you've done in the area of ADHD.

4    A    There have not been.

5    Q    Okay.  Let me ask you a couple of quick

6    questions.

7         Is this a true and correct copy of your

8    educational and professional training background?

9    A    Yes, it is.

10   Q    And on a quick read, I didn't see any

11   references on here to articles or teaching experience or

12   courses or anything like that relating to attention

13   deficit hyperactivity disorder.  Is that correct?

14   A    That is correct.

15   Q    On Page 5 of this document -- actually, let's

16   start with Page 4 where there's a reference at the

17   bottom to graduate training.

18   A    Correct.

19   Q    And then when it carries over there's a list of

20   individuals, and then below that it says "Intern and

21   Post-Doctoral Training"?

22   A    Correct.

23   Q    What's the difference between those two levels

24   of training?

25   A    The graduate student is a graduate in the

1    clinical psychology graduate program at USF.   They have

2    not completed their academic training.

3         In clinical psychology after you complete your

4    academic work, you apply for a clinical internship.   You

5    hope you get one.   If you get one, it's one year.   If

6    you successfully complete that and you go on to a

7    subspecialty, such as neuropsychology and so forth, it's

8    either a one-year or two-year fellowship, and you hope

9    you get that as well.   So --

10   Q    So it goes graduate training, intern and then

11   post-doctoral fellowship are the three --

12   A    That is correct.

13   Q    -- orderings?

14        And then one of the graduate students on the

15   list is Megan McMurray?

16   A    Correct.

17   Q    And then next to her name it says that she is a

18   currently a psychology intern at the University of

19   Alabama, Birmingham?

20   A    At that time she was.   She's now faculty.

21   Q    Okay.   And Megan McMurray is the individual who

22   actually conducted the evaluation of Ms. Black.   Is that

23   correct?

24   A    That is correct.

25        Is it possible to clarify something?

1    without a supervisor who specialized in neuropsychology.

2            They asked me, "Could you please fill in for

3    this other person?"  I said okay.  So that is full

4    volunteer.  I accept no funds.

5            We have an affiliation agreement.  And I have

6    been volunteering my clinical supervision since, I'm

7    estimating, October/November 2013 at USF Psychological

8    Services Center.

9            So my Moffitt clinical practice, which is all

10   cancer patients -- if you know anything about Moffitt,

11   it's an NCI-Designated Comprehensive Cancer Center.

12   That's all cancer.  But my training is in general

13   clinical psychology and neuropsychology.  I am

14   volunteering my services at the USF Psychological

15   Services Center.

16       Q    Okay.  Is the Psychological Services Center

17   also called the Psychiatry Center?

18       A    No.  Psychiatry is -- psychiatry is run by

19   physicians.  They have M.D.'s; psychologists have

20   Ph.D.'s.

21       Q    Is there also a USF Counseling Center that's

22   distinct?

23       A    That is a distinct center as well.

24       Q    Okay.  So had you begun these volunteer

25   services roughly at the time that Ms. Black was

1    evaluated?

2        A    It was the year before.

3        Q    The year before?

4        A    2013 is when I was requested to help.

5        Q    Have you had any discussions with Ms. McMurray

6    regarding this lawsuit?

7        A    No.  She sent me an email saying "sorry" or

8    something along those lines.  "Best wishes."

9        Q    Okay.

10       A    It was a simple email.

11       Q    Okay.

12       A    Limited.

13       Q    Give me a summary, please, of your areas of

14   specialization.

15       A    I specialize in the assessment and a little bit

16   of treatment in support of cancer patients going through

17   cancer treatment.

18            My subspecialties are patients with brain

19   tumors.  The idea of brain damage associated with cancer

20   treatment -- the generic slang term is chemo brain or

21   chemo fog.

22            I also work very closely with the blood and

23   marrow transplant program.  I see all their patients

24   because of the high-dose exposure to chemotherapy to

25   ablate their immune system and hopefully be better to

1    cancer but have only ADHD?  Do you treat or --

2         A    At Moffitt Cancer Center?  No, I do not.

3         We only see cancer patients or patients with a

4    cancer-like phenomenon.  The tumor itself may not be a

5    cancer but a meningioma or a pituitary adenoma, but

6    they're treated like a cancer.

