```
 1    IN THE UNITED STATES
      DISTRICT COURT FOR
 2    THE MIDDLE DISTRICT
      OF FLORIDA
 3    TAMPA DIVISION

 4    CASE NO.:  8:16-cv-2117-T-23TGW

 5

 6

 7

 8    ELIZABETH A. BLACK,

 9              Plaintiff,

10    -vs-

11    NATIONAL BOARD OF MEDICAL EXAMINERS,

12              Defendant.

13    ------------------------------------/

14

15

16

17    DEPOSITION OF:   ASHLEY VIGIL-OTERO, Psy.D.

18    DATE TAKEN:      May 16, 2017

19    TIME:            8:36 a.m.

20    PLACE:           Thompson, Sizemore,
                         Gonzalez & Hearing, P.A.
21                     201 North Franklin Street, Suite 1600
                       Tampa, Florida  33602
22
      REPORTED BY:     Michele Coburn
23                     Professional Court Reporter

24

25
```

```
 1      APPEARANCES:

 2

        MEGAN COLLINS, ESQUIRE
 3           Disability Rights Florida
             1930 Harrison Street, Suite 104
 4           Hollywood, Florida  33020
             850-488-9071
 5           850-488-8640
             MeganC@DisabilityRightsFlorida.org
 6      -and-
        CURTIS FILAROSKI, ESQUIRE
 7           Disability Rights Florida
             2473 Care Drive, Suite 200
 8           Tallahassee, Florida  32308
             850-488-9071
 9           850-488-8640
             CurtisF@DisabilityRightsFlorida.org
10
                  APPEARING ON BEHALF OF THE PLAINTIFF
11

12      ROBERT A. BURGOYNE, ESQUIRE
             Norton Rose Fulbright US, LLP
13           799 9th Street NW, Suite 1000
             Washington, D.C.  20001-4501
14           202-662-4513
             robert.burgoyne@nortonrosefulbright.com
15
                  APPEARING ON BEHALF OF THE DEFENDANT
16           (Pro Hac Vice)

17

        BENJAMIN W. BARD, ESQUIRE
18           Thompson, Sizemore, Gonzalez & Hearing, P.A.
             201 North Franklin Street, Suite 1600
19           Tampa, Florida  33602
             813-273-0050
20           813-273-0072
             bbard@tsghlaw.com
21
                  APPEARING ON BEHALF OF THE DEFENDANT
22

23

24

25
```

ELIZABETH A. BLACK vs NATIONAL BOARD OF MEDICAL EXAMINERS
ASHLEY VIGIL-OTERO, PSY.D. on 05/16/2017                                Page 3

1        BRUCE D. LAMB, ESQUIRE
              Gunster
2             401 East Jackson Street, Suite 2500
              Tampa, Florida  33602
3             813-222-6605
              813-314-6905
4             blamb@gunster.com

5                  APPEARING ON BEHALF OF WITNESS

6

         ALSO PRESENT:
7
              Ann Marie Cintron-Siegel,
8             Director of Advocacy, Education and Outreach
              Disability Rights Florida
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ELIZABETH A. BLACK vs NATIONAL BOARD OF MEDICAL EXAMINERS
ASHLEY VIGIL-OTERO, PSY.D. on 05/16/2017

Page 4

1                           INDEX

2

                                              PAGE
3
    Direct Examination by Mr. Burgoyne            6
4
    Cross-Examination by Ms. Collins             67
5
    Redirect Examination by Mr. Burgoyne         72
6
    Certificate of Reporter                      77
7
    Oath of Reporter                             78
8
    Errata Sheet                                 79
9
    Letter                                       80
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ELIZABETH A. BLACK vs NATIONAL BOARD OF MEDICAL EXAMINERS
ASHLEY VIGIL-OTERO, PSY.D. on 05/16/2017                                    Page 5

```
 1                            EXHIBITS

 2                                                    PAGE

 3    Vigil-Otero Exhibit 1
           Curriculum Vitae                            21
 4
      Vigil-Otero Exhibit 2
 5         Page from Website                            22

 6    Vigil-Otero Exhibit 3
           "Attention Deficit Hyperactivity
 7         Disorder"                                    26

 8    Vigil-Otero Exhibit 4
           "Diagnosis of ADHD in Adults"               29
 9
      Vigil-Otero Exhibit 5
10         "About ADHD"                                 34

11    Vigil-Otero Exhibit 6
           "The ADHD Diagnostic Process"               35
12
      Vigil-Otero Exhibit 7
13         "For Healthcare Professionals"              36

14    Vigil-Otero Exhibit 8
           "New Patient Information Form"               37
15
      Vigil-Otero Exhibit 9
16         "Global Assessment of Functioning
           (GAF) Scale"                                 53
17

18

19

20

21

22

23

24

25
```

```
 1                    ASHLEY VIGIL-OTERO, Psy.D.,

 2    having been duly sworn, was examined and testified upon

 3    her oath as follows:

 4                    THE WITNESS:  Yes.

 5                         DIRECT EXAMINATION

 6    BY MR. BURGOYNE:

 7         Q    My name is Bob Burgoyne, and I represent the

 8    National Board of Medical Examiners.  You're here today

 9    in connection with a lawsuit brought by Elizabeth Black

10    against the NBME.

11              Could you state your full name for the record?

12         A    Sure.  It's Dr. Ashley Vigil-Otero.

13         Q    Where do you work?

14         A    So I'm in private practice in Tampa, Florida.

15         Q    How long have you been in private practice?

16         A    Ten years.

17         Q    Did you ever work in the same building with

18    Dr. Bob Parrino?

19         A    I did.

20         Q    Were you in the same practice together?

21         A    No.

22         Q    Have you ever been deposed before?

23         A    Yes.

24         Q    How many times?

25         A    Once.
```

1        Q    You probably recall generally, but let me just

2    sort of review the ground rules.

3        A    Uh-uh.

4        Q    Basically, you're under oath, and the testimony

5    you give today can be used in our court case and may be

6    relied upon by the judge.

7             If at any point I ask you a question that you

8    don't understand, will you make a point of asking me to

9    clarify it?

10       A    Yes.

11       Q    Any point you want to take a break, please let

12   me know.  We can go off the record anytime.

13            Try to keep your voice up.  It doesn't sound

14   like that will be an issue, but sometime the witness

15   talks softly.

16            And let's try to avoid talking over each other.

17   Again, I don't anticipate that will be a problem, but

18   let me finish my question and I'll let you finish your

19   answer --

20       A    Sure.

21       Q    -- before I start talking.

22            Are you on any medications today that might

23   affect your testimony?

24       A    No.

25       Q    Are there any other reasons why you might not

1    be able to give complete and truthful answers today?

2        A    No.

3        Q    What was the nature of the other proceeding in

4    which you gave a deposition, just generally?

5        A    It was a case where I had to call DCF because a

6    child disclosed sexual abuse.

7        Q    Let me hand you one of the subpoenas that I'd

8    sent to you.  If you could just take a look -- this is

9    the second one I sent you in advance of the deposition.

10   If you'll take a look at the third page, which is where

11   we have our document request.

12       A    Uh-uh.

13       Q    Just quickly look at the documents we asked you

14   to produce.  The first one was your current CV, and I

15   believe I have a copy of that.

16       A    Uh-uh.

17       Q    Did you produce that?

18       A    Yes.

19       Q    And the second one was all of your documents

20   relating in any way to Elizabeth Black.

21            Have you produced those records to us?

22       A    Yes.

23       Q    And the last one was all articles, book

24   chapters, speeches or other similar documents that you

25   authored or coauthored on the subject of ADHD.

1          Are there any such documents?

2      A    No.

3      Q    You can flip that over.  Just stick it in the

4  middle.

5          Have you been asked by Ms. Black or her counsel

6  to provide any opinions in this case?

7      A    No.

8      Q    What do you know about the underlying lawsuit

9  between Ms. Black and the National Board of Medical

10  Examiners?  What was your understanding of the nature of

11  the claims?

12      A    My understanding is that she was asking for

13  additional time for testing.

14      Q    Okay.  Have you had any communications with

15  Ms. Black about the lawsuit?

16      A    No.  Only to verify that she did want me to

17  send records to you.

18      Q    No telephone conversations about the substance

19  of the claims?

20      A    No.  The telephone conversation was just about

21  whether or not she wanted me to send the records.

22      Q    Have you had any communications with her

23  counsel on any subject?

24      A    No.

25      Q    Putting aside the conversation you had about

1    producing her records, when did you last communicate

2    with Ms. Black?

3         A    Her last session, which was about three years

4    ago.

5         Q    Did you review any records to prepare for

6    today's deposition?

7         A    Yes.

8         Q    What records were those?

9         A    Her chart, the records that were produced to

10   you.

11        Q    Did you review any documents other than

12   Ms. Black's records?

13        A    No.

14        Q    Did you have discussions or communications with

15   any other professionals regarding your deposition,

16   putting aside your counsel?

17        A    No.

18        Q    Is there anything else you did in preparation

19   for today's deposition?

20        A    No.

21        Q    Got a good night's sleep?

22        A    Yes.

23        Q    Do you have any areas of specialization in your

24   practice?

25        A    Yes.

1        Q    What are those?

2        A    Anxiety, depression, ADHD and high achievement

3   perfectionism.

4        Q    Most of those I understand.   Tell me about high

5   achievement perfectionism.

6        A    So that is for individuals that are pretty

7   high-achieving, to the point where they have a lot of

8   success and achievement and accolades.   However, they

9   typically are under a lot of stress and have a need to

10  want to feel better and have a more balanced lifestyle.

11            So typically you'll see attorneys or

12  professionals that are doing well on the surface but

13  really want more well-being.

14       Q    Is that a DSM disorder?

15       A    No.

16       Q    Okay.   Do you consider yourself an expert in

17  the diagnosis of attention deficit hyperactivity

18  disorder?

