```
 1   IN THE UNITED STATES
     DISTRICT COURT FOR
 2   THE MIDDLE DISTRICT
     OF FLORIDA
 3   TAMPA DIVISION

 4   CASE NO.:   8:16-cv-2117-T-23TGW

 5

 6

 7

 8   ELIZABETH A. BLACK,

 9              Plaintiff,

10   -vs-

11   NATIONAL BOARD OF MEDICAL EXAMINERS,

12              Defendant.

13   --------------------------------------/

14

15

16   DEPOSITION OF:   ELIZABETH ANN BLACK

17   DATE TAKEN:      May 17, 2017

18   TIME:            8:06 a.m.

19   PLACE:           Thompson, Sizemore,
                        Gonzalez & Hearing, P.A.
20                    201 North Franklin Street, Suite 1600
                      Tampa, Florida   33602
21
     REPORTED BY:     Michele Coburn
22                    Professional Court Reporter

23

24              (Volume I, Pages 1 - 101)

25
```

```
 1   APPEARANCES:

 2

     CURTIS FILAROSKI, ESQUIRE
 3        Disability Rights Florida
          2473 Care Drive, Suite 200
 4        Tallahassee, Florida  32308
          850-488-9071
 5        850-488-8640
          CurtisF@DisabilityRightsFlorida.org
 6   -and-
     MEGAN COLLINS, ESQUIRE
 7        Disability Rights Florida
          1930 Harrison Street, Suite 104
 8        Hollywood, Florida  33020
          850-488-9071
 9        850-488-8640
          MeganC@DisabilityRightsFlorida.org
10
               APPEARING ON BEHALF OF THE PLAINTIFF
11

12   ROBERT A. BURGOYNE, ESQUIRE
          Norton Rose Fulbright US, LLP
13        799 9th Street NW, Suite 1000
          Washington, D.C.  20001-4501
14        202-662-4513
          robert.burgoyne@nortonrosefulbright.com
15
               APPEARING ON BEHALF OF THE DEFENDANT
16        (Pro Hac Vice)

17
     BENJAMIN W. BARD, ESQUIRE
18        Thompson, Sizemore, Gonzalez & Hearing, P.A.
          201 North Franklin Street, Suite 1600
19        Tampa, Florida  33602
          813-273-0050
20        813-273-0072
          bbard@tsghlaw.com
21
               APPEARING ON BEHALF OF THE DEFENDANT
22

23   ALSO PRESENT:

24        Ann Marie Cintron-Siegel,
          Director of Advocacy, Education and Outreach
25        Disability Rights Florida
```

Elizabeth A. Black vs National Board of Medical Examiners
ELIZABETH ANN BLACK VOLUME I on 05/17/2017

Page 9

```
                    ELIZABETH ANN BLACK,
   having been duly sworn, was examined and testified upon
   her oath as follows:
              THE WITNESS:  Uh-uh.
                       DIRECT EXAMINATION
   BY MR. BURGOYNE:
       Q   Elizabeth, as I mentioned, my name is Bob
   Burgoyne, and I'm one of the attorneys for the National
   Board of Medical Examiners.  As you know, we're here
   today for your deposition in the lawsuit you've brought
   against NBME.
              If I ask you any questions today that you don't
   understand, will you make a point of asking me to frame
   it in a better way, a more intelligible way?
       A   Yeah.
       Q   And will you make a point of answering with
   words, not nods so that the court reporter --
       A   Yes.  Sorry.
       Q   Oh, that's all right, if you haven't been
   through this before.
              Could you state your full name for the record?
       A   Elizabeth Ann Black.
              I apologize.  I have a cold, so --
       Q   Not a problem.
       A   That's why my voice is --
```

1  under both?
2      A   I think it's still -- I do qualify under both.
3  I was diagnosed under both.
4      Q   Right.
5      A   My initial diagnosis was under the DSM-IV in
6  2009, I believe.
7      Q   Dr. Fleischer?
8      A   Dr. Fleischer.  So that was very much DSM-IV.
9          I don't -- I don't know if Dr. Booth-Jones is
10 DSM-IV or V.  I think she was maybe DSM-V, actually.
11         So I've been diagnosed under both.  So, yes.  I
12 fit those categories.  However, based on what the
13 national board keeps saying, it was significant enough
14 to include in my -- the difference between DSM-IV and V
15 is significant enough to raise a question as to why they
16 keep using DSM-IV.
17     Q   Okay.
18     A   But again, do you have the definitions?
19     Q   Mercifully for you, not in your documents.
20 We've had other professionals who have testified about
21 the DSM, the differences between the two.
22     A   Right.  No.  I could look up the actual
23 definitions.
24     Q   Yeah.  Not to worry.
25         You mentioned Dr. Fleischer and

```
 1   Dr. Booth-Jones.
 2        Are those the two professionals who have
 3   diagnosed you with ADHD?
 4        A    Yes.  Done official testing and diagnoses.
 5   Yes.
 6        Q    Okay.  When did you first start taking
 7   prescription medications to deal with any anxiety or
 8   distractibility issues?
 9        A    From Dr. Fleischer.  So the spring of 2009.
10        Q    Okay.  And we'll look at some documents.
11             March of 2009, roughly?
12        A    Yes.
13        Q    Okay.
14        A    I believe so.
15        Q    And he was the first physician to prescribe any
16   medications for you?
17        A    Uh-uh.  I probably took them for -- I don't
18   know when they stopped, but until I took the MCAT.
19        Q    Okay.
20        A    So probably three to five months max.  No.
21   Three months probably.  I don't know.
22        Q    Prior to that had you ever taken any
23   medications that had been prescribed for others?
24        A    For other people?
25        Q    Yes.
```

