Atkinson-Baker Court Reporters
www.depo.com

1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF FLORIDA

3              TAMPA DIVISION

4

5   ELIZABETH A. BLACK,                **CERTIFIED COPY**

          Plaintiff           :

6                              :

      vs.                      :No.

7                              :8:16-cv-02117-T-23TGW

8   NATIONAL BOARD OF MEDICAL   :
    EXAMINERS,                   :

9          Defendants          :

10                             :
    ------------------------------x

11

12

13

14              DEPOSITION OF

15            DR. KEVIN MURPHY

16        PHILADELPHIA, PENNSYLVANIA

17            May 11, 2017

18

19

20

ATKINSON-BAKER, INC.
21  COURT REPORTERS
    (800) 288-3376
22  www.depo.com

23

    REPORTED BY:  PATRICIA BROWN
24

    FILE NO.  AB03C78
25

Atkinson-Baker Court Reporters
www.depo.com

```
 1              UNITED STATES DISTRICT COURT

 2              MIDDLE DISTRICT OF FLORIDA

 3                    TAMPA DIVISION

 4                              :

 5   ELIZABETH A. BLACK,        :
                                :
 6              Plaintiff       :
                                :Civil Action No.
 7         vs.                  :8:16-cv-02117-T-23TGW
                                :
 8                              :
     NATIONAL BOARD OF MEDICAL  :
 9   EXAMINERS,

10              Defendants
     ------------------------------x
11

12

13

14

15

16

17      Deposition of DR. KEVIN MURPHY, taken on behalf

18   of Defendants, at 3750 Market Street, Philadelphia,

19      Pennsylvania 19104, commencing at 8:07 a.m.

20    Thursday, May 11, 2017, before Patricia Brown.

21

22

23

24

25
```

2

```
 1                    A-P-P-E-A-R-A-N-C-E-S
 2          FOR PLAINTIFF:
            LAW OFFICES OF DISABILITY RIGHTS FLORIDA
 3          BY:   MEGAN COLLINS, Esq.
            1930 Harrison Street
 4          Suite 104
            Hollywood, Florida 33020
 5          Phone #850-488-9071
            E-mail: MeganC@DisabilityRightsFlorida.org
 6
            LAW OFFICES OF DISABILITY RIGHTS FLORIDA
 7          BY:   CURTIS FILAROSKI, Esq.
            2473 Care Drive
 8          Suite 200
            Tallahassee, Florida 32308
 9          Phone #850-488-9071
            E-mail: CurtisF@DisabilityRightsFlorida.org
10
            LAW OFFICES OF DISABILITY RIGHTS FLORIDA
11          BY: ANN MARIE CINTRON-SIEGEL, Esq.
            1930 Harrison Street
12          Suite 104
            Hollywood, Florida 33020
13          Phone# 850-488-9071
            E-mail: AnnS@DisabilityRightsFlorida.org
14
              FOR DEFENDANTS:
15          LAW OFFICES OF NORTON ROSE FULBRIGHT
            BY: ROBERT A. BURGOYNE, Esq.
16          799 9th Street, NW
            Suite 1000
17          Washington, DC 20001
            Phone# 1-202-662-4513
18          E-mail:robert.burgoyne@nortonrosefulbright.
            com
19
20          NATIONAL BOARD OF MEDICAL EXAMINERS
            BY: SUZANNE WILLIAMS, Esq.
21          3750 Market Street
            Philadelphia, Pennsylvania 19104
22          Phone# 215-590-9538
            E-mail: Swilliams@nbme.org
23
24
25
```

Atkinson-Baker Court Reporters
www.depo.com

```
1                    I N D E X

2    WITNESSES:  DR. KEVIN MURPHY

3         EXAMINATION                      PAGE

4       By MS. CINTRON-SIEGEL              5
        By MR. BURGOYNE                    128
5

6
                   E X H I B I T S
7
     NUMBER              DESCRIPTION            PAGE
8
     No. 1  CV= KRM 1-24 (Confidential)        54
9    No. 2  Request for test accommodations
                     (Confidential)            56
10   No. 3  Results submitted on 12-29-14
                     (Confidential)            63
11   No. 4  Request for test accommodations
                     (Confidential)            84
12   No. 5  View results (Confidential)        98
     No. 6  Test results & clinical impressions
13                   (Confidential)            113

14

15

16           INSTRUCTIONS NOT TO ANSWER:

17              PAGELINE

18              --              --

19

20           INFORMATION REQUESTED:

21              (None)

22

23

24

25
```

4

Dr. Kevin Murphy
May 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1                PHILADELPHIA, PENNSYLVANIA,

 2            Thursday, May 11, 2017; 8:07 a.m.

 3                        -  -  -

 4                      EXAMINATION

 5   BY MS. CINTRON-SIEGEL:

 6   Q.     Good morning, Dr. Murphy.

 7   A.     Good morning.

 8   Q.     I'm Ann Siegel.  And I'm an attorney with

 9   Disability Rights Florida.

10                 Would you state your name for the

11   record.

