

```
 1   IN THE UNITED STATES
     DISTRICT COURT FOR
 2   THE MIDDLE DISTRICT
     OF FLORIDA
 3   TAMPA DIVISION

 4   CASE NO.:  8:16-cv-2117-T-23TGW

 5

 6

 7

 8   ELIZABETH A. BLACK,

 9              Plaintiff,

10   -vs-

11   NATIONAL BOARD OF MEDICAL EXAMINERS,

12              Defendant.

13   --------------------------------------/

14

15

16

17   DEPOSITION OF:    ASHLEY VIGIL-OTERO, Psy.D.

18   DATE TAKEN:       May 16, 2017

19   TIME:             8:36 a.m.

20   PLACE:            Thompson, Sizemore,
                         Gonzalez & Hearing, P.A.
21                     201 North Franklin Street, Suite 1600
                       Tampa, Florida  33602
22
     REPORTED BY:      Michele Coburn
23                     Professional Court Reporter

24

25
```

```
 1    APPEARANCES:

 2

      MEGAN COLLINS, ESQUIRE
 3         Disability Rights Florida
           1930 Harrison Street, Suite 104
 4         Hollywood, Florida  33020
           850-488-9071
 5         850-488-8640
           MeganC@DisabilityRightsFlorida.org
 6    -and-
      CURTIS FILAROSKI, ESQUIRE
 7         Disability Rights Florida
           2473 Care Drive, Suite 200
 8         Tallahassee, Florida  32308
           850-488-9071
 9         850-488-8640
           CurtisF@DisabilityRightsFlorida.org
10
              APPEARING ON BEHALF OF THE PLAINTIFF
11

12    ROBERT A. BURGOYNE, ESQUIRE
           Norton Rose Fulbright US, LLP
13         799 9th Street NW, Suite 1000
           Washington, D.C.  20001-4501
14         202-662-4513
           robert.burgoyne@nortonrosefulbright.com
15
              APPEARING ON BEHALF OF THE DEFENDANT
16            (Pro Hac Vice)

17
      BENJAMIN W. BARD, ESQUIRE
18         Thompson, Sizemore, Gonzalez & Hearing, P.A.
           201 North Franklin Street, Suite 1600
19         Tampa, Florida  33602
           813-273-0050
20         813-273-0072
           bbard@tsghlaw.com
21
              APPEARING ON BEHALF OF THE DEFENDANT
22

23

24

25
```

```
 1    BRUCE D. LAMB, ESQUIRE
         Gunster
 2       401 East Jackson Street, Suite 2500
         Tampa, Florida  33602
 3       813-222-6605
         813-314-6905
 4       blamb@gunster.com

 5            APPEARING ON BEHALF OF WITNESS

 6
      ALSO PRESENT:
 7
         Ann Marie Cintron-Siegel,
 8       Director of Advocacy, Education and Outreach
         Disability Rights Florida
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

INDEX

|  | PAGE |
|---|---|
| Direct Examination by Mr. Burgoyne | 6 |
| Cross-Examination by Ms. Collins | 67 |
| Redirect Examination by Mr. Burgoyne | 72 |
| Certificate of Reporter | 77 |
| Oath of Reporter | 78 |
| Errata Sheet | 79 |
| Letter | 80 |

EXHIBITS

|   |   | PAGE |
|---|---|------|
| Vigil-Otero Exhibit 1 | Curriculum Vitae | 21 |
| Vigil-Otero Exhibit 2 | Page from Website | 22 |
| Vigil-Otero Exhibit 3 | "Attention Deficit Hyperactivity Disorder" | 26 |
| Vigil-Otero Exhibit 4 | "Diagnosis of ADHD in Adults" | 29 |
| Vigil-Otero Exhibit 5 | "About ADHD" | 34 |
| Vigil-Otero Exhibit 6 | "The ADHD Diagnostic Process" | 35 |
| Vigil-Otero Exhibit 7 | "For Healthcare Professionals" | 36 |
| Vigil-Otero Exhibit 8 | "New Patient Information Form" | 37 |
| Vigil-Otero Exhibit 9 | "Global Assessment of Functioning (GAF) Scale" | 53 |

```
 1                   ASHLEY VIGIL-OTERO, Psy.D.,
 2    having been duly sworn, was examined and testified upon
 3    her oath as follows:
 4              THE WITNESS:  Yes.
 5                        DIRECT EXAMINATION
 6    BY MR. BURGOYNE:
 7         Q    My name is Bob Burgoyne, and I represent the
 8    National Board of Medical Examiners.  You're here today
 9    in connection with a lawsuit brought by Elizabeth Black
10    against the NBME.
