## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ELIZABETH A. BLACK,

           Plaintiff,

vs.                                CASE NO.: 8:16-cv-2117-T-23TGW

NATIONAL BOARD OF
MEDICAL EXAMINERS,

           Defendant.

_____/

## PLAINTIFF'S SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, ELIZABETH A. BLACK, by and through her undersigned attorneys, and for her complaint against the NATIONAL BOARD OF MEDICAL EXAMINERS (NBME), hereby files this Second Amended Complaint. Pursuant to Fed. R. Civ. Pro. 15(a)(2), Defendant has not consented to Plaintiff's filing of this Amended Complaint:

### JURISDICTION AND VENUE

1.     Plaintiff brings this action for declaratory and injunctive relief for violations of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. § 12101, *et seq.*; specifically, violations of Title III of the ADA, 42 U.S.C. §§ 12181 – 12189.

2.     Plaintiff's cause of action for disability discrimination under the ADA is authorized by 42 U.S.C. § 12188.

3.     The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331, and 1343(a)(4).

4.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 & 2202, and Fed. R. Civ. P. 65.

5.     Venue is proper in the Middle District of Florida because a substantial part of the events or omissions giving rise to the present claim occurred in this District, and Plaintiff is a natural person domiciled and residing in this judicial circuit. *See* 28 U.S.C. § 1391(b) and (c).

## PARTIES

6.     Plaintiff Elizabeth A. Black, a 33 year-old Caucasian female residing in Tampa, Florida, is presently enrolled in the University of South Florida's Morsani College of Medicine.

7.     Plaintiff Black was diagnosed with attention deficit hyperactivity disorder (ADHD), combined presentation, in March, 2009 by Dr. Scott Fleischer according to the relevant clinical diagnostic standards published by the American Psychiatric Association (APA) in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, 1994 (DSM-IV). The diagnosis was confirmed in October, 2014 by Dr. Margaret Booth-Jones following the administration of a battery of

2

assessments and a determination that Ms. Black met the clinical diagnostic criteria for ADHD, combined presentation, as expressed by the APA in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, 2013 (DSM-5).

8.     Defendant NBME is a private, non-profit organization, incorporated in the District of Columbia. Its offices and principal place of business are located in Philadelphia, Pennsylvania.

9.     Together with the Federation of State Medical Boards, Defendant NBME sponsors the United States Medical Licensing Examination (USMLE), a standardized examination used to evaluate applicants' competence for purposes of medical licensure in the United States and its territories. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps", as an integral element in the process of licensing physicians.

10.    As such, the NBME is subject to the requirements of Section 309 of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12189, and related implementing regulations, 28 C.F.R. § 36.309, as well as all other requirements specified within Title III of the ADA, 42 U.S.C. §§ 12181 – 12189.

## FACTUAL ALLEGATIONS

### Plaintiff

11.     Plaintiff Elizabeth A. Black was born 4 weeks premature via Cesarean delivery due to a breach presentation on June 4, 1983. Ms. Black has a twin brother.

12.     Despite indicating a lifelong difficulty with her ability to concentrate and focus, Ms. Black progressed through the formative years of her education without diagnosis or treatment for ADHD. In addition to noting her parents' general discouragement towards the clinical evaluation of their children, Ms. Black contends this process was aided both through her development of various self-accommodating compensatory mechanisms intended to benefit her learning and studying capacities, as well as through the effective design and imposition of a highly-structured home environment.

13.     Following her high school graduation from Wissahickon High School in Ambler, Pennsylvania, Ms. Black matriculated at Princeton University in Princeton, New Jersey, where she received a Bachelor's Degree in History while minoring in Latin American Studies. Ms. Black notes the relative absence of structure in her college life during this period due to living away from home for the first time as a significant contributing factor to her relative academic struggles as an undergraduate at Princeton.

14.     Thereafter, Ms. Black completed post-baccalaureate classes at the University of Pennsylvania. She attributes her academic success while completing

4

this coursework in large part to the structure provided through once again living at home while attending classes during this period.

15.     Following a decision to attend medical school, Ms. Black began preparations for taking the Medical College Admission Test (MCAT). In the course of sitting for several unscored administrations[1] of the MCAT, Ms. Black identified a severe difficulty completing portions of the examination within the specified time constraints.

16.     In response to her difficulties navigating the timing constraints of the MCAT, Ms. Black sought clinical evaluation and treatment to assist her ability to focus during preparations. In March, 2009, Ms. Black was diagnosed with ADHD, combined presentation, according to DSM-IV (1994) diagnostic criteria, by Dr. Scott Fleischer, a licensed psychiatrist in Pennsylvania.

17.     Following this diagnosis, Ms. Black was prescribed stimulants as a treatment aid – which she continues to utilize to assist her management of not just her studying and learning capacities, but also other facets of her day-to-day life.

18.     At this time, and at all times until March, 2015, MCAT applicants who requested and thereupon received testing accommodations on a scored administration of the MCAT had their scores "flagged" by the testing entity when

---

[1] Following an administration of the MCAT examination, test-takers are permitted to elect that their score not be officially reported.

reported to medical schools and other third parties. Ms. Black has indicated that her awareness of this practice governed her reluctance, at the time, to seek testing accommodations on the MCAT following her diagnosis of ADHD, combined presentation. Ultimately, Ms. Black decided against requesting accommodations on either of her scored administrations of the MCAT due to this awareness.

19.     In addition, at this time, total composite scores on the MCAT ranged from 3-45, based upon individual score ranges of 1-15 on the verbal reasoning, biological sciences, and physical sciences portions of the examination.

20.     Despite beginning her treatment as prescribed during preparations in the weeks prior to sitting for her first scored administration of the MCAT, Ms. Black received a composite score of 22 on this administration – a score roughly commensurate with a 32nd percentile examination performance.

21.     As a result of Ms. Black's performance on this first reported administration of the MCAT, a conditional acceptance she had received to attend medical school at Thomas Jefferson University in Philadelphia, Pennsylvania pending receipt of her MCAT scores was effectively revoked.

22.     On her second scored administration of the MCAT, following a more-prolonged exposure and acclimation to the above treatment regimen and related clinical consultation, Ms. Black received a composite score of 29 – a score roughly commensurate with a 73rd percentile performance on the examination.

23.    Thereupon, Ms. Black enrolled as a student at the University of South Florida's (USF's) Morsani College of Medicine for the 2011-2012 school year.

24.    While enrolled, Ms. Black has continued to receive clinical consultation and treatment for her diagnosed condition of ADHD, and has continued to utilize prescribed stimulant medications as directed by her clinicians.

