# Charles J. Golden, Ph.D.

Board Certified (ABPP)
Clinical Neuropsychology and Clinical Psychology
Florida License PY-5226

**Home:**
2862 NE 35th Court
Lighthouse Point, Fl 33064

(954) 663-1004

**Office:**
College of Psychology
Nova Southeastern University
3301 College Avenue
Fort Lauderdale, Fl 33314
(954) 262-5715 (office)

Email: charlesjgolden@gmail.com

**Name**: Elizabeth Black
**D.O.B.:** [ ] 1983
**Age:**  34
**Gender**: Female
**Level of Education:** 18
**Dates of Testing:**  July 18 and 19, 2017

**Presenting Problem:**

Elizabeth Black was evaluated to determine whether she qualified for accommodations on a test related to medical school performance. She is currently involved in a lawsuit because of denial of her previous requests.

**History of Current Problem:**

The client's prior history and testing has been well documented in her file as well as in depositions. The current focus of this evaluation was to determine whether she has a disorder that interferes with her performance on high stakes timed tests, a major life function of immeasurable importance in today's academic and professional worlds. She has a history of performing above average on such tests in general. On the SAT, her Verbal score ranged from 610-650 over multiple administrations, placing her performance at one to one and one-half standard deviations above the general population average. On the SAT Math test, she showed performance in the same range. On the SAT achievement tests across a wide range of topics, she performed in the range of 470 (slightly below the average of 500) to 610 (1.1 standard deviations above average.)

On the MCAT, she took the test four or five times but cancelled the scores in all but two instances. Initially, she performed overall at the 32nd percentile, below average for those taking the MCAT. If we adjust however for the fact the the MCAT scores are based on a higher performing population, her performance is about at the average expected for the general population. On the last time she took the test- after several cancelled tests and taking an intensive training course- she scored overall at the 73rd %, about 2/3 of a standard deviation

**EXHIBIT 2**

better than the population taking the MCAT and about 1.5 standard deviations better than the general population, consistent with her scores on the SAT after considerable effort.

Her school grades and behavior have bene uniformly positive, graduating ultimately from Princeton University before eventually attending medical school. We have no reports on any other standardized testing prior to her SAT scores.

Prior neuropsychological and psychiatric evaluations have diagnosed her with ADHD. She has been treated with medication but was not on medication when receiving the current test, which is consistent with practice in the evaluation of ADHD. The client reported struggling with attention throughout her life, but she was able to overcome these issues with her intelligence.

**Mental Status Exam:**

Elizabeth is a 34-year-old, right handed, Caucasian Female. She arrived on time for the appointment. She was dressed casually and well groomed. She appeared her stated age and was of average height, and appeared to be of average weight. She was oriented to person, time, place, and situation with no evidence of formal thought disturbance. She denied hallucinations, and did not make statements consistent with a delusional disorder. Rapport was easily established and maintained. She responded appropriately to all questions. She was comfortable conversing with the clinician and demonstrated a desire to be open and honest. She demonstrated appropriate insight into the reason for the evaluation and her situation. Her attention and concentration wavered as the exam proceeded, and was clearly more impaired for visual attention as compared to auditory attention. Her affect was appropriate to the situation and topics of discussion; she described her mood as "normal" but noted she had had mild anxiety regarding her current situation and occasions when she was depressed (but not dysfunctional in either case). She appeared to have a high energy level and was very talkative and open. She made appropriate eye contact when spoken to and was cooperative during the interview. There was mild evidence of extra psychomotor activity, but she was able to remain seated and displayed appropriate behavior throughout the interview. She denied previous and current homicidal/suicidal ideation, plan, or intent.

**Behavioral Observations:**

She was compliant throughout testing and was eager to complete the evaluation. She showed strong effort on all tests and showed positive response to feedback and encouragement. She was able to attend to the tasks presented to her and remained seated throughout the testing process without any visible difficulties. She showed no difficulty maintaining eye contact throughout testing. Moreover, she was able to joke occasionally and would converse spontaneously. She was very open throughout testing and willing to answer any questions posed. She would be mildly distressed when she did not immediately know the answer to a question and would respond quickly to stimuli, but usually accurately.

**Tests Administered**

Biopsychosocial Interview
Wechsler Adult Intelligence Scale– Fourth Edition (WAIS-IV)
Nelson Denny Reading Test
Conners' Continuous Auditory Test of Attention (CATA)
Conners' Continuous Performance Test III (CPT-III)
Wisconsin Card Sorting Test (WCST)
Category Test
Trail Making Test A & B
Millon Clinical Multiaxial Inventory III (MCMI-III)
MSVT

## Test Results

### Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV)

The Wechsler Adult Intelligence Scale – Fourth Edition is a measure of general intellectual functioning. With a chronological age of 34 years, Ms. Blacks' overall level of intellectual functioning was found to be in the top 1-2% of the population. Her verbal performance was in the top 1`% of the population, while her processing speed was only average on Coding, but very strong on Symbol Search. Scaled scores from 7-13 are average. Standard scores from 85-115 are in the average range. Complete test scores are listed below:

| Verbal Comprehension Index | Scores | Perceptual Reasoning Index | Scores |
|---|---|---|---|
| Similarities | 15 | Block Design | 15 |
| Vocabulary | 18 | Matrix Reasoning | 14 |
| Information | 15 | Visual Puzzles | 13 |
| Working Memory Index | Scores | Processing Speed Index | Scores |
| Digit Span | 17 | Symbol Search | 15 |
| Arithmetic | 11 | Coding | 9 |

| Index Scores | Score |
|---|---|
| Full Scale IQ | 129 |
| Verbal Comprehension | 136 |
| Perceptual Reasoning | 123 |
| Working Memory | 122 |
| Processing Speed | 111 |

### Nelson Denny Reading Test

The Nelson Denny Reading Test was used to test speeded reading comprehension. For the standard time administration (20 minutes Comprehension), her overall performance was in the Average range (Standard score=91, Grade Equivalent=14.4). When provided with 40% extra time on the extended administration of Comprehension (32 minutes), her scores significantly improved (Standard score=107, Grade Equivalent=107). Her reading rate of 179 was lower than

expected (Standard score=84). When compared against a beginning 13th grade population (high school students attending college for the first time, a better approximation of the normal population), her overall Comprehension performance was in the Average range (SS=105) and her Reading Rate was also in the average range (SS=90). With 40% extended time, her performance was well above the general population average, with a standard score of 123.

### Conners' Continuous Auditory Test of Attention (CATA)

The Conners' Continuous Auditory Test of Attention is a computerized auditory performance test that assesses attention. T scores above 60 or below 40 are indicative of possible impairment. Her profile as a whole was suggestive of problems with sustained attention. Complete scores are listed below:

| Measure | T-score |
| --- | --- |
| Detectability | 55 |
| Omissions | 45 |
| Commissions | 53 |
| Perseverative Commissions | 50 |
| Hit Reaction Time (HRT) | 36 |
| HRT Standard Deviation | 54 |
| HRT Block Change | 67 |

### Conners' Continuous Performance Test III (CPT-III)

The Conner's Continuous Performance Test –III is a computerized visual performance test that assesses attention and impulse control. T scores above 60 or below 40 are indicative of possible impairment. Elizabeth showed five atypical T scores, indicating a high probability of a disorder characterized by visual attentional problems. There were strong indicators of impulsiveness, as well as milder indicators of inattention and vigilance issues. Complete scores are listed below:

| Measure | T-score | Measure | T-score |
| --- | --- | --- | --- |
| Detectability | 98 | HRT Block Change | 51 |
| Omissions | 49 | HRT Inter-Stimulus Interval Change | 60 |
| Commissions | 71 | | |
| Perseverations | 81 | | |
| Hit Reaction Time (HRT) | 40 | | |
| HRT Standard Deviation | 55 | | |
| Variability | 53 | | |

### Wisconsin Card Sorting Test (WCST)

The Wisconsin Card Sorting Test is used to assess executive functioning, namely the ability to shift and maintain problem-solving strategies for abstract problems when given feedback. A computerized 128-card version of the test was used for this evaluation. Elizabeth's overall scores

fell in the Average range. She completed 6 categories wit 76 trials with no evidence of perseveration.

**Category Test**

The Category Test is a computerized evaluative tool used to measure non-verbal concept formation and the ability to shift and maintain problem-solving strategies. Elizabeth's score fell in the Average range. T-scores between 40 and 60 are in the average range. She made 16 errors (T=52).

**Trail Making Test A and B**

The Trail Making tests measure cognitive flexibility, sequencing ability, and visual-motor speed. Trails A is a measure of visual scanning and motor speed. The examinee is asked to draw connecting lines between numbered circles in sequential order (1 to 2, 2 to 3, etc.). Trails B is similar to Trails A but also measures the ability to shift between different kinds of sequencing tasks. The examinee is asked to alternate between numbers and letters, in order, while connecting the circles (1 to A, 2 to B, 3 to C, etc. Her Trails A score of 18 seconds (no errors) and Trails B score of 54 seconds (1 error) fell within the normal range, although Trails B is expected to be about twice Trails A showing a relative slowness.

**Millon Clinical Multiaxial Inventory-III (MCMI)**

The Millon Clinical Multiaxial Inventory III is a self-report measure that assesses a wide range of information related to personality, emotional adjustment, and attitude toward taking tests. Base Rate scores between 75 and 84 fall in the subclinical range. Base rate scores 85 and above fall in the clinical range. The profile as a whole was consistent with a normal individual without significant emotional or personality problems.

| Scale Category | BR Scores | Scale Category | BR Scores |
|---|---|---|---|
| Modifying Indices | | Severe Personality Pathology | |
| Disclosure | 43 | Schizotypal | 64 |
| Desirability | 80 | Borderline | 36 |
| Debasement | 52 | Paranoid | 0 |
| | | | |
| Clinical Personality Patterns | | Clinical Syndromes | |
| Schizoid | 0 | Anxiety | 20 |
| Avoidant | 36 | Somatoform | 0 |
| Depressive | 30 | Bipolar: Manic | 72 |
| Dependent | 75 | Dysthymia | 24 |
| Histrionic | 66 | Alcohol Dependence | 20 |
| Narcissistic | 63 | Drug Dependence | 20 |

| | | | |
|---|---|---|---|
| Antisocial | 36 | Posttraumatic Stress Disorder | 0 |
| Aggressive (Sadistic) | 48 | | |
| Compulsive | 66 | <u>Severe Syndromes</u> | |
| Passive-Aggressive (Negativistic) | 30 | Thought Disorder | 45 |
| Self-Defeating | 20 | Major Depression | 0 |
| | | Delusional Disorder | 0 |

**MSVT:**

The MSVT is a measure of effort and malingering. She scored in the normal range on all measures:

IR: 100%
DR: 100%
DNS: 100%
PA: 100%
FR: 85%

**Discussion:**

The client put forth excellent effort throughout seven hours of testing over two days. The testing showed an individual with excellent cognitive skills, with her Verbal Comprehension Index of 136 (2.4 standard deviations over the average IQ and in the top 1% of the population). Her performance across all of the cognitive tests were above average, but she showed a relative weakness in speed of reading comprehension and on some of the attentional tests.

Her Nelson-Denny speeded Comprehension Score during the initial 20 minutes was 91, placing her six-tenths of a standard deviation below the average for individuals with a BA degree and one-third of a standard deviation above the average for the population as a whole. Her reading speed however was at the lower end of average (SS=90) even for the general population. However, it should be noted that reading rate is an unstable score and cannot be relied on by itself. Even with 40% extra time, however, she performs more poorly than would be predicted by her IQ.

On the CPT-III, the test of visual attention, her performance was highly impaired and clearly indicated the presence of a substantial attentional disorder along with evidence of impulsivity and vigilance issues over time. On the CATA, a similar test of auditory attention, she showed a lesser level of attentional issues, suggesting that she likely learns faster and better from auditory rather than written presentations. This would be useful to her when presentations are in lecture or auditory format.

Finally, her previous performance on actual high stakes timed tests shows that her performance – while well above the average for the general population- is well below levels predicted by her Verbal Comprehension Index, the single best predictor of her potential on those tests. On the SAT, her IQ would predict a score of 740 (range 690-790), which is well above even her best score (it should be remembered that retesting and practice can lead to improvements in SAT

scores as well as other tests.) Her achievement and math scores were even lower below her expected levels.

On the MCAT, her initial scores were at best average for the general population, over two standard deviations below the score expected by her VCI. After several aborted retests and intensive training, her score reached 1.5 standard deviations better than expected in the general population, still substantially below her expected score of 2.4 standard deviations.

While the client did report problems with attention and impulsivity, she was never diagnosed nor did she request accommodations or help until 8 years ago. This is not unusual in extremely bright children who are not hyperactive and disruptive, but who are likely to be impulsive in answering questions and to be distracted but often answer correctly and perform overall better than average students. Since they are not disruptive and teachers do not realize their full potential, they are not identified as having a problem. That however is very different from not having the disorder. These issues are not identified until the individual is faced with high stake timed tests, with the disorder becoming more evident as the tests increase in difficulty and the role of attention becomes more critical. This is seen in Elizabeth as she underperformed on the SAT (although she failed to recognize this) and then severely underperformed on her first MCAT. Taking the MCAT and her problems studying at this point raised the issue of whether there was a problem interfering with her success. This resulted in her first evaluation and the subsequent diagnosis.

The testing, history and analysis clearly point to the presence of a disability that interferes with her ability to perform in circumstances that demand high levels of attention. It could be attempted to argue that her problem is not ADHD but rather another disorder (such as anxiety) which interferes with high stakes testing, but such a diagnosis is not consistent either with the test results now or in the past. It should also be noted that even if another disorder was the cause, that disorder would also be a disability which would require similar accommodations.

One issue relevant to this case is the definition of learning disability. Initially, the concept of LD and ADHD was based on the idea that an individual had to perform worse than the general population in order to have a disability, regardless of what the overall potential of that individual might be. This resulted in many bright individuals with ADHD and with LD being denied accommodations because their overall performance was not impaired compared to the general population. However, changes both in psychological diagnostic procedures as well as in law eliminated this requirement, focusing on the degree to which a disability interfered with the potential achievement of an individual, usually measured by either full scale or verbal IQ depending on what disorder and condition was involved. Thus, it was recognized that the Law student who was very bright but could read only at an average rate due to a LD or ADHD was in fact impaired and deserved accommodations so that they could perform in law school at their maximum level and receive accommodations for law boards. This case is identical to those cases.

Elizabeth's disability shows up as a significant issue when she is faced with highly speeded, timed behaviors. As noted above, the major impact is in high stakes speeded tests as shown above especially when visual attention is demanded. In situations where auditory attention is

demanded, she would function at her highest competence. In situations that are visual but do not demand higher levels of attention, she would function well. Thus, her ability to function as a doctor in most situations would not be impacted, as most situations between a doctor and patient do not demand the highest levels of visual focus and attention. There could be an impact in limited specialty areas where she would not function at an optimal level: emergency visually detailed surgery for example might be impacted. However, most physicians do not function in such environments and her optimal specialties will be identified at higher levels of training.

DSM-V criteria for ADHD are clearly met when it is recognized that the issue is not whether she performs like the normal population but rather performs below her potential because of the disorder. DSM-V defines ADHD as a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development. This is defined as:

> **(1) For older adolescents and adults (age 17 and older), five or more symptoms are required. In Elizabeth we see the following symptoms:**

Often fidgets with or taps hands and feet, or squirms in seat

Often has difficulty sustaining attention in tasks or activities

Restlessness

Often talks excessively

Often blurts out answers before a question has been completed

Is easily distracted **by extraneous stimuli**

> **(2) Several inattentive or hyperactive-impulsive symptoms present prior to age 12 years.**

The above symptoms have been reported throughout her life as documented in her file. It is not necessary that ADHD be diagnosed prior to age 12, only that the symptoms are present.

> **(3) Several inattentive or hyperactive-impulsive symptoms present in two or more settings (e.g. at home, school or work; with friends or relatives; in other activities)**

These symptoms are clearly seen in school and were reported by friends and relatives as documented in her file.

> **(4) Clear evidence that the symptoms interfere with, or reduce the quality of, social, academic or occupational functioning**

Her academic issues have been discussed above and are seen most clearly in highly speeded tests. There has been lesser impact in other aspects of her life as the symptoms are mitigated by her very high intelligence.

(5) **Symptoms do not occur exclusively during the course of schizophrenia or another psychotic disorder, and are not better explained by another mental disorder (e.g. mood disorder, anxiety disorder, dissociative disorder, personality disorder, substance intoxication or withdrawal).**

There is no evidence whatsoever of a major psychiatric disorder which have been responsible for her symptoms. As noted earlier, anxiety was considered but her history, testing and presentation are in my opinion inconsistent with such a diagnosis. However, if it were thought that an alternate psychiatric diagnosis was a better explanation, this would represent a disability which would require the same accommodations.

The other alternate diagnosis that would be considered under DSM V is Specific Learning Disability in Reading. The criteria for this diagnosis includes possible deficits in:

☐ Word reading accuracy
☐ Reading rate or fluency
☐ Reading comprehension

Elizabeth meets these criteria as well because of her issues in speeded comprehension as described in this report. This diagnosis was not made because it was decided that her problems were better explained by ADHD. If we were to conclude that she does not meet the criteria for ADHD, then she clearly meets the criteria for Specific Learning Disability in reading. The criteria does not require that her reading be below that of the general population: the issue is whether her reading reflects her optimal ability. The most basic point of accommodations is to allow individuals to have the opportunity to function at their highest level (in this case in timed high stakes tests) when they are limited by extraneous factors such as attention or speeded reading comprehension. Whether she is diagnosed as ADHD or Specific Learning Disability, she requires the extra time to be able to function at her highest level.

Based on this, Elizabeth Black clearly has ADHD and has shown a lifelong pattern of underachievement consistent with this diagnosis, which is clear in her performance on high stakes, timed tests. As a result, the testing clearly supports accommodations including both 50% extra time and double breaks to allow her to recover and perform more poorly as her performance declines over time without breaks to a greater level than individuals with no disability.

Please feel free to call me who any questions at 954-663-1004.
Sincerely,

*[signature]*

Charles J. Golden, Ph.D., ABPP, ABPN, ABAP
Diplomate, American Board of Professional Psychology

(Clinical Psychology and Clinical Neuropsychology)
Diplomate, American Board of Professional Neuropsychology
Diplomate, American Board of Assessment Psychology
Professor of Psychology
Florida Licensed Psychologist #PY-5226