**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ELIZABETH A. BLACK,

Plaintiff,

vs.                                    CASE NO.:  8:16-cv-02117-T-23TGW

NATIONAL BOARD OF
MEDICAL EXAMINERS,

Defendant.

_____/

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to this Court's Case Management and Scheduling Order, ECF No. 17, Plaintiff files her Proposed Findings and Fact and Conclusions of Law:

**FINDINGS OF FACT**

1.  This case was brought by Elizabeth A. Black ("Plaintiff"), a 34-year-old medical student at the University of South Florida (USF) Morsani College of Medicine (MCOM) who is seeking to take the United States Medical Licensing Examination (USMLE) Step One Examination (Step 1 Exam) in a manner accessible to her as an individual with attention deficit hyperactivity disorder (ADHD). The Step 1 exam is a necessary pre-requisite for Plaintiff to continue on to her third year of medical school.

2.  The Step 1 exam is administered by Defendant, National Board of Medical Examiners (NBME), a not-for-profit organization. Defendant also processes requests for accommodations, through its Disability Services Section, on the Step 1 exam.

3. Plaintiff alleges that Defendant has violated her rights under Title III of the Americans with Disabilities Act by denying her accommodations on the Step 1 exam. Specifically, Plaintiff is seeking 50% extra time on the examination to accommodate the substantial limitations caused by her impairment of ADHD. Defendant counters by asserting that Plaintiff does not have a disability under the ADA.

<u>Plaintiff's History of Diagnosis of and Treatment for ADHD, and its Disabling Effects</u>

4. Plaintiff was not initially diagnosed with ADHD until she was 26 years old. ECF No. 38-1, at 11.[1] Prior to this time, Plaintiff had gone through and excelled in elementary school, middle school, high school, secondary and post-secondary school without diagnosis or need for formal accommodations.

5. Plaintiff initially sought treatment from Dr. Scott Fleischer, her diagnosing physician, because she was having trouble concentrating during her studies for the Medical College Admission Test (MCAT), a standardized examination that is crucial for enrollment in medical school. ECF No. 38, at 1, ¶ 3.

6. Plaintiff's ADHD diagnosis was made by Dr. Fleischer following a "consultation and brief psychiatric evaluation" of Plaintiff, ECF No. 38, at 1, ¶ 5, and was the result of Dr. Fleischer's clinical and professional opinion that Plaintiff "was experiencing symptoms that are consistent with ADD [and that she] might respond positively to appropriate medications." *Id.* at 2, ¶ 7.

7. Upon matriculating to USF MCOM, Plaintiff began receiving medication management from Dr. Swapna Mukherjea in relation to her ADHD on September 6, 2011 from USF's

---

[1] All citations to the record are to portions of the record expected to be presented as exhibits at trial. Accordingly, they are portions of the record that can be expected to be able to be referred to and/or cited by the Court in its Findings of Fact. For an explanation as to the citation to deposition transcripts, *see infra* n.2.

Counseling Center. ECF No. 39-4, at 1; ECF No. 39-3, at 2. Plaintiff also received six counseling sessions from Tania Sales, Psy.D, around this time. *Id.*

8. On or around July 19, 2012, Plaintiff began seeking counseling services from the Counseling Center on a more permanent basis. *Id.* Plaintiff sought treatment from the Counseling Center due to attentional, academic, and anxiety-related concerns. ECF No. 39-2, p. 14, at 200:25–201:4; *see also* ECF No. 39-3, at 1 (listing "Life Skills & Planning," "Attention Deficit Disorder," "Interpersonal Difficulties," and "Anxiety: Performance (e.g. test) & Generalized" as reasons for seeking services at the Counseling Center).

9. Around the time she began receiving counseling treatment, Plaintiff was required to undergo a battery of tests -- including the Adult ADHD Self-Report Scale (ASRS) Parts A & B, the Conners' Continuous Performance Test (CPT-II), and the Brief Test of Attention (BTA) -- related to her ADHD. ECF No. 39-5. The "Overall Clinical Impression" of this evaluation was that "[t]he client's [Plaintiff's] symptoms may indicate ADHD symptoms," with the ASRS tests indicating Plaintiff was "[h]ighly likely to have ADHD," the CPT-II results indicating Plaintiff had a "54% [p]robability of symptoms indicating ADHD," and the BTA results indicating her "[s]cores are in the low average range." *Id.* at 1.

10. On June 10, 2013, Plaintiff began seeing Ashley Vigil-Otero, Psy.D. for therapy related to issues with her ADHD, specifically issues with "work/life balance [and] stress [with] school." ECF No. 39-6, at 4.

11. Dr. Vigil-Otero testified that she had "approximately nine" sessions with Plaintiff, ECF No. 39-7, at 20:1[2], and that during her time seeing Plaintiff "she was on the verge of not being able to stay in medical school" and was having "to postpone tests and was having difficulties." *Id.* at 32:8–16. Dr. Vigil-Otero reports that while Plaintiff first came "across … as very articulate" and as someone with only occasional struggles, "the level of impairment definitely did come across as more pronounced as she continued to struggle." *Id.* at 52:5–11; *see also id.* at 68:21–69:9 (while treating Plaintiff "she really was starting to get off track in her goals, to the point where it was impacting her ability to meet medical school demands, and that problem was worsening as she was postponing [taking her Step 1 examination].").

12. Dr. Vigil-Otero testified that her treatment of Plaintiff was targeted at behaviors related to Plaintiff's limitations in concentration, specifically since "in this period of her life where she had higher demands that required high levels of concentration these behaviors [procrastination] were really impacting her and really compounding her challenge of study." *Id.* at 67:21–68:5; *see also id.* 29:5–10 ("[S]he had great difficulty sustaining attention, completing her study goals, really getting derailed by little things, getting off task, being able to prioritize and engage in studying that required a lot of sustained attention.").

13. Ultimately, Dr. Vigil-Otero confirmed Plaintiff's diagnosis of ADHD. *See id.* at 24:15–22 ("I did diagnose her with ADHD. [Y]ou really just need to meet the criteria for the DSM [and] she provided those symptoms."). Dr. Vigil-Otero concluded that Plaintiff's

---

[2] For the purposes of these Proposed Findings of Fact and Conclusions of Law, Plaintiff will be citing to deposition testimony as reflected in the deposition transcripts. However, Plaintiff anticipates the same manner of testimony elicited in deposition will be elicited at trial, and thus expects the same factual allegations to arise in the testimony at trial, ultimately to be included in this Court's Findings of Fact. Accordingly, for these Proposed Findings of Fact, Plaintiff will treat deposition testimony as identical to anticipated trial testimony for the purposes herein.

ADHD was of the type that went "under the radar" as a child because she was a "high-achieving, well-behaved perfectionist child" but that many of these qualities "further derailed her in adulthood" due to her ADHD, which led to her adult diagnosis. *Id.* at 69:16–70:10.

14. On or around October 9, 2014 Plaintiff was referred by Dr. Phyllis Feldman, a psychiatrist at the USF Counseling Center, to take a re-evaluation conducted by Megan McMurray, a graduate student at the time, and supervised by Dr. Margret Booth-Jones, to confirm her diagnosis of ADHD. ECF No. 35, p. 15, at 27:16–19. As part of her re-evaluation, Plaintiff provided an extensive psychiatric, medical, and social/family history, and took a battery of examinations, including a CPT-II, a Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV), and a Conners' Adult ADHD Rating Scales – Self Report: Long Version (CAARS – S:L). ECF No. 32-15.

15. As a result of the re-evaluation, Plaintiff was diagnosed with ADHD with combined presentation; it was also recommended that she receive academic accommodations, specifically "extended time for testing and quiet testing accommodations in all courses and standardized tests." *Id.* at 8.

16. Dr. Booth-Jones, who supervised and signed off on this evaluation of Plaintiff, stated that it was her opinion that Plaintiff "has a significant discrepancy between her intellectual ability and her working memory and processing speed. [It's a s]tandard presentation of ADHD." ECF No. 35, p. 18, at 31:15–18.

17. Dr. Booth-Jones attributes Plaintiff's coping with ADHD throughout childhood and subsequent diagnosis as an adult as being due to a sort of "breaking point" where the condition finally fully presented itself such that it impaired Plaintiff's functioning –

"there just gets to be a critical mass of information … there gets to be a point where they [high-achieving individuals like Plaintiff] just can't do any more and it [ADHD symptoms] presents itself." *Id.*, p. 6, at 65:9–66:6.

18. On July 18–19, 2017, during the course of this litigation and in preparation for trial, Plaintiff was evaluated by Plaintiff's expert witness Dr. Charles Golden. ECF No. 47-2. The purpose of the evaluation "was … to determine whether [Plaintiff] qualified for accommodations on a test related to medical school performance." *Id.* at 1. The tests administered were a biopsychosocial interview, the WAIS-IV, Nelson Denny Reading Test, Conners' Continuous Auditory Test of Attention (CATA), Conners' Continuous Performance Test III (CPT-III), Wisconsin Card Sorting Test (WCST), Category Test, Trial Making Test A & B, Millon Clinical Multiaxial Inventory III (MCMI-III), and a MSVT. *Id.* at 2–3.

19. As a result of the evaluation, Dr. Golden concluded that Plaintiff "clearly has ADHD and has shown a lifelong pattern of underachievement consistent with this diagnosis, which is clear in her performance on high stakes, timed tests." *Id.* at 9; *see also id.* at 8–9 (discussing how Plaintiff meets the DSM-V criteria for ADHD). Dr. Golden also explained Plaintiff's adult ADHD diagnosis was the result of being an "extremely bright [child]" with "issues [that] are not identified until the individual is faced with high stake timed tests, with the disorder becoming more evident as the tests increase in difficulty and the role of attention becomes more critical." *Id.* at 7.

20. Moreover, Dr. Golden stated that "[t]he testing, history and analysis [sic] clearly point to the presence of a disability that interferes with her ability to perform in circumstances that demand high levels of attention." *Id.* Thus, Dr. Golden concluded in his report that

there are areas – specifically concentrating and reading – where Plaintiff's ADHD substantially limited major life activities crucial to taking high-stake standardized examinations. *See id.* at 7 (noting that Plaintiff's "disability shows up as a significant issue when she is faced with highly speeded, time behaviors [including] in high stakes speeded tests…especially when visual attention is demanded"); at 9 (discussing Plaintiff's significant limitations in the area of reading, such that it may be appropriate to diagnose her with a Specific Learning Disability in Reading"). He stated that these significant limitations, caused by Plaintiff's ADHD, resulted in Plaintiff performing well-below her expected performance on high stakes, timed testing, e.g. standardized examinations. *Id.*

### The USMLE Step 1 Examination

21. The USMLE Step One examination ("Step 1 exam") is an "assessment of basic science knowledge [and an] application of that knowledge." ECF No. 39-9, p. 6, 11:14–15. It is a one-day, eight-hour exam broken up into 7 test blocks (each 60 minutes each, with 40 questions), with 15 minutes of tutorial time and 45 minutes for break time. ECF No. 39-10, at 3.

22. Licensing authorities across the country rely on the USMLE Step examination, including the Step 1 exam, to help evaluate the qualifications of individuals seeking their license to practice medicine. ECF No. 36, ¶ 5. Accordingly, the Step 1 exam serves a gate-keeping purpose for the medical profession.

23. Defendant provides accommodations to individuals with disabilities pursuant to the ADA. *Id.* at ¶¶ 7–8; *see also* 42 U.S.C. § 12189.

24. At USF MCOM, students take the Step 1 exam between their second and third year of medical school, and are required to pass the examination before moving onto their third year of schooling. *See* http://health.usf.edu/medicine/mdprogram/careeradvising (last visited Aug. 1, 2017).

25. Due to Plaintiff's failure to pass the examination with accommodations, she has not been able to continue on in medical school since the last time she failed the Step One examination, in 2015, when "she was in the middle of a clinical rotation" and forced to discontinue her studies at medical school until she passed the examination. ECF No. 39-2, p. 9, at 28:22–25.

<u>Plaintiff's Applications for Accommodations on the Step 1 Exam</u>

26. Plaintiff began attending medical school at USF MCOM in 2011. *Id.* at 28:10–11. Starting in March of 2013, Plaintiff's second year of medical school, Plaintiff began receiving testing accommodations from USF MCOM – 50% extra time and reduced distraction environments for examinations – based on her diagnosis of ADHD. ECF No. 33-2, at 9–10.

27. In her third year of medical school, which was in 2013–14, Plaintiff prepared to take the USMLE Step One examination administered by the Defendant. *See* ECF No. 39-2, p. 13, at 189:9–19.

28. After taking multiple leaves of absences from medical school beginning on April 23, 2013, ECF No. 32, p. 14, at 41:2–11, Plaintiff took her first administration of the Step 1 examination on July 3, 2014 and failed, scoring a 183 (a passing score is 192). ECF No. 33-4, at 70.

29. Plaintiff reports that she did not seek accommodations on this administration of the examination because she was concerned about the Defendant's then practice of "flagging" an individual's examination if they received accommodations, and was advised by medical school advisors that this would disadvantage her going forward.  ECF No. 39-2, p. 10, at 43:21–44:21.

30. On November 18, 2014, after Defendant discontinued its practice of flagging, Plaintiff applied for accommodations for her second administration of the Step 1 examination. ECF No. 33-2. Included with her application was her ADHD evaluation from Dr. Booth-Jones, a personal statement detailing her struggles with ADHD, her transcripts from college, a statement from Pamela O'Callaghan supporting Plaintiff's need for accommodation, and a certification of prior testing accommodations from USF. *Id.*

31. Despite this information, Plaintiff's request was denied on March 2, 2015. ECF No. 34-1, at 4–5. The denial concluded that Plaintiff's "documentation [did] not demonstrate that you are currently substantially limited in a major life activity as compared to most people or that additional testing time is an appropriate [accommodation]." *Id.* at 5. The denial questioned Plaintiff's ADHD diagnosis, noting that Plaintiff, despite presenting documentation of her diagnosis and its impact, did not present any "objective data or documentation … verifying that you have shown pervasive problems [associated with ADHD]" and that Plaintiff did not have any issues progressing through school or college, or in taking standardized tests.

32. Following this denial, Plaintiff sat for her second administration of the Step One examination on April 9, 2015 and scored a 189, three points short of the passing threshold of 192. ECF No. 33-4, at 76.

33. Shortly after her second administration, Plaintiff sat for her third administration of the Step One examination on July 2, 2015 following an "absolute deadline by which to take Step 1 of July 2 (no further delays will be permitted)" issued by Kira Zwygart – Dean of Student Affairs at the time at USF MCOM – to Plaintiff. ECF 39-11, at 1.

34. The time constraints rendered Plaintiff unable to apply for accommodations, and she once again failed the examination, scoring a 173. ECF No. 33-4, at 82.

35. After confirming with USF that she could take the Step 1 examination a fourth time and remain enrolled in the medical school, ECF No. 39-12, Plaintiff applied for accommodations a second time on January 22, 2016, intending the accommodations to apply to a future, fourth administration of the examination, which she had already registered for at that time. ECF No. 33-4, at 8. Her second application included, among many other items, various report cards and standardized examination results from K–12, letters from various individuals discussing the impact ADHD has had on Plaintiff's life, and documents reflecting the therapy and counseling Plaintiff attended to manage her disability. *See generally id.*  In addition, NBME considered the documents included in Plaintiff's first application. *See* ECF No. 36, at 4, ¶ 16.

36. Plaintiff's request was denied on March 28, 2016. ECF No. 34-1, at 1–3. The denial letter stated that "[o]ur review of the supplemental documentation that you provided with your recent submission found no new substantive information or evidence that alters our original decision." *Id.* at 2–3. Despite the denial, the letter did state that "[w]hile we are unable to provide you with accommodations under the ADA, for your comfort, we will provide ... [a]dditional break time/standard test time." *Id.* at 3. Plaintiff never requested this accommodation and no explanation was given as to why it was provided.

37. In addition to Catherine Farmer, Psy.D, who authored the denial letters sent to Plaintiff, Dr. Kevin Murphy also reviewed Plaintiff's applications as an ADHD consultant. In his role as a consultant, Dr. Murphy is "not a decision maker," ECF No. 33, p. 8, at 33:6–8, although he stated "I think most of the time obviously they will go with my recommendation." *Id.* at 33:19–20.

38. For Plaintiff, Dr. Murphy's review of the documents submitted led him to conclude, for both applications, that "the documentation provided does not adequately substantiate an ADHD diagnosis." ECF No. 33-3, at 2; *see also* ECF No. 33-5, at 3. Dr. Murphy's conclusion was made in part because he does not accept or grant deference to a previous diagnosis of ADHD from an evaluation conducted by a qualified professional. ECF No. 39-13, pp. 6–8, at 123:19–125:6. This is despite the fact that he would "diagnose somebody without the ability to have done the assessment" himself or "determine the impact of someone's disability based just on a record review." *Id.*, p. 5, at 24:17–22.

39. Considering the role that consultants have in the review process, Dr. Murphy's review of Plaintiff's applications likely had close to a determinative impact on her denial. *See* ECF No. 39-9, pp. 7–8, at 16:15–17:13 (consultants review an application if a review by the Defendant's Disability Services Section, which processes accommodations requests, does not result in a determination).

40. Ultimately, on each of the three administrations of the examination, Plaintiff reports that she could not finish any of the sections of the examination – she either guessed the answers or left the answer bubbles blank on the final questions of each section. ECF No. 39-2, p. 16, at 208:11–23. The scoring sheet provided by Defendant in discovery largely reflects this difficulty – many of Plaintiff's incorrect answers occur at the end of testing

sections, and it appears Plaintiff is often filling out the same answer bubble (e.g. eight consecutive "B" answers at the end of the final section on her third test, ECF No. 39-14, at 26) to end sections. *Id.*

41. Plaintiff reports that her trouble with standardized exams is a phenomenon that has occurred all of her life, and that she is never able to complete these types of examinations due to being distracted and impulsively choosing answers "instead of taking the time to think through the questions." ECF No. 39-2, pp. 17–18, at 211:20–212:22.

## CONCLUSIONS OF LAW

1. Under Title III of the ADA, the plaintiff has the initial burden in establishing the elements of a claim under the ADA; if these elements are established, the burden shifts to the Defendant to provide an affirmative defense. *See Norkunas v. Seahorse NB, LLC*, 444 Fed. Appx. 412, 417 (11th Cir. 2011); *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1274 (11th Cir. 2006).

2. Under the ADA, an individual has a disability if they have "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).

3. Under 42 U.S.C. § 12102(1)(A), the "actual disability prong," "a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Holt v. Grand Lake Mental Health Center, Inc.*, 443 F.3d 762, 765 (10th Cir. 2006).

4. Moreover, "[t]he definition of disability [is to be] construed in favor of broad coverage of individuals … to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A); *see also* 28 C.F.R. § 36.105(a)(2)(i) (reiterating the same).

5. If an individual is found to have a disability under the ADA, one of the protections afforded by Title III is that "any person that offers examinations...related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189.

6. As elaborated on in the Federal regulations, such a "person" must offer any examination "so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills." 28 C.F.R. § 36.309(b)(1)(i).

7. In determining what accommodation(s) "best ensures" an individual with a disability can take an examination in an accessible manner, "[a]ny request for documentation [made by a testing entity must be] reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested," *id.* § 36.309(b)(1)(iv); moreover, "the [testing] entity [must give] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations." *Id.* § 36.309(b)(1)(v).

<u>Plaintiff Has a Disability Under the ADA</u>

8. Pursuant to the elements laid out in 42 U.S.C. § 12102(1)(A) (to be hereinafter referred to as the "actual disability definition" of disability under the ADA) and elaborated upon in 28 C.F.R. § 36.105, Plaintiff has a disability.

9. Pursuant to Federal regulations, ADHD is one example of a "physical or mental impairment" for the purposes of the "actual disability definition" under the ADA. *Id.* § 36.105(b)(2).

10. As was demonstrated by the evidence and testimony at trial, Plaintiff has been diagnosed a minimum of four times by qualified professionals with ADHD. While Defendant disputes these diagnoses, their disagreement with the methodology employed by Plaintiff's qualified professionals does not constitute a legal defense, nor does it overturn the deference under ADA to be given to qualified professionals who have made individualized assessments of an individual. *See* 36 C.F.R. App. A, § 36.309 ("When an applicant's documentation demonstrates a consistent history of a diagnosis of a disability, and is prepared by a qualified professional who has made an individualized evaluation of the applicant, there is little need for further inquiry into the nature of the disability and generally testing entities should grant the requested modification, accommodation, or aid."); Testing Accommodations, U.S. Department of Justice, *available at* https://www.ada.gov/regs2014/testing_accommodations.html (last visited May 31, 2017) ("Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations. […] A testing entity should generally accept such documentation and provide the recommended testing accommodation without further inquiry.").

11. Accordingly, this Court holds that Plaintiff has an impairment, satisfying the first prong of the "actual disability" definition of disability.

12. Moreover, the Plaintiff has identified six major life activities – learning, reading, memory, concentration, test-taking, and working – that she alleges are substantially limited by her impairment (ADHD) in the context of taking the Step 1 exam, satisfying the second prong. The question remains as to whether Plaintiff is substantially limited in these major life activities – the third prong.

13. The ADA counsels that the term "substantially limits" "shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008," 42 U.S.C. § 12102(4)(B); the ADA Amendments Act found that courts had "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress" and that it was intending to "reinstat[e] a broad scope of protection to be available under the ADA." Pub. L. No. 110-325, § 2(a)(7) & (b)(1), 122 Stat. 3553 (2008).

14. Accordingly, "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 36.105(d)(1)(i); *see also id.* § 36.105(d)(1)(ii) ("The primary object of attention in cases brought under Title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity."); § 36.105(d)(1)(vi) ("[T]he term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act.").

15. Moreover, Federal regulations counsel that evaluation whether an individual is
substantially limited should focus "on how a major life activity is substantially limited. . .
not on what outcomes an individual can achieve." *Id.* § 36.105(d)(3)(iii).

16. While Plaintiff must be found by this Court to be substantially limited in major life
activities as compared to the general population, *id.* § 36.105(d)(1)(v), the focus should
not be on the outcomes Plaintiff has achieved in the past, as compared to the general
population, but rather on the condition and the manner that Plaintiff is substantially
limited in the major life activities necessary to take the Step 1 exam as compared to the
general population. *Id.* § 36.105(d)(3).

17. Specifically, this Court should consider the "difficulty, effort or time required to perform
a major life activity" and "the length of time a major life activity can be performed." *Id.* §
36.105(d)(3)(ii).

18. There was ample evidence and testimony presented at trial to demonstrate that Plaintiff is
substantially limited, as compared to the general population, in the condition and manner
in which she takes the Step 1 exam – an examination that implicates the major life
activities alleged (learning, reading, memory, concentration, and working). *See* 35 C.F.R.
App. C, §§ 35.105 & 36.105 ("[T]he Department notes that one or more already-included
major life activities—such as reading, writing, concentrating, or thinking, among
others—will virtually always be implicated in test taking."); *see also Bartlett v. New York
State Bd. of Law Examiners*, 970 F.Supp. 1094, 1121 (S.D.N.Y. 1997) ("If plaintiff's
disability prevents her from competing on a level playing field with other bar
examination applicants, then her disability has implicated the major life activity of
working because if she is not given a chance to compete fairly on what is essentially an

16

employment test, she is necessarily precluded from potential employment in that field. In this sense, the bar examination clearly implicates the major life activity of working."). Plaintiff presented the following testimony at trial that supports this contention:

a.  Dr. Ashley Vigil-Otero – who evaluated, treated, and diagnosed Plaintiff – testified that Plaintiff has substantial limitations, caused by her ADHD, in her major life activities concentrating, memory, and learning– all of which consequently, due to their impact on her ability to take the Step 1 exam, affect her major life activity of working – in the context of taking a high-stakes standardized examination like the Step 1 exam, both in studying for the exam and taking the exam. *See, e.g.*, ECF No. 39-7, at 68:2–4 ("[When Plaintiff] had higher demands that required high levels of concentration [her ADHD was] really impacting her[…]."); 29:5–10 ("[S]he had great difficulty sustaining attention, completing her study goals, really getting derailed by little things, getting off task, being able to prioritize and engage in studying that required a lot of sustained attention."). Specifically, Dr. Vigil-Otero noted that Plaintiff had substantial limitations related to studying for the examination, i.e. substantial limitation in the major life activities of concentrating, learning, and memory as it related to taking the Step 1 exam.  In other words, the substantial limitations on these major life activities severely impacted her *ability* (i.e. condition and manner) to prepare for and take the examination, in a way that is not experienced by the general population;

b.  Dr. Charles Golden testified that Plaintiff's ADHD substantially limits major life activities crucial to test-taking – he stated that Plaintiff's impairment substantially impacts her abilities during high-stakes standardized test-taking such that it

interferes with her potential achievement level. ECF No. 47-2, at 9; *see also id.* at 7 ("The testing, history and analysis [sic] clearly point to the presence of a disability that interferes with her ability to perform in circumstances that demand high levels of attention."). Dr. Golden observed her limitations in the testing setting, i.e. substantial limitation in the major life activities of concentrating and reading as it related to taking the Step 1 exam, results in her lowered scores. Accordingly, though Plaintiff, as Defendant points out, is average or above average in her standardized test *results* (i.e. outcomes) as compared to the general population, the fact that she is not able to reach her achievement level evidences a substantial limitation in the *condition and manner* in which she is able to perform the major life activities crucial to test taking as compared to the general population; and

c.  Finally, Plaintiff herself testified with specificity as to how she was substantially limited in the condition and manner in which she has been able to exercise major life activities crucial to taking high-stakes standardized examinations. In short, she reports not being able to finish any of the sections on any of the Step 1 exam administrations she took, ECF No. 39-2, p. 16, at 208:11–23, which is reflected in her scoring sheets, *see* ECF No. 39-14, and overall states that she has had difficulty focusing and concentrating on each standardized examination she has taken throughout her life, including the Step 1 exam. ECF No. 39-2, p. 17, at 211:20–212:22.

19. Defendant's claim that Plaintiff is too high achieving to have an impairment that substantially limits major life activities in unavailing in light of the ADA's explicit

rejection, post-ADAAA, of the notion that high-achieving individual cannot have a disability under the "actual disability" definition. 28 C.F.R. § 36.105(d)(3)(iii). Defendant does not have an affirmative defense in this regard.

20. Accordingly, Plaintiff is substantially limited, as compared to the general population, in her alleged major life activities. Therefore, Plaintiff is an individual with a disability under the ADA.

<u>Plaintiff Is Entitled to Accommodations on Future Administrations of the Step 1 Exam</u>

21. Plaintiff is entitled to accommodations on the Step 1 exam to "best ensure" the examination measures her aptitude and achievement level.

22. An examination administered by an entity, like Defendant, subject to Title III of the ADA must provide an examination in a manner that is accessible with respect to an individual's "specific impairment and the specific nature of [the] exam." *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011). For Plaintiff, this means receiving 50% extra time on the Step 1 exam.

23. Testing entities are not required to provide the accommodation requested by an individual with a disability, only an accommodation that is as effective as the request accommodation and appropriate to the needs of that individual. *See Bonnette v. District of Columbia Court of Appeals*, 796 F.Supp.2d 164, 183 (D.D.C. 2011). However, three factors counsel in favor of allowing Plaintiff's preferred accommodation of 50% extra time:

    a.   Qualified professionals evaluating Plaintiff testified that Plaintiff should be allowed extra time on her examination. ECF No. 32-15, at 8 (Dr. Booth-Jones); Trial Brief, Ex 1, at 7–8 (Dr. Golden); *see also* 36 C.F.R. App. A, § 36.309

("[W]hen testing entities receive documentation provided by a qualified
professional who has made an individualized assessment of an applicant that
supports the need for the modification, accommodation, or aid requested, they
shall generally accept such documentation and provide the accommodation.");

b. Plaintiff had been receiving 50% extra test time on her examinations at USF
MCOM due to the limitations and impairments caused by her disability. ECF No.
33-2, at 18, 78. These accommodations had been provided as of March of 2013
and have been maintained for the purposes of Plaintiff's test-taking at USF
MCOM. The Federal regulations operationalizing the ADA counsel that
"documentation of past modifications, accommodations, or auxiliary aids or
services received in similar testing situations" should be given "considerable
weight." 28 C.F.R. § 36.309(b)(1)(v); *see also* 36 C.F.R. App. A, § 36.309 ("[A]
recent history of past accommodations is critical to an understanding of the
applicant's disability and the appropriateness of testing accommodations."); and

c. Finally, Defendant has no qualms about granting additional time to take the Step
One examination as an accommodation for individuals who need it. As testified
by Catherine Farmer, who works at Defendant's Disability Services Section,
approximately 75% of all accommodations granted on the Step 1 exam are for
extra time. ECF No. 39-9, p. 9, at 102:16–25. Accordingly, it cannot be said that
an accommodation for extra time would undermine the purposes of the
examination. Rather, it is an accommodation already utilized by Defendant to
ensure individuals with certain impairments can take the Step 1 exam in a way
that best ensure the results reflect their aptitude and achievement level.

24. Taken together, Defendant violates Title III of the ADA by denying Plaintiff the accommodation of 50% extra time on the Step 1 exam.

## CONCLUSION

For these reasons, the Court rules in favor of Plaintiff on her Title III claim. Defendant is ordered to provide Plaintiff the accommodation of 50% extra time on future administrations of the Step 1 exam.

Respectfully submitted: August 25, 2017

**Curtis Filaroski**
FL Bar No. 111972
curtisf@disabilityrightsflorida.org
**Megan Collins**
FL Bar No. 119112
meganc@disabilityrightsflorida.org
**Ann Marie Cintron-Siegel**
FL Bar No. 166431
anns@disabilityrightsflorida.org
**Attorneys for Plaintiff Elizabeth Black**
Disability Rights Florida
2473 Care Drive, Suite 200
Tallahassee, FL 32308
Phone: 850-488-9071
Fax: 850-488-8640

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of August, 2017, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of

electronic filing to the following:

GREGORY A. HEARING
ghearing@tsghlaw.com
Thompson, Sizemore, Gonzalez & Hearing, P.A.
201 N. Franklin Street, Suite 1600
Post Office Box 639 (33601)
Tampa, Florida 33602

ROBERT A. BURGOYNE
robert.burgoyne@nortonrosefulbright.com
Norton Rose Fulbright US LLP
799 9th Street, NW, Suite 1000
Washington, DC 20001-4501

Attorneys for National Board of Medical Examiners

Plaintiff's counsel has also emailed copies of the foregoing to the Defendant's attorneys.

Curtis Filaroski
Attorney for Plaintiff