## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ELIZABETH A. BLACK,

        Plaintiff,

vs.                             CASE NO.:  8:16-cv-02117-T-23TGW

NATIONAL BOARD OF
MEDICAL EXAMINERS,

        Defendant.

_____/

## TRIAL BRIEF

    Pursuant to this Court's Case Management and Scheduling Order, ECF No. 17, Plaintiff files

this Trial Brief:

### TABLE OF CONTENTS

INTRODUCTION ................................................................. 3

DISPUTED ISSUES OF LAW AT TRIAL ................................................. 4

FACTUAL BACKGROUND ............................................................. 5

    Plaintiff's ADHD Diagnosis, Treatment for ADHD, and
    the Manner in Which it Substantially Limits Her in Major
    Life Activities ................................................................. 5

        *Dr. Scott Fleischer's ADHD Diagnosis* ...................................5

        *USF Counseling Center: Treatment and Evaluation* ................. 6

        *Dr. Ashley Vigil-Otero: Treatment and ADHD Diagnosis* ...........7

        *Dr. Margret Booth-Jones' ADHD Diagnosis* ...........................8

***Dr. Charles Golden's ADHD Diagnosis*** ........................... 9

The USMLE Step 1 Examination ............................................... 10

Plaintiff's Applications for Accommodations on the Step 1 Exam ....... 11

***Plaintiff's First Administration of the Step 1 Exam*** .............. 11

***Plaintiff's First Application for Accommodations and
Second Administration of the Step 1 Exam*** ........................ 12

***Plaintiff Third Administration of the Step 1 Exam*** ............... 13

***Plaintiff's Second Application for Accommodations and
Fourth Administration of the Step 1 Exam*** ........................ 13

LEGAL OVERVIEW ................................................................. 15

Burden of Proof ................................................................. 15

Relevant Substantive Law ....................................................... 15

LEGAL ANALYSIS OF KEY ISSUES AT TRIAL .................................. 16

Plaintiff Has a Disability Under the ADA ................................... 16

***Plaintiff Has a Recognized Impairment – ADHD*** ..................16

***Plaintiff's Impairment Substantially Limits Multiple
Major Life Activities*** ...................................................... 19

Plaintiff Is Entitled to Accommodation on Future Administrations
of the Step 1 Exam ........................................................... 24

CONCLUSION ...................................................................... 27

## LEGAL AUTHORITY RELIED UPON IN THIS BRIEF

Case Law

*Bartlett v. New York State Bd. of Law Examiners*, 970 F.Supp. 1094 (S.D.N.Y. 1997)
*Bonnette v. District of Columbia Court of Appeals*, 796 F.Supp.2d 164, 183 (D.D.C. 2011)
*Coring v. LodgeNet Interactive Corp.*, 896 F.Supp.2d 1138 (M.D. Fla. 2012)
*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011)
*Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1274 (11th Cir. 2006)

*Holt v. Grand Lake Mental Health Center, Inc.*, 443 F.3d 762 (10th Cir. 2006)
*Mazzeo v. Color Resolutions Intern., LLC*, 746 F.3d 1264 (11th Cir. 2014)
*Norkunas v. Seahorse NB, LLC*, 444 Fed. Appx. 412, 417 (11th Cir. 2011)
*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)
*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002)

Statutes

42 U.S.C. § 12102
42 U.S.C. § 12189

Public Laws

Pub. L. No. 110-325, 122 Stat. 3553 (2008)

Regulations

28 C.F.R. § 36.105
28 C.F.R. § 36.309

Regulatory Guidance/Appendices

35 C.F.R. App. C, §§ 35.101 & 36.101
35 C.F.R. App. C, §§ 35.105 & 36.105
36 C.F.R. App. A, § 36.309

Legislative Materials

154 Cong. Rec. S8840-01 (Sept. 16, 2008) (Statement of Managers)

Policy Documents

Testing Accommodations, U.S. Department of Justice, *available at*
    https://www.ada.gov/regs2014/testing_accommodations.html

## INTRODUCTION

On July 22, 2016, Plaintiff Elizabeth A. Black ("Plaintiff") filed a complaint[1] in this District

alleging that Defendant National Board of Medical Examiners ("Defendant") violated Title III of

the Americans with Disabilities Act (ADA) by denying her request for accommodations on the

United States Medical Licensing Exam (USMLE) Step 1 examination, which is a pre-requisite to

---

[1] An amended complaint was filed with this Court on May 31, 2017. ECF No. 29.

Plaintiff's advancement to her third year of medical school at University of South Florida Morsani College of Medicine (USF MCOM). Specifically, Plaintiff alleges that Defendant denied her, an individual with a disability caused by her diagnosed attention deficit hyperactivity disorder (ADHD), the ability to take the USMLE Step 1 examination in a manner accessible to her, i.e. with the reasonable accommodation of 50% extra test time on the examination.

In its defense, Defendant has and will continue to argue that Plaintiff is not an individual with a disability.[2] Defendant argues that Plaintiff's diagnosis of ADHD, an "impairment" under the ADA, was not properly granted by the qualified professionals that have reviewed Plaintiff, and even if such a diagnosis was properly granted, it does not substantially limit Plaintiff in any major life activities relevant to taking the USMLE Step 1 examination. However, through documentary evidence and testimony, Plaintiff can establish that 1) she has been diagnosed with the impairment of ADHD a minimum of four times by qualified professionals who have personally examined Plaintiff – in contrast to the qualified experts employed by Defendant – and 2) this impairment, as attested to by these qualified professionals and Plaintiff herself, substantially limit her in major life activities crucial to taking a standardized examination such as the USMLE Step 1 examination. Accordingly, evidence presented at trial will demonstrate that Plaintiff is entitled to judgment in her favor.

## DISPUTED ISSUES OF LAW AT TRIAL[3]

---

[2] At no point in its answers or briefing has Defendant raised the defense that, were this Court to find Plaintiff is an individual with a disability, Plaintiff is not entitled, pursuant to 42 U.S.C. § 12189 and 28 C.F.R. § 36.309, to her requested reasonable accommodation of 50% extra time on the USMLE Step 1 examination. *See* ECF Nos. 9, 30, 31. However, Plaintiff will proceed in this Brief as if Defendant has reserved this argument, *see* ECF No. 30, p. 19, should the Court conclude Plaintiff does have a disability, in order to appraise the Court on possible arguments and issues to be raised under this legal standard.

[3] An additional disputed issue of law presented in the parties Joint Pre-trial Stipulation is the issue as to whether the prevailing party is entitled to reasonable attorney's fees and costs. ECF No. 48, at 27. However, as this issue will not be argued at trial, only following a judgment in favor of one of the parties, Plaintiff will not discuss this potential legal issue in this Brief.

1.  Is Plaintiff "disabled" under the ADA, and thus qualified to the protections afforded by that statute? 42 U.S.C. § 12102; 28 C.F.R. § 36.105.

2.  If Plaintiff is "disabled" under the ADA, what accommodations is she entitled to, as an individual with her specific disability – stemming from her ADHD – on the USMLE Step One Examination that will best ensure that the exam results accurately reflect her aptitude on the skills the exam purports to measure, rather than reflecting her impairments. 42 U.S.C. § 12189; 28 C.F.R. § 36.309.

## FACTUAL BACKGROUND

The following is a brief overview of the facts of the case, to be reflected by the evidence and testimony to be presented at trial:

Plaintiff's ADHD Diagnosis, Treatment for ADHD, and the Manner in Which it Substantially Limits Her in Major Life Activities

Plaintiff has been diagnosed a minimum of four times with ADHD as of the writing of this Brief. Moreover, the qualified professionals evaluating her for ADHD have noted on numerous occasions the substantial limitations that her ADHD has had on her functioning and performance. The evidence in the record, and to be presented at trial, will reflect the following facts about Plaintiff's evaluations and diagnoses:

### *Dr. Scott Fleischer's ADHD Diagnosis*

Plaintiff was initially diagnosed with ADHD on March 24, 2009 by Dr. Scott Fleischer. ECF No. 38-1, at 11.[4] The diagnosis was made following a "consultation and brief psychiatric

---

[4] When citing exhibits and portions of exhibits filed in the docket previously, Plaintiff will cite to the document number (e.g. ECF No. X) followed by the page number. For depositions filed previously, only portions of which were filed, Plaintiff will cite to the page number in the document that the excerpt is located on followed by the page and line number in the deposition transcript (e.g. ECF No. A, p. B, at C:D-E). To the extent a deposition excerpt relied upon by Plaintiff has not already been filed, Plaintiff will file it as a separate exhibit.

To the extent Plaintiff utilizes supporting materials not already filed with the Court, an index of such items will be filed along with the materials themselves. When citing to these materials, Plaintiff will cite to their exhibit number (e.g. Ex. Y) followed by the page number.

evaluation" of Plaintiff, ECF No. 38, at 1, ¶ 5, and was the result of Dr. Fleischer's clinical and professional opinion that Plaintiff "was experiencing symptoms that are consistent with ADD [and that she] might respond positively to appropriate medications." *Id.* at 2, ¶ 7. Plaintiff initially sought treatment from Dr. Fleischer because she was having trouble concentrating during her studies for the Medical College Admission Test (MCAT), a standardized examination that is crucial for enrollment in medical school. *Id.* at 1, ¶ 3; ECF No. 39-2, p. 12, at 141:14–23. Upon diagnosing her, Dr. Fleischer prescribed Ritalin to treat her ADHD. ECF No. 38-1, at 12.

### *USF Counseling Center: Treatment and Evaluation*

On or around July 19, 2012, Plaintiff began seeking counseling treatment – as opposed to merely medication management, which she began receiving on September 6, 2011, ECF No. 39-4, at 1, from Dr. Swapna Mukherjea, ECF No. 39-3, at 2 – from USF's Counseling Center, after receiving six counseling sessions from Tania Sales, Psy.D., initially in September of 2011. *Id.* Plaintiff sought treatment from the Counseling Center due to attentional, academic, and anxiety-related concerns. ECF No. 39-2, p. 14, at 200:25–201:4; *see also* ECF No. 39-3, at 1 (listing "Life Skills & Planning," "Attention Deficit Disorder," "Interpersonal Difficulties," and "Anxiety: Performance (e.g. test) & Generalized" as reasons for seeking services at the Counseling Center). Around the time she began receiving counseling treatment, Plaintiff was required to undergo a battery of tests – including the Adult ADHD Self-Report Scale (ASRS) Parts A & B, the Conners' Continuous Performance Test (CPT-II), and the Brief Test of Attention (BTA) – related to her ADHD. ECF No. 39-5. The "Overall Clinical Impression" of this evaluation was that "[t]he client's [Plaintiff's] symptoms may indicate ADHD symptoms," with the ASRS tests indicating Plaintiff was "[h]ighly likely to have ADHD," the CPT-II results

indicating Plaintiff had a "54% [p]robability of symptoms indicating ADHD," and the BTA results indicating her "[s]cores are in the low average range." *Id.* at 1.

### *Dr. Ashley-Vigil Otero: Treatment and ADHD Diagnosis*

On June 10, 2013, Plaintiff began seeing Ashley Vigil-Otero, Psy.D. for therapy related to issues with her ADHD, specifically issues with "work/life balance [and] stress [with] school." ECF No. 39-6, at 4. Dr. Vigil-Otero reports that she had "approximately nine" sessions with Plaintiff, ECF No. 39-7, at 20:1, and that during her time seeing Plaintiff "she was on the verge of not being able to stay in medical school" and was having "to postpone tests and was having difficulties." *Id.* at 32:8–16. Dr. Vigil-Otero reports that while Plaintiff first came "across … as very articulate" and as someone with only occasional struggles, "the level of impairment definitely did come across as more pronounced as she continued to struggle." *Id.* at 52:5–11; *see also id.* at 68:21–69:9 (while treating Plaintiff "she really was starting to get off track in her goals, to the point where it was impacting her ability to meet medical school demands, and that problem was worsening as she was postponing [taking her Step 1 examination].").

Dr. Vigil-Otero stated that her treatment was targeted at behaviors related to Plaintiff's limitations in concentration, specifically since "in this period of her life where she had higher demands that required high levels of concentration these behaviors [procrastination] were really impacting her and really compounding her challenge of study." *Id.* at 67:21–68:5; *see also id.* 29:5–10 ("[S]he had great difficulty sustaining attention, completing her study goals, really getting derailed by little things, getting off task, being able to prioritize and engage in studying that required a lot of sustained attention."). In other words, Dr. Vigil-Otero noted that many of Plaintiff's problem behaviors were related to her studying for the Step 1 exam, caused by Plaintiff's substantial limitations in concentrating, learning, and memory.

Ultimately, Dr. Vigil-Otero confirmed Plaintiff's diagnosis of ADHD.[5] *See id.* at 24:15–22

("I did diagnose her with ADHD. [Y]ou really just need to meet the criteria for the DSM [and]

she provided those symptoms."); *see also id.* at 25:13–16 (stating that a Dr. Saneholtz had

diagnosed her with ADHD at the USF Counseling Center as well as "prior providers ... before

her that also diagnosed ADHD").[6] Dr. Vigil-Otero concluded that Plaintiff's ADHD was of the

type that went "under the radar" as a child because she was a "high-achieving, well-behaved

perfectionist child" but that many of these qualities "further derailed her in adulthood" due to her

ADHD, which led to her adult diagnosis. *Id.* at 69:16–70:10.

### Dr. Margret Booth-Jones' ADHD Diagnosis

On or around October 9, 2014 Plaintiff was referred by Dr. Phyllis Feldman, a psychiatrist at

the USF Counseling Center, to take a re-evaluation conducted by Megan McMurray, a graduate

student at the time, and supervised by Dr. Margret Booth-Jones, to confirm her diagnosis of

ADHD. ECF No. 35, p. 15, at 27:16–19. As part of her re-evaluation, Plaintiff provided an

extensive psychiatric, medical, and social/family history, and took a battery of examinations,

including a CPT-II, a Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV), and a

Conners' Adult ADHD Rating Scales – Self Report: Long Version (CAARS – S:L). ECF No.

32-15. As a result of the re-evaluation, Plaintiff was diagnosed with ADHD with combined

presentation; it was also recommended that she receive academic accommodations, specifically

"extended time for testing and quiet testing accommodations in all courses and standardized

tests." *Id.* at 8.

---

[5] One of Dr. Vigil-Otero's specializations at her practice is ADHD. *Id.* at 11:1–3. She considers herself an expert in diagnosing ADHD due to her educational and occupational background. *Id.* at 11:16–25.

[6] Defendant states in its Motion for Summary Judgment, when discussing a subsequent ADHD evaluation of Plaintiff supervised by Dr. Margret Booth-Jones, discussed *infra*, that Dr. Booth-Jones was incorrect in her belief that Plaintiff had been diagnosed twice by two different psychiatrists with ADHD. *See* ECF No. 31, at 21. However, Defendant is incorrect in its conclusion – the record reflects that a *minimum* of two psychiatrists, Dr. Fleischer and Dr. Vigil-Otero, had diagnosed Plaintiff with ADHD prior to the evaluation supervised by Dr. Booth-Jones, and possible third, Dr. Saneholtz, according to Dr. Vigil-Otero, had done so as well.

Dr. Booth-Jones, who supervised and signed off on this evaluation of Plaintiff, stated that it was her opinion that Plaintiff "has a significant discrepancy between her intellectual ability and her working memory and processing speed. [It's a s]tandard presentation of ADHD." ECF No. 35, p. 18, at 31:15–18. While Dr. Booth-Jones stated that she is not an expert in diagnosing ADHD, *id.*, p. 13, at 22:10–13, she does diagnose individuals "pretty common[ly]" with ADHD at her job at the Moffitt Cancer Center. ECF No. 39-8, p. 5, at 20:13–16 (Dep. Booth-Jones). Dr. Booth-Jones attributes Plaintiff's coping with ADHD throughout childhood and subsequent diagnosis as an adult as being due to a sort of "breaking point" where the condition finally fully presented itself such that it impaired Plaintiff's functioning – "there just gets to be a critical mass of information … there gets to be a point where they [high-achieving individuals like Plaintiff] just can't do any more and it [ADHD symptoms] presents itself." *Id.*, p. 6, at 65:9–66:6.

### *Dr. Charles Golden's ADHD Diagnosis*

On July 18–19, 2017, during the course of this litigation and in preparation for trial, Plaintiff was evaluated by Plaintiff's expert witness Dr. Charles Golden. ECF No. 47-2.[7] The purpose of the evaluation "was … to determine whether [Plaintiff] qualified for accommodations on a test related to medical school performance." *Id.* at 1. The tests administered were a biopsychosocial interview, the WAIS-IV, Nelson Denny Reading Test, Conners' Continuous Auditory Test of Attention (CATA), Conners' Continuous Performance Test III (CPT-III), Wisconsin Card Sorting Test (WCST), Category Test, Trial Making Test A & B, Millon Clinical Multiaxial Inventory III (MCMI-III), and a MSVT. *Id.* at 2–3.

As a result of the evaluation, Dr. Golden concluded that Plaintiff "clearly has ADHD and has shown a lifelong pattern of underachievement consistent with this diagnosis, which is clear in her

---

[7] As of the filing of this Brief, Defendant has a Motion in Limine pending seeking to exclude Dr. Golden's evaluation. *See* ECF No. 47. Plaintiff filed a Response defending its planned use of Dr. Golden's report on August 24, 2017. ECF No. 50.

performance on high stakes, timed tests." *Id.* at 9; *see also id.* at 8–9 (discussing how Plaintiff meets the DSM-V criteria for ADHD). Dr. Golden also explained Plaintiff's adult ADHD diagnosis was the result of being an "extremely bright [child]" with "issues [that] are not identified until the individual is faced with high stake timed tests, with the disorder becoming more evident as the tests increase in difficulty and the role of attention becomes more critical." *Id.* at 7.

Moreover, Dr. Golden stated that "[t]he testing, history and analysis [sic] clearly point to the presence of a disability that interferes with her ability to perform in circumstances that demand high levels of attention." *Id.* Thus, Dr. Golden concluded in his report that there are areas – specifically concentrating and reading – where Plaintiff's ADHD substantially limited major life activities crucial to taking high-stake standardized examinations. *See id.* at 7 (noting that Plaintiff's "disability shows up as a significant issue when she is faced with highly speeded, time behaviors [including] in high stakes speeded tests...especially when visual attention is demanded"); at 9 (discussing Plaintiff's significant limitations in the area of reading, such that it may be appropriate to diagnose her with a Specific Learning Disability in Reading"). He stated that these significant limitations, caused by Plaintiff's ADHD, resulted in Plaintiff performing well-below her expected performance on high stakes, timed testing, e.g. standardized examinations. *Id.*

### The USMLE Step 1 Examination

The USMLE Step One examination ("Step 1 exam") is an "assessment of basic science knowledge [and an] application of that knowledge." ECF No. 39-9, p. 6, 11:14–15. It is a one-day, eight-hour exam broken up into 7 test blocks (each 60 minutes each, with 40 questions), with 15 minutes of tutorial time and 45 minutes for break time. ECF No. 39-10, at 3. Licensing

authorities across the country rely on the USMLE Step examination, including the Step 1 exam, to help evaluate the qualifications of individuals seeking their license to practice medicine. ECF No. 36, ¶ 5. Accordingly, the Step 1 exam serves a gate-keeping purpose for the medical profession.

At USF MCOM, students take the Step 1 exam between their second and third year of medical school, and are required to pass the examination before moving onto their third year of schooling. *See* http://health.usf.edu/medicine/mdprogram/careeradvising (last visited Aug. 1, 2017). Due to Plaintiff's failure to pass the examination with accommodations, she has not been able to continue on in medical school since the last time she failed the Step One examination, in 2015, when "she was in the middle of a clinical rotation" and forced to discontinue her studies at medical school until she passed the examination. ECF No. 39-2, p. 9, at 28:22–25.

<u>Plaintiff's Applications for Accommodations on the Step 1 Exam</u>

Plaintiff began attending medical school at USF MCOM in 2011. *Id.* at 28:10–11. Starting in March of 2013, Plaintiff's second year of medical school, Plaintiff began receiving testing accommodations from USF MCOM – 50% extra time and reduced distraction environments for examinations – based on her diagnosis of ADHD. ECF No. 33-2, at 9–10. In her third year of medical school, which was in 2013–14, Plaintiff prepared to take the USMLE Step One examination administered by the Defendant. *See* ECF No. 39-2, p. 13, at 189:9–19.

***Plaintiff's First Administration of the Step 1 Exam***

After taking multiple leaves of absences from medical school beginning on April 23, 2013, ECF No. 32, p. 14, at 41:2–11, Plaintiff took her first administration of the Step 1 examination on July 3, 2014 and failed, scoring a 183 (a passing score is 192). ECF No. 33-4, at 70. Plaintiff reports that she did not seek accommodations on this administration of the examination because

11

she was concerned about the Defendant's then practice of "flagging" an individual's examination if they received accommodations, and was advised by medical school advisors that this would disadvantage her going forward.[8] ECF No. 39-2, p. 10, at 43:21–44:21.

### *Plaintiff's First Application for Accommodations on and Second Administration of the Step 1 Exam*

On November 18, 2014, after Defendant discontinued its practice of flagging, Plaintiff applied for accommodations for her second administration of the Step 1 examination. ECF No. 33-2. Included with her application was her ADHD evaluation from Dr. Booth-Jones, a personal statement detailing her struggles with ADHD, her transcripts from college, a statement from Pamela O'Callaghan supporting Plaintiff's need for accommodation, and a certification of prior testing accommodations from USF. *Id.* Despite this information, Plaintiff's request was denied on March 2, 2015. ECF No. 34-1, at 4–5. The denial concluded that Plaintiff's "documentation [did] not demonstrate that you are currently substantially limited in a major life activity as compared to most people or that additional testing time is an appropriate [accommodation]." *Id.* at 5. The denial questioned Plaintiff's ADHD diagnosis, noting that Plaintiff, despite presenting documentation of her diagnosis and its impact, did not present any "objective data or documentation … verifying that you have shown pervasive problems [associated with ADHD]" and that Plaintiff did not have any issues progressing through school or college, or in taking standardized tests.[9] *Id.* Following this denial, Plaintiff sat for her second administration of the Step One examination on April 9, 2015 and scored a 189, three points short of the passing threshold of 192. ECF No. 33-4, at 76.

---

[8] Plaintiff also cited this reason as why she did not seek accommodations on the MCAT. ECF No. 39-2, p. 10, at 43:21–44:21.

[9] The denial also noted Plaintiff's MCAT score of 29 on her second administration of that test as a factor in denying her application for accommodations. However, the denial letter failed to mention her previous score of 22 on the MCAT, ECF No. 32-6; her failing grade on her first administration of the Step One examination, ECF No. 33-4, at 70; or any of her other standardized examination scores.

12

### *Plaintiff's Third Administration of the Step 1 Exam*

Shortly after her second administration, Plaintiff sat for her third administration of the Step One examination on July 2, 2015 following an "absolute deadline by which to take Step 1 of July 2 (no further delays will be permitted)" issued by Kira Zwygart -- Dean of Student Affairs at the time at USF MCOM – to Plaintiff. ECF 39-11, at 1. The time constraints rendered Plaintiff unable to apply for accommodations, and she once again failed the examination, scoring a 173. ECF No. 33-4, at 82.

### *Plaintiff's Second Application for Accommodations on and Fourth Administration of the Step 1 Exam*

After confirming with USF that she could take the Step 1 examination a fourth time and remain enrolled in the medical school, ECF No. 39-12, Plaintiff applied for accommodations a second time on January 22, 2016, intending the accommodations to apply to a future, fourth administration of the examination, which she had already registered for at that time.[10] ECF No. 33-4, at 8. Her second application included, among many other items, various report cards and standardized examination results from K–12, letters from various individuals discussing the impact ADHD has had on Plaintiff's life, and documents reflecting the therapy and counseling Plaintiff attended to manage her disability. *See generally id.* In addition, NBME considered the documents included in Plaintiff's first application. *See* ECF No. 36, at 4, ¶ 16.

Plaintiff's request was denied on March 28, 2016. ECF No. 34-1, at 1–3. The denial letter stated that "[o]ur review of the supplemental documentation that you provided with your recent submission found no new substantive information or evidence that alters our original decision." *Id.* at 2–3. Despite the denial, the letter did state that "[w]hile we are unable to provide you with

---

[10] In addition to seeking accommodations for her diagnosed ADHD, Plaintiff sought accommodations for her diagnosis of converge insufficiency. ECF No. 33-4, at 11. However, this Response will only discuss her diagnosis of ADHD, per the Stipulation of the Parties. *See* ECF No. 31-2.

accommodations under the ADA, for your comfort, we will provide ... [a]dditional break time/standard test time." *Id.* at 3. Plaintiff never requested this accommodation and no explanation was given as to why it was provided.

In addition to Catherine Farmer, Psy.D, who authored the denial letters sent to Plaintiff, Dr. Kevin Murphy also reviewed Plaintiff's applications as an ADHD consultant. In his role as a consultant, Dr. Murphy is "not a decision maker," ECF No. 33, p. 8, at 33:6–8, although he stated "I think most of the time obviously they will go with my recommendation." *Id.* at 33:19–20. For Plaintiff, Dr. Murphy's review of the documents submitted led him to conclude, for both applications, that "the documentation provided does not adequately substantiate an ADHD diagnosis."[11] ECF No. 33-3, at 2; *see also* ECF No. 33-5, at 3. Considering the role that consultants have in the review process, Dr. Murphy's review of Plaintiff's applications likely had close to a determinative impact on her denial. *See* ECF No. 39-9, pp. 7–8, at 16:15–17:13 (consultants review an application if a review by the Defendant's Disability Services Section, which processes accommodations requests, does not result in a determination).

***

Ultimately, on each of the three administrations of the examination, Plaintiff reports that she could not finish any of the sections of the examination – she either guessed the answers or left the answer bubbles blank on the final questions of each section. ECF No. 39-2, p. 16, at 208:11–23. The scoring sheet provided by Defendant in discovery largely reflects this difficulty – many of Plaintiff's incorrect answers occur at the end of testing sections, and it appears Plaintiff is often filling out the same answer bubble (e.g. eight consecutive "B" answers at the end of the

---

[11] Dr. Murphy reports that he does not accept or grant deference to a previous diagnosis of ADHD from an evaluation conducted by a qualified professional. ECF No. 39-13, pp. 6–8, at 123:19–125:6 (Dep. Murphy); *but see id.*, p. 5, at 24:17–22 (Dr. Murphy would not "diagnose somebody without the ability to have done the assessment" himself or "determine the impact of someone's disability based just on a record review.").

final section on her third test, ECF No. 39-14, at 26) to end sections. *Id.* Plaintiff reports that her trouble with standardized exams is a phenomenon that has occurred all of her life, and that she is never able to complete these types of examinations due to being distracted and impulsively choosing answers "instead of taking the time to think through the questions." ECF No. 39-2, pp. 17–18, at 211:20–212:22.

## LEGAL OVERVIEW

### Burden of Proof

Under Title III of the ADA, the plaintiff has the initial burden in establishing the elements of a claim under the ADA; if these elements are established, the burden shifts to the Defendant to provide an affirmative defense. *See Norkunas v. Seahorse NB, LLC*, 444 Fed. Appx. 412, 417 (11th Cir. 2011); *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1274 (11th Cir. 2006).

### Relevant Substantive Law

Under the ADA, an individual has a disability if they have "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Under 42 U.S.C. § 12102(1)(A), the "actual disability prong," "a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Holt v. Grand Lake Mental Health Center, Inc.*, 443 F.3d 762, 765 (10th Cir. 2006). Moreover, "[t]he definition of disability [is to be] construed in favor of broad coverage of individuals … to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A); *see also* 28 C.F.R. § 36.105(a)(2)(i) (reiterating the same).

If an individual is found to have a disability under the ADA, one of the protections afforded by Title III is that "any person that offers examinations...related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. As elaborated on in the Federal regulations, such a "person" must offer any examination "so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills." 28 C.F.R. § 36.309(b)(1)(i). In determining what accommodation(s) "best ensures" an individual with a disability can take an examination in an accessible manner, "[a]ny request for documentation [made by a testing entity must be] reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested," *id.* § 36.309(b)(1)(iv); moreover, "the [testing] entity [must give] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations." *Id.* § 36.309(b)(1)(v).

## LEGAL ANALYSIS OF THE KEY ISSUES AT TRIAL

### 1. Plaintiff Has a Disability Under the ADA

The evidence and testimony to be presented by Plaintiff at trial can demonstrate that Plaintiff meets the ADA's definition of disability under the "actual disability prong."

#### *Plaintiff Has a Recognized Impairment – ADHD*

Pursuant to Federal regulations, ADHD is one example of a "physical or mental impairment" for the purposes of the "actual disability prong" under the ADA. *Id.* § 36.105(b)(2). Plaintiff has been diagnosed with ADHD on numerous occasions; as detailed in this Brief, and as reflected in the evidence and testimony to be presented at trial, Plaintiff has, at minimum, being diagnosed with ADHD by Dr. Scott Fleischer, Dr. Ashley Vigil-Otero, Dr. Margret Booth-Jones (in a supervisory capacity), and, most recently, by Dr. Charles Golden.

Defendant will argue at trial that each of these four diagnoses is insufficient. Specifically, Defendant, through its three expert witnesses, will argue that the diagnoses made by the qualified professionals were not the result of proper methodology. *See* ECF No. 31, at 23–24 ("There is no plausible evidence of childhood onset, no plausible evidence of impairment across multiple domains of her life (academic, social, and vocational), and no plausible evidence of pervasive functional impairment in her daily living."). However, Defendant's focus on "proper methodology"[12] in arriving at an ADHD diagnosis, a diagnosis made on *four separate instances* by qualified professionals, places an improper focus on how the impairment aspect of the "actual disability prong" is satisfied. In determining whether an individual has an impairment, the focus should be on whether a diagnosis was made by a qualified professional, not on scrutinizing the methods in which that diagnosis is made, especially when reasonable expert opinions may differ.

The rules of construction regarding the definition of disability in the ADA counsels that the definition "shall be construed in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A)[13]; *see also* 154 CONG. REC. S8840-01 (Sept. 16, 2008) (Statement of Managers)

---

[12] It should be noted that the proper methodology in arriving at an ADHD diagnosis is disputed by the parties, as will be elucidated at trial by competing expert testimony. Specifically, it is expected that Dr. Golden will defend the methodology he employed in making his recent ADHD diagnosis of Plaintiff.

[13] Unlike many of the other cases litigated in the 11th Circuit and in this District, *see, e.g., Coring v. LodgeNet Interactive Corp.*, 896 F.Supp.2d 1138 (M.D. Fla. 2012), all conduct and actions taken relevant to this case occurred after the enactment of the ADA Amendments Act of 2008. *Cf. Mazzeo v. Color Resolutions Intern., LLC*, 746 F.3d

(statement accompanying ADA Amendments Act (ADAAA) of 2008 stating that the definition

of disability is to be construed broadly); 35 C.F.R. App. C, §§ 35.101 & 36.101 ("The question

of whether an individual meets the definition of disability should not demand extensive

analysis"). Considering these rules of construction, individuals like Plaintiff should not be

*required* to obtain a diagnosis from a renowned expert, like Dr. Kevin Murphy[14] – Defendant's

expert witness and the physician who reviewed Plaintiff's accommodations applications, and

who clearly disagreed with the methodology employed by Plaintiff's diagnosing professionals –

to demonstrate they have an impairment. Rather, documentation demonstrating that an individual

has an impairment, produced by an individual qualified to make that conclusion, i.e. a qualified

professional, should suffice under the ADA. *See* 36 C.F.R. App. A, § 36.309 ("When an

applicant's documentation demonstrates a consistent history of a diagnosis of a disability, and is

prepared by a qualified professional who has made an individualized evaluation of the applicant,

there is little need for further inquiry into the nature of the disability and generally testing entities

should grant the requested modification, accommodation, or aid."); Testing Accommodations,

U.S. Department of Justice, *available at*

https://www.ada.gov/regs2014/testing_accommodations.html (last visited May 31, 2017)

("Testing entities should defer to documentation from a qualified professional who has made an

individualized assessment of the candidate that supports the need for the requested testing

accommodations. […] A testing entity should generally accept such documentation and provide

the recommended testing accommodation without further inquiry."); *see also* 28 C.F.R. §

36.309(b)(1)(iv) ("Any request for documentation [for testing accommodations must be]

---

1264, 1269–70 (11th Cir. 2014) (affidavit from doctor discussing substantial limitations in major life activites "enough for [Plaintiff] to present a *prima facie* case" at the summary judgment stage under the ADA Amendments Act); *see also* ECF No. 39, at 14 n. 13 (Defendant's reliance on pre-ADAAA cases in its motion briefing).

[14] It should be noted that though this should not be *required* by the ADA, Plaintiff did obtain a diagnosis by a renowned expert – Dr. Charles Golden – during the course of this litigation.

reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.").

Defendant and its expert witnesses' disagreement over the methodology employed by Plaintiff's expert witnesses in diagnosing Plaintiff with ADHD should not suffice to defeat Plaintiff's claim of impairment under the ADHD. Moreover, this Court should consider the evidence and testimony to be presented at trial that Plaintiff has been diagnosed with ADHD by four separate qualified professionals, all of whom personally evaluated Plaintiff (save Dr. Booth-Jones, who supervised the personal evaluation). The fact that Defendant's own expert, Dr. Murphy, himself would not diagnose someone with ADHD without having seen them – coupled with the fact that all of Plaintiff's diagnoses have been the result of in-person evaluations while Defendant's rejection of these diagnoses have all been based on record review – standing alone should defeat any notion that Plaintiff does not have the impairment of ADHD. *See* ECF No. 39-13, p. 5, at 24:17–22 (Dr. Murphy would not "diagnose somebody without the ability to have done the assessment" himself, nor would he "determine the impact of someone's disability based just on a record review.").

### *Plaintiff's Impairment Substantially Limits Multiple Major Life Activities*

As Plaintiff alleged in her Amended Complaint, ECF No. 29, at 33, ¶ 97, shared in her response to NBME's First Set of Interrogatories, ECF No. 39-15, at 2, ¶ 2, her ADHD causes her to be substantially limited in the major life activities of learning, reading, memory, and concentrating. *See* 36 C.F.R. § 36.105(c)(1)(i) (listing "thinking," "concentrating," and "learning" as major life activities). Moreover, due to her difficulties in learning, reading, memory, and concentrating as it relates to the Step 1 exam, an examination that is necessary for Plaintiff to pass in order to pursue her chosen profession in the medical field, Plaintiff is also

substantially limited in the major life activity of working. *Cf. Bartlett v. New York State Bd. of Law Examiners*, 970 F.Supp. 1094, 1121 (S.D.N.Y. 1997) ("If plaintiff's disability prevents her from competing on a level playing field with other bar examination applicants, then her disability has implicated the major life activity of working because if she is not given a chance to compete fairly on what is essentially an employment test, she is necessarily precluded from potential employment in that field. In this sense, the bar examination clearly implicates the major life activity of working."); *see also* 36 C.F.R. § 36.105(c)(1)(i) (listing "working" as a major life activity). Each of these substantial limitations in major life activities effect Plaintiff in the context of taking the Step 1 exam; thus, she is also substantially limited in the realm of test-taking. *See* 35 C.F.R. App. C, §§ 35.105 & 36.105 ("[T]he Department notes that one or more already-included major life activities—such as reading, writing, concentrating, or thinking, among others—will virtually always be implicated in test taking.").[15]

Defendant will argue at trial that even if this Court were to conclude Plaintiff has an impairment under the ADA due to her diagnosed ADHD, her impairment does not substantially limit any major life activities. Defendant's chief arguments in support of its contention will be the fact that Plaintiff has been high performing in the past academically and on standardized tests. *See* ECF No. 31, at 24 ("Individuals who perform at the level that Ms. Black has performed – with no extra testing time or other accommodations – do not have a disorder that rises to the level of a disability under the ADA.") However, Defendant's focus on academic outcomes in analyzing whether she is substantially limited in the major life activities of learning, reading, memory, and concentrating – and consequently working and test-taking – as well as its reliance on largely pre-ADAAA case law in conducting this analysis, *see* ECF No. 39, at 14 n. 13, is

---

[15] The addition of the major life activities of "working" and "test-taking" are included in Plaintiff's Second Amended Complaint, the acceptance of which is still pending before this Court. *See* ECF No. 43.

misguided. The ADA – specifically since the enactment of the ADAAA – does not permit the use of outcomes an individual can achieve as a proxy for disability; rather, the ADA is concerned with whether an individual has an impairment that substantially limits one or more major life activities. Accordingly, a lengthy discussion of Plaintiff's past achievements is unnecessary for the purposes of establishing the presence of a disability.

The ADA counsels that the term "substantially limits" "shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008," 42 U.S.C. § 12102(4)(B); the ADA Amendments Act found that courts had "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress" and that it was intending to "reinstat[e] a broad scope of protection to be available under the ADA." Pub. L. No. 110-325, § 2(a)(7) & (b)(1), 122 Stat. 3553 (2008). Accordingly, "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 36.105(d)(1)(i); *see also id.* § 36.105(d)(1)(ii) ("The primary object of attention in cases brought under Title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity."); § 36.105(d)(1)(vi) ("[T]he term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act.").

Contrary to the outcomes- and achievement-based focus that will be relied on by Defendant at trial, and consistent with the change in scope the ADAAA brought to the term "substantially limits" as compared to old case law, *see, e.g., Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) (holding that a determination of disability under the ADA should be made in reference to

21

an individual's ability to mitigate his or her impairment through corrective measures)[16], Federal regulations counsel that evaluation whether an individual is substantially limited should focus "on how a major life activity is substantially limited. . . not on what outcomes an individual can achieve."28 C.F.R. § 36.105(d)(3)(iii). While Plaintiff must be found by this Court to be substantially limited in major life activities as compared to the general population, *id.* § 36.105(d)(1)(v), the focus should not be on the outcomes Plaintiff has achieved in the past, as compared to the general population, but rather on the condition and the manner that Plaintiff is substantially limited in the major life activities necessary to take the Step 1 exam as compared to the general population. *Id.* § 36.105(d)(3). Specifically, this Court should consider the "difficulty, effort or time required to perform a major life activity" and "the length of time a major life activity can be performed." *Id.* § 36.105(d)(3)(ii).

The qualified professionals who evaluated, treated, and diagnosed Plaintiff discussed numerous times the substantial limitations her ADHD places on her major life activities thinking, concentrating, memory, and learning – all of which consequently, due to their impact on her ability to take the Step 1 exam, affect her major life activity of working and test-taking – in the context of taking a high-stakes standardized examination like the Step 1 exam, both in studying for the exam and taking the exam. Specifically, Dr. Golden and Dr. Vigil-Otero noted these limitations; that Plaintiff is substantially limited in major life activities connected to preparing and taking (i.e. condition and manner) the Step 1 standardized examination, specifically in studying for the examination, i.e. substantial limitation in the major life activities of concentrating, learning, and memory as it related to taking the Step 1 exam, and taking the exam itself, as Dr. Golden noted her limitations in the testing setting results in her lowered scores, i.e.

---

[16] The ADAAA was explicitly intended to overturn *Sutton, Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and its progeny. Pub. L. No. 110-325, § 2(a)(4) & (5).

substantial limitation in the major life activities of concentrating and reading as it related to taking the Step 1 exam.

Dr. Golden most succinctly discusses the effect her impairment has on major life activities crucial to test-taking. He states in his report, and will discuss in his testimony, that Plaintiff's impairment substantially impacts her abilities during high-stakes standardized test-taking such that it interferes with her potential achievement level. ECF No. 47-2, at 9; *see also id.* at 7 ("The testing, history and analysis [sic] clearly point to the presence of a disability that interferes with her ability to perform in circumstances that demand high levels of attention."). Accordingly, though Plaintiff, as Defendant points out, is average or above average in her standardized test *results* (i.e. outcomes) as compared to the general population, the fact that she is not able to reach her achievement level or attain her study goals on the Step 1 exam evidences a substantial limitation in the *condition and manner* in which she is able to perform the major life activities crucial to test taking as compared to the general population.

Plaintiff herself spoke with specificity as to how she was substantially limited in the condition and manner in which she has been able to exercise major life activities crucial to taking high-stakes standardized examinations. In short, she reports not being able to finish any of the sections on any of the Step 1 exam administrations she took, ECF No. 39-2, p. 16, at 208:11–23, which is reflected in her scoring sheets, *see* ECF No. 39-14, and overall states that she has had difficulty focusing and concentrating on each standardized examination she has taken throughout her life, including the Step 1 exam. ECF No. 39-2, p. 17, at 211:20–212:22.

The concerns expressed by the professionals treating and evaluating Plaintiff reflect the feelings by these individuals that Plaintiff experiences substantial limitations in major life activities not experienced by the general population, e.g. "great difficulty sustaining attention

[and] completing her study goals," substantial limitations due to "a disability [that] interferes with her ability to perform in circumstances that demand a high level of attention," etc. As will be further elucidated by expert testimony at trial[17], the difficulties noted by Plaintiff's treating and evaluating professionals are reflective of substantial limitations, as compared to the general population, in major life activities crucial to test-taking, i.e. thinking, concentrating, memory, and learning, which further results in a substantial limitation in working. Moreover, Plaintiff's testimony will demonstrate that, in taking the Step 1 exam and indeed all standardized examinations, she has substantial "difficulty … [in] perform[ing] a major life activity" and her limitations increase "the length of time a major life activity can be performed." *See* 28 C.F.R. § 36.105(d)(3)(ii). The fact that Plaintiff may have been diagnosed later in life or was high achieving in the past – which Defendant claims precludes her from having a disorder that rises to the level of disability, ECF No. 31, at 24 – does not affect this conclusion. *See* ECF No. 47-2, at 7 (late diagnosis of ADHD typical for an individual with Plaintiff's profile).

* * *

In conclusion, Plaintiff has an impairment that substantially limits her in a set of major life activities, and thus she is disabled under the "actual disability prong" of the ADA.

    2.   <u>Plaintiff Is Entitled to Accommodations on Future Administrations of the Step 1 Exam</u>

As an individual with a disability qualified to receive the protections under the ADA, Plaintiff is, as the evidence and testimony at trial will demonstrate, entitled to her requested accommodations of 50% extra test time on the Step 1 exam. An examination administered by an entity, like Defendant, subject to Title III of the ADA must provide an examination in a manner

---

[17] It should be noted that such testimony is beyond what is required by the ADA; indeed, Plaintiff's testimony should suffice to demonstrate that she is substantially limited in the alleged major life activities. *See* 28 C.F.R. § 36.105(d)(1)(vii)("The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.").

that is accessible with respect to an individual's "specific impairment and the specific nature of [the] exam." *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011). For Plaintiff, this means receiving 50% extra time on the Step 1 exam.

On two occasions, Plaintiff has requested, and Defendant has denied, an accommodation – 50% extra time – that best ensures Plaintiff can take the Step One examination in a way that accurately reflects her aptitude in the areas the exam purports to measure – i.e. "basic science knowledge [and the] application of that knowledge." While testing entities are not required to provide the accommodation requested by an individual with a disability, only an accommodation that is as effective as the request accommodation and appropriate to the needs of that individual, *see Bonnette v. District of Columbia Court of Appeals*, 796 F.Supp.2d 164, 183 (D.D.C. 2011), three factors counsel in favor of 50% extra time on the examination as being the accommodation that best ensures Plaintiff is evaluated on the examination according to her aptitude.

First, the treating professional supervising the evaluation of Plaintiff for ADHD at USF recommended that Plaintiff "should be allowed extended time … in all courses and standardized tests to maximize her ability to focus." ECF No. 32-15, at 8. Moreover, during the course of this litigation, Dr. Golden has also recommended that Plaintiff receive "accommodations including both 50% extra time and double breaks." ECF No. 47-2, at 7–8. Accordingly, in the opinion of qualified professionals, the 50% extra time on examinations is the accommodation that "best ensures" the Step 1 exam is testing Plaintiff's basic science knowledge and application thereof. *See* 36 C.F.R. App. A, § 36.309 ("[W]hen testing entities receive documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested, they shall generally accept such documentation and provide the accommodation.").

Second, Plaintiff had been receiving 50% extra test time on her examinations at USF MCOM due to the limitations and impairments caused by her disability. ECF No. 33-2, at 18, 78. These accommodations had been provided as of March of 2013 and have been maintained for the purposes of Plaintiff's test-taking at USF MCOM. The Federal regulations operationalizing the ADA counsel that "documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations" should be given "considerable weight." 28 C.F.R. § 36.309(b)(1)(v); *see also* 36 C.F.R. App. A, § 36.309 ("[A] recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations.").

Finally, Defendant has no qualms about granting additional time to take the Step One examination as an accommodation for individuals who need it. As reported by Catherine Farmer, who works at Defendant's Disability Services Section, approximately 75% of all accommodations granted on the Step 1 exam are for extra time. ECF No. 39-9, p. 9, at 102:16–25. Accordingly, it cannot be said that an accommodation for extra time would undermine the purposes of the examination. Rather, it is an accommodation already utilized by Defendant to ensure individuals with certain impairments can take the Step 1 exam in a way that best ensure the results reflect their aptitude and achievement level.

Taking these factors together, and given the overwhelming documentation provided by Plaintiff, more than one hundred pages, documenting her impairment and its substantial impact on her ability to take the examination under normal time constraints, Plaintiff should be granted 50% extra time to take the Step One examination as an accommodation that best ensures the Step 1 exam is accessible to her. To find, as Defendant has, that Plaintiff does not meet the criteria for 50% extra time is clearly in violation of Title III of the ADA – she has received identical

accommodations for similar testing situations in medical school based on the same impairment of ADHD, which impairs her in the same way in both situations; she has provided ample documentation from qualified treating professionals explaining her diagnosis, her impairment from that diagnosis, and the need for accommodations arising from this impairment, far beyond what is "reasonable and limited to the need for the … accommodation"; and Defendant concedes that granting extra time does not impair their ability to evaluate an individual's aptitude on the Step 1 exam. Accordingly, Plaintiff's applications for accommodations should have been granted, and any future administrations of the examination should grant Plaintiff 50% extra time.

**CONCLUSION**

For these reasons, and based on the evidence and testimony to be presented at trial, the Court should rule in favor of Plaintiff on all Counts alleged in her Complaint and grant her the remedy requested – injunctive relief ordering Defendant to grant her accommodations on the Step 1 exam.

Respectfully submitted: August 25, 2017

**Curtis Filaroski**
FL Bar No. 111972
curtisf@disabilityrightsflorida.org
**Megan Collins**
FL Bar No. 119112
meganc@disabilityrightsflorida.org
**Ann Marie Cintrol-Siegel**
FL Bar No. 166431
anns@disabilityrightsflorida.org
**Attorneys for Plaintiff Elizabeth Black**
Disability Rights Florida
2473 Care Drive, Suite 200
Tallahassee, FL 32308
Phone: 850-488-9071
Fax: 850-488-8640

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of August, 2017, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of

electronic filing to the following:

GREGORY A. HEARING
ghearing@tsghlaw.com
Thompson, Sizemore, Gonzalez & Hearing, P.A.
201 N. Franklin Street, Suite 1600
Post Office Box 639 (33601)
Tampa, Florida 33602

ROBERT A. BURGOYNE
robert.burgoyne@nortonrosefulbright.com
Norton Rose Fulbright US LLP
799 9th Street, NW, Suite 1000
Washington, DC 20001-4501

Attorneys for National Board of Medical Examiners

Plaintiff's counsel has also emailed copies of the foregoing to the Defendant's attorneys.

Curtis Filaroski
Attorney for Plaintiff

28