7         So I don't want to get down to the cellular

8    level.  But they are treated like a cancer, but it may

9    not actually be a malignant tumor.  Same idea.

10        Q    Okay.  Do you consider yourself an expert in

11   the diagnosis of attention deficit hyperactivity

12   disorder?

13        A    No, I do not.

14        Q    Are there any professionals who you consider to

15   be experts in the field of ADHD?

16        A    That I could name?  No.  That doesn't mean they

17   don't exist.  I just can't name them.

18        Q    Okay.  Have you participated in any

19   ADHD-related research?

20        A    Not specifically.  No.

21        Q    Have you taught any classes regarding ADHD

22   diagnosis or treatment?

23        A    In providing general neuropsychological

24   lectures, it has been one of 20 bullet points but not a

25   stand-alone.  But again, many of the phenomena that we

1    witness through cancer care, pituitary disease and so

2    forth looks like ADHD.  So it is used as a parallel or

3    an illustration --

4        Q    Okay.

5        A    -- but not as a stand-alone.

6        Q    Have you authored any books or book chapters,

7    articles or other publications regarding ADHD?

8        A    No.

9        Q    What are the major symptoms of ADHD?

10       A    Starting with what is observable is typically

11   difficulty staying on task, difficulty attending to

12   specific details.  For the inattention side there could

13   be a whole long list of them.  Then the impulsivity,

14   jumping from one thing to another.  It changes with age,

15   somewhat different by gender as well and by intellectual

16   ability.

17            I think the difficulty sitting still is what

18   most people think, but that's very rarely what we see.

19   It's usually much more contained.

20       Q    To what extent do the symptoms that are

21   attributable to ADHD -- are those symptom also

22   experienced just in the general population?

23       A    I can't provide a statistic, but I think it's

24   the degree of which it causes disability or dysfunction

25   in a certain setting that it gets the label.

```
 1    probably a parent and a teacher if they were little.

 2         In college settings typically a roommate or a

 3    significant other:  boyfriend, girlfriend, spouse.

 4    Teachers don't see them enough, so that's not useful in

 5    the college setting.

 6         Q    And then you distinguished, I believe, between

 7    a comprehensive evaluation and a reevaluation.

 8         What's a reevaluation?

 9         A    A reevaluation, which is very common at the USF

10    Psychological Services Center because the counseling

11    center, which is also part of USF, often sees them

12    first -- so they have a -- their protocol requires we do

13    brief testing just to maintain their ability to

14    prescribe psychostimulants.  Psychostimulants do require

15    a prescription.

16         So it's very common for the psychiatrist at USF

17    counseling -- in this case, I think Phyllis Feldman --

18    to refer over and say just, "Reduce fee.  Just get it

19    done so I can keep writing your" --

20         THE COURT REPORTER:  I'm sorry?

21         THE WITNESS:  Vyvanse, V-y-v-a-n-s-e.

22         A    -- "to be able to maintain prescribing."

23    BY MR. BURGOYNE:

24         Q    Was Ms. Black's a reevaluation?

25         A    Correct.
```

1          It was our understanding she was diagnosed

2     twice by two different psychiatrists with ADHD.

3          Q    Sitting here today, do you have any

4     understanding regarding the differences in the DSM-IV

5     and DSM-V regarding the diagnosis of ADHD?

6          A    I looked through both of those over the years.

7     It was sort of very long-handed between the IV and V.

8     It was not a quick fix or a quick switch.

9          I think the real understanding that it's a

10    neurodevelopmental disorder, knowing that it is to be

11    classified as a psychiatric condition requiring

12    treatment as opposed to more of a behavioral issue.

13         Also, the presentation of symptoms in childhood

14    as opposed to the diagnosis in childhood -- I think that

15    was nicely clarified.  A lot of children don't have

16    access to diagnosis in childhood.

17         There's a lot of overlap.  Unless it was in

18    front of me, I can't go through the specifics.  But I

19    found it helpful to -- it's sort of how we see it.  It's

20    more neurodevelopmental as opposed to mood or

21    behavioral.

22         Q    Okay.  Do the DSM-IV and DSM-V both require

23    evidence of impairment in multiple settings as part of

24    the diagnosing criteria?

25         A    It should be present in multiple settings.

1    A   Going back to 1990, or which year are we

2    talking to?  I've seen some changes.

3    Q   **As amended, as it currently exists.**

4        **Do you have any understanding --**

5    A   2013?  Which amendment?

6    Q   **The ADA was amended in 2013.**

7    A   Yeah.

8        They use words that have -- that are somewhat

9    vague:  "substantial" and so forth.  So I think it's the

10   idea, at least from my reading and my understanding when

11   I apply it, that the person cannot do what they could

12   previously or what others of their peers are able to do.

13       So it's really not -- it's either their peers

14   have the ability through the same amount of effort that

15   the individual cannot achieve or they had that ability

16   and lost the ability.

17   Q   **Do you have any understanding as to whether or**

18   **not the comparison group, in evaluating substantial**

19   **limitation, is their peers versus most people in the**

20   **general population?**

21   A   That's a question I don't understand.

22   Q   **Okay.**

23   A   Who is the peers?

24   Q   **Well, when you're determining whether or not**

25   **they're substantially limited under the ADA, do you know**

1    whether the appropriate question is substantially

2    limited compared to their peers or some other comparison

3    group?

4         A    I don't know the distinction.

5         Q    Do you have any opinion on whether Ms. Black is

6    substantially limited in her ability to perform any

7    major life activities?

8         A    My opinion is that she does have difficulty.

9         Q    Difficulties versus substantial limitations

10   or --

11        A    At the time I reviewed Megan McMurray's work,

12   she was achieving with medication in the classroom.  At

13   that point that's all we knew.  She hadn't taken any

14   licensing exams.

15            She has a significant discrepancy between her

16   intellectual ability and her working memory and

17   processing speed.  Standard presentation of ADHD.  It's

18   very predictable.

19            And so we were supporting her request to stay

20   on psychostimulants.  That was the referral question,

21   and we strongly recommended she continue to take her

22   medication.

23        Q    You referred to a significant discrepancy,

24   which is a term I usually hear in the context of

25   learning disabilities.

1    Q   I think they're discussing it.  It looks like

2    there's a references to, for example, 2001 articles in

3    the footnotes at the end.

4    A   I wouldn't -- I mean, I might have read it back

5    in the '90s.

6    Q   Okay.  But sitting here today, it's nothing you

7    recall seeing?

8    A   No.

9    Q   Okay.  Look at Page 151, if you would.  Sort of

10   four or five lines down there's a sentence that reads,

11   "Second, a review of historical records is invaluable.

12   Obtaining a full developmental history often provides an

13   impressionistic understanding of the extent of

14   difficulties in attention, impulsivity and

15   hyperactivity.  In contrast, a review of the record of

16   performance at the time that it occurred provides a more

17   elaborate profile.  School records in the form of report

18   cards and completion of standardized tests provide very

19   useful information."

20        Do you know whether Ms. McMurray reviewed any

21   academic records as part of her evaluation?

22   A   I think she asked the questions in interview

23   format but did not ask for records as this was a

24   reevaluation.

25   Q   Do you know if she was aware of how Ms. Black

1   Q   Okay.  Was there any -- do you know whether or

2   not any consideration was given to having the form

3   completed by either of her parents?

4   A   We didn't recommend it since they don't observe

5   her.

6   Q   You didn't want any information regarding her

7   childhood history?

8   A   That's not what I said.  You asked if I wanted

9   her parents to complete the CAARS O:L.  I did not want

10  that.  That was never considered since they don't

11  observe her on a daily basis.

12  Q   What is the point of the CAARS observer form?

13  What are you trying to get with that information?

14  A   Some collaborating evidence or statement of

15  behaviors associated with potential ADHD if it can be

16  observed by others.

17      We have seen disconnects.  People -- clients

18  report one thing and no one around them sees it.  It

19  doesn't mean it's not true.  It's just a level of

20  evidence we don't have.

21  Q   And were any instruments used to confirm

22  childhood onset?

23  A   Instruments?  No.  No instruments were used.

24  Q   Was anything used other than self-report?

25  A   No.  Not by my clinic or USF Psychological

Case 8:16-cv-02117-SDM-TGW   Document 35   Filed 06/30/17   Page 21 of 32 PageID 710

ELIZABETH A. BLACK vs NATIONAL BOARD OF MEDICAL EXAMINERS
MARGARET BOOTH-JONES, PH.D. on 05/15/2017                                      Page 41

```
 1   Services Center.
 2        Q   If you'd look at the last page, please.  And
 3   there's a reference here to the client coming in to
 4   obtain a letter that she had requested written by you?
 5        A   Correct.
 6        Q   I didn't see a reference on here to your
 7   interaction with --
 8        A   There doesn't need to be.
 9        Q   Okay.
10        A   I'm not a graduate student.
11        Q   So this is -- well, neither is the assistant
12   clinical director, but she's made an entry here.
13        A   Julie Cessna?
14        Q   Yeah.
15        A   She's a graduate student.
16        Q   She's a graduate student even though it says
17   "Clinic Assistant Director"?
18        A   Julie Cessna was a graduate student at the
19   time.
20        Q   So only graduate students have to enter
21   interactions with a patient?
22        A   In the blue notes -- this is a blue note --
23   correct.  Yes.
24        Q   Okay.  Where would you enter any notes you had
25   regarding interactions with the patient?
```

First Choice Reporting & Video Services
www.firstchoicereporting.com

1      A    In a formal document.   Hence, the letter that I

2  think was given to you.

3      Q    Okay.  Would you memorialize that anywhere else

4  other than in the context of the actual letter you

5  prepared?

6      A    No.

7      Q    Would you memorialize the telephone interview

8  you had with her anywhere else than just the letter?

9      A    I'm not sure what the word "memorialize" means

10  in this --

11      Q    Well, take progress notes.

12      A    No.

13      Q    Okay.

14      A    I would not.

15      Q    Was Ms. Black billed for the time you spent

16  interviewing her?

17      A    No.

18      Q    Have you ever met Ms. Black in person?

19      A    No.

20      Q    Have you ever spoken to anybody at the medical

21  school regarding her performance in medical school?

22      A    No.

23          (Booth-Jones Exhibit 7 marked for

24      identification.)

25  BY MR. BURGOYNE:

1    Q    Would you please identify what we have marked

2    as Booth-Jones 7 for us, please?

3    A    It appears to be a copy of the

4    psychoeducational evaluation from October 2014.

5    Q    And the first section of this report that's

6    called "Reason for Referral" -- is that where the

7    explanation is provided for why Ms. Black came to your

8    center?

9    A    Yes, it is.

10   Q    And it states that she had come in so that she

11   could continue receiving psychostimulant medication.   Is

12   that correct?

13   A    Right.  She was referred by Dr. Feldman.

14   Q    Dr. Feldman.  Okay.

15        If you'd look at the "History of Presenting

16   Problems."

17   A    Uh-uh.  Yes.

18   Q    The phrase "she reported" appears throughout

19   that section.

20        Was anything other than self-report considered

21   in terms of her history of presenting problems?

22   A    No.

23   Q    The second line says, "She reported that she

24   was diagnosed with ADHD by a psychiatrist in 2009."

25        Did you ever see any diagnosis or any

1    documentation of the diagnosis by that professional?

2         A    No, I did not.

3         Q    Okay.  Did Ms. McMurray, to your knowledge?

4         A    Not that I know of.  Not to my knowledge.

5         Q    Were you aware that -- if Ms. Black had had a

6    copy of the documentation from that diagnosis, would

7    that have been useful in your evaluation?

8         A    I always like as much information as possible.

9    It wouldn't have changed what we did.  I would have used

10   it and I would have read it.

11        Q    Keep that document in front of you, and let me

12   hand you an additional document.

13             (Booth-Jones Exhibit 8 marked for

14        identification.)

15   BY MR. BURGOYNE:

16        Q    And I'll represent to you that this is a

17   document we obtained from Dr. Fleischer, which is the

18   professional who has been identified to us by Ms. Black

19   as having provided the initial diagnosis of ADHD.

20             You've never seen this document before, have

21   you?

22        A    No, I have not.

23        Q    As you see, it consists of an office

24   consultation/evaluation with handwritten notes.  It's

25   four pages long.

1          Could you look through that for a minute,

2     please?

3          A    With no disrespect, the handwriting is a little

4     challenging to me.

5          Q    It's very challenging.

6               And mainly I just wanted you to look at the

7     type of information they're attempting to capture as

8     opposed to necessarily what's -- have you had a chance

9     to look at that?

10         A    From what I could discern.

11         Q    Okay.

12         A    The front page I think is the most challenging.

13         Q    Yes.  Yes.

14              And if you look at the third page, can you tell

15    from that what conclusions were reached regarding

16    Ms. Black in the assessment section there, the

17    diagnosis?

18         A    It looks like two diagnoses:  ADHD and GAD.

19         Q    What is GAD?

20         A    Generalized anxiety disorder.

21         Q    Ordinarily is there any significance to the

22    order of multiple diagnoses?

23         A    No.  Though I'm not sure what was scribbled

24    out.  I don't know what the numbers inside the circles

25    with the line through it on the second line stand for.

1    I don't want to hazard a guess either.

2        Q   If this was the only step taken to evaluate

3    Ms. Black for ADHD -- namely, this interview as

4    reflected on this form -- in your opinion, would that be

5    an adequate basis for making a professional judgment as

6    to whether or not Ms. Black suffered from attention

7    deficit hyperactivity disorder?

8        A   This is a psychiatrist or a physician.  So I

9    don't want to provide an opinion based outside my

10   specialty of psychology.

11       Q   Well, from the perspective of a psychologist,

12   would you deem this an adequate basis to reach a

13   judgment on whether or not an individual suffered from

14   attention deficit disorder?

15       A   I can't tell from this paper what actually was

16   done.

17       Q   Well, I know you're fighting me on answering

18   this.

19           If all that was done --

20       A   I promise you, I'm not being uncooperative.

21       Q   If all that was done was a 15-minute, a

22   half-hour evaluation, would you deem that an adequate

23   basis for making an evaluation for ADHD?

24       A   As I a psychologist, I wouldn't think it was.

25   It's not what I would do, but I don't do this.  So I

1    don't know if this was the only interaction.  I don't

2    know if there was any other corroborating information.

3    This is --

4        Q    Well, assume for me there was not, that this

5    was it.

6        A    But this is not a written document.  This is a

7    checklist.

8             Was there a written document, like a report?

9        Q    This is the written document that he has

10   provided.

11       A    Okay.

12            MS. COLLINS:  I'm going to object to the extent

13       it calls for speculation as to what was done based

14       on records we don't have.

15   BY MR. BURGOYNE:

16       Q    And I'm asking you to assume, as your state of

17   facts -- and we can consider it a hypothetical.  But if

18   this was the extent of what Dr. Fleischer did -- namely,

19   conduct a half-hour interview with Ms. Black -- would

20   you consider that to be an adequate basis for reaching

21   an evaluation -- a diagnostic determination?

22       A    I would want to do more.

23            Can we leave it at that?

24       Q    We can leave it at that.

25       A    Can I ask one question?

1    postbaccalaureate program at the University of

2    Pennsylvania because they were both very structured."

3         Do you know what is meant there by "very

4    structured"?

5         A    I know what I think is implied.

6         Q    Okay.  What do you understand that to mean?

7    What was structured about her college and high school

8    experience?

9         A    You're held accountable to go to class.  You

10   have lots of frequently-measured -- frequent

11   measurements of your efforts, academic efforts --

12   quizzes, tests, papers -- as opposed to the unstructured

13   where you make your own schedule and are not really

14   accountable.

15        Q    Is there any discussion in this document

16   regarding whether Ms. Black was experiencing any

17   impairment in the vocational or employment setting?

18        A    I could reread the document, but I don't recall

19   that --

20        Q    Where would that normally be captured?

21        A    Typically in "Presenting Problems" -- I'm

22   sorry -- "History of Presenting Problems."

23        Q    And by all means, reread as much as you need

24   to.  You did indicate that you'd read it in preparation

25   for the deposition, but please take as much time as you

1    need to look at it.

2         Have you had a chance to look at it?

3    A    I've looked at it.

4    Q    And did you see any discussion in there whether

5    Ms. Black was experiencing any impairment in the

6    vocational realm or had experienced?

7    A    I don't see it.

8    Q    And to the extent she experienced any

9    impairment in the educational or academic realm, would

10   that also be reflected in the "History of Presenting

11   Problems"?

12   A    Primarily.

13   Q    Do you have any understanding as to how --

14   specific understanding as to how Ms. Black performed in

15   her postbaccalaureate program at U Penn?

16   A    I don't have any specific information about her

17   endeavors at the University of Pennsylvania.

18   Q    And to the extent she was experiencing any

19   level of impairment in her social life, where would that

20   be reflected in this report?

21   A    It could be presented in several places,

22   actually:  in the presenting problems section, in the

23   developmental if she'd had issues in development

24   associated with social, and then in the social/family.

25   Q    And so far as this report discloses, did

1    Ms. Black report that she was experiencing any level of

2    impairment in her social life?

3         A    To my knowledge, not impairment in her social

4    life.

5         Q    And if I asked you this before, I apologize,

6    Dr. Booth-Jones.

7              What did Ms. McMurray do to confirm childhood

8    onset?

9         A    Past history.  Probably most presented in the

10   clinical note interview form, the handwritten one.  And

11   it could -- typically it is a question on the gold sheet

12   as well.

13        Q    And again, in Ms. Black's case that would have

14   been based solely on information provided by Ms. Black?

15        A    Yes.  As she'd already been diagnosed.

16   Correct.

17        Q    Did Ms. McMurray explore whether or not there

18   was a family history of psychiatric disorders?

19        A    I think there was a commentary at some point

20   about possible ADHD for her brother, possibly her twin.

21   But I do not know more than that.

22        Q    Would that ordinarily be in her social/family

23   history or somewhere else in this report?

24        A    Most likely social/family or in developmental.

25        Q    Do you see a reference to that anywhere in this

ELIZABETH A. BLACK vs NATIONAL BOARD OF MEDICAL EXAMINERS
MARGARET BOOTH-JONES, PH.D. on 05/15/2017

Page 71

CERTIFICATE OF REPORTER

STATE OF FLORIDA)

COUNTY OF HILLSBOROUGH)

        I, MICHELE COBURN, Court Reporter and Notary Public, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.

        I further certify that I am not a relative, employee, attorney, or counsel of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

        Dated:   May 19, 2017.

_Michele Coburn_
MICHELE COBURN

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA)

 4    COUNTY OF HILLSBOROUGH)

 5

 6            I, MICHELE COBURN, Notary Public, State of

 7    Florida, certify that the witness, MARGARET BOOTH-JONES,

 8    Ph.D., personally appeared before me on the 15th day of

 9    May, 2017, and was duly sworn.

10

11            WITNESS my hand and official seal this 19th

12    day of May, 2017.

13

14

15

16

17

18                   Michele Coburn
                     _____
19                   MICHELE COBURN
                     Notary Public
20                   State of Florida
                     Commission # FF169882
21                   My Commission Expires:  11/21/18

22

23                   [SEAL: MICHELE COBURN
                      Notary Public - State of Florida
24                    My Comm. Expires Nov 21, 2018
                      Commission # FF 169882
25                    Bonded through National Notary Assn.]
```