19       A    Yes.

20       Q    And what do you base that expertise on or how

21  did you derive that expertise?

22       A    Obviously, I've had a lot of training in

23  graduate school, internship and post-doc, in addition to

24  all my clinical experience in working with individuals

25  with that disorder in childhood and adulthood.

1       Q     Do you consider your expertise to extend to

2    both childhood and adult ADHD?

3       A     Yes.

4       Q     Have you participated in any ADHD-related

5    research?

6       A     Where I'm conducting the research, no.

7       Q     Or where you're participating with anyone else

8    who's leading the research.

9       A     No.   My training was more clinical in nature.

10      Q     I think we covered this with your resume.

11            But have you authored any books, articles or

12   other publications regarding ADHD?

13      A     No.

14      Q     Conducted any poster sessions?

15      A     No.   I've done speaking engagements in the

16   community.

17      Q     Any of the coursework you've taught -- has that

18   related specifically to ADHD?

19      A     Yes.

20      Q     And what coursework was that?

21      A     Psychological assessment, and so going over

22   empirically-based methods of how to assess disorders.

23      Q     Tell me what you mean by "empirically-based

24   methods for assessing disorders."

25      A     So what are the benchmarks of how one diagnoses

1  ADHD or depression or a learning disability?

2      Q    Where does one go to find the diagnostic

3  criteria for ADHD?

4      A    The DSM, Diagnostic and Statistical Manual.

5      Q    What is the current edition of that

6  publication?

7      A    We're in the fifth.

8      Q    Do you have any treatises that you consult

9  regarding the ADHD diagnosis or treatment, putting aside

10  the DSM?

11      A    What do you mean by that?

12      Q    Well, authored -- publications authored by

13  individuals who are experts in the field.

14      A    So what is your question?  Do I have --

15      Q    Do you have any treatises in your office that

16  you periodically consult regarding ADHD diagnosis apart

17  from the DSM?

18      A    Sure.  A lot of my lit reviews have actually

19  moved to online.  So a lot of things that I reference as

20  far as current standards tend to be articles that would

21  be found more online, but I do have books that I

22  sometimes reference as well.

23      Q    Are there any professionals who you consider to

24  be nationally-recognized experts in the field of ADHD?

25      A    Sure.

1    Q    Who are some of those?

2    A    Barkley.  Sattler is somebody who is recognized

3  as far as the assessment.  So I often look to him as far

4  as what standards he has recommended.

5    Q    Any others?

6    A    Those are kind of off the top of my head.

7    Q    Are you familiar with Dr. Kevin Murphy?  Have

8  you seen that name?

9    A    No.  I'm not familiar.

10    Q    In your opinion, can ADHD be validly diagnosed

11  based solely on an informal interview?

12    A    No.  There would need to be some sort of

13  history gathering, you know, with collateral or some

14  sort of review of history other than just the patient.

15    Q    What would you want to see if you were

16  diagnosing an adult who had never been previously

17  diagnosed with ADHD?

18    A    Well, that depends.  I would say if I am

19  treating the individual and the question is not to

20  necessarily document it, I would really want to get a

21  thorough history from them and hear about their

22  childhood and probably have some sort of collateral

23  information.  Sometimes it's not readily available with

24  an adult.

25         I would at least want to talk to maybe another

1    treating provider or go into more depth about what their

2    childhood experience was like and try to ascertain the

3    history as best I could.

4         Q    And why does their childhood history matter?

5         A    Their childhood history matters because it is

6    thought to be a neurodevelopmental disorder, meaning

7    that it would have presented in childhood or be

8    reflected somewhere in their childhood.

9         Q    Would it be helpful if you were able to obtain

10   the person's school records from elementary school and

11   high school and college?

12        A    Possibly.  But as a treating provider, one

13   would probably not go to that length as a treating

14   provider.  Your role is to try to help the person with

15   their symptoms.

16            If you feel the diagnostic criteria is met and

17   you have some indication that you might talk to a

18   collateral contact, it would be rare to go to that

19   length for an adult.

20        Q    You've referred a couple times to instances in

21   which you're a treating provider and the type of

22   evaluation you might do in that context.

23            What are some other contexts in which you might

24   evaluate someone for ADHD and do different things?

25        A    So if you were actually trying to answer the

```
 1    question, the diagnostic question, if you were the
 2    evaluating psychologist trying to do the assessment --
 3    formal.
 4         Q    And when would that -- give us some
 5    illustrations of when that might occur.
 6         A    So if the person is coming -- genuinely does
 7    not know what their diagnosis is, and so you are
 8    actually trying to establish what is the root problem.
 9    If the person might have an established diagnosis and
10    they are trying to document that to get accommodations
11    for their diagnosis.
12         Q    What would you do differently in that context
13    in terms of interview or records or --
14         A    In that context --
15         Q    -- performance?
16         A    -- obviously, there would be an interview.
17    There would also be a battery of tests.
18              You know, it's really tailored to the
19    individual.  There's not necessarily a specific test.
20    There's a range of typical tests.
21              And so if the person I knew was going to be
22    applying to a certain board, I would certainly try to
23    make sure that my battery follows that.
24              But usually you have something like a cognitive
25    assessment as well as achievement and maybe some testing
```

1    to assess how they perform under timed conditions and

2    maybe tests of attention as well as obtaining some sort

3    of history outside of the patient.

4         Q    And in that context, would school records be of

5    more use to you?  Would you want to see those if they

6    were available?

7         A    Sure.  If they were available.

8         Q    And what are you looking for when you review

9    school records in the context of doing an initial

10   evaluation to determine whether someone has ADHD?

11        A    So it can be difficult because it depends on

12   the school.  There are sometimes comments written on

13   report cards.  So sometimes anything that would note

14   off-task behavior or, you know, an individual has

15   challenges of paying attention.  So sometimes those

16   comments aren't available.

17             Also looking at performance.  However, if the

18   person is very bright and high-achieving, sometimes

19   those grades in childhood won't reflect the impairment.

20             And so that's part of the consideration, but

21   there's not necessarily a hard and fast rule as opposed

22   to looking for Cs or Ds or something like that.  It's

23   part of just gathering information.

24        Q    Do you evaluate the patient's employment

25   history as well if there is an employment history?

```
 1        A    Sure.  You know, usually patients don't
 2   necessarily have kind of performance reviews or
 3   something like that.
 4             But I wouldn't dive into interviewing past
 5   employers or anything like that.  I would more really
 6   ask about the nature of their work, and that would
 7   really be provided by the patient's report as opposed to
 8   kind of investigating into companies.
 9        Q    But you'd explore the issue with the patient?
10        A    Sure.
11        Q    And again, in that context what are you looking
12   for by way of a discussion of their employment history?
13   What type of questions might you ask and what type of
14   information are you trying to gather?
15        A    Yeah.
16             In addition to trying to obtain how their
17   performance was, what challenges they face, could they
18   meet deadlines, what type of situations were
19   particularly difficult, where did they have impairments
20   if they did have them, how was their overall functioning
21   at that employer?
22        Q    Okay.  Do you, likewise, ask questions relating
23   to their social or family relationships?
24        A    Sure.  That's part of kind of standard
25   questioning that you would engage in.
```

1      Q    And what are you looking for in that context?

2      A    So there are some individuals that can have

3   ADHD symptoms that impact their social functioning.  So

4   there are some individuals that's not necessarily an

5   issue.

6           So it's not a diagnostic criteria.  But I would

7   be looking for any kind of difficulties they had in kind

8   of social rejections, difficulties where maybe they had

9   some challenge maintaining relationships.  Sometimes

10   that's available.  Sometimes it's not present with

11   somebody with ADHD.

12      Q    In terms of the DSM criteria, does an

13   individual need to have impairment in more than one

14   domain in their life to meet the diagnostic criteria?

15      A    Typically.  Typically.

16      Q    And what are the various domains that one

17   considers for that purpose?

18      A    Social, occupational, academic.

19      Q    Any others that --

20      A    Not off the top of my head.

21      Q    I think you said you last treated Ms. Black

22   about three years ago?

23      A    I think so.  I would have to check the record.

24      Q    Okay.  Do you recall offhand how many sessions

25   you had with her?

1          A    I want to say it was approximately nine, but

2      I'd have to check.

3          Q    Was she referred to you by another

4      professional?

5          A    She was.

6          Q    Who was that?

7          A    Abby Saneholtz at USF Counseling.

8          Q    Did you ever administer any rating scales or

9      screening instruments to Elizabeth Black?

10         A    No.

11         Q    Any continuance performance tests or other

12     types of assessments?

13         A    No.

14         Q    Likewise, you never administered any IQ tests?

15         A    No.

16         Q    Have you ever seen the results from any

17     assessments that were administered to Ms. Black by other

18     professionals?

19         A    No.

20         Q    Have you ever seen any diagnostic reports

21     prepared by other professionals regarding Ms. Black?

22         A    No.

23         Q    Did you ever have occasion to speak to any of

24     her medical school professors while you were treating

25     her?

1      A    No.

2      Q    "No" answers expedite things.  You get an

3  A plus for that.

4           Let me hand you what we will mark as

5  Vigil-Otero 1.

6           (Vigil-Otero Exhibit 1 marked for

7      identification.)

8  BY MR. BURGOYNE:

9      Q    Would you identify this document for the

10 record, please?

11     A    Yes.  It's my CV.

12     Q    Do you know when this was current as of?  Is

13 this your current resume right now?

14     A    It is.

15     Q    In your discussion of your clinical experience

16 and your current private practice you indicate that you

17 provide individual and family therapy and that you also

18 provide personality and psychoeducational assessments?

19     A    Uh-uh.

20     Q    Which of those services did you provide with

21 regard to Ms. Black?

22     A    Individual therapy.

23     Q    Okay.  On Page 2 from your Vanderbilt

24 experience there's a reference to producing integrated

25 psychological reports.

1          What does that mean?

2      A    So basically that means producing a

3  psychological assessment or evaluation.  And so the term

4  "integrated" is just a fancy way of saying how do you

5  take all the data and produce a comprehensive eval.

6      Q    And then down to "Teaching and University

7  Experience" there's a discussion of your time as adjunct

8  instructor at USF?

9      A    Yes.

10      Q    It states that you "Taught child assessment to

11  doctoral clinical psychology students covering both

12  personality and cognitive measures; emphasized

13  evidence-based assessment."

14      A    Uh-uh.

15      Q    What is evidence-based assessment?

16      A    So that's what I referenced earlier.  That is

17  what are the empirical standards?  What does the

18  research recommend that we do as far as what are the

19  standards of testing for each disorder?

20      Q    If you will flip that over so it will be nice

21  and organized for the court reporter.  Thanks.

22          (Vigil-Otero Exhibit 2 marked for

23      identification.)

24  BY MR. BURGOYNE:

25      Q    Would you identify what we've marked as

```
 1     Exhibit 2?

 2        A    This is from my website resource page.

 3        Q    Yes.

 4             And so you say this is just a page from your

 5     website?

 6        A    Yes.

 7        Q    And is this a page that is intended to provide

 8     resource information for third parties?

 9        A    Yes.   Uh-uh.

10        Q    The first disorder that's described here is

11     anxiety?

12        A    Uh-uh.

13        Q    Did you reach any conclusions about whether

14     Elizabeth Black experienced any symptoms consistent with

15     anxiety?

16        A    I saw her as a patient that had a primary ADHD

17     with secondary anxiety features.

18             So sometimes you have an individual -- their

19     ADHD can create havoc and stress to the point where it

20     is triggered -- it triggers some anxiety.

21        Q    How about depression?  Did you see any symptoms

22     of depression in your sessions with Elizabeth?

23        A    I did not at the time I saw her.

24        Q    What did you base your understanding on in

25     terms of Elizabeth suffering from ADHD?  Because you
```

1    didn't do the evaluation.   Correct?

2        A    Right.

3        Q    What was your basis for concluding that she had

4    an ADHD diagnosis?

5        A    How did I come to that?

6        Q    Yeah.

7        A    She provided information that aligned with the

8    DSM criteria, and in addition to that I did obtain

9    collateral information from that previous therapist that

10   she met with for a year.

11       Q    Okay.   That was Dr. Saneholtz?

12       A    Uh-uh.

13       Q    Now, you say she provided symptoms that

14   "aligned with."

15            You didn't independently reach a conclusion to

16   diagnose her with DSM -- meeting the criteria, did you?

17       A    I did diagnose with her ADHD.   She did come in

18   with a historical diagnosis.   But to actually meet --

19   actually receive a diagnosis of ADHD, you really just

20   need to meet the criteria for the DSM.   So she provided

21   those symptoms.   That was also verified by her former

22   therapist.

23       Q    Maybe I'm confused, but I thought you said

24   earlier you couldn't make a valid diagnosis based just

25   on talking with the individual.

1      A    Right.  I also obtained additional information

2    from her former therapist.

3          So when a patient comes in you do have to give

4    a provisional diagnosis, and at the time she did provide

5    that information.

6          Obviously, when I'm giving that diagnosis I'm

7    not going out and doing collateral contact.  And so for

8    the purposes of treatment, the history that I obtained

9    was from the former therapist, which I believe I

10   obtained within the next day or two.  So it did confirm

11   my impressions and the information that Ms. Black had

12   provided.

13     **Q    Is it your understanding that Dr. Saneholtz had**

14   **diagnosed Ms. Black with ADHD?**

15     A    Yes.  And that she also had prior providers as

16   well before her that also diagnosed ADHD.

17     **Q    The next page where it talks about ADHD on the**

18   **exhibit we were just looking at --**

19     A    Uh-uh.

20     **Q    Do you recall how you came up with these**

21   **resource materials?**

22     A    No.  So I created this about ten years ago.

23   It's been on my to-do list to revise.  So I can't

24   recall.

25     **Q    The first link is to the National Institute of**

1    Mental Health.

2          Is that a federal agency?

3      A   Uh-uh.

4      Q   Okay.  And then below that there's a reference

5    to CHADD.

6          Could you explain on the record who CHADD is

7    and what that organization is?

8      A   So I believe it's a nonprofit national

9    organization.  But essentially, it's a group for support

10   and it provides information for individuals with ADHD.

11     Q   All right.

12         (Vigil-Otero Exhibit 3 marked for

13         identification.)

14   BY MR. BURGOYNE:

15     Q   I took advantage of your resource material, so

16   the things I'm going to show you now I retrieved from

17   the links that you provided on your website.

18     A   Uh-uh.

19     Q   And you see at the bottom this is from the

20   National Institute of Mental Health, which is within the

21   National Institutes of Health.  And it's a discussion of

22   attention deficit hyperactivity disorder.

23     A   Uh-uh.

24     Q   And if you look at the second page, the part

25   below the indented discussion under

```
 1      "Hyperactivity-Impulsivity" where it talks about

 2      diagnosing ADHD.

 3          A    Uh-uh.

 4          Q    It reads, "Diagnosis of ADHD requires a

 5      comprehensive evaluation by a licensed clinician, such

 6      as a pediatrician, psychologist or psychiatrist with

 7      expertise in ADHD.  For a person to receive a diagnosis

 8      of ADHD, the symptoms of inattention and/or

 9      hyperactivity-impulsivity must be chronic or

10      long-lasting, impair the person's functioning, and cause

11      the person to fall behind normal development for his or

12      her age."

13              Would you agree with those statements?

14          A    Yes.

15          Q    What did you do to confirm early onset with

16      regard to Elizabeth Black's ADHD-related symptoms, if

17      anything?

18          A    So really that was just self-report and, again,

19      something that was discussed with her past therapist.

20      What she described was her whole life really struggling

21      with these issues.

22          Q    In the next paragraph the last line of the

23      paragraph reads, "Adults with undiagnosed ADHD may have

24      a history of poor academic performance, problems at

25      work, or difficult or failed relationships."
```

1          Did Elizabeth describe any poor academic

2     performance to you from elementary school or high

3     school?

4          A    No.   I believe she told me that that started in

5     college.

6          Q    She's had a number of jobs.

7          Did she describe any problems at work relating

8     to her ADHD symptoms?

9          A    We didn't go into over-detailed discussions

10    about that but more just difficulties kind of following

11    through, meeting deadlines.   That kind of applied to

12    those situations.

13         Q    And did she discuss any difficult or failed

14    relationships that she's had?

15         A    Sure.   Some of those failed relationships.

16    They weren't a huge bulk of our conversations.

17         Q    Which relationships were those?

18         A    She was having a romantic relationship at the

19    time that sometimes would come up in our sessions.

20         Q    Is that the kind of thing you'd ordinarily

21    document in your progress notes?

22         A    Sure.   And that was in there from time to

23    time --

24         Q    Okay.

25         A    -- although our treatment was pretty targeted

1    and specific.  So that wasn't the bulk of our treatment.

2        Q    What was it targeted on?

3        A    Some of the behaviors that she was having

4    challenges with.

5        Q    What were those behaviors?

6        A    So she had great difficulty sustaining

7    attention, completing her study goals, really getting

8    derailed by little things, getting off task, being able

9    to prioritize and engage in studying that required a lot

10   of sustained attention.

11            (Vigil-Otero Exhibit 4 marked for

12       identification.)

13   BY MR. BURGOYNE:

14       Q    Take a look at the next exhibit.  And this is a

15   document from the CHADD website.

16       A    Uh-uh.

17       Q    And if you look five or six lines down in the

18   first paragraph there's a sentence that reads, "ADHD

19   cannot be diagnosed accurately just from brief office

20   observations or just by talking to the person."

21            That's consistent with your view, isn't it?

22       A    Where are you at?

23       Q    The third-from-the-bottom line in the first

24   paragraph.

25       A    I would say there's always an issue of precise

1   diagnosis, but sometimes that is the best we have in

2   that first visit.  Over time a diagnosis would be

3   confirmed as far as how the person is functioning as

4   well as obtain collateral information.

5        So "ADHD cannot be diagnosed accurately" -- I

6   think my interpretation of that is that it does need

7   additional information, but we do have to do the best we

8   can with what we have.

9        Q    Is it fair to say that the more information you

10  have, the more confident you are in your diagnosis?

11       A    I would say that that really depends.

12  Obviously, if you have a lot of outside information and

13  more time, sure.  You can be more persuaded.

14       However, there is a clinical art to

15  understanding some of these diagnoses.  So sometimes you

16  can get to that conclusion without huge amounts of

17  information or investigation.

18       Q    What do you you do to evaluate the level of

19  functional impairment in a patient?

20       A    So that would be the patient is really

21  disclosing how they're being impaired, and it can be

22  relatively subjective.

23       Again, in a clinical setting there's not

24  necessarily a tool that I would give to indicate that.

25  But it's really from patient report and, again, talking

1    to others as well.

2        Q    Look at Page 2, if you would, please.  And it's

3    the third paragraph.  It begins, "Several of the

4    symptoms must have been present prior to age 12."

5            Is that consistent with the DSM-V requirements?

6        A    It is.

7        Q    Okay.  And again, to the extent you

8    corroborated that Elizabeth was experiencing symptoms

9    prior to age 12, that would have been based just on

10   anything she told you?

11       A    Right.  Self-report and the prior therapist.

12       Q    Did you even get into that subject with her or

13   did you --

14       A    Yeah.  She talked about -- again, I remember

15   her talking about that term, "My whole life I have

16   struggled with this."

17       Q    Two more sentences in:  "It is important to

18   note that the presence of significant impairment in at

19   least two major settings of the person's life is central

20   to the diagnosis of ADHD."

21       A    Uh-uh.

22       Q    Do you believe that's an accurate statement?

23       A    It can be, although I do believe that there

24   could be one area that's more pronounced than another.

25       Q    And the next sentence:  "Impairment refers to

1   how ADHD interferes with an individual's life.  Examples

2   of impairment include losing a job because of ADHD

3   symptoms, experiencing excessive conflict and distress

4   in a marriage, getting into financial trouble because of

5   impulsive spending, failure to pay bills in a timely

6   manner or being put on academic probation in college due

7   to failing grades."

8          Are you aware of Elizabeth experiencing any of

9   those types of impairments?

10      A   Yes.  When she was coming to see me she was on

11  the verge of not being able to stay in medical school.

12  I don't know all the nuances of that, but I believe she

13  had to postpone tests and was having difficulties.

14         And she also discussed difficulties with her

15  thesis and her GPA in college that were really impacted

16  by her ADHD.

17      Q   Would it surprise you if she had attributed her

18  college difficulties to her participation in Division I

19  sports in an application to the University of

20  Pennsylvania?

21      A   Can you repeat the question?

22      Q   Well, when she applied to the University of

23  Pennsylvania for her postbaccalaureate work, she

24  explained her academic difficulties by saying she was a

25  Division I athlete which required excessive amounts of

 1    time.

 2         A    Uh-uh.

 3         Q    Is that also something that might explain why

 4    she was having difficulties on her thesis or her

 5    academics?

 6         A    Somebody with ADHD sometimes has difficulty in

 7    being over-involved, and I could see somebody especially

 8    at that time not being self-aware.

 9              I don't think she actually was formally

10    diagnosed.  So it would make sense that they would

11    think, "Oh, it was just sports."  But a lot of

12    individuals play sports, and it can actually help GPA

13    because it provides extra structure.

14         Q    Look at Page 3, if you would, the second

15    paragraph:  "Many professionals find it helpful to

16    review old report cards and other school records dating

17    back to kindergarten or even the preschool years.  If

18    such records are available, they should be brought to

19    the first appointment.  Copies of reports from any

20    previous psychological testing should also be brought to

21    the appointment.  For adults who experience problems in

22    the workplace, job evaluations should be brought for

23    review if available."

24              Again, do you know why those records are

25    relevant in the ADHD diagnosis?

1      A    Sure.   It provides additional information.

2    However, it would be pretty rare for an adult seeking

3    psychotherapy to come with their kindergarten report

4    cards.

5      Q    How about in the context of seeking evaluation

6    for other purposes?

7      A    It would also be rare for most adults to have

8    access to that.  But typically, a past psychological or

9    records from a past therapist or something would be

10   requested.

11     Q    And again, I take it the reason you didn't ask

12   for any of those is because you were treating her for

13   therapy purposes?

14     A    Right.

15     Q    This is another document from the CHADD

16   website.

17          (Vigil-Otero Exhibit 5 marked for

18          identification.)

19   BY MR. BURGOYNE:

20     Q    All right.  For Exhibit 5 on Page 2 there's a

21   discussion of providing an assessment of the severity of

22   symptoms under DSM-V?

23     A    Uh-uh.

24     Q    What does that mean in the context of a

25   diagnosis?  What is the clinician supposed to do in that

1    regard?

2        A    So this was a more recent change where there's

3    a specifier and you are -- it is more subjective.  You

4    are really trying to indicate how severe the person's

5    challenges are.  Just what it says in the document:  if

6    there's a few, that would be more mild.  And then the

7    more impairment they have, they would obviously get a

8    moderate or severe specifier.

9        Q    Okay.  Do you recall ever attaching any of

10   those ratings to Elizabeth, or did you even apply the

11   DSM-V?

12       A    No.  We were in the DSM-IV-TR, and we didn't

13   actually have those specifiers.

14       Q    To what extent do these ratings -- are they

15   sort of analogous to the GAF that would have been

16   provided under DSM-IV?

17       A    They could be somewhat similar.  We no longer

18   have that, and so I guess you could say that's part of

19   it.  That was part of the change.

20       Q    Do both focus on the extent of the impairment

21   and the symptoms?

22       A    Yes.

23            (Vigil-Otero Exhibit 6 marked for

24       identification.)

25   BY MR. BURGOYNE:

1    Q    This is another document from the CHADD website

2    and there's a discussion of the ADHD diagnostic process.

3         And just walking through this quickly, you

4    conducted an initial screening evaluation of Ms. Black?

5    A    Yes.

6    Q    Okay.  Did you do a comprehensive evaluation

7    for ADHD with the various steps outlined here?

8    A    No.

9    Q    All right.

10        (Vigil-Otero Exhibit 7 marked for

11        identification.)

12   BY MR. BURGOYNE:

13   Q    V-O 7 is also from the CHADD website and it's a

14   document "For Healthcare Professionals."

15        Do you see on the top of the second page where

16   there's a heading "What are the DSM-V criteria for

17   diagnosing ADHD?"

18   A    Uh-uh.

19   Q    It says, "In adults the symptoms must affect

20   the ability to function in daily life and persist from

21   adolescence.  In addition, the behaviors must create

22   significant difficulty in at least two areas of life

23   such as home, social settings, school or work."

24        Is that consistent with your understanding of

25   the DSM-V criteria?

1       A    Yes.

2       Q    At the bottom it states, "As ADHD symptoms

3   affect each person to varying degrees."

4            Is that consistent with your understanding?

5       A    What was the question?

6       Q    Whether or not, essentially, everyone in the

7   population experiencing -- periodically experiences

8   ADHD-like symptoms.

9       A    Uh-uh.

10      Q    Is that a yes?

11      A    So what was the question?

12      Q    Yes.

13           Is it your experience that most people

14  experience ADHD-like symptoms in their lives?

15      A    I think most people experience challenges with

16  inattention.  That's not necessarily ADHD-like symptoms,

17  which would be the whole constellation of the DSM.

18      Q    Fair enough.  All right.

19           (Vigil-Otero Exhibit 8 marked for

20      identification.)

21  BY MR. BURGOYNE:

22      Q    Dr. Vigil-Otero, I've handed you some of the

23  documents that you've produced to us from your file

24  relating to Ms. Black.

25      A    Uh-uh.

1    Q    Could you identify, please, the first two

2    pages?

3    A    This is part of my new-patient intake form.

4    Q    And is the handwriting here Elizabeth's

5    handwriting?

6    A    Yes.

7    Q    And she indicates at the top she was referred

8    by Dr. Saneholtz?

9    A    Yes.

10   Q    And at the very top there's some handwritten

11   notations.

12        Were those added to the document as part of

13   your production to me in response to my subpoena?

14   A    Yes.

15   Q    Can you look at these, please, and just quickly

16   confirm that these are accurate copies of records that

17   you have produced from your files?

18   A    Yes.  I believe they are some of them.

19   Q    And were these records produced at or around

20   the time shown on the records?  In other words, they're

21   contemporaneous records of your sessions with Ms. Black?

22   A    I'm sorry.  Can you repeat the question?

23   Q    Yes.

24        Were these records prepared at or about the

25   date shown on the documents?

1       A    Yes.

2       Q    And did you keep these records in the ordinary

3   course of your medical practice?

4       A    Yes.

5       Q    On the second page you asked Elizabeth to list

6   all of her prescribed medications and dosages?

7       A    Uh-uh.

8       Q    And can you identify any of the medications

9   that relate to either ADHD or anxiety?

10      A    Sure.  The Vyvanse 40 milligrams and the 10

11  milligrams of Adderall -- those are stimulants.  And

12  Clonazepam is for anxiety p.r.n., as needed.

13      Q    What does that mean:  "p.r.n."?

14      A    So she was prescribed to take that if and when

15  she felt anxious, as opposed to the other medications

16  which she was prescribed daily.

17      Q    Okay.  How about the Adderall where it says

18  "when needed"?

19      A    Oh, actually, that was when needed.  It looks

20  like Vyvanse was her regular dose --

21      Q    Okay.

22      A    -- and then she would add that when needed as

23  well.

24      Q    What does "p.r.n." stand for?

25      A    I'm not sure of the exact terminology, but it

1    means when needed.

2        Q    Okay.  All right.  Relatively speaking, are

3    these large dosages of any of the medications?

4        A    I'm not really familiar with current standards

5    in dosing because that's not really what I do.

6        Q    Okay.  On the third page there's a discussion

7    of the activities that are enjoyed in free time.

8             Why do you ask that question of patients?

9        A    Because typically if we need to increase

10   coping, we want to know what their areas are.  And it's

11   important to not just focus on psychopathology but also

12   positive areas of functioning.

13       Q    This is a general intake form.  Correct?

14       A    Yes.

15       Q    It's not specific to ADHD?

16       A    No.

17       Q    It doesn't attempt to capture symptoms that an

18   individual might be experiencing relative to the DSM

19   criteria?

20       A    Right.

21       Q    And does the document identify why Elizabeth

22   came to you for therapy?

23       A    Well, what she wrote down and what she reported

24   were a little bit different but overlapped.  On this

25   document she wrote "To reduce anxiety and get back to

1    positive thinking."

2        Q    And then above that it looks like she also

3    wrote she had a "desire to maintain a work/life balance

4    and stress with school"?

5        A    Uh-uh.  Yes.

6             However, when she arrived -- and sometimes

7    individuals fill this out when they arrive -- and she

8    told me about some of her presenting issues.  They were

9    a little bit more specific than some of those general

10   statements she wrote before.

11       Q    Do you recall what Ms. Black told you at the

12   time regarding difficulties she was having in her

13   work/life balance?

14       A    Yes.  She was -- essentially, what came out was

15   that she did have a tendency -- and this was my

16   understanding, not necessarily her own words.  She'd

17   have a tendency to overcompensate for some of her

18   challenges, and that would be to engage in more

19   perfectionistic habits.  So some of her challenges

20   related to ADHD and the ways she tried to compensate for

21   that.

22            And so she would find herself incredibly

23   stressed and feeling unbalanced for those periods where

24   she was trying to, you know, really overdo it.  And so

25   there was kind of this constant pull between under- and

1    overdoing some of her tasks.

2        Q    What other causes might result in a lack of

3    balance in work and life and stress?  And can anxiety

4    cause similar stresses?

5        A    If an individual had an anxiety disorder -- I

6    mean, certainly anything -- any behavioral or

7    psychological condition could cause stress in work/life

8    balance issues.

9        Q    And then it said that, "This issue has

10   persisted approximately two years."

11            Is that referring to the issues stated above?

12       A    Where are you?

13       Q    Right here where your question is, "How long

14   has this issue persisted," and she wrote, "Approximately

15   two years."

16            And I assume that's referring to the issue that

17   she has identified above about wanting to maintain a

18   work/life balance --

19       A    Right.  Yes.

20       Q    -- and stress with school?

21            Do you recall how long she'd been in medical

22   school at that point?

23       A    I don't.  I would have to look at her chart,

24   but I want to say, I think, two or three years.

25       Q    The next page is a request or an authorization

1    form for you to access some of her records?

2         A    Uh-uh.

3         Q    And then it looks like this one relates to

4    Dr. Saneholtz and the USF Counseling Center?

5         A    Uh-uh.

6         Q    And above that you have two boxes --

7    three boxes that an individual can check?

8         A    Uh-uh.

9         Q    The first one authorizes the disclosure of

10   medical records, including mental health or

11   psychological and psychiatric treatment?

12        A    Uh-uh.

13        Q    And that's the box she checked?

14        A    Uh-uh.

15        Q    And then it looks like you also on your form

16   have a box that authorizes you to get access to school

17   records and information relating to school functioning?

18        A    Uh-uh.

19        Q    When would you ask someone to check that box?

20        A    So typically that would only be checked for

21   minors where I might need to speak to the school,

22   advocate on the patient's behalf.  With adults, I

23   usually am not getting involved in their school

24   functioning.

25        Q    Did you ever get any records from Dr. Saneholtz

1   or the counseling center?

2      A   No.

3          What is standard practice is I typically call

4   the provider and we do a phone session as opposed to

5   having them fax all the records and me going through

6   every session.

7      Q   The next page is a second authorization form

8   authorizing you to get additional records from an

9   additional provider.  Is that correct?

10     A   Yes.

11     Q   And this is marked AVO 0006.

12         And this person is Dr. Parrino?

13     A   Uh-uh.

14     Q   Who is Dr. Parrino?

15     A   Dr. Parrino was a clinical psychologist, an

16  additional psychologist at USF.

17     Q   Did you work at USF for a period of time?

18     A   I did.

19     Q   Did you overlap with Dr. Parrino?

20     A   I did.

21     Q   Did you work with him in that context?

22     A   I mean, we were just two providers.  I wasn't

23  working with him.

24     Q   And why did you obtain an authorization form

25  with respect to records in the possession of

1   Dr. Parrino?

2       A    I think Ms. Black just filled out two.

3   Technically, I just really needed one for USF

4   Counseling.  So Dr. Saneholtz and Dr. Parrino were both

5   at USF.

6           I only spoke to Dr. Saneholtz because she was

7   the therapist that was with her for a year.  It was

8   my understanding that she was just starting to see

9   Dr. Parrino for a couple sessions or something of that

10  nature.

11      Q    Looking back at Page 4 where you have a chart

12  where they indicate issues they may have had in the

13  past, and Elizabeth wrote in ADHD --

14      A    Uh-uh.

15      Q    -- in 2009?

16      A    Uh-uh.

17      Q    I'll represent to you that she has stated in

18  this case that that was her initial diagnosis for ADHD

19  and it was provided by a Dr. Fleischer.

20      A    Yes.

21      Q    Do you recognize that name?

22      A    I don't recall.  But I knew that she was

23  diagnosed in 2009 in, I believe, Philadelphia, if I

24  recall.

25      Q    Now, at the time I believe Elizabeth had some

```
1    medical records in her possession from Dr. Fleischer.

2            You didn't ever see those records?

3        A    No, I did not.

4        Q    Were you aware that he had diagnosed her with

5    general anxiety disorder and ADD?

6        A    I was not.  She did tell me she was diagnosed

7    with ADHD and anxiety disorder.

8        Q    Go to the next page, if you would.  It's

9    AVO 0013, and it looks like it's an insurance form.

10       A    Uh-uh.

11       Q    What is this document?

12       A    So I saw Ms. Black out of pocket, meaning she

13   paid me and submitted my receipt.  And they would send

14   an explanation of benefits to both of us and reimbursed

15   her for a portion of the session.

16       Q    Okay.  So this is just confirming that she's

17   been reimbursed for the session?

18       A    Yes.  Correct.

19       Q    The next page -- would you identify this?  It's

20   AVO 0015.  At the top it says "Record of Psychological

21   Service"?

22       A    Yes.

23       Q    It's got the patient name and the date of

24   service?

25       A    Uh-uh.
```

1      Q    Does this document go to the insurance company?

2    Is this what you would give to Elizabeth to provide to

3    the insurer?

4      A    Correct.

5      Q    And what is the CPT code for this particular

6    service?

7      A    So this was the initial interview:  90791.

8      Q    Okay.

9      A    That would be how they code the session for

10   insurance standards.

11     Q    And if there was no DSM code on this form,

12   would the visit be covered by the insurance company?

13     A    No.

14     Q    On the next page it's got "Initial Assessment"

15   as its title?

16     A    Uh-uh.

17     Q    And it says AVO 0016 at the top.

18     A    Uh-uh.

19     Q    Could you tell us what this document is?

20     A    This is part of how I document the first

21   session.

22     Q    Okay.  And does this particular document

23   consist of two pages?  Both of these pages go together?

24     A    Yes.

25     Q    Okay.  All right.  And what is the information

1   that's over to the right next to Axis I -- A-x-i-s --

2   that is written by hand?

3        A    So that's a CPT code.  And the date and time --

4   for whatever reason, this form neglected to put that, so

5   I would always handwrite that in.

6        Q    It's the CPT code for an initial interview?

7        A    Uh-uh.

8        Q    Then it says 6/10/13 and it looks like the

9   initial interview lasted from 12:45 to 1:15?

10       A    Uh-uh.

11       Q    Under Axis I there are three different codes

12  for ADHD.  The first is for ADHD combined, the second is

13  ADHD inattentive, and the third is ADHD -- what's that

14  stand for there:  "hyper-imp"?

15       A    Hyperactive-impulsive.

16       Q    Impulsive.  Okay.

17            And you circled "ADHD inattentive"?

18       A    Uh-uh.

19       Q    What is the difference between those different

20  types of ADHD diagnoses?

21       A    So essentially, there's a list of criteria for

22  the inattentive symptoms in addition to a

23  hyperactive-impulsive.

24            Some individuals have more pronounced

25  inattention where they're meeting criteria for that

1    subset of symptoms.  Others have more

2    hyperactive-impulsive.  Others have that combination.

3        Q    And you concluded the most appropriate

4    diagnosis was the inattentive variety for Elizabeth?

5        A    Yes.  I did see that she had a restlessness to

6    her in her history that would be a more adult

7    manifestation of hyperactivity.  However, from the

8    snapshot that I saw her at that time, the inattentive

9    symptoms were quite salient and more pronounced.

10       Q    You referenced sort of the symptoms and the

11   diagnostic criteria.

12            Where did you attempt to capture which of the

13   diagnostic symptoms she was experiencing?  Did you

14   memorialize that in any written document?

15       A    No.

16            Essentially, you know, as the patient is

17   talking I am listening for those symptoms.  When you

18   have a patient that is very articulate and talkative,

19   sometimes they are dominating some of those -- they're

20   really providing that information, and I will interject

21   and ask follow up-questions.  I'm really listening to

22   some of her history and kind of asking questions when I

23   need to fill in the holes.

24       Q    Gotcha.

25            For Axis II and III you circled "none."

1            Would either of those axes come into play

2      ordinarily in the context of ADHD?

3           A    What do you mean?  Would there be --

4           Q    Well, would you always circle "none" with an

5      ADHD patient, or there might be instances where you'd

6      circle "yes" and provide additional information?

7           A    Sure.  There's certain individuals where I

8      would provide additional information there.

9           Q    And give us an example.  For example, what does

10     Axis II look at?

11               (Mr. Bard entered.)

12          A    So Axis II, which we no longer have, would be

13     what would be a personality disorder.  I believe

14     intellectual -- low intellectual functioning would also

15     be recorded on the Axis II, if memory serves me

16     correctly.  Axis III would be medical conditions.  So

17     what else is comorbid medically?

18     BY MR. BURGOYNE:

19          Q    And then how about Axis III?

20          A    That would be --

21          Q    That was Axis III.  Okay.

22          A    Uh-uh.  The medical.

23          Q    Then Axis IV -- what is the purpose of that?

24          A    So that is, where is this individual having

25     difficulties functioning?  Where is the impairment?  And

1    so that is the -- I circled "social, education,

2    occupational."

3         Q    What was occupational based on?

4         A    The occupational for her was more of a morph

5    occupational and education, as far as she was working

6    towards trying to obtain an occupation.  So there was

7    overlap there for her.

8         Q    And the social -- was that the relationship

9    with the boyfriend you were referencing?

10        A    She, actually, also was having a lot of

11   difficulties connecting and maintaining relationships

12   with her med school contemporaries and her peers.  And

13   so that was also an area where she really was struggling

14   as well and felt isolated.

15        Q    And then what's the purpose of Axis V?

16        A    So that's where we come up with our idea of how

17   much the person is suffering at that time.

18        Q    And you indicated earlier that you had

19   diagnosed her as having ADHD.

20             Is this the document that reflected that

21   diagnosis?

22        A    Yes.

23        Q    Okay.  All right.  Looking again at the current

24   GAF, what does GAF stand for?

25        A    We no longer use it, but I believe it stood for

1    global assessment of functioning.

2        Q    And there's a place for the current GAF, and

3    you assigned a score of 80?

4        A    Uh-uh.

5        Q    And then the highest in the past 12 months --

6    again, you assigned a score of 80.  Is that correct?

7        A    Uh-uh.

8             I will say when I first met Ms. Black she comes

9    across, you know, as very articulate.  And after I met

10   with her, the level of impairment definitely did come

11   across more pronounced as she continued to struggle.

12       Q    What does a GAF of 80 signify in the hierarchy?

13       A    That the person is having some occasional

14   struggles.  But obviously, it's not severe.

15       Q    So a GAF of 80 would not signify a magnitude of

16   impairment that is consistent with a clinical finding of

17   disability?

18       A    I mean, not necessarily.  You could have a

19   clinical issue and you could be at a time in your life

20   where it's not completely impairing.

21            However, as I said, that first session she

22   talked about her challenges.  But as I got to know her

23   more and really heard how much she was struggling, you

24   know, I would not have continued to characterize her in

25   the AD range.

1          MS. CINTRON-SIEGEL:  I'm sorry.  Would you mind

2      if we just take a quick break?

3          MR. BURGOYNE:  Sure.  Let me quickly just

4      finish this one document and then we can break.

5          MS. CINTRON-SIEGEL:  Sure.

6          MR. BURGOYNE:  That would be great.

7          (Vigil-Otero Exhibit 9 marked for

8      identification.)

9  BY MR. BURGOYNE:

10     Q    Vigil-Otero Exhibit 9 is an excerpt from the

11 DSM-IV-TR regarding global assessment of functioning,

12 GAF scale.

13          Have you seen this information before?

14     A    Yes.

15     Q    And you recognize this as a discussion of what

16 each of the codes in the GAF signify?

17     A    Uh-uh.

18     Q    And can you read what a score of 80 signifies?

19     A    Uh-uh.  "The symptoms are present.  They are

20 transient and expectable reactions to psychosocial

21 stressors; difficulty concentrating; no more than a

22 slight impairment; and social, occupational or school

23 functioning."

24          MR. BURGOYNE:  All right.  Let's take a break.

25          (Recess from 9:49 a.m. 9:53 a.m.)

1        MR. BURGOYNE:   Back on the record.

2   BY MR. BURGOYNE:

3        Q    And looking again at your records.  Do you

4   still have those in front of you?  Turn to the page that

5   has AVO 0017 at the top, and this is the second page of

6   your initial assessment form.

7        A    Uh-uh.

8        Q    And could you just help us read some of or

9   understand some of your handwriting here?  Could you

10  read the "Presenting problem" that you've identified

11  here?

12       A    Uh-uh.  Anxiety, all-or-nothing thinking,

13  work/life balance.  Patient currently having

14  difficulty --

15       Q    And try to go slowly so she can capture it.

16       A    Sorry.  I'm a fast talker.

17            Patient currently has difficulty studying,

18  staying consistent with Step 1 exam next month.

19  Diagnosed with ADHD in 2009.  Meds prescribed at the

20  counseling center.

21       Q    All right.  How about -- the next section is a

22  discussion of her "Current & past medications."

23            How about, could you read what you've written

24  under "Previous psychological or psychiatric

25  issues/treatment"?

1      A    Dr. Abby Saneholtz, USF Counseling, 2012

2    through 2013.  Monthly treatment for six months related

3    to anxiety and ADHD.  Patient was also seen in Philly by

4    a therapist in 2009.  Patient will see Bob Parrino for

5    test anxiety tomorrow.

6      Q    "Family Relationships" -- what's the

7    handwriting there?

8      A    Patient has a twin brother and two older

9    brothers.  Was closest to older brother.  When patient

10   moved to the Dominican Republic for three years,

11   patient/brother conflict occurred.  Relationship never

12   fully recovered, according to patient.

13     Q    Then under "Other Relationships" what does your

14   handwriting say?

15     A    Patient has limited close social relationships

16   in Tampa.  Has not connected with many med school

17   classmates due to age/cultural differences.  Patient has

18   been in a romantic relationship for three months.  Male

19   has become enraged, jealous.  Perceived abandonment.

20   Unclear about status of current relationship.

21     Q    And under "Job/School"?

22     A    Third-year medical student at USF.  Patient was

23   not overly interested in starting medicine but tried

24   multiple careers:  investment banking, law assistant,

25   nonprofit work in HIV in Dominican Republic.  Patient

1    currently studying for Step 1.

2        Q    Under "Major Life Stressors" what does that

3    say?

4        A    Ongoing angst about vocation and current

5    location, stress of med school.

6        Q    Under "Interests and personal strengths"?

7        A    Some interests.  Enjoys travel.  And I'm not

8    sure what that says.

9        Q    Okay.  How about the next sentence?

10       A    Patient encouraged to use gratitudes at night

11   to decrease pessimism.

12       Q    What does that mean:  "use gratitudes"?

13       A    It is a strategy from the field of positive

14   psychology.  So it was homework that she was assigned to

15   help decrease kind of a more negative outlook that she

16   was having at that time.

17       Q    And then the "Treatment Goals" -- were those

18   goals identified by you or by Ms. Black or by both of

19   you together?

20       A    Both.

21       Q    Okay.  So she wanted to improve her mood

22   regulation, improve behavior regulation, improve

23   relationships outside of family and maintaining her

24   functioning/prevent worsening of symptoms?

25       A    Yes.

1      Q    And what was the frequency of sessions?

2      A    Biweekly.

3      Q    Okay.  Turn the page, if you would.  This is

4   AVO 0018.  It's a document dated 6/12/12.  It looks to

5   be two days after your initial visit with Elizabeth.

6          Are these your notes from a phone call you had

7   with Dr. Saneholtz?

8      A    Yes.

9      Q    Is this your handwriting?

10     A    Yes.

11     Q    The first line says "ADHD."  The second line

12   says "perfectionist."

13          What is that a reference to?

14     A    That she was an individual with ADHD with

15   perfectionistic traits as well, which can be common for

16   adult ADHD.

17     Q    And what's the next sentence mean --

18     A    That she --

19     Q    -- "Family - pressure to succeed"?

20     A    That she experienced family pressure to

21   succeed.

22     Q    Who did she experience that pressure from?

23     A    I can't recall at the time, but I'm assuming

24   parental pressure.  It might have been from her siblings

25   as well.

1      Q    And what does the next line read?

2      A    "Med school - pleasing everyone else."

3      Q    What's that a reference to?

4      A    I believe part of her decision, according to

5  Saneholtz, to attend medical school had to do with

6  pleasing some family members.

7      Q    The next line:  "Relationship - been

8  challenging."

9           Do you know what relationship that's reference

10 to?

11     A    I believe that was her romantic relationship.

12     Q    The next line says "gets frustrated with social

13 situation"?

14     A    Uh-uh.  Those are some of the peer

15 frustrations.

16     Q    Then "core areas."  Then what does it say after

17 that?

18     A    "Critical.  All/nothing."

19     Q    What does the reference to critical mean?

20     A    She's highly self-critical.

21     Q    And then what about "all/nothing"?

22     A    So that is a thinking distortion called

23 all-or-nothing thinking.

24     Q    What does that mean in sort of lay terms?

25     A    Lay terms it's when -- I mean, many of us do

1    this.  It's when an individual has a tendency -- "If I

2    can't do it perfectly or 200 percent, then I can't do it

3    at all."

4          And so it is a tendency to kind of go into

5    overdoing it and underdoing it and be self-critical if

6    you're not perfectly successful.

7    Q    Gotcha.

8         How about the next line?

9    A    "Critical brother."

10   Q    Okay.  And then below that what does that say?

11   A    It says "not good enough."

12   Q    All right.  And the next page, 0019 -- is this

13   just your receipt for a psychotherapy session?

14   A    Yes.

15   Q    Two pages in:  AVO 0021.  Is this a progress

16   note from your session with Elizabeth on June 26th,

17   2013?

18   A    Yes.

19   Q    Is this your handwriting on the document?

20   A    Yes.

21   Q    Could you read this handwriting for us starting

22   at the top above "Progress Note"?

23   A    Okay.  So those are notes that are not the most

24   legible.  But mother uptight.  I don't know if that says

25   resistant or what that says.  Mother started -- I'm not

1    sure with the photocopy.

2          Never been close to mother.  Is kind of cold.

3    Scottish/Dutch.  I can't read that with all the copying.

4    Yeah.  I can't read the little writing there.

5          Q    Okay.  What about below the box?  It looks like

6    it begins "nurse," "mother" maybe?

7          A    Uh-uh.

8          Q    What does the rest of that say?

9          A    I'm not sure with all the black around it, but

10   something with brothers.  Father teaches Spanish.

11         Q    Likeable?

12         A    Likeable.  Uh-uh.

13         Q    And then your note -- these are your notes from

14   this session below that?

15         A    Yes.

16         Q    Can you read those notes for us?

17         A    Patient continues to procrastinate.  Has been

18   seen by Parrino.  Patient has not been able to study due

19   to getting off ambitious schedule and then not being

20   able to rebound.

21         All-or-nothing thinking discussed and

22   challenged.  Patient will work on following through with

23   behavior plan.  Patient encouraged to focus on present.

24   Patient did engage in what went well.

25         Discussed family of origin.  Describes

```
 1    annoyance at mother.  States that she has never been

 2    close to mother.  Describes mother as uptight.  Patient

 3    has feelings of resentment towards mother.  Will be

 4    further discussed at a later session.

 5         Patient tried to explain that she has not

 6    studied because she had to clean parents' vacation home

 7    and related this back to mother's lack of cleaning.

 8         Patient's excuse for not studying was

 9    identified.  Patient will be seen in two weeks.

10         Q    Is that your initials, just your signature at

11    the bottom?

12         A    Yes.

13         Q    The next page.  It looks like the next two

14    pages go together.

15         Is this your progress note from a session on

16    July 18th, 2013?

17         A    Yes.

18         Q    You state, "Elizabeth has made some progress

19    with regards to studying.  Discovered that patient has

20    ideas that this one test is going to significantly

21    impact the rest of patient's career options."

22         Do you recall offhand which test she was

23    referring to there?  Was that a medical school test or

24    the Step 1 exam?

25         A    The Step 1.
```

1     Q    I ask that because if you look at the next page

2  it says, "This is only 1.5 hours" --

3     A    Uh-uh.

4     Q    -- and the Step exam is eight hours.

5     A    That was in reference to studying so we would

6  have a behavioral plan where she was going to study.

7     Q    She would study for one-and-a-half hours?

8     A    To put it into perspective.  Yeah.

9     Q    Gotcha.  Okay.

10         So the next page is the coping card statements

11  that are referred to?

12     A    Uh-uh.

13     Q    And who comes up with these coping card

14  concepts?  Are those suggestions you made to her?

15     A    That was something that we would collaborate

16  on.  We would come up with a plan so that she had a way

17  to remember some of the work and consider some of the

18  CPT strategies.  We would do that together.

19     Q    And what were the coping mechanisms reflected

20  on the notes here?  This is AVO 0026.  I just want to

21  make sure I'm reading your handwriting.

22     A    Oh, you want me to --

23     Q    Could you explain each of those for me?

24     A    Yeah.  "This is only one-and-a-half hours.  I

25  can do this and call my family and relax after.  I

```
 1    always come through.  In the clutch I can always get it

 2    done.  I know I can do this.  I just need to break down

 3    my goals, not fixate on years in the future."

 4        Q    Gotcha.

 5             All right.  The next page -- are those your

 6    notes as well?

 7        A    That was the back of the card.  Yes.

 8        Q    Okay.  All right.  And so what does that mean?

 9    It says "Action Plan"?

10        A    Right.  The first part of what we just read was

11    more of her cognitive work.  This was more the

12    behavioral where she came up with a plan of specifically

13    from 5 to 6:30 -- I don't know what day that was -- she

14    would read a lecture, and during that time there would

15    be no Internet or phone use.

16        Q    The next page, AVO 0030 -- is this a progress

17    note with your handwriting from July 24th, 2013?

18        A    Yes.

19        Q    Could you read this progress note for us?

20        A    Made some progress with regards to increased

21    studying and decreased procrastination.  Continues to

22    experience days where patient will avoid work.  Patient

23    appears to get off track and then can't recover and

24    procrastinates entire day.  Patient/therapist came up

25    with specific plan that is realistic and allows small
```

1    windows of time for breaks.  And when -- if patient is

2    not on schedule she will remember that her schedule

3    allows lapses in time.

4            The idea of maybe pausing rather than

5    derailment discussed.  Patient will remind herself that

6    she still has time.  Patient will be seen in one week.

7        Q    Okay.  AVO 0033 -- is this your patient note

8    from a session on July 31st, 2013?

9        A    Yes.

10       Q    The first line reads, "Patient made some

11   progress with bx plan."

12            What does "bx" stand for?

13       A    Behavioral plan.

14       Q    Gotcha.

15            She has postponed tests until next month.  It

16   goes on to say patient will work on complying with more

17   realistic goals and leaving house at night to study.

18            What is the reference to the leaving the house

19   at night to continue to study?

20       A    We had identified that at night she seemed to

21   get sidetracked and that it would be helpful to actually

22   leave and have that planned in advance as opposed to

23   continuing to struggle with distractions that were at

24   her house.  I believe she had a roommate.

25       Q    Okay.  The next page, AVO 0046, is a progress

1    note of yours from August 21st, 2013.  Is that correct?

2        A    Uh-uh.

3        Q    And these, again, are your notes?

4        A    Yes.

5        Q    And could you just read this?

6        A    Patient's productivity improved.  Patient has

7    left the house more.  Goals for today include 3:45 to 6.

8    Maybe one-hour video or -- I don't know, actually, what

9    that says.  Video 6:30 to 10.  Patient will use

10   something to remind her of plan to increase focus.

11   Discussed behavioral strategies to increase productivity

12   for test in ten days.  Will check in via phone.  Earlier

13   bedtime also discussed.

14       Q    And was the reference to leaving the house more

15   just a reference to her getting in an environment where

16   she studied better?

17       A    It was in reference to what we had discussed

18   where she had -- it was established that it would help

19   her leave the house at night.  So she did do that.

20       Q    Okay.  All right.  The next page, AVO 0048 --

21   is this your progress note for a session on

22   September 9th, 2013?

23       A    Yes.

24       Q    Could you please read the notes from this

25   session?

1      A    Patient did not take test.  Plan is to take

2   test in October.  Have continued to allow things to

3   derail me, in quotes.  Canceling -- I'm not sure what

4   that says.

5      Q    **Does that say canceling the static?**

6      A    Canceling the static.

7      Q    **Again, that's in quotes?**

8      A    Uh-uh.

9           Interventions to decrease avoidance and limit

10  distraction discussed.  Patient encouraged to break down

11  larger goals into smaller parts.  Use timer on phone.

12  Will call for appointment as needed.  Placing boundaries

13  on friends.  Maybe friends' expectations discussed.

14     Q    **And then the last one is AVO --**

15     A    I don't have that.

16     Q    **Okay.  It's one that's just a note from April**

17  **14th saying you spoke to Elizabeth.**

18          **Is that about your records?**

19     A    Yes.

20     Q    **Is that the last conversation that you**

21  **mentioned earlier?**

22     A    Uh-uh.  She actually followed up via email to

23  say to send them.

24          MR. BURGOYNE:  Okay.  That's all I have.

25          MS. COLLINS:  Can we take a second?

```
 1              MR. BURGOYNE:  Want to take a break?  Sure.
 2              (Recess from 10:15 a.m. to 10:18 a.m.)
 3                         CROSS-EXAMINATION
 4     BY MS. COLLINS:
 5         Q    Okay.  You said you provided a provisional
 6     diagnosis of ADHD?
 7         A    Yes.
 8         Q    What is a provisional diagnosis?
 9         A    So anytime a patient comes in you do have to
10     make some sort of diagnosis or some distinction.  And so
11     we call that kind of a provisional diagnosis that's
12     confirmed or not over time.
13         Q    Did your treatment of Elizabeth and what you
14     learned about her confirm that diagnosis over time?
15         A    Yes.  She did highly fit somebody that was
16     struggling from a primary ADHD with perfectionistic
17     features.
18         Q    You said your treatment was targeted at certain
19     behaviors?
20         A    Yes.
21         Q    Can you explain what those behaviors were?
22         A    Sure.
23              Elizabeth presented with behaviors where she
24     had procrastination, where she had a true reluctance to
25     engage in tasks that required sustained attention.  She
```

1   would get sidetracked very easily.

2           So in this period of her life where she had

3   higher demands that required high levels of

4   concentration these behaviors were really impacting her

5   and really compounding her challenge of study.

6       **Q   How severe would you say the behaviors were?**

7       A   I would say they grew increasingly severe the

8   more time that the test grew near.  Some of the ways

9   that she tried to compensate for her ADHD actually

10  exacerbated and further compounded her problems.

11          So that perfectionism started to really further

12  increase the procrastination behaviors where she would

13  lose a whole day of studying due to ADHD and the kind of

14  all-or-nothing thinking.

15      **Q   You stated that her GAF score was 80 when she**

16  **came in initially?**

17      A   Uh-uh.

18      **Q   And that as you treated her you began to see**

19  **that it might be more significant?**

20      A   Right.  Uh-uh.

21      **Q   How would you -- could you opine as to where**

22  **you would categorize her after the course of your**

23  **treatment?**

24      A   I would probably have to reference the --

25      **Q   And for the record, you're referencing the**

1    global assessment of functioning scale?

2        A    Yes.

3            I would say she was going down into the 40s,

4    between that 41 and 50.  She wasn't suicidal, but she

5    really was starting to get off track in her goals, to

6    the point where it was impacting her ability to meet

7    medical school demands, and that problem was worsening

8    and she was postponing.  I think she might have done

9    that twice over the course of treatment.

10       Q    And then if I could have you grab -- I think

11   it's Exhibit 3, I think is what it's marked as.  And on

12   the second page under "Hyperactivity-Impulsivity" --

13       A    Uh-uh.

14       Q    -- in the third paragraph --

15       A    Yes.

16       Q    -- the second sentence:  "The symptoms of ADHD

17   can be mistaken for emotional or disciplinary problems

18   or missed entirely in quiet, well-behaved children,

19   leading to a delay in diagnosis."

20            Would you agree with that statement?

21       A    I would.  I would say that it is often the case

22   in a high-achieving, well-behaved perfectionist child

23   who is bright.  They often can go under the radar, not

24   receive diagnosis, and then get a later diagnosis in

25   life.

1      Q    Would you say Ms. Black fits that

2    categorization?

3      A    Very much so.  She is so likeable.  Although I

4    didn't know her in childhood, I could see where a

5    teacher would really like her.  She's very hard-working.

6    But some of those perfectionistic qualities actually

7    further derailed her in adulthood that probably,

8    actually, helped her in childhood and decrease maybe the

9    radar that should have been if she had been assessed in

10   childhood.

11     Q    And then -- you can put that one back.  And

12   then it's Exhibit 4.

13     A    Yes.

14     Q    And I'm on the third page in the bottom left

15   paragraph, the first sentence:  "The single most

16   important part of a comprehensive ADHD evaluation is a

17   structured or semi-structured interview which provides a

18   detailed history of the individual."

19     A    Uh-uh.

20     Q    Would you say you agree with that statement?

21     A    I would.

22          There are times when an evaluation, a formal

23   evaluation is necessary.  But you technically can make a

24   solid diagnosis from a comprehensive semi-structured

25   interview.  It's a good measure to also get outside

1    collateral information.

2          But we certainly -- it could be

3    cost-prohibitive to say we can't make this diagnosis

4    without a battery of tests that are thousands of dollars

5    and very time-consuming.

6       Q    And then I have one last question.  This one

7    might be 7.

8       A    Yes.

9       Q    Okay.  And on the third page under where it's

10   categorizing mild, moderate, severe, that first

11   sentence:  "It is also important to note that the

12   severity level and presentation of ADHD can change

13   during a person's lifetime."

14          Would you say you agree with that statement?

15      A    Yes.  That is true.  I do agree with that.

16      Q    And what would cause the severity and

17   presentation level to change?

18      A    There could be a lot of external factors.  For

19   example, if you put somebody in a situation where there

20   are higher requirements for sustained attention, such as

21   the case with studying or taking a standardized exam,

22   you can see where that aversiveness that comes up for a

23   person with ADHD is really exhausted and then the

24   symptoms can actually worsen.

25          MS. COLLINS:  Okay.  I have nothing else.

```
 1                   REDIRECT EXAMINATION

 2   BY MR. BURGOYNE:

 3       Q    A couple quick follow-ups for you.

 4       A    Uh-uh.

 5       Q    You never actually at the time assigned a

 6   different GAF score to Elizabeth Black, did you?

 7       A    No.  That's not something that I went back and

 8   I did.

 9       Q    Let me make sure I understand that.

10            You're saying that you would assign her, in

11   retrospect, Level 40?

12       A    Between those 40s and 50s in that she was

13   having serious impairment in keeping up with medical

14   school.

15       Q    Was there any difference between the day she

16   arrived and the day you concluded your therapy sessions

17   in terms of the difficulty she was experiencing at

18   medical school?

19       A    Yeah.  That first day, as a pleaser, she came

20   across as having difficulties, and she did explain those

21   difficulties and the history.  But we weren't able to

22   get into the heart of what was actually happening as far

23   as the difficulties.

24            So as time went on and the time crunch

25   increased, she was really experiencing a complete
```

1    derailment where she would have an entire day that was

2    lost.

3        **Q    Isn't that why she came to you in the first**

4    **place, because she was having those problems?**

5        A    She was.  However, she came saying, "I want

6    more work/life balance, but I'm also having this really

7    significant struggle that relates to work/life balance."

8            So she kind of came with more idealistic goals.

9    But as we peeled back, there was clearly specific issues

10   that were impacting her.

11       **Q    Let's look at 50 in the GAF scale.**

12       A    Uh-uh.

13       Q    That's "Serious symptoms (e.g., suicidal

14   ideation, severe obsessional rituals, frequent

15   shoplifting) or any serious impairment in social,

16   occupational or school functioning (few friends, unable

17   to keep a job)."

18            Do any of those things accurately characterize

19   Elizabeth?

20       A    So that "e.g." is "for example."

21       **Q    Right.**

22       A    And so like I said, she wasn't experiencing

23   suicidal ideation.  But her specific difficulties were

24   seriously impairing her in her occupational, or in this

25   case school functioning, to the point where her goal of

1    being a medical student was in jeopardy.

2        Q    Would you have concerns if somebody -- or how

3    do you visualize Elizabeth practicing medicine if you

4    assign those levels of impairment to her in dealing with

5    stress and attention and distractibility?

6        A    I couldn't make that determination because I

7    was seeing her at one specific snapshot in time.  And

8    although you have pressure as a physician, you certainly

9    don't have the same demands as far as studying for a

10   test and having to kind of sit through eight hours of

11   testing, or whatever you said.

12       Q    Did you see those stressors impacting her in

13   any context other than preparing for this test?

14       A    In her past or the present?

15       Q    In her past.  Well, when you were seeing her.

16       A    Yes.  She did describe really debilitating

17   procrastination behaviors, which she was actually having

18   kind of memories from those times, which was compounding

19   her difficulties, such as her thesis, sitting for the

20   MCAT.  And she talked about kind of in general her GPA

21   took a hit in college.

22       Q    She had a 3.8 in her postbaccalaureate program.

23            Why wasn't she experiencing those kinds of

24   debilitating procrastination tendencies at that time?

25       A    So she could have been.  However, sometimes the

```
 1   outcome on one's report card is not necessarily a

 2   reflection of the patient because we don't know the

 3   angst that one had to go through to get that.

 4          For her, she talked about, "I always get there

 5   in the clutch," which reflects how she could have been

 6   still procrastinating a great deal in that program.  It

 7   could have been a cost to her mental health because

 8   she's so bright as far as -- she's not somebody that I

 9   suspect has any kind of intellectual impairment.  I

10   think that also compensated.

11      Q    And you don't have any factual basis for that.

12   That's just a possible explanation for what's going on

13   at the time?

14      A    Sure.

15          MR. BURGOYNE:  No further questions.

16          MS. COLLINS:  I don't have anything.

17          MR. LAMB:  They're going to transcribe this,

18   and you have the right to read it.  I would

19   encourage you to read it if it's ordered because

20   it's going to probably be read or provided to the

21   court in lieu of -- it's not really a discovery

22   deposition.

23          So she'll read.

24          MR. BURGOYNE:  Okay.

25          THE COURT REPORTER:  Mr. Burgoyne, would you
```

1          like to order?

2               MR. BURGOYNE:  Yes, please.

3               THE COURT REPORTER:  Ms. Collins, would you

4          like a copy?

5               MS. COLLINS:  Yes please.

6               (Proceedings concluded at 10:31 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3      STATE OF FLORIDA)

 4      COUNTY OF HILLSBOROUGH)

 5

 6              I, MICHELE COBURN, Court Reporter and Notary

 7      Public, do hereby certify that I was authorized to and

 8      did stenographically report the foregoing deposition;

 9      that a review of the transcript was not requested; and

10      that the transcript is a true record of my stenographic

11      notes.

12

13              I further certify that I am not a relative,

14      employee, attorney, or counsel of any of the parties'

15      attorneys or counsel connected with the action, nor am I

16      financially interested in the action.

17

18              Dated:  May 19, 2017.

19

20

21

22                          Michele Coburn
                            _____
23                          MICHELE COBURN

24

25
```

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA)

 4    COUNTY OF HILLSBOROUGH)

 5

 6             I, MICHELE COBURN, Notary Public, State of

 7    Florida, certify that the witness, ASHLEY VIGIL-OTERO,

 8    Psy.D., personally appeared before me on the 16th day of

 9    May, 2017, and was duly sworn.

10

11             WITNESS my hand and official seal this 19th

12    day of May, 2017.

13

14

15

16

17

18                           MICHELE COBURN
                             Notary Public
19                           State of Florida
                             Commission # FF169882
20                           My Commission Expires:  11/21/18

21

22

23

24

25
```

```
 1                        ERRATA SHEET

 2     IN RE:  BLACK VS. NBME

 3     DEPOSITION OF:  ASHLEY VIGIL-OTERO, Psy.D.
       TAKEN:   MAY 16, 2017
 4
       DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
 5
       Please sign, date and return this sheet to our office.
 6     If additional lines are required for corrections, attach
       additional sheets.
 7
       At the time of the reading and signing of the
 8     deposition, the following changes were noted:

 9     PAGE  LINE  CHANGE                 REASON

10     ----  ----  -------------------------------------

11     ----  ----  -------------------------------------

12     ----  ----  -------------------------------------

13     ----  ----  -------------------------------------

14     ----  ----  -------------------------------------

15     ----  ----  -------------------------------------

16     ----  ----  -------------------------------------

17     ----  ----  -------------------------------------

18     ----  ----  -------------------------------------

19     ----  ----  -------------------------------------

20     ----  ----  -------------------------------------

21     Under penalty of perjury, I declare that I have read my
       deposition and that it is true and correct, subject to
22     any changes in form or substance entered here.

23
       SIGNATURE OF ASHLEY VIGIL-OTERO, Psy.D.
24     _____

25     DATE: _____
```

```
 1                              LETTER

 2
         May 19, 2017
 3
         Ashley Vigil-Otero, Psy.D.
 4       200 South Hoover Boulevard, Suite 165
         Tampa, Florida  33609
 5       drashleyvigil@gmail.com

 6       IN RE:  Black vs. NBME

 7       Dear Dr. Vigil-Otero:

 8       In reference to your deposition taken in the
         above-styled case on May 16, 2017, you reserved the
 9       right to read and sign your deposition transcript.

10       We have enclosed the original errata page with a copy of
         the transcript so you may read and sign.  Please make
11       whatever changes are necessary on the enclosed errata
         page.  Once you have made the corrections and signed at
12       the bottom, please forward the original errata page back
         to our office at 1080 Woodcock Road, Suite 100, Orlando,
13       Florida 32803.

14       If the errata page is not signed within 30 days after
         this letter has been furnished, we will then process the
15       transcript without a signed errata page.  If you wish to
         waive your right to read and sign the transcript, please
16       sign at the bottom of this letter and return it to our
         office.
17
         Your prompt attention to this matter is appreciated.
18

19       Sincerely,

20       Michele Coburn

21
         I do hereby waive my right to read and sign.
22

23       _____
         Ashley Vigil-Otero, Psy.D.
24
         cc:  Robert A. Burgoyne, Esquire
25            Megan Collins, Esquire
```