1  Q   So on Page 4 is this a complete and accurate
2  list of the healthcare professionals who you consulted
3  regarding ADHD issues?
4  A   Yes.  I believe so.
5  Q   All right.  In Response 5 you state that you
6  "addressed the functional limitations that you
7  experienced as a result of ADHD through maintaining a
8  highly-structured setting in my younger years and
9  engaging in structured activities such as
10 extracurricular sports"?
11 A   Yes.
12 Q   How did extracurricular sports provide a
13 structured environment?
14 A   Well, they're about the same time every day.
15 They require you to maintain a structured schedule of
16 sleep, eating and all of that stuff, in addition to the
17 fact that a variety of studies have been done that have
18 shown that exercise and being outside is just as
19 effective as medication.
20 Q   For ADHD?
21 A   Uh-uh.  Yes.
22 Q   Okay.
23 A   So we were all very active, and the majority of
24 my childhood was outside.
25 Q   Okay.  I take it Princeton had a very

1      Q   Who is Abigail Saneholtz?

2      A   A counselor at USF that I think I referenced

3  before.  You only get so many sessions with a person.

4  People come here to finish their training.  So all these

5  people are finishing their -- they usually stay for a

6  little bit and move along.

7          So she was the person I guess I saw after

8  Dr. Sales.  And I think I get -- like I don't know if it

9  was six sessions or some sort of set amount.  But it's

10 not, "Oh, hey, you're going to keep coming here for

11 years."  She must have been the next one in July of

12 2012.

13     Q   Okay.  And she's someone else you were seeing

14 just for general counseling purposes?

15     A   Yeah.

16         I think it was probably Dr. Sales -- and this

17 might be completely inaccurate -- that referred me to

18 Dr. Vigil-Otero.

19     Q   We saw her yesterday.  She said it was

20 Dr. Saneholtz.

21     A   It was one of the ones with the Ss.  There we

22 go.

23     Q   All right.  And Dr. Saneholtz never conducted

24 any evaluations of you for determining whether she would

25 provide a diagnosis of ADHD?

1   A    No.  She -- no.  None of them did.
2   Dr. Vigil-Otero didn't.  None of these people did.
3        Q    All right.  Was Dr. Saneholtz one of the
4   individuals who you saw for one of the more extended
5   periods?
6        A    I don't know.
7        Q    You don't know?  Okay.
8        A    When did her notes stop?
9        Q    It looks like the last one for her is March
10  7th, 2013.  It's Page 196.
11       A    So it seems like I saw her longer than
12  Dr. Sales then.
13       Q    Yeah.  That was my sense from looking at the
14  records.
15       A    I can't -- I don't -- I would be going off of
16  the same records you're going off of in terms of timing
17  and I'm out.
18       Q    Okay.  And again, this is the first time you've
19  ever seen these notes as well?
20       A    Yes.
21            It looks like I saw her once a month.  I
22  definitely didn't see anyone very consistently.  And it
23  was probably once a month to just have a check-in, like
24  I was saying before, to have someone to be accountable
25  to.

CERTIFICATE OF REPORTER

STATE OF FLORIDA)
COUNTY OF HILLSBOROUGH)

      I, MICHELE COBURN, Court Reporter and Notary Public, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.

      I further certify that I am not a relative, employee, attorney, or counsel of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

      Dated: May 24, 2017.

*Michele Coburn*
MICHELE COBURN

CERTIFICATE OF OATH

STATE OF FLORIDA)
COUNTY OF HILLSBOROUGH)

    I, MICHELE COBURN, Notary Public, State of Florida, certify that the witness, ELIZABETH ANN BLACK, personally appeared before me on the 17th day of May, 2017, and was duly sworn.

    WITNESS my hand and official seal this 24th day of May, 2017.

*Michele Coburn*
MICHELE COBURN
Notary Public
State of Florida
Commission # FF169882
My Commission Expires: 11/21/18

MICHELE COBURN
Notary Public - State of Florida
My Comm. Expires Nov 21, 2018
Commission # FF 169882
Bonded through National Notary Assn.