12   A.     Dr. Kevin Murphy.

13   Q.     Have you ever been deposed?

14                 (Discussion held off the record.)

15                 DR. KEVIN MURPHY

16             having first been duly sworn, was

17             examined and testified as follows:

18                        -  -  -

19   BY MS. CINTRON-SIEGEL:

20   Q.     All right.  Have you ever been deposed before?

21   A.     Yes.

22   Q.     And how many times?

23   A.     Hard to say for sure.  It's been over a number

24   of years but I would guess four or five.

25   Q.     Has it been recently?
```

5

Dr. Kevin Murphy
May 11, 2017

1   A.    Yes.

2   Q.    Do you believe there's an increase in

3   individuals being diagnosed with ADHD?

4   A.    No.

5   Q.    Why not?

6   A.    Because ADHD is a condition that is

7   underdiagnosed, overdiagnosed and misdiagnosed.  So

8   it's a very hard thing to do in a reliable way.

9   There's a lot of clinicians that don't understand

10  how to do a good evaluation.  So, I think that

11  depending on who's doing the evaluation, there's

12  always potential for misdiagnosis, overdiagnosis or

13  underdiagnosis.

14  Q.    And do all individuals with ADHD present in

15  the same manner?

16  A.    No.

17  Q.    What would typically be expected of someone

18  with ADHD?

19  A.    Longitudinal course of developmental deviant

20  problems in major life activities.  For example,

21  difficulty in school early on.  Typically, you would

22  see a child with ADHD having problems in school with

23  either academic underachievement, variable grades,

24  teacher comments that would be a testament to the

25  developmental deviance of their problems with self

20

Dr. Kevin Murphy
May 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1    control.  Comments such as, you know, Johnny's not
 2    working up to his potential.  He's easily
 3    distracted.  He didn't hand the homework assignment
 4    in.  He won't keep his hands to himself.  He zones
 5    out in class.  He does not follow directions.  Is
 6    disruptive in class.  So you would see typically
 7    patterns.  And that's the other thing that's
 8    important.  Is that in a case of ADHD, we're looking
 9    for patterns.
10              We're not looking for one isolated
11    comment or one content issue over here.  We're
12    talking about teacher comments that tend to persist.
13    And the 5th grade teacher says the same thing as the
14    6th grade teacher and the 7th grade teacher, and
15    there's persistence.  So we would see what I like to
16    call footprints in the sand along the way of
17    somebody who has a developmental disorder that is
18    defined by difficulty compared to same age peers.
19    It's usually not difficult to see the deviant
20    patterns that go on.
21              So we would see school problems early
22    on that persist into adolescence, into high school,
23    into college.  And a lot of the research that we've
24    done that we've seen that, you know, 32 percent of
25    the cohort that we study didn't finish high.  And
```

21

Dr. Kevin Murphy
May 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1  five percent of a group didn't, you know, finished

 2  college.  It puts up significant challenges to

 3  people in an academic realm.

 4            So we see early manifestations of

 5  that, teacher, comments, grade variability.  We see

 6  difficulty in transition to adult life with doing

 7  life effectively.  Work place issues, being tired,

 8  being -- having tendencies to be laid off and fired

 9  more frequently than other people.  Trouble with

10  supervisors, impulsivity, arguments.  Trouble in

11  marriages.  Trouble in parenting.  Trouble in

12  managing money.  Trouble in a lot of different

13  aspects of functioning.

14            And it tends to persist over time and

15  across situations.  And it's very frustrating to

16  people, especially people who are smart, who have

17  frustration that I should being doing better, but I

18  would if I could, but I can't.  That's how it feels

19  inside.  I'd like to be able to do my homework.  I

20  would like to be able to follow through.  I would

21  like to be able to do better.  But no matter how

22  hard I try, it doesn't really work out.

23            So it overpowers their ability to

24  compensate.  That's what makes it a disorder.  And

25  it's usually resulting in observable documented
```

22

Dr. Kevin Murphy
May 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    evidence of deviance that is clinically significant.

2    And that's what we're always looking for trying to

3    validate the diagnosis.

4    Q.    In your practice do you do any school like K

5    through 12 evaluations?

6    A.    I do not see children.  I will occasionally

7    see high school kids, juniors and seniors.  I think

8    my cut off is roughly 15 or 16.  I won't see anybody

9    younger than that.

10   Q.    So at any time previous to the adult clinic

11   did you do any assessments, evaluations of younger

12   kids in the school system?

13   A.    No.

14   Q.    In any of your studies, do you look at the K

15   through 12 system at all, students in the K through

16   12 system?

17   A.    Not in any research that I do.  Again I am not

18   a child psychologist.  I'm an adult psychologist.

19   So I didn't do any research with children.

20   Q.    Could a person with ADHD and you say it

21   affects them across all settings, could the

22   symptomology be more prevalent at work than at home?

23   A.    Yes.

24   Q.    I'm going to assume since you said that --

25   well, let me ask you.  It's dangerous to assume

23

Dr. Kevin Murphy
May 11, 2017

1    A.    Again, I consider all the data in a file and

2    try to take into account everything including what

3    you just mentioned.  But when we're talking about

4    the magnitude of impairment in a clinical diagnosis

5    that is by definition something that is very

6    different than a normal functioning.  If there are

7    no -- if there's no evidence of impairment, if

8    there's stellar performance across the board in

9    school.  If there are no teacher comments.  If there

10   are no problems with standardized tests in the past,

11   that conveys a lot to me that it's not rising to a

12   level of a magnitude of problems that would warrant

13   a diagnostic label or a label of a disability.  So,

14   again I go back to that and to look at the totality

15   of documentation and try to consider everything.

16   Q.    And what would you consider stellar

17   performance?

18   A.    Unimpaired performance in life, in school,

19   decent grades.  And again one of the things I think

20   we want to talk about is this specific case because

21   we're talking more generalities I think here.

22              In this particular case when I look at

23   the history of Ms. Black, she did extremely well in

24   school.  She got almost all A's in high school.  She

25   had no evidence of early onset of any kind of

42

1    problems that were significant.  She did well enough

2    to get into Princeton University, one of the most

3    competitive colleges in the county.  She did high

4    average to above average on the SAT.  She scored in

5    the average to high average range on the MCAT.  She

6    earned almost a 3.2 grade point average at a

7    competitive college, Princeton, while playing

8    division one sports.  She got into medical school.

9    And there was no evidence -- the history that she

10   presented flies in the face of somebody who has a

11   developmentally deviant disorder that's affected

12   them more times and across situations.

13   Q.    And the grades especially I will tell you

14   elementary through grades are subjective.  In my

15   review of documents I have seen students who get

16   grades that in my opinion are gifted.  Not that the

17   student isn't gifted, but the grade was a gift.

18   Because I've seen other students turn in the same

19   quality of work and not.

20              So grades can be suspect especially if

21   a teacher sees that one tries harder and has to work

22   harder for that.  A grade is not an end all be all

23   indicator really of your functioning, and that I

24   guess is why they came up with this idea of

25   standardized testing which again is a whole other

Atkinson-Baker Court Reporters
www.depo.com

1    when you were doing your initial review for

2    Ms. Black in 2014?

3    A.    Yes.

4                 MR. BURGOYNE:   I'm assuming this is

5         the complete set, but yes.

6                 But I haven't looked through it to see

7         that everything's there, but assuming it is,

8         yes.

9                 MS. CINTRON-SIEGEL:   You went all

10        through all my copy of it.

11                MR. BURGOYNE:   Yes.

12                MS. CINTRON-SIEGEL:   That's one of.   I

13        actually have two of them.

14                MR. BURGOYNE:   Okay.

15                (Document handed to counsel, then to

16        witness.)

17   BY MS. CINTRON-SIEGEL:

18   Q.    And after you reviewed that packet, what was

19   your recommendation?

20   A.    My recommendation was to deny the

21   accommodation request.

22   Q.    And why did you recommend denying?

23   A.    I wrote a report to explain all the reasoning

24   for that.   But basically the reason was because the

25   documentation did not in my opinion substantiate a

57

Dr. Kevin Murphy
May 11, 2017

1    history of ADHD, a current ADHD diagnosis, a

2    disability under the ADHD's definition of

3    disability, and there was no basis to recommend

4    accommodation.

5    Q.    Were there more documents that you would have

6    requested or needed to --

7    A.    Well, I pointed out that she did not provide

8    certain evidence that could have been provided.

9    This was a very -- not a lot of documentation was

10   provided in this first request.  So I didn't see, it

11   was very inadequate in my opinion to substantiate a

12   diagnosis or a disability or the provision of

13   accommodation.  There was a lot of problems with it

14   that I pointed out in my report.

15   Q.    Did you happen to ask for any other documents

16   from NBME?

17   A.    No.

18   Q.    And in that packet I believe is Ms. Black's

19   psychoeducational evaluation from Dr. Booth Jones.

20   What were your impressions of her evaluation?

21   A.    I did not think her evaluation was sufficient

22   to substantiate a diagnosis or the need for

23   accommodations.

24   Q.    And why not?

25   A.    Because the report basically -- the diagnosis

Dr. Kevin Murphy
May 11, 2017

1   was based on essentially self report, symptom

2   endorsement on an ADHD rating scale and test scores

3   that are not diagnostic for ADHD.  So she did not

4   substantiate the diagnosis.  I did not think that

5   she substantiated childhood onset of symptoms or

6   impairment.  I did not think that she illuminated or

7   established the chronic and pervasive nature of the

8   symptoms and impairment over time and across

9   situations that were consistent with ADHD.  I don't

10  think she explained adequately how Ms. Black could

11  have done as well as she had done without any kind

12  of accommodations or treatment up through the point

13  of her MCAT which is when she initially requested

14  the accommodations.  So it just was not the kind of

15  comprehensive report that's necessary to establish a

16  diagnosis or a disability for a lot of reasons in my

17  opinion.

18  Q.    And if Ms. Black had come to you to evaluate,

19  and what would you have done differently?

20  A.    I would have asked her for all of her school

21  records.  I would have asked her for report cards

22  from K through 12, college, graduate school.  I

23  would have asked her to talk with a collateral

24  informant who knew her well.  That hadn't been done

25  initially here with Dr. Booth Jones.  A parent, for

59

1  A.    No.

2           And again she may have had symptoms of

3  ADHD that were observed, but that's not enough for a

4  diagnosis or a disability.  We all have symptoms of

5  ADHD.  They're common to human nature.  Where they

6  become a disorder is when they are developmentally

7  deviant, when they interfere, when they mess things

8  up, when they impair someone's functioning.  And

9  this again very little evidence.  No evidence in my

10 opinion that this is rising from that level.

11 Q.    If you would go to the -- it looks like the

12 page behind it, Exhibit E brings us to KRM 154.  And

13 this is from a Robert N. Rodger, PhD.  And in this

14 it is alleging that she's being -- sought treatment

15 for anxiety related concerns and intentional and

16 academic concerns.  Does that not support a

17 diagnosis for ADHD?

18 A.    Not in my opinion, no.  The reason for that is

19 if you look at the content of all of those -- the

20 fact that somebody seeks help for psychological

21 diagnosis is very common.  Many people seek

22 therapist for personal growth reasons, for anxiety,

23 for depression, for all kinds of different reasons.

24 And when you read through the notes here, the flavor

25 of the issues that she was seeking help for were

90

1   largely based on anxiety, adjusting to medical

2   school, being not particularly comfortable with

3   medical school.  Wondering career-wise if she made

4   the right choice.  Ambivalence about being in

5   medical school.  Wondering if she would rather be

6   down in the Dominican Republic doing her work down

7   there.  There was a lot of ambivalence.  A lot of

8   quotes from her doctors about her difficulty

9   adjusting to Tampa.  Her medical school cohort being

10  younger than she was.  Relationship stuff with

11  boyfriends.  There was nothing about ADHD like

12  stuff.  This was much more anxiety, adjustment,

13  medical school, career, personal adjustment to her

14  situation.  So I didn't see that as being evidence

15  that she's (A) disabled or (B) reflective of having

16  ADHD.

17          One of her diagnosticians even went as

18  far to say that he wondered if she was unconsciously

19  sabotaging herself because she didn't really want to

20  be a doctor.

21  Q.    If you could move to KRM 089.

22  A.    89 before this or after?

23  Q.    No, it's actually after.  It comes in under

24  Exhibit F.

25  A.    Okay.

Atkinson-Baker Court Reporters
www.depo.com

1    just rephrase it, please.

2    Q.    What is the considered professional standard

3    in diagnosing ADHD?

4    A.    Establishing whether the symptoms of ADHD that

5    define it in the DSM are present.  Are they present

6    to developmentally deviant levels.  Is there a

7    childhood onset of the symptoms because it's

8    considered a developmental problem that starts by

9    definition in childhood or early adolescence.  Is

10   there evidence to show that the symptoms are

11   producing clinically significant impairment that is

12   problematic and developmentally deviant through the

13   course of one's life.

14           ADHD doesn't suddenly go away.  It

15   tends to persist over time and across situations.

16   So we're looking at, are the symptoms there.  Are

17   they there to a greater extent than other people who

18   don't have ADHD.  Are they producing impairment in

19   school, in work, in social functioning, in executive

20   functioning and daily adaptive functioning, in time

21   management and doing day-to-day life.  What's the

22   evidence for that.  And is there any better

23   explanation for the symptoms than ADHD.  Because

24   ADHD like symptoms can be caused by a lot of

25   different things.

                                                          99

Dr. Kevin Murphy
May 11, 2017

1   Q.     Like what?

2   A.     Anxiety, depression, substance abuse,

3   situational stressors, medical conditions, marital

4   problems, transient circumstances that might be

5   brief.  A whole range of things.

6   Q.     And did you find any of those other stressors

7   that could account for Ms. Black's symptoms?

8   A.     Well, her documentation is -- contains

9   discussion about her anxiety.  Some depression

10  symptoms, adjustment issues at school, vocational

11  ambivalence, career ambivalence.  So, yeah, there's

12  a lot of possible reasons she may have been affected

13  in a test situation or in medical school.

14            Plus there are many people who --

15  medical school is not easy.  It requires a different

16  set of skills.  A lot of people who do well, enter a

17  medical school and struggle because they're not

18  necessarily -- they're strength's aren't

19  particularly that cut out for a medical school

20  environment.  So they may struggle.  Not because

21  they have a disability necessarily.  Because the

22  match of their strengths in that environment may not

23  ideal.

24  Q.     Would you expect that from somebody with a

25  high IQ such as Ms. Black has?

100

Dr. Kevin Murphy
May 11, 2017

1    A.    It doesn't -- correlation of high IQ doesn't

2    necessarily make the difference.  There's a lot of

3    other factors that go into it.

4    Q.    Where would we find this diagnostic criteria

5    that you're using?

6    A.    In the diagnostic manual DSM 5.

7    Q.    So when you were evaluating Ms. Black's

8    records, you were using the standards of the DSM 5?

9    A.    Yes.

10   Q.    I think before and I'm trying not to

11   mischaracterize your testimony.  You said that

12   different -- I guess for lack of a better term,

13   different people exhibit symptoms differently under

14   ADHD.

15   A.    Yes.  There's different subtypes of ADHD.

16   Q.    Is there any difference in how it effects

17   males versus females?

18   A.    According to research very little.  Research

19   suggest that there's really one avenue.  That one

20   area that tends to be more male dominated than

21   female dominated and that is the existence of

22   conduct disorder in adolescence.  Tends to be more

23   male having more conduct disorder problems than

24   females.  But other than that, you will see very

25   similar presentations in males and females.

101

Dr. Kevin Murphy
May 11, 2017

1  Q.    In Exhibit 3.  It would be, 211.

2           MR. BURGOYNE:  Okay.  So, this is the

3  first evaluation?

4  BY MS. CINTRON-SIEGEL:

5  Q.    I wanted to ask a question.  I think there was

6  a statement in there where you said I want to know

7  what is the typical profile of someone struggling

8  with ADHD at the magnitude of a clinical diagnosis

9  of a disability.  I believe that was in your letter,

10  in your December letter.  What did you mean by that?

11  A.    I'm sorry.  I was doing this.

12           I'm sorry can you repeat --

13  Q.    The typical profile I believe because I put it

14  in quotes.  What is the typical profile of someone

15  struggling with ADHD at the magnitude of a clinical

16  diagnosis or a disability?

17  A.    Okay.  I guess I would answer that first by

18  saying not Ms. Black's profile, okay.  The typical

19  presentation I alluded to a little bit earlier was

20  things like parents getting worried about their kid

21  and saying something's wrong.  I'm getting feedback.

22  They're not responding to normal disciplinary

23  things.  I'm worried about them.  The teachers are

24  telling me problematic things about them every year.

25           They're not doing their homework.  I'm

102

Dr. Kevin Murphy
May 11, 2017

1   trying to get them to behave and get out of the

2   house in the morning and not be late, and respond to

3   things, and follow rules, and it's not happening,

4   and I'm frustrated, and this is not right.  My other

5   kids aren't like this.  And we need some help.  And

6   if you look at the school report cards, grades all

7   over the place.  Teacher comments.  They're

8   recommending an evaluation.  I don't want my --

9                MR. BURGOYNE:  Slow down a little bit.

10               THE WITNESS:  All right.

11               MS. CINTRON-SIEGEL:  I think smoke's

12        coming off there.

13               THE WITNESS:  Sorry.  This gets me

14        going.  I'm sorry about that, ma'am.

15               So the typical profile is concern,

16        frustration, normal disciplinary interventions

17        aren't working.  Something's wrong with my kid.

18        Teachers are picking up on it.  There's

19        comments.  There's paper trail.  There's

20        persistence, there's pervasiveness.  There's

21        real impairment that is preventing -- I've

22        mentioned in some of our research, you know,

23        kids dropping out of high school.  Not

24        finishing college, getting fired from jobs, not

25        paying bills, money management.  I've done a

103

Dr. Kevin Murphy
May 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    lot of research to show the pervasive impact in

2    this in a lot of different life areas, and it's

3    a very impairing disorder.  So, we're looking

4    for evidence for that.

5         And when you look at a history like

6    Ms. Black's, it's none of that there.  It's

7    not -- she's not having any of this parent

8    concern.  A couple of comments on her

9    elementary school records that are very common

10   to children.  That isn't rising to a level of a

11   pattern or an impact that's preventing her from

12   achieving.

13        So when I say she doesn't have a

14   typical profile, if you -- and I think -- if

15   you knew a kid with ADHD and you tracked them

16   and you watched them, if you hang out for a day

17   at a child ADHD clinic and watch what parents

18   are saying in a clinic, they're not having a

19   good old time and waiting for their kid to be

20   evaluated.  It's a heavy thing.  They're

21   worried.  Something's wrong with my kid.

22        There's nothing here in that realm.

23   There's nothing here that rises to that level.

24   There's nothing here that illuminates a picture

25   that is consistent with ADHD.  When you are in

Atkinson-Baker Court Reporters
www.depo.com

1              the trenches and you see what these people do

2              and how they function, hers is more closer to

3              the antithesis of ADHD than anything else in my

4              opinion.

5    BY MS. CINTRON-SIEGEL:

6    Q.      So there's not in your opinion then, there's

7    not different varying degrees of the ADHD?  Everyone

8    has to be at that high magnitude in order to be the

9    person with ADHD?

10   A.      Not necessarily.  So, not everybody has to be

11   on the severe end.  There are other -- but when you

12   make the clinical diagnosis, when your labeling

13   somebody with a diagnostic manual diagnosis, there

14   needs to be evidence.  And sometimes when I do talks

15   and I try to educate clinicians, I will say to them

16   in a case like this, you know, if I'm trying to

17   convince people that Ms. Black has ADHD and the

18   other attorneys on the other side say, Dr. Murphy,

19   on what basis did you label this young lady with

20   ADHD?  After all, she went to -- she got all A's in

21   high school.  She got into Princeton.  She had no

22   early treatment.  She had no efforts that were

23   mediation.  There was no parent concern.  There was

24   no early evaluations.  There was no special

25   education.  There was no tutoring.  There was no

                                                          105

Dr. Kevin Murphy
May 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1                   REPORTER'S CERTIFICATE

 2          I, PATRICIA BROWN, stenographic reporter,

 3     certify:  That the foregoing proceedings were taken

 4     before me at the time and place therein set forth,

 5     at which time the witness was put under oath by me;

 6              That the testimony of the witness, the

 7     questions propounded, and all objections and

 8     statements made at the time of the examination were

 9     recorded stenographically by me and were thereafter

10     transcribed;

11              That a review of the transcript by the

12     deponent was not requested.

13              That the foregoing is a true and correct

14     transcript of my shorthand notes so taken.

15              I further certify that I am not a relative or

16     employee of any attorney of the parties, nor

17     financially interested in the action.

18              I declare under penalty of perjury under the

19     laws of Pennsylvania that the foregoing is true and

20     correct.

21              Dated this 23nd day of May, 2017.

22

23     BY: _____

24                      Patricia Brown

25
```

130

Dr. Kevin Murphy
May 11, 2017