11              Could you state your full name for the record?
12         A    Sure.  It's Dr. Ashley Vigil-Otero.
13         Q    Where do you work?
14         A    So I'm in private practice in Tampa, Florida.
15         Q    How long have you been in private practice?
16         A    Ten years.
17         Q    Did you ever work in the same building with
18    Dr. Bob Parrino?
19         A    I did.
20         Q    Were you in the same practice together?
21         A    No.
22         Q    Have you ever been deposed before?
23         A    Yes.
24         Q    How many times?
25         A    Once.
```

1   Q   Who are some of those?
2   A   Barkley. Sattler is somebody who is recognized
3   as far as the assessment. So I often look to him as far
4   as what standards he has recommended.
5   Q   Any others?
6   A   Those are kind of off the top of my head.
7   Q   Are you familiar with Dr. Kevin Murphy? Have
8   you seen that name?
9   A   No. I'm not familiar.
10  Q   In your opinion, can ADHD be validly diagnosed
11  based solely on an informal interview?
12  A   No. There would need to be some sort of
13  history gathering, you know, with collateral or some
14  sort of review of history other than just the patient.
15  Q   What would you want to see if you were
16  diagnosing an adult who had never been previously
17  diagnosed with ADHD?
18  A   Well, that depends. I would say if I am
19  treating the individual and the question is not to
20  necessarily document it, I would really want to get a
21  thorough history from them and hear about their
22  childhood and probably have some sort of collateral
23  information. Sometimes it's not readily available with
24  an adult.
25      I would at least want to talk to maybe another

1  treating provider or go into more depth about what their
2  childhood experience was like and try to ascertain the
3  history as best I could.
4     Q   And why does their childhood history matter?
5     A   Their childhood history matters because it is
6  thought to be a neurodevelopmental disorder, meaning
7  that it would have presented in childhood or be
8  reflected somewhere in their childhood.
9     Q   Would it be helpful if you were able to obtain
10 the person's school records from elementary school and
11 high school and college?
12    A   Possibly.  But as a treating provider, one
13 would probably not go to that length as a treating
14 provider.  Your role is to try to help the person with
15 their symptoms.
16        If you feel the diagnostic criteria is met and
17 you have some indication that you might talk to a
18 collateral contact, it would be rare to go to that
19 length for an adult.
20    Q   You've referred a couple times to instances in
21 which you're a treating provider and the type of
22 evaluation you might do in that context.
23        What are some other contexts in which you might
24 evaluate someone for ADHD and do different things?
25    A   So if you were actually trying to answer the

1    question, the diagnostic question, if you were the
2    evaluating psychologist trying to do the assessment --
3    formal.
4         Q    And when would that -- give us some
5    illustrations of when that might occur.
6         A    So if the person is coming -- genuinely does
7    not know what their diagnosis is, and so you are
8    actually trying to establish what is the root problem.
9    If the person might have an established diagnosis and
10   they are trying to document that to get accommodations
11   for their diagnosis.
12        Q    What would you do differently in that context
13   in terms of interview or records or --
14        A    In that context --
15        Q    -- performance?
16        A    -- obviously, there would be an interview.
17   There would also be a battery of tests.
18             You know, it's really tailored to the
19   individual.  There's not necessarily a specific test.
20   There's a range of typical tests.
21             And so if the person I knew was going to be
22   applying to a certain board, I would certainly try to
23   make sure that my battery follows that.
24             But usually you have something like a cognitive
25   assessment as well as achievement and maybe some testing

1  to assess how they perform under timed conditions and
2  maybe tests of attention as well as obtaining some sort
3  of history outside of the patient.
4      Q   And in that context, would school records be of
5  more use to you?  Would you want to see those if they
6  were available?
7      A   Sure.  If they were available.
8      Q   And what are you looking for when you review
9  school records in the context of doing an initial
10 evaluation to determine whether someone has ADHD?
11     A   So it can be difficult because it depends on
12 the school.  There are sometimes comments written on
13 report cards.  So sometimes anything that would note
14 off-task behavior or, you know, an individual has
15 challenges of paying attention.  So sometimes those
16 comments aren't available.
17         Also looking at performance.  However, if the
18 person is very bright and high-achieving, sometimes
19 those grades in childhood won't reflect the impairment.
20         And so that's part of the consideration, but
21 there's not necessarily a hard and fast rule as opposed
22 to looking for Cs or Ds or something like that.  It's
23 part of just gathering information.
24     Q   Do you evaluate the patient's employment
25 history as well if there is an employment history?

1  A   Sure.  You know, usually patients don't
2  necessarily have kind of performance reviews or
3  something like that.
4      But I wouldn't dive into interviewing past
5  employers or anything like that.  I would more really
6  ask about the nature of their work, and that would
7  really be provided by the patient's report as opposed to
8  kind of investigating into companies.
9  Q   But you'd explore the issue with the patient?
10 A   Sure.
11 Q   And again, in that context what are you looking
12 for by way of a discussion of their employment history?
13 What type of questions might you ask and what type of
14 information are you trying to gather?
15 A   Yeah.
16     In addition to trying to obtain how their
17 performance was, what challenges they face, could they
18 meet deadlines, what type of situations were
19 particularly difficult, where did they have impairments
20 if they did have them, how was their overall functioning
21 at that employer?
22 Q   Okay.  Do you, likewise, ask questions relating
23 to their social or family relationships?
24 A   Sure.  That's part of kind of standard
25 questioning that you would engage in.

1   Q   And what are you looking for in that context?
2   A   So there are some individuals that can have
3   ADHD symptoms that impact their social functioning. So
4   there are some individuals that's not necessarily an
5   issue.
6       So it's not a diagnostic criteria. But I would
7   be looking for any kind of difficulties they had in kind
8   of social rejections, difficulties where maybe they had
9   some challenge maintaining relationships. Sometimes
10  that's available. Sometimes it's not present with
11  somebody with ADHD.
12  Q   In terms of the DSM criteria, does an
13  individual need to have impairment in more than one
14  domain in their life to meet the diagnostic criteria?
15  A   Typically. Typically.
16  Q   And what are the various domains that one
17  considers for that purpose?
18  A   Social, occupational, academic.
19  Q   Any others that --
20  A   Not off the top of my head.
21  Q   I think you said you last treated Ms. Black
22  about three years ago?
23  A   I think so. I would have to check the record.
24  Q   Okay. Do you recall offhand how many sessions
25  you had with her?

1    A    I want to say it was approximately nine, but
2    I'd have to check.
3    Q    Was she referred to you by another
4    professional?
5    A    She was.
6    Q    Who was that?
7    A    Abby Saneholtz at USF Counseling.
8    Q    Did you ever administer any rating scales or
9    screening instruments to Elizabeth Black?
10   A    No.
11   Q    Any continuance performance tests or other
12   types of assessments?
13   A    No.
14   Q    Likewise, you never administered any IQ tests?
15   A    No.
16   Q    Have you ever seen the results from any
17   assessments that were administered to Ms. Black by other
18   professionals?
19   A    No.
20   Q    Have you ever seen any diagnostic reports
21   prepared by other professionals regarding Ms. Black?
22   A    No.
23   Q    Did you ever have occasion to speak to any of
24   her medical school professors while you were treating
25   her?

1    A    No.
2    Q    "No" answers expedite things.  You get an
3    A plus for that.
4         Let me hand you what we will mark as
5    Vigil-Otero 1.
6         (Vigil-Otero Exhibit 1 marked for
7         identification.)
8    BY MR. BURGOYNE:
9    Q    Would you identify this document for the
10   record, please?
11   A    Yes.  It's my CV.
12   Q    Do you know when this was current as of?  Is
13   this your current resume right now?
14   A    It is.
15   Q    In your discussion of your clinical experience
16   and your current private practice you indicate that you
17   provide individual and family therapy and that you also
18   provide personality and psychoeducational assessments?
19   A    Uh-uh.
20   Q    Which of those services did you provide with
21   regard to Ms. Black?
22   A    Individual therapy.
23   Q    Okay.  On Page 2 from your Vanderbilt
24   experience there's a reference to producing integrated
25   psychological reports.

```
 1    Exhibit 2?
 2        A    This is from my website resource page.
 3        Q    Yes.
 4             And so you say this is just a page from your
 5    website?
 6        A    Yes.
 7        Q    And is this a page that is intended to provide
 8    resource information for third parties?
 9        A    Yes.  Uh-uh.
10        Q    The first disorder that's described here is
11    anxiety?
12        A    Uh-uh.
13        Q    Did you reach any conclusions about whether
14    Elizabeth Black experienced any symptoms consistent with
15    anxiety?
16        A    I saw her as a patient that had a primary ADHD
17    with secondary anxiety features.
18             So sometimes you have an individual -- their
19    ADHD can create havoc and stress to the point where it
20    is triggered -- it triggers some anxiety.
21        Q    How about depression?  Did you see any symptoms
22    of depression in your sessions with Elizabeth?
23        A    I did not at the time I saw her.
24        Q    What did you base your understanding on in
25    terms of Elizabeth suffering from ADHD?  Because you
```

1   didn't do the evaluation. Correct?
2      A   Right.
3      Q   What was your basis for concluding that she had
4   an ADHD diagnosis?
5      A   How did I come to that?
6      Q   Yeah.
7      A   She provided information that aligned with the
8   DSM criteria, and in addition to that I did obtain
9   collateral information from that previous therapist that
10  she met with for a year.
11     Q   Okay. That was Dr. Saneholtz?
12     A   Uh-uh.
13     Q   Now, you say she provided symptoms that
14  "aligned with."
15        You didn't independently reach a conclusion to
16  diagnose her with DSM -- meeting the criteria, did you?
17     A   I did diagnose with her ADHD. She did come in
18  with a historical diagnosis. But to actually meet --
19  actually receive a diagnosis of ADHD, you really just
20  need to meet the criteria for the DSM. So she provided
21  those symptoms. That was also verified by her former
22  therapist.
23     Q   Maybe I'm confused, but I thought you said
24  earlier you couldn't make a valid diagnosis based just
25  on talking with the individual.

1  medical records in her possession from Dr. Fleischer.
2         You didn't ever see those records?
3     A   No, I did not.
4     Q   Were you aware that he had diagnosed her with
5  general anxiety disorder and ADD?
6     A   I was not. She did tell me she was diagnosed
7  with ADHD and anxiety disorder.
8     Q   Go to the next page, if you would. It's
9  AVO 0013, and it looks like it's an insurance form.
10    A   Uh-uh.
11    Q   What is this document?
12    A   So I saw Ms. Black out of pocket, meaning she
13 paid me and submitted my receipt. And they would send
14 an explanation of benefits to both of us and reimbursed
15 her for a portion of the session.
16    Q   Okay. So this is just confirming that she's
17 been reimbursed for the session?
18    A   Yes. Correct.
19    Q   The next page -- would you identify this? It's
20 AVO 0015. At the top it says "Record of Psychological
21 Service"?
22    A   Yes.
23    Q   It's got the patient name and the date of
24 service?
25    A   Uh-uh.

1   Q   Does this document go to the insurance company?
2   Is this what you would give to Elizabeth to provide to
3   the insurer?
4   A   Correct.
5   Q   And what is the CPT code for this particular
6   service?
7   A   So this was the initial interview: 90791.
8   Q   Okay.
9   A   That would be how they code the session for
10  insurance standards.
11  Q   And if there was no DSM code on this form,
12  would the visit be covered by the insurance company?
13  A   No.
14  Q   On the next page it's got "Initial Assessment"
15  as its title?
16  A   Uh-uh.
17  Q   And it says AVO 0016 at the top.
18  A   Uh-uh.
19  Q   Could you tell us what this document is?
20  A   This is part of how I document the first
21  session.
22  Q   Okay. And does this particular document
23  consist of two pages? Both of these pages go together?
24  A   Yes.
25  Q   Okay. All right. And what is the information

CERTIFICATE OF REPORTER

STATE OF FLORIDA)
COUNTY OF HILLSBOROUGH)

      I, MICHELE COBURN, Court Reporter and Notary Public, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.

      I further certify that I am not a relative, employee, attorney, or counsel of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

      Dated:  May 19, 2017.

*Michele Coburn*
MICHELE COBURN

CERTIFICATE OF OATH

STATE OF FLORIDA)
COUNTY OF HILLSBOROUGH)

I, MICHELE COBURN, Notary Public, State of Florida, certify that the witness, ASHLEY VIGIL-OTERO, Psy.D., personally appeared before me on the 16th day of May, 2017, and was duly sworn.

WITNESS my hand and official seal this 19th day of May, 2017.

*Michele Coburn*
MICHELE COBURN
Notary Public
State of Florida
Commission # FF169882
My Commission Expires: 11/21/18

MICHELE COBURN
Notary Public - State of Florida
My Comm. Expires Nov 21, 2018
Commission # FF 169882
Bonded through National Notary Assn.