25.    In March, 2013, Ms. Black began receiving the provision of certain testing accommodations – namely, time-and-a-half testing time and reduced distraction testing environments on formal written examinations – following application with USF's Students with Disabilities Services office, and that office's determination that Ms. Black met the university's standards for disability documentation.

26.    In October, 2014, in response to a change in university policy, Ms. Black and several other students receiving treatment from USF's Counseling Center were asked to obtain updated clinical evaluations.

27.    Thereupon, she met with clinicians at the USF Psychological Services Center who conducted a complete psychoeducational evaluation supervised by Dr. Margaret Booth-Jones, Ph.D., confirming that Ms. Black satisfied diagnostic criteria for ADHD, combined presentation, as outlined in the newly-published DSM-5 (2013).

<u>The National Board of Medical Examiners and the United States Medical Licensing Examination Accommodated Testing Application Process</u>

7

28.     Founded in 1915, the NBME is an independent, not-for-profit organization that "serves the public through its high-quality assessments of healthcare professionals."

29.     Among other services and activities it provides, the NBME develops and manages the USMLE. As indicated on the NBME's website, "[w]hile the individual licensing boards grant the license to practice medicine, all medical boards in the US accept a passing score on the USMLE as evidence that an applicant demonstrates the core competencies to practice medicine. As a result, healthcare consumers throughout the nation enjoy a high degree of confidence that their doctors have met a common standard." The USMLE is administered at locations around the world to individuals who are attending, or have attended, medical schools in the United States and abroad.

30.     The USMLE is a three-step standardized examination used to evaluate applicants' competence for purposes of medical licensure in the United States and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care.

31.     Step 1 of the USMLE assesses whether applicants understand and can apply important concepts of the sciences basic to the practice of medicine, with

special emphasis on principles and mechanisms underlying health, disease, and modes of therapy. As indicated on the USMLE website, the Step 1 examination purportedly "ensures mastery of not only the sciences that provide a foundation for the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning."

32.    The Step 1 examination is a one-day examination, divided into seven 60-minute blocks and administered in one 8-hour testing session. In any given examination, the total number of questions will not exceed 280.

33.    The NBME processes requests for test accommodations on behalf of the USMLE program. As indicated on the USMLE website,[2] "[t]he purpose of accommodations is to provide equal access to the USMLE testing program. Accommodations 'match up' with the identified functional limitation so that the area of impairment is alleviated by an auxiliary aid or adjustment to the testing procedure. **Functional limitation refers to the behavioral manifestations of the disability that impede the individual's ability to function, i.e., what someone**

_____

[2] On or around May 1, 2017, NBME updated their website and made changes to the portion of the website discussing testing accommodations. While most changes appear to be intended to present what is expected  of applicants in a more streamlined fashion, the changes notably omit any reference to DSM-IV. Accordingly, it should be noted that references to NBME's website in this Amended Complaint are referring to the website as it was when Plaintiff made her requests for accommodation and filed her Initial Complaint. Other than the references to DSM-IV, Plaintiff contends the requirements on the website remain the same content-wise.

**cannot do on a regular and continuing basis as a result of the disability.**"
(Emphasis in original).

34.     In order to document a need for accommodations, the application used to request testing accommodations instructs applicants to submit: 1.) a personal statement describing the applicant's disability, as well as its impact on daily life and educational functioning; 2.) supporting documentation such as psychoeducational evaluations, medical records, copies of report cards, academic and score transcripts, faculty or supervisor feedback, job performance evaluations, clerkship/clinical course evaluations, verification of prior academic/test accommodations, et cetera; and 3.) a complete and comprehensive evaluation that is typewritten on letterhead and signed, and indicates the professional's qualifications.

35.     Importantly, this application also asks applicants to specifically list the "**current** DSM/ICD diagnosis/diagnoses" for which they are requesting accommodations. (Emphasis in original).

36.     Elsewhere in a document available on the USMLE website entitled "General Guidelines for all disabilities" it is explained that a "professionally

recognized diagnosis for the particular category of disability is expected, e.g., the DSM-IV diagnostic categories for learning disorders."[3]

37.     Also notable on this application is the additional direction, contained within the "**What to Submit**" section, specifically requesting the submission of "childhood records" if the request for accommodations "is based on a developmental disorder (e.g., LD, dyslexia, ADHD)." (Emphasis in original).

38.     Beyond the document entitled "General Guidelines for all disabilities" there are other "Guidelines" documents available on the USMLE website, ostensibly provided to further instruct applicants regarding other required aspects of their request for testing accommodations. In total, there are four of these additional "Guidelines" documents – one each for applicants alleging learning disorders, ADHD, vision impairments, and hearing impairments.

39.     The "Guidelines" document specifically relating to ADHD provides applicants with slightly more than three full pages explaining the "additional issues documentation must address relative to ADHD." This document is broken into eight separate sections containing issues to be addressed by applicants.

40.     The third of these sections is entitled "**3. Documentation necessary to substantiate the [ADHD] must be comprehensive**" and notes that since

---

[3] Notably, there was no reference made to the updated DSM-5 (2013) diagnostic standards in this document.

ADHD is "first exhibited in childhood (although it may not have been formally diagnosed) and in more than one setting, objective, relevant, historical information is essential. Information verifying a chronic course of ADHD symptoms from childhood through adolescence to adulthood, such as educational transcripts, report cards, teacher comments, tutoring evaluations, job assessments and the like are necessary." (Emphasis in original).

41.    This section also specifies that evaluators are "expected to review and discuss DSM-IV diagnostic criteria for ADHD and describe the extent to which the patient meets these criteria[,]" and that a "history of the individual's presenting symptoms must be provided, including evidence of ongoing impulsive/hyperactive or inattentive behaviors (as specified in DSM-IV) that significantly impair functioning in two or more settings." A later section of the document, entitled "**5. Identification of DSM-IV Criteria**", directs that a "diagnostic report must include a review of the DSM-IV criteria for ADHD both currently and retrospectively and specify which symptoms are present (see DSM-IV for specific criteria). According to DSM-IV, 'the essential feature of ADHD is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development.'" (Emphasis in original). Moreover, the section of this document entitled "**6. Documentation Must Include a Specific Diagnosis**" notes that submitted reports "must include a

12

specific diagnosis of ADHD based on the DSM-IV diagnostic criteria." (Emphasis in original).[4]

42.     Based upon the foregoing, it is incontrovertible that, at the time of Ms. Black's applications, the NBME maintained a policy and practice of exclusively soliciting DSM-IV diagnostic information from applicants requesting testing accommodations on the Step Examinations comprising the USMLE – at least in terms of all relevant instruction and guidance available to such applicants, and to the general public at large.

43.     Another section of this "Guidelines" document for applicants requesting testing accommodations based upon a diagnosis of ADHD, entitled "**4. Relevant Assessment Batteries**", explains that "[t]est scores or subtest scores alone on the Wechsler Adult Intelligence Scale – IV (WAIS-IV), memory function tests, attention or tracking tests or continuous performance tests do not in and of themselves establish the presence or absence of ADHD. They may, however, be useful as one part of the process in developing clinical hypotheses." (Emphasis in original).

44.     The final section of this "Guidelines" document concludes by noting that, "[b]ecause of the challenge of distinguishing ADHD from normal

---

[4] Notably, there was no reference made to the updated DSM-5 (2013) diagnostic standards in this document.

13

developmental patterns and behaviors of adults, *including procrastination,*

*disorganization, distractibility, restlessness, boredom, academic underachievement*

*or failure, low self-esteem and chronic tardiness or inattendance*, a multifaceted

evaluation must address the intensity and frequency of the symptoms and whether

these behaviors constitute an impairment in a major life activity." (Emphasis

added).

45.     Relatedly, a separate section of the "Test Accommodations" portion

of the USMLE website provides applicants with information regarding the

NBME's 2011 Settlement Agreement with the United States Department of

Justice. There is indication provided that such information was posted

electronically to the USMLE website on March 18, 2011.

46.     Beyond its recitation of the NBME's obligations under relevant

portions of Title III of the Americans with Disabilities Act, as amended, and

related implementing regulations, this Settlement Agreement contains a provision

indicating that "NBME will carefully consider the recommendation of qualified

professionals who have personally observed the applicant in a clinical setting and

have determined – in their clinical judgment and in accordance with generally-

accepted diagnostic criteria, as supported by reasonable documentation – that the

individual is substantially limited in one or more major life activities within the

meaning of the ADA […]."

14

47.     The information presented about this Settlement Agreement on the USMLE website, in relevant part, answers the question "[i]s an evaluation report from my doctor/psychologist recommending that I receive accommodations sufficient to be granted test accommodations for USMLE?" by noting that, "[t]he supporting documentation that you submit from a qualified professional is a necessary part of any request and is carefully reviewed by the NBME. However, as the settlement agreement notes, NBME is not required to defer to the conclusions or recommendations of an applicant's supporting professional. We carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation. Should our review of your documentation result in denial of your request, we will explain our reasons in writing. If your documentation is insufficient to make a decision or we have other questions or concerns, you will be notified and given an opportunity to supplement your request and supporting documentation."

48.     Beyond the availability of submitting supplemental documentation on subsequent reapplications following the NBME's denial of a request for testing accommodations on a USMLE Step Examination, there exists no prescribed or mandated avenue for a direct appeal or review of the NBME's determinations.

49.     Similar to the MCAT, the NBME maintained a practice of "flagging" the USMLE score reports and transcripts of individuals accepting the provision of

testing accommodations until that practice was discontinued on September 10, 2014.

### Evolution of ADHD Diagnostic Thought from DSM-IV (1994) to DSM-5 (2013)

50.    The diagnostic criteria for ADHD presented in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, 1994 (DSM-IV), included an assessment of whether an individual had displayed six of nine enumerated symptoms of either "inattention" or "hyperactivity/impulsivity" which have persisted for at least six months to a degree that is maladaptive and inconsistent with developmental level. Individuals who were assessed to have displayed six of nine symptoms expressed for both "inattention" and "hyperactivity/impulsivity" were referred to, upon diagnosis, as having a "combined presentation" of ADHD.

51.    The diagnostic criteria in DSM-IV also specified that symptoms causing "impairment" must be present before age 7, and in two or more settings (e.g., at school [or work] and at home). Additionally, the criteria required "clear evidence of clinically significant impairment in social, academic, or occupational functioning."

52.    By comparison, the diagnostic criteria for ADHD presented in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, 2013 (DSM-

5)[5] include essentially the same nine symptoms for either "inattention" or "hyperactivity/impulsivity", however these standards are now followed by examples of different ways in which such symptoms may present, including ways they would appear in older adolescents and adults. For example, the symptom "often has difficulty sustaining attention in tasks or play activities" as previously contained in the grouping of inattentive symptoms in DSM-IV is now presented as "often has difficulty sustaining attention in tasks or play activities (e.g., has difficulty remaining focused during lectures, conversations, or lengthy readings)." Additionally, DSM-5 now provides that a lower threshold of symptoms (five, instead of six) is sufficient for a reliable diagnosis in adolescents and adults.

53.    In summarizing its changes to ADHD diagnostic criteria expressed in DSM-5, the American Psychiatric Association noted "[t]he definition of ADHD has been updated in [DSM-5] to more accurately characterize the experience of affected adults. This revision is based on nearly two decades of research showing that ADHD, although a disorder that begins in childhood, can continue through adulthood for some people. Previous editions of DSM did not provide appropriate guidance to clinicians in diagnosing adults with the condition."

---

[5] The American Psychiatric Association's publication of DSM-5 in 2013 represented the culmination of a fourteen year revision process coordinated by the Association.

54.     Whereas the age of onset criteria contained in DSM-IV formerly established a requirement that "some hyperactive-impulsive or inattentive symptoms that caused impairment were present before age 7 years[,]" in DSM-5 this criteria has been revised to require that "several inattentive or hyperactive-impulsive symptoms were present prior to 12 years." Furthermore, in addition to now requiring symptoms to have displayed by age 12, as opposed to age 7, DSM-5 no longer requires a demonstration that such symptoms have "caused impairment" in an individual, only that they have been displayed by the age of 12.

55.     Similarly, in DSM-IV, symptoms were required to cause impairment in at least 2 settings; DSM-5 now requires only that "several inattentive or hyperactive-impulsive symptoms are present in two or more settings." Thus, symptoms must only be evident in more than one setting or context, but do not have to necessarily or demonstrably impair that individual's functioning in multiple contexts.

56.     Moreover, another example of the clinical shift away from an impairment analysis in the diagnosis of ADHD is contained in the evolution of a requirement found in DSM-IV to predicate diagnoses upon "clear evidence of clinically significant impairment in social, academic, or occupational functioning." By comparison, DSM-5 now requires "clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning."

57.     An entirely new wrinkle in the clinical diagnosis of ADHD is the ability, under DSM-5, for clinicians to specify the severity level of an individual's ADHD as either mild, moderate, or severe. "Mild" severity is restricted to cases where there are few, if any, symptoms beyond those required to make the diagnosis, and no more than minor impairment in functioning; "moderate" severity is simply defined as symptoms or functional impairment that display between "mild" and "severe".[6]

### Plaintiff's First Application for Reasonable Test Accommodations on the USMLE Step 1 Examination

58.     Beginning with a memo dated April 23, 2013 and signed by Dr. Steven Specter, Ph.D., USF Associate Dean of Student Affairs, Ms. Black requested and received a leave of absence in order to prepare for and take her Step 1 Examination. Such leave of absence was extended through supplemental memos issued by Dr. Specter on June 19th, July 5th, July 30th, August 28th, October 22nd, and November 14th, 2013.

59.     In January, 2014, Ms. Black paid the sum of $3,121.88 to register for and attend Becker Professional Education's seven week-long USMLE Step 1 review course in Dallas, Texas.

---

[6] Under the clinical impairment analysis required by DSM-IV, individuals displaying "mild" severity – and very likely those displaying "moderate" severity – would not possess a requisite level of "clear evidence of clinically significant impairment" to warrant diagnosis.

60.     Ms. Black's leave of absence from USF was thereafter further extended by memos issued by Dr. Specter on February 17th, May 19th, and June 3rd, 2014.

61.     Prior to the NBME's election to discontinue its practice of "flagging" the test scores of individuals receiving accommodations on administrations of USMLE Step Examinations (in September, 2014), Ms. Black sat for an administration of the USMLE Step 1 Examination in July, 2014, receiving a score of 183 that placed her nine points shy of passing the examination. Ms. Black reports that she was unable to finish any of the examination's individual sections in the time allotted.

62.     By memos dated September 26th, October 24th, and November 24th, 2014, Dr. Kira Zwygart, M.D., Associate Dean of Student Affairs, authorized the further extension of Ms. Black's leave of absence.

63.     Months after the NBME discontinued its practice of "flagging", Ms. Black submitted her first application for testing accommodations on the USMLE Step 1 Examination to the NBME in November, 2014. Specifically, such application sought the accommodation of 50% additional test time (time-and-a-half testing time), the same provision that she indicated she had been receiving from USF for more than a year-and-a-half on written examinations. Ms. Black noted that

she was first diagnosed with ADHD in "2008/2009" and listed her current DSM-5

diagnosis as "314.01 ADHD, with combined presentation."[7]

64.     In this application, Ms. Black included a personal statement, as

directed, recounting her lifelong difficulty processing and retaining information

(especially in relation to peers and her twin brother), as well as the ways in which

her distractibility and impulsivity had impacted her learning abilities and academic

approaches to that point. Ms. Black noted she was "able to overcome [her]

disability without diagnosis or medication as a child because [she] was in a highly

structured school environment with supportive parents." Ms. Black concluded her

personal statement by explaining that she had "investigated special time

accommodations for the MCAT and prior to taking Step 1 for the first time (July

2014) […] I never chose to apply for the accommodations based on the fact that I

would be singled out on my score report, all the while knowing that additional time

would be hugely advantageous to me."

65.     Also included with Ms. Black's initial application for

accommodations was a letter of support from Pamela O'Callaghan, Ph.D., Director

of USF's Academic Support Center and an Assistant Professor in USF's

Department of Family Medicine. Ms. O'Callaghan's letter indicated that Ms.

---

[7] Though unprompted, Ms. Black specifically noted that her diagnosis was "DSM-5: 314.01 – Attention deficit hyperactivity disorder with combined presentation" on her initial application for testing accommodations.

Black's requested accommodations "are needed to mediate Ms. Black's functional capacity. These accommodations will provide the necessary time to reread passages, refocus due to internal or external distractions and take breaks from the testing environment, resulting in a more accurate assessment of her knowledge and thinking abilities."

66.    Finally, accompanying Ms. Black's application for testing accommodations was a full, complete copy of the October, 2014 psychoeducational evaluation conducted at USF's Psychological Services Center and supervised by Dr. Margaret Booth-Jones, Ph.D. In relevant part, such evaluation concluded by recommending that Ms. Black "receive academic accommodations for ADHD (at her discretion). Specifically, Ms. Black should be allowed extended time for testing and quiet testing accommodations in all courses and standardized tests to maximize her ability to focus."

67.    Thereafter, more than three months after submission of her application for requested accommodations, Ms. Black received written notification from Catherine Farmer, Psy.D., Director of NBME's Disability Services division, informing Ms. Black that her request for testing accommodations had been denied.

68.    The first page of this communication presents quoted passages from both Ms. Black's personal statement as well as the accompanying

psychoeducational evaluation, essentially without inclusion of additional comment, input or instruction.

69.     The second page of Ms. Farmer's letter begins with her assertion, presented without reference, that ADHD "is a neurodevelopmental disorder that begins in childhood and is defined by impairing levels of inattention, disorganization, and or hyperactivity-impulsivity."

70.     Ms. Farmer continues to explain that Ms. Black's documentation "does not demonstrate a record of chronic and pervasive problems with inattention, impulsivity, behavioral regulation, or distractibility that impaired your functioning during development or currently." Specifically, Ms. Farmer notes that Ms. Black had not submitted school records "to demonstrate impaired functioning" and had further provided "[n]o objective data or documentation [...] via formal faculty/supervisor feedback, job performance evaluations, or through other sources of information verifying that you have shown pervasive problems managing daily demands for attention, organization, or executive functioning."

71.     Ms. Farmer specifically notes that, "[a]s best one can tell from the documentation provided, you progressed through primary and secondary school without grade retention, special education evaluation or services and with an academic record and scores on timed standardized tests sufficient to gain

admission to Princeton University and University of South Florida Morsani
College of Medicine, all without accommodations."

72.     Without mentioning Ms. Black's first reported score of 22 on the
MCAT – as indicated, *supra* – Ms. Farmer notes that Ms. Black earned a score of
29 on the MCAT under standard conditions in 2009, and that "[o]verall, these data
do not demonstrate impairments that limit a major life activity."

73.     Although there is no way for Ms. Black to ascertain what role, if any,
that Ms. Farmer assumed in the NBME's review and ultimate denial of Ms.
Black's initial request for testing accommodations, neither Ms. Farmer, nor any
representative or agent of NBME, reviewed or assessed Ms. Black personally or
through personal interview as a part of its initial determination.

74.     Following notification of the NBME's denial of her requested testing
accommodations, Ms. Black sat for a second administration of the USMLE Step 1
Examination in April, 2015, receiving a score of 189 that placed her three points
shy of the passing score of 192. Once again, Ms. Black reports that she was unable
to finish any of the examination's individual sections in the time allotted.

75.     Additionally, following the examination, Ms. Black lodged a formal
complaint regarding technical difficulties she purportedly experienced during the
administration of the exam. Following its investigation of Ms. Black's complaint,
the NBME noted that Ms. Black had not performed a "headphone check" as

required during a tutorial and, as such, "it is not possible to determine what effect, if any, the situation […] may have had on [her] exam performance."

76.    Ms. Black has reported feeling tremendous pressure, both academic and financial, to thereafter sit for a third administration of the Step 1 Examination again in July, 2015, without the time necessary to reapply for testing accommodations or to pursue a challenge of the NBME's denial. Ms. Black received a score of 173 that placed her 19 points shy of attaining a passing score of 192. As was the case with the first two administrations of the exam, Ms. Black again reported that she was unable to finish any of the individual sections of the examination in the time allotted.

77.    In a memorandum dated August 18, 2015, Dr. Brian Bognar, M.D., Chair of USF's Academic Performance Review Committee, notified Ms. Black that the Committee "was informed that you recorded a failing score on your third and final sponsored attempt at USMLE Step 1. However, the Committee was also informed that you are appealing the previous decision of the NBME to deny testing accommodations for Step 1 […] [y]ou will remain on leave of absence pending the receipt of NBME's decision."  Ms. Black contends that it was around this time that she first learned of the college's policy of sponsoring no more than three total administrations of the Step 1 Examination.

<u>Plaintiff's Second Application for Reasonable Test Accommodations<br>on the USMLE Step 1 Examination</u>

78.     Without a prescribed appeal or review apparatus articulated or presented to her or other examinees and applicants for test accommodations, and after receiving generalized assurances from NBME staff that the testing entity would provide a new determination following submission of additional documentation, Ms. Black thereupon began the time- and labor-intensive undertaking of compiling supplemental documentation for submission.

79.     On January 22, 2016, Ms. Black submitted a second application for testing accommodations with the NBME. Attached to the application, Ms. Black submitted an introductory letter titled "Request for USMLE Step 1 Test Accommodations / Appeal of Decision" contending that the NBME's rationale for denying her previous request was "cursory and inaccurate" and submitting additional documentation to "support and further demonstrate the chronic nature of [her] impaired attention span, disorganization, and hyperactivity-impulsivity."

80.     Ms. Black included report cards from Kindergarten to Fifth Grade with this application, noting the ways in which she contended such documentation provided insight into her claims of distractibility, impulsivity, and hyperactivity. Ms. Black explained that "[m]y childhood report cards and teacher's comments show clear evidence of ADHD as I developed. Despite these impairments, I was able to compensate adequately and proceed unnoticed and undiagnosed in the

public school system. Additionally, my parents did not ascribe to mental health practices [...]."

81.    In response to the notion that she had not sufficiently demonstrated the effects of ADHD across multiple settings, and in an effort to display the "global impact of ADHD" on her life, Ms. Black included letters recounting aspects of her functioning from her 9th grade honors English teacher and basketball coach, and a college roommate and friend of Ms. Black's for fourteen years who is now a licensed pediatrician.

82.    Ms. Black also endeavored to display her clinical history while a medical student by including confirmation of her receipt of consultation and treatment services from USF's Counseling Center on 83 occasions over a nearly three-year period, as well as the significant impact studying and preparing for the USMLE Step 1 Examination had thus far had on her academic studies by including various academic probation and counseling memos, as well as evidence of her numerous requests for extensions of her leave of absence from medical school. Ms. Black also included information regarding her tutoring efforts and related counseling specifically in response to her struggles preparing for the Step 1 Examination.

83.    In addition, Ms. Black included letters of support and clarification from the university psychologist who had diagnosed her in 2014, the Director of

USF's Students with Disabilities Services program, and a representative from Disability Rights Florida.

84.     Finally, Ms. Black included the NBME's 2011 Settlement Agreement with the Department of Justice – referred to *supra* – as well as a document published by the Department of Justice, Civil Rights Division, Disability Rights Section entitled "ADA Requirements: Testing Accommodations" that "provides technical assistance on testing accommodations for individuals with disabilities who take standardized exams and other high-stakes tests [by addressing] the obligations of testing entities."

85.     Two months thereafter, Ms. Black received a second denial of her requested testing accommodations from the NBME, dated March 28, 2016, and signed once again by Catherine Farmer, Psy.D., Director of NBME's Disability Services division.

86.     As before, Ms. Farmer begins her letter to Ms. Black by presenting a quoted passage from the letter of introduction accompanying Ms. Black's second application, as well as by summarizing the exhibits and other information – including, specifically, the letter of support provided by Dr. Booth Jones, Ph.D. – that likewise accompanied Ms. Black's application. As before, this portion of Ms. Farmer's communication does not incorporate any additional comment, input or instruction.

87.     Ms. Farmer continues by noting that "ADHD is a neurodevelopmental disorder that begins in childhood. Even if not formally diagnosed in childhood, the essential feature of ADHD is a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development[,]" before concluding that Ms. Black's school records "do not demonstrate chronic and pervasive problems with inattention, impulsivity, behavioral regulation, or distractibility that *impaired* [her] functioning" during development. (Emphasis added).

88.     Despite specifically requesting documentation relating to clinical diagnoses made pursuant to DSM-IV (1994) more than three years after publication of DSM-5 (2013), Ms. Farmer notes, "[w]ith regard to the relationship between diagnostic criteria for a disorder and disability, the authors of [DSM-5] write, 'It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.'"[8]

---

[8] Importantly, such passage is embedded within a portion of the DSM-5 (2013) entitled "Cautionary Statement for Forensic Use of DSM-5" that explains "DSM-5 is also used as a reference for the courts and attorneys in assessing the forensic consequences of mental disorders. As a result, it is important to note that the definition of mental disorder included in DSM-5 was developed to meet the needs of clinicians, public health professionals, and research investigators rather than all of the technical needs of the courts and legal professionals." Such statement continues by counseling that "the use of DSM-5 should be informed by an awareness of the risks and limitations of its use in forensic settings. When

89.     Ms. Farmer continues by explaining that the "technical assistance" document published by the Department of Justice and provided by Ms. Black in her second application for testing accommodations with the NBME "does not override the Department of Justice's actual regulations [...] or otherwise impose restrictions on NBME that are at odds with NBME's rights and obligations under the ADA." Ms. Farmer specifically refers Ms. Black to a portion of the NBME's 2011 Settlement Agreement with the Department of Justice indicating, in relevant part, as follows:

> NBME will carefully consider the recommendation of qualified professionals who have personally observed the applicant in a clinical setting and have determined – in their clinical judgment and in accordance with generally accepted diagnostic criteria, as supported by reasonable documentation – that the individual is substantially limited in one or more major life activities within the meaning of the ADA and needs the requested

---

DSM-5 categories, criteria, and textual descriptions are employed for forensic purposes, there is a risk that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-5 mental disorder such as intellectual disability (intellectual developmental disorder), schizophrenia, major neurocognitive disorder, gambling disorder, or pedophilic disorder does not imply that an individual with such a condition meets the legal criteria for the presence of a mental disorder or a specified legal standard (e.g., for competence, criminal responsibility, or disability). For the latter, additional information is usually required beyond that contained in the DSM-5 diagnosis, which might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability."

test accommodations in order to demonstrate his or her ability and achievement level.

NBME also has the right to have the information submitted by or on behalf of an applicant reviewed by one or more qualified professionals of NBME's choosing at NBME's request and expense. NBME is not required to defer to the conclusions or recommendations of an applicant's supporting professional but it must provide an explanation for declining to accept those conclusions or recommendations.

90.     Although the NBME explains that the testing entity is unable to provide Ms. Black with her requested accommodations under the Americans with Disabilities Act, as amended, Ms. Farmer's letter concludes by offering Ms. Black additional break time "for [her] comfort" during its administration of her USMLE Step 1 Examination, an accommodation that Ms. Black neither sought nor requested in either of her applications.

91.     As stated previously, although there is no way for Ms. Black to ascertain what role, if any, that Ms. Farmer assumed in the NBME's review and ultimate denial of Ms. Black's second request for testing accommodations, neither Ms. Farmer, nor any representative or agent of NBME, reviewed or assessed Ms. Black personally or through personal interview as a part of its second determination.

92.     On May 24, 2016 Ms. Black received notification from Dr. Bryan Bognar, M.D., Chair of USF's Academic Performance Review Committee (ARPC), informing her that the ARPC will allow a "fourth and final attempt" at the

USMLE Step 1 Examination (thereby waiving the rule specifying that the college will only sponsor a maximum of three administrations of the USMLE Step 1 Examination), and that she will be dismissed from USF's Morsani College of Medicine M.D. program if she fails to pass her next administration of this examination. The Committee also clarified, however, that Ms. Black's leave of absence from her coursework may continue until she receives her examination results, and that a separate requirement specifying that all academic requirements of the M.D. program must be fulfilled with six years of matriculation has been effectively tolled during Ms. Black's extended leave of absence.

93.     However, following a meeting of the ARPC on July 14, 2016, Ms. Black was informed that the university would not permit her to continue with her third year coursework while she seeks review of NBME's determinations, until she has successfully passed the Step 1 Examination.

## COUNT 1

### VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

94.     Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

95.     Among the stated purposes of the ADA is the congressional intent to provide a clear and comprehensive national mandate for the elimination of

discrimination against individuals with disabilities, and to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities. 42 U.S.C. § 12101(b).

96.     For purposes of the ADA, the term "disability" means, with respect to an individual, a physical or mental impairment that substantially limits one or more major life activities of such individual, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(1).

97.     Without limitation, the activities of learning, reading, concentrating, and thinking are among the stated "major life activities" specifically contemplated by the drafters of the ADA. 42 U.S.C. § 12102(2)(A).

98.     The implementing regulations of the ADA are also instructive in interpreting the definition of "major life activities."

99.     Plaintiff's claimed disability in this case, is an inability to concentrate, think, and learn like the average person on tests like the USMLE Step 1 Exam. As a result of these impairments, Plaintiff is substantially limited in the major life activity of test-taking. *See* 35 C.F.R. App. C, §§ 35.105 & 36.105 ("[T]he Department notes that one or more already-included major life activities—such as reading, writing, concentrating, or thinking, among others—will virtually always be implicated in test taking.").

100.   Also, and in the alternative, Plaintiff is substantially impaired in the major life activity of working.

101.   The EEOC regulations provide the following definition of substantial limitation in the major life activity of working:

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the *average person having comparable training, skills and abilities.*

29 C.F.R. §1630.2(j)(3)(i)(emphasis added).

102.   In *Bartlett v. New York State Bd. of Law Examiners*, 970 F. Supp. 1094 (S.D. New York 1997), the court held that a plaintiff's disability implicates the major life activity of working with respect to the bar examination "because if she is not given a chance to compete fairly on what is essentially an employment test, she is necessarily precluded from potential employment in that field." *Id.* at 1121.

103.   Plaintiff, much like the client in *Bartlett* will be precluded from potential employment as a medical doctor if she is not given a chance to compete fairly on the USMLE Step 1 examination. The USMLE Step 1 examination is a licensing examination and the Defendant's failure to accommodate Plaintiff on this exam implicates the major life activity of working.

104.   In considering whether Plaintiff is substantially limited in the major life activity of working, the relevant reference group is "the average person having comparable training, skills and abilities." This is a crucial distinction for Plaintiff whose history of self-accommodation has allowed her, much like the client in *Bartlett*, to achieve great accomplishments thus far in her academic career.

105.   The regulation regarding the major life activity of working provides that in order to be substantially limited in the major life activity of working, plaintiff must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(i).

106.   In determining whether an individual is substantially limited in the major life activity of working, the court may also consider the geographical area to which the individual has reasonable access and the class of jobs from which the plaintiff has been excluded. 29 C.F.R. §1630.2(j)(3)(ii). Courts have found that "[c]ertainly, if an applicant were disqualified from an entire field, there would be a substantial handicap to employment." *E.E. Black, Ltd. V. Marshall,* 498 F. Supp. 1088, 1101 (D. Hawai'i 1980).

107.   As intended by Congress, the definition of disability expressed in the ADA "shall be construed in favor of broad coverage of individuals [...] to the maximum extent permitted [...]." 42 U.S.C. § 12102(4)(A).

108.   As intended by Congress, the ADA's use of the term "substantially limits" in the definition of disability "shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." 42 U.S.C. § 12102(4)(B).[9]

---

[9] In 2008, Congress adopted the ADA Amendments Act (The ADAAA) to enact far-reaching changes in the application of the ADA designed to overrule case law narrowly construing the scope of the ADA, and to restore broad coverage of disabilities under the ADA. Pub. L. No. 110-325, 122 Stat. 3553, 42 U.S.C. § 12101. Congress intended, for example, to ensure that a person with a specific learning disability is not excluded from coverage under the ADA because he or she performs well academically (it is "critical to reject the assumption that an individual who has performed well academically cannot be substantially limited in activities such as learning, reading, writing, thinking, or speaking." STATEMENT OF MANAGERS, 154 CONG. REC. AT S8842, *see also* 2008 HOUSE COMM. ON EDUC. AND LABOR REPORT AT 10 (stating the same in nearly identical language)).

The House Committee on Education and Labor noted that some courts have found that students who had reached a high level of academic achievement were not considered individuals with disabilities under the ADA. *Id.* The Committee singled out – and summarily rejected – the decisions in *Price v. Nat'l Bd. of Med. Exam'rs*, 966 F. Supp. 419 (S.D. W.Va. 1997); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F. 3d 620 (6th Cir. 2000); and *Wong v. Regents of Univ. of Cal.*, 379, F. 3d 1097 (9th Cir. 2004). *Id. at 11*. Further, the Committee explicitly endorsed Judge Sonia Sotomayor's holding in *Bartlett v. New York State Bd. of Law Exam'rs*, 226 F. 3d 69 (2d. Cir. 1998), in which the court held that a determination of whether a plaintiff is substantially limited should not take into consideration the plaintiff's ability to self-accommodate. *Id. at 16*. In support of such endorsement, the Committee expressed its belief that someone should not be penalized simply because they have "managed their own adaptive strategies or received informal or undocumented accommodations that have the effect of lessening the deleterious impacts of their disability." *Id.*

109.   As intended by Congress, for purposes of the ADA an impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability. 42 U.S.C. § 12102(4)(C).

110.   Based on the foregoing, Plaintiff is an individual with a "disability" as that concept is defined by the federal Americans with Disabilities Act of 1990, as amended. 42 U.S.C. § 12102.

111.   Pursuant to Title III of the ADA, private entities that administer examinations related to professional licensing must offer the examinations in a place and manner accessible to individuals with disabilities, or must offer alternative accessible arrangements for such individuals. 42 U.S.C. § 12189 and 28 C.F.R. § 36.309(a).

112.   Pursuant to 28 C.F.R. § 36.309, private entities that administer such examinations are required to provide reasonable modifications to the examination and appropriate auxiliary aids and services (i.e., testing accommodations) for individuals with disabilities. Private entities must ensure that such examinations are selected and administered "so as to best ensure[10] that, when the examination is

---

[10] More expansive than the "reasonable accommodation" standard typically addressed through ADA jurisprudence, a "best ensures" standard requires "a level playing field in the administration of professional exams," and requires an entity administering an examination to provide impacted test-takers "with an accommodation that is at least 'as effective' as her preferred accommodation." *Jones v. Nat'l Conf. of Bar Exam'rs*, 801 F. Supp. 2d 270, 284-85, 25 A.D. Cas. (BNA) 394 (D. Vt. 2011), appeal dismissed as moot, 476 Fed. Appx. 957 (2d. Cir

administered to an individual with a disability that impairs sensory, manual, or

speaking skills, the examination results accurately reflect the individual's aptitude

or achievement level or whatever other factor the examination purports to measure,

rather than reflecting the individual's impaired sensory, manual, or speaking skills

(except where those skills are the factors that the examination purports to

measure)." 28 C.F.R. § 36.309(b)(1)(i).

113.   Additionally, private entities administering such examinations must

assure that any request for documentation is "reasonable and limited to the need"

for the modification or accommodation requested. 28 C.F.R. § 36.309(b)(1)(iv).

114.   Moreover, when considering requests for modifications and

accommodations, a private entity administering such examinations must ensure

that it "gives considerable weight" to documentation of past modifications and

accommodations received in similar testing situations. 28 C.F.R. § 36.309(b)(1)(v).

115.   Finally, the ADA's implementing regulations specifically provide that

required modifications and accommodations "may include changes in the length of

---

2012) (requiring defendant to provide plaintiff with her requested accommodations
to "best ensure" that plaintiff's "knowledge [...] is tested [...] rather than the
extent to which Plaintiff is able to overcome her uncontested disabilities."); *Bonnette v. District of Columbia Ct. of Appeals*, 796 F. Supp 2d 164, 183 (D.D.C. 2011) (holding that defendants must offer plaintiff an accommodation as effective as her preferred accommodations unless the defendant can show that plaintiff's preferred accommodations would fundamentally alter the nature of the examination or constitute an undue burden).

time permitted for completion of the examination" as well as adaptation of the manner in which the examination is given. 28 C.F.R. § 36.309(b)(2).

116.   As a direct and proximate result of Defendant's refusal to acknowledge Plaintiff's protections and its own obligations under the ADA through the provision of requested reasonable accommodations on the USMLE Step 1 Examination, Defendant has violated the ADA by discriminating against Plaintiff in a number of ways, including, without limitation, the following:

(a)  In twice determining, following its review of significant documentation submitted by Plaintiff – including: (1) evidence of Plaintiff's clinical diagnoses of ADHD, combined presentation, made in 2009 under criteria specified in DSM-IV (1994) and in 2014 under criteria specified in DSM-5 (2013); (2) evidence of Plaintiff's receipt of similar testing accommodations while a student at USF's Morsani College of Medicine; (3) evidence assembled by Plaintiff nearly twenty five years after she was in grade school demonstrating – inasmuch as such evidence could be expected to demonstrate – symptoms of hyperactivity, distractibility and impulsivity, without the benefit of clinical observation or reporting from that time period; (4) evidence in the form of letters of support from one of Plaintiff's high school teachers and athletic coaches, as well as one of Plaintiff's college roommates, herself now a medical professional, demonstrating Ms. Black's functional performance and difficulties across multiple settings before

Plaintiff had yet turned age eighteen; and (5) additional evidence in the form of letters of support from others at USF with knowledge of Plaintiff's present-day functioning and difficulties managing her diagnosed condition, especially as it relates to her preparations for the USMLE Step 1 Examination – that Plaintiff was not an individual with a disability as that term is presently understood in the ADA, as amended, despite the expressed intent of Congress for the ADA to be construed in favor of broad coverage of individuals to the maximum extent permitted;

(b)  In determining, after review of the above documentation and other documentation Defendant had available to it related to Plaintiff's applications for testing accommodations, that Plaintiff was not "currently substantially limited" in the major life activities of, for instance, learning, reading, concentrating or thinking – all major life activities specifically contemplated by the ADA and implementing regulations. As noted, *supra*, an evaluation or determination of the ways in which an individual is "substantially limited" by a disability is to be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008. Defendant's assertion that Ms. Black "progressed through primary and secondary school without grade retention, special education evaluation or services and with an academic record and scores on timed standardized tests sufficient to gain admission to Princeton University and University of South Florida Morsani College of Medicine, all without accommodations[,]" is, on its face, evidence that

40

Defendant's determination that Plaintiff is not substantially limited in a major life activity was guided by both its own assumptions regarding the import of Plaintiff's academic success as well as a simultaneous unwillingness to acknowledge Plaintiff's explanation of her lifelong utilization of compensatory mechanisms and self-accommodation strategies designed to ensure academic success relative to her peers;

(c)  By refusing to "best ensure" that past administrations of the USMLE Step 1 Examination accurately reflect Plaintiff's aptitude or achievement level, or whatever other factor this examination purports to measure, rather than reflecting Plaintiff's impaired skills as an individual with a disability, as that phrase is understood and contemplated by the ADA;

(d)  By failing to carefully consider the recommendations and clinical determinations of separate qualified professionals who have personally observed Plaintiff in a clinical setting, and who have determined – in their clinical judgment and in accordance with generally-accepted diagnostic criteria, as supported by reasonable documentation – that Plaintiff is substantially-limited in one or more major life activities within the meaning of the ADA, thereby needing the requested test accommodations in order to demonstrate her ability and achievement level on the USMLE Step 1 Examination. In its March 2, 2015 denial of Plaintiff's application for testing accommodations, Defendant simply includes large, quoted

passages of Plaintiff's 2014 Psychoeducational Evaluation without the addition of commentary or an explanation of their selection. Beyond inclusion of this quoted text, Defendant does not directly reference, nor take direct issue with, the evaluation's profiling of Plaintiff's psychiatric, medical, developmental, social or family history; its assessment battery or assessment results and interpretations; or its conclusions and recommendations. Moreover, aside from its assertion in this same letter that "[a] diagnostic label, in and of itself, does not establish coverage under the ADA", it is entirely unclear what portion or portions of either Plaintiff's 2009 or 2014 diagnoses that Defendant is disputing or taking issue with in its denials. Although Defendant's second denial letter to Plaintiff on March 28, 2016 cites a portion of its 2011 Settlement Agreement with the Department of Justice indicating that "NBME also has the right to have the information submitted by or on behalf of an applicant reviewed by one or more qualified professionals of NBME's choosing at NBME's request and expense. NBME is not required to defer to the conclusions or recommendations of an applicant's supporting professional but it must provide an explanation for declining to accept those conclusions or recommendations[,]" it is unclear if, in so noting, Defendant is advising Plaintiff that her application and supporting documentation has been separately reviewed by professionals of Defendant's choosing and what effect, if any, such review had upon Defendant's ultimate determination or determinations;

(e)  By generally requiring at the time of Plaintiff's applications that all applicants for reasonable testing accommodations, and specifically requiring applicants requesting accommodations pursuant to a diagnosis of ADHD, to submit documentation identifying and including a specific diagnosis made by an appropriate professional according to now-outdated diagnostic criteria outlined in DSM-IV (1994). As detailed, *supra*, in consideration of the evolution of clinical thought addressing diagnostic approaches to identifying ADHD (especially in adolescents and adult populations) between publication of DSM-IV (1994) and DSM-5 (2013), as well as the myriad ways in which current diagnostic practices embrace the "settings", "symptoms" and "impairment" analyses as those concepts are now presently contained in DSM-5, Defendant has effectively deprived Plaintiff – and similarly-situated applicants – of the benefit of not merely her own knowledge and understanding of how applications for testing accommodations are processed by the NBME (including an appraisal or awareness of the attendant diagnostic criteria used in its determinations), but also her ability to evaluate any such application or determination in an effort to supplement or coordinate documentary submissions accordingly. Defendant's request for documentation insofar as they relied on DSM-IV diagnostic criteria can certainly not be typified as "reasonable" under the ADA's relevant implementing regulations.

(f) By refusing to provide Plaintiff accommodations on the USMLE Step 1 Examination and, as a result, subjecting Plaintiff, a qualified individual with a disability, to discrimination on the basis of her disability, which substantially limits her in the major life activity of working, by precluding her from employment in an entire class of jobs.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant, providing the following relief:

1.    Entrance of an injunction directing Defendant National Board of Medical Examiners and its officers, employees, and agents to cease discriminating against Plaintiff by granting her requested reasonable testing accommodations on the USMLE Step 1 Examination for time-and-a-half testing, based upon her ample submission of professional evaluative and personal corroborative documentation and evidence, as well as her explanation of the ways in which she has compensated and accommodated for functional deficits created by her diagnosed condition of ADHD, combined presentation, thereby remaining undiagnosed until age 25.

2.    Entrance of an injunction directing Defendant National Board of Medical Examiners to amend whatever determination processes it presently utilizes to evaluate applications and requests for the provision of testing accommodations in a manner that makes them fully compliant with all aspects of the Americans

with Disabilities Act, as amended, in all regards, especially as such determination processes are explained and presented to the general public and potential test-takers.

3.      Declaring that Defendant National Board of Medical Examiners violated the Americans with Disabilities Act, as amended, in denying Plaintiff's requests for accommodations on the USMLE Step 1 exam.

4.      Declaring Defendant National Board of Medical Examiners' apparent and professed practice, three years after publication of updated diagnostic standards expressed in DSM-5 (2013), of inexplicably conducting its accommodated testing determinations pursuant to the now-outdated diagnostic standards expressed in DSM-IV (1994) – as evidenced by Defendant's numerous references to such standards across various documents instructing and informing applicants' submission of documentation – to the extent such a practice is ongoing, to be evidence, on its face, of Defendant's violation of both the spirit and letter of the Americans with Disabilities, as amended.

4.      Retain jurisdiction over this action to ensure Defendant National Board of Medical Examiners' compliance with the mandates of the Court's Orders.

5.      Award Plaintiff the costs of this action, and reasonable attorneys' fees pursuant to 42 U.S.C. § 12188 and 42 U.S.C. § 2000a-3.

6.     Provide such other and further relief as the Court deems to be just and equitable.

Respectfully submitted this 4th day of August, 2017,

By:

**Megan Collins**
Florida Bar No. 0119112

**Curtis Filaroski**
Florida Bar No. 111972
**Attorneys for Plaintiff**
Disability Rights Florida
2473 Care Drive, Suite #200
Tallahassee, Florida  32308
(850) 488-8640
curtisf@disabilityrightsflorida.org
meganc@disabilityrightsflorida.org

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that a true and correct copy of the foregoing was filed on CM/ECF on August

4, 2017, and electronically delivered to the following individuals:

GREGORY A. HEARING
Florida Bar No.: 817790
ghearing@tsghlaw.com
Thompson, Sizemore, Gonzalez & Hearing, P.A.
201 N. Franklin St., Suite 1600
Post Office Box 639 (33601)
Tampa, Florida 33602
Tel: (813) 273-0050
Fax: (813) 273-0072

ROBERT A. BURGOYNE
Appearing *Pro Hac Vice*
D.C. Bar No.: 366757
robert.burgoyne@nortonrosefulbright.com
Norton Rose Fulbright US LLP
799 9th Street, NW, Suite 1000
Washington, DC 20001-4501
Tel: (202) 662-4513
Fax: (202) 662-4643

/s/ Megan Collins
Megan Collins, Esq.