**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

_____

ELIZABETH A. BLACK,                )

               Plaintiff,       )

v.                                 )          CASE NO.: 8:16-cv-02117-SDM-TGW

NATIONAL BOARD OF                  )
MEDICAL EXAMINERS,                 )

            Defendant.       )

_____)

### DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant National Board of Medical Examiners ("NBME") respectfully submits the following proposed findings of fact and conclusions of law:

### FINDINGS OF FACT

**A.**    **Parties**

1.  NBME is a non-profit corporation whose mission is to protect the health of the public by providing standardized, state-of-the-art assessments for health professionals.

2.  Together with the Federation of State Medical Boards, NBME has established the United States Medical Licensing Examination, or "USMLE." The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.

3.  There are three "Steps" to the USMLE, all of which must be passed before a physician with an M.D. degree is eligible to apply for an unrestricted license to practice medicine in the United States.

4.   This case involves the USMLE Step 1 exam.  Step 1 is a standardized, multiple-choice examination that assesses understanding and application of basic science concepts important to the practice of medicine.  Under standard testing conditions, the exam is administered in one eight-hour day, including break time.

5.   Ms. Black is a student at the University of South Florida ("USF") Morsani College of Medicine, currently on a leave of absence.  She claims to need extra testing time on the Step 1 exam based upon a diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD").

6.   Ms. Black contends that, as a result of her ADHD, she is substantially limited in the major life activities of learning, reading, memory and concentrating.  *See* Joint Pretrial Statement at 3 (Dkt. 48) (hereafter cited as "JPS").

7.   As discussed below, the evidence does not support Ms. Black's contentions.  She has performed exceedingly well in all facets of her life – academic, personal, social and vocational– without needing any accommodations.  This includes her performance on other high-stakes standardized exams, which she has always taken without additional testing time.  She did not request any accommodations in elementary school, middle school, high school, college, or the pre-med, Post-Baccalaureate program that she took, nor did she do so on the SAT, her College Board subject tests, or the Medical College Admission Test.

**B.      Testing Accommodations on the USMLE Exams**

8.   NBME provides testing accommodations to individuals who have a physical or mental impairment that substantially limits their ability to perform one or more major life activities that are relevant when taking a USMLE examination.  Depending upon the disability, the accommodations might include extra breaks, a reader or scribe, or extra testing time.

9.      NBME's accommodation process is designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations to which they are not entitled, and which could affect the reliability of their resulting test score and/or provide them with an unfair advantage over other candidates.

10.     The accommodation policies for the USMLE exams are set forth on the USMLE website.

11.     NBME employs several full-time employees to review accommodation requests, communicate with candidates seeking accommodations, and coordinate the provision of approved accommodations.   Dr. Catherine Farmer, a clinical psychologist, is the Director of Disability Services for NBME.

12.     NBME routinely seeks input from independent, external professionals who have expertise in the disability that is identified as the basis for a candidate's accommodation request. The external experts are asked to review all of the candidate's supporting documentation and then address three central questions:  (i) does the documentation confirm the claimed impairment; (ii) if so, does the impairment substantially limit the candidate's ability to perform one or more major life activities that are relevant when taking a USMLE exam; and (iii) if so, are the accommodations requested by the candidate reasonable – that is, will they enable the candidate to take the exam in an accessible manner, notwithstanding his or her disability?

13.     External reviewers provide their opinions and make recommendations to NBME on whether a given accommodation request should be approved.   The final decision on an accommodation request, however, is made by NBME.

14.     As one of NBME's experts explained at trial, it is a common and "professionally sound" practice for entities such as NBME, state boards of law examiners, and other testing entities

to call upon external experts to review documentation submitted in support of a request for accommodations and to provide an opinion on whether the diagnosis assigned is supported by the documentation, the level and type of functional impairment demonstrated by the applicant, and the appropriateness of specific accommodations in a given case if accommodations are warranted." [*See* Expert Report of Dr. Michael Gordon at ¶ 4 (Def. Tr. Ex. 70).]

15. The accommodation policies and practices described by Dr. Farmer and posted on the USMLE website are reasonable and appropriate.

**C.**   **The Diagnostic Criteria for ADHD**

16. The Diagnostic and Statistical Manual of Mental Disorders ("DSM") is an authoritative source for diagnosing mental impairments. *See* JPS ¶ XI.A*; see also U.S. v. Long*, 562 F.3d 325, 334 n.22 (5th Cir. 2009). The current edition, DSM-5, sets forth the following diagnostic criteria for ADHD:

> A. A **persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development**, as characterized by (1) and/or (2):
>
> > 1. **Inattention**: Six (or more) … symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that **negatively impacts directly on social and academic/occupational activities**….  *Note:* …For older adolescents and adults (age 17 and older), at least five symptoms are required….
> >
> > 2. **Hyperactivity and impulsivity**: Six (or more) … symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that **negatively impacts directly on social and academic/occupational activities**…:  *Note:* ….For older adolescents and adults (age 17 and older), at least five symptoms are required.
>
> B. Several inattentive or hyperactive-impulsive **symptoms were present prior to age 12 years.**
>
> C. Several inattentive or hyperactive-impulsive **symptoms are present in two or more settings (e.g., at home, school, or work; with friends or relatives; in other activities)**.

D.  There is **clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning**.

E.  The symptoms do not occur exclusively during the course of schizophrenia or another psychotic disorder and are not better explained by another mental disorder (*e.g.*, mood disorder, anxiety disorder, dissociative disorder, personality disorder, substance intoxication or withdrawal).

*See* ADHD Diagnostic Criteria, DSM-5 (Def. Tr. Ex. 5) (emphasis added).

17.    According to the organization Children and Adults with Attention-Deficit/Hyperactivity Disorder ("CHADD"), a national organization that provides support for individuals with ADHD, an evaluation for ADHD should be "comprehensive and multidimensional."[1]  "Although procedures and testing materials may vary, certain protocols are considered essential for a comprehensive evaluation.  These include a thorough diagnostic interview, information from independent sources such as the spouse or other family members, DSM-5 symptom checklists, standardized behavior rating scales for ADHD and other types of psychometric testing as deemed necessary by the clinician."[2]

**D.      Ms. Black's Standardized Testing History**

18.    Ms. Black has taken numerous standardized tests over the course of her lifetime, prior to enrolling in medical school, and she has consistently done very well.  She did not request or receive extra testing time on any of these standardized tests.  *See* JPS ¶¶ IX.A, IX.B, IX.G, IX.P.

19.    The standardized tests taken by Ms. Black in elementary and middle school included the Otis-Lemon School Ability Test ("OLSAT") and the Metropolitan Achievement Tests

[1]  *See*  http://www.chadd.org/Understanding-ADHD/For-Professionals/For-Healthcare-Professionals/The-ADHD-Diagnostic-Process.aspx. (Def. Tr. Ex. 55).

[2]  *See* http://www.chadd.org/Understanding-ADHD/For-Professionals/For-Healthcare-Professionals/The-ADHD-Diagnostic-Process/Diagnosis-in-Adults.aspx. (Def. Tr. Ex. 56).

("MAT").  *See* Def. Tr. Exs. 8, 9.  Her scores on the OLSAT were consistently in the Average or Above Average range in both the verbal and nonverbal categories.  When she took the MAT in the 8th Grade, her performance was "well above average," with scores on all subtests in the 90th percentile or better nationally (*i.e.*, the top 10%), including in Reading Comprehension.  *See* JPS ¶ IX.B.

20.     In high school, Ms. Black took the SAT college admissions test three times.  She also took College Board subject-matter tests in Spanish and Writing.  All of these tests were time-limited, standardized tests.  She did not request extra testing time.  Her combined scores for Verbal and Math on the SAT ranged from 1240 to 1260, with her highest score being a 650 in Verbal.  Those scores put her in the top 20% (*i.e.*, 80th percentile or better) of all SAT examinees in calendar year 2000.  *See* JPS ¶ IX.F, IX.G; Def. Tr. Ex. 10.

21.     Ms. Black took the Medical College Admission Test ("MCAT") twice in 2009.  The MCAT is an extremely challenging test, taken by a highly select group of individuals with exceptional academic credentials.[3]  Her first score placed her in the 32nd percentile of all individuals who tested when she did.  She did even better the second time, after taking a preparation course.   Indeed, she did extremely well, scoring in the 73rd percentile.  Her score was in the top 27% of all examinees.  Ms. Black did not receive extra time on the MCAT.  *See* JPS ¶¶ IX.0, IX.P; Def. Tr. Ex. 11.

22.     Like the Step 1 exam, the MCAT lasts several hours, contains multiple-choice questions, and is administered on a computer.

---

[3] According to the Association of American Medical Colleges, which administers the MCAT exam, there were 53,042 applicants to U.S. medical schools for the 2016-17 school year, but only 21,030 matriculants.  *See* Table A-1 at 5 and n.1, found at https://www.aamc.org/download/321442/data/factstablea1.pdf.

E.     **Ms. Black's Academic History**

23.     Ms. Black attended high school in Pennsylvania.   She did not receive any accommodations.  With the exception of one B in the 9th grade (in an Honors Science course) and two Bs her Senior year (in Honors/AP English and Honors/AP Calculus), she was a straight-A student.  All told, 19 of her classes were Honors classes, she graduated with a cumulative GPA of 3.941, and she finished 4th in a class of roughly 320 students. *See* JPS ¶ IX.C; Def. Tr. Ex. 16.

24.     Ms. Black achieved these exemplary grades while participating in numerous extra-curricular activities.  She played varsity field hockey all four years of high school, serving as Captain her Senior year and receiving All League and All American honors.  She also played lacrosse and basketball, ran track, was an officer for two years on the Student Council, and was a member of several clubs.  *See* JPS ¶ IX.D; Def. Tr. Exs. 15, 16.

25.     On the strength of her academic record, Ms. Black was admitted to Princeton University.  Princeton is an academically rigorous Ivy League school that consistently ranks among the best universities in the country.[4]

26.     Ms. Black graduated from Princeton in four years and achieved mostly As and Bs. *See* JPS ¶ IX.H; Def. Tr. Ex. 12.  She achieved those grades while participating as an NCAA Division I athlete on Princeton's nationally-ranked women's field hockey team, with All American recognition in 2002 and 2003.  Def. Tr. Ex. 6 (Ms. Black's CV).  She devoted "many hours to the Princeton Field Hockey team," developed "lasting friendships," and confirmed that she is able to "perform successfully … in a pressure situation."  Her coach described her as having the "commitment, drive, focus and longevity needed to achieve" success at the "highest level in the

---

[4] *See, e.g.*, U.S. News & World Reports, *Best Colleges Rankings* (2017) (ranking Princeton as the number 1 national university in the country, ahead of Harvard, the University of Chicago, Yale and 306 other national universities) (available at www.usnews.com/best-colleges/rankings/national-universities).

country."

27.    Ms. Black did not request accommodations at Princeton.  JPS ¶ IX.I.

28.    Ms. Black participated in a university-level study-abroad program in the summer of 2003.  She earned an A- in each of her courses (Advanced Spanish/Mexican Culture and Literature), without any accommodations.  JPS ¶ IX.J.

29.    In 2007, Ms. Black was admitted to a pre-med, Post-Baccalaureate program at another Ivy League school, the University of Pennsylvania ("UPenn").  JPS IX.M.  The program was academically demanding and had a "brutal daily schedule."  Over the course of a year, Ms. Black took nine courses in Biology, Chemistry and Physics and achieved a 4.0 GPA during two of her sessions.

30.    Ms. Black's Pre-Health Programs Adviser at UPenn described Ms. Black as a "superb student" who "earned an outstanding 3.79 cumulative GPA in our rigorous program," while maintaining "part time research and volunteer positions."  He also noted her "outstanding interpersonal skills," and described her as "focused."

31.    Ms. Black did not receive any accommodations at UPenn.  JPS IX.N.

32.    Ms. Black enrolled in the University of South Florida's Morsani College of Medicine in August 2011.  JPS ¶ IX.T.  Before she began classes, her father completed a form on her behalf which confirmed that Ms. Black does not have "any condition(s) that would require reasonable accommodation" in order for her to satisfy the school's technical standards.  Def. Tr. Ex. 20. Those standards include having the ability to "analyze, synthesize, extrapolate, solve problems, and reach diagnostic and therapeutic judgments;" to "communicate the results of [an] examination to the patient and to [one's] colleagues with accuracy, clarity and efficiency;" and to "perform with precise, quick and appropriate actions in emergency situations."  *Id*.  Ms. Black

testified that the information provided by her father was accurate.

33.     According to Ms. Black, she will be able to practice medicine without receiving any accommodations.  *See* Def. Tr. Ex. 3 (Resp. to RFA 17).

34.     Ms. Black took written, time-limited exams during her first year of medical school. She passed all her courses, without receiving extra testing time.  JPS ¶ IX.U.

35.     Ms. Black first requested accommodations in the latter half of her second year of medical school.  The school approved her request in March 2013, authorizing 50% additional time on exams taken outside of the clinical setting.  JPS ¶ IX.X.

### F.     Ms. Black's Employment History

36.     After graduating from college in May 2005, and before deciding to attend medical school, Ms. Black became a legal assistant at the law firm Shearman & Sterling in New York City. JPS ¶ IX.K.  For roughly a year, she "[r]eviewed, drafted, revised and organized legal documents, surveys, title policies and general files" relating to large, commercial real estate transactions.  Def. Tr. Ex. 6.  She learned the "intricate details of real estate law" in this job and confirmed that she has "the ability to manage multiple projects at one time."

37.     Ms. Black did not receive accommodations at Shearman & Sterling (or while working in any other job she has ever held).  *See* JPS IX.L.

38.     In August 2006, Ms. Black became a Research Assistant at the N.Y. State Psychiatric Institute at Columbia University.  She coordinated research studies, recruited subjects for the studies, assisted with grant and manuscript preparations, and analyzed, managed and input research data.  Def. Tr. Ex. 6 at 1-2.  According to a supervisor, she performed all of her work "superbly."  She did not receive any accommodations in this job.  JPS ¶ IX.L.

39.     Ms. Black then enrolled in her Post-Baccalaureate program at UPenn.  After

completing that program in 2008 and taking the MCAT exam, she moved to the Dominican Republic, where she worked in various jobs for roughly three years. JPS ¶ IX.R.

40.     All of Ms. Black's jobs in the Dominican Republic called for strong communication skills, attention to detail, and focus.  She was as an intern for an International Family Aids Program, where she taught classes and developed the curriculum for an outreach program.  She was a high school science teacher.  And she did logistics and procurement work and maintained project finances for two international relief organizations.  *See* Def. Tr. Ex. 6.  She did not receive accommodations in any of these jobs.  JPS ¶ IX.S.

41.     Since August 2016, Ms. Black has been employed as a middle school teacher.  JPS ¶ IX.NN.   In obtaining that position, she passed a qualifying subject-matter exam without additional testing time.  She has not requested any accommodations from her employer.

**G.      Ms. Black's Initial ADHD Diagnosis at Age 26, by Dr. Scott Fleischer**

42.     Ms. Black was first diagnosed with ADHD in 2009, when she was 26 years old. The diagnosis was provided by Dr. Scott Fleischer, a psychiatrist in Pennsylvania.  JPS ¶ IX.Q.

43.     When she went to see Dr. Fleischer, Ms. Black was taking a medication that is used to treat anxiety.  She told Dr. Fleischer that that she was "planning to take the MCAT exam" and "was having some difficulties with her concentration and focus."  *See* Decl. of Scott A. Fleischer, M.D. (Def. Tr. Ex. 37).

44.     Dr. Fleischer "conducted a consultation and brief psychiatric evaluation" of Ms. Black, "for which she was charged $132."  *Id*. ¶ 5.  The primary purpose of the evaluation was to identify "what symptoms she reported experiencing and how those symptoms might respond to medications…."  *Id.* ¶ 8.  Her reported symptoms were "consistent with ADD" and she also "reported experiencing anxiety." *Id.* ¶ 7.  Based upon the "information she provided," Dr. Fleischer

diagnosed Ms. Black as having two disorders:  "'GAD' (General Anxiety Disorder) and 'ADD' (Attention Deficit Disorder)."  *Id*. ¶ 9.  He recommended that she stop taking one of the drugs she was taking, continue taking another drug that she was taking at the time, begin taking Ritalin, and consider taking another drug in the future.  *Id.*

45.     Dr. Fleischer "did not administer any screening tests, ratings scales, continuous performance tests, or neuropsychological measures to Ms. Black during [his] evaluation…."  *Id*. ¶ 8.  He did not "review any of her educational or employment records," or "seek information about Ms. Black from third parties."  *Id*.  He did not "attempt to measure the extent of the functional limitations that she reported" experiencing.  *Id*.  He simply conducted "an informal interview of Ms. Black in order to determine whether she was experiencing symptoms that are consistent with ADD, and that might respond positively to appropriate medications."  *Id.* ¶ 7.

46.     The Court finds that Dr. Fleischer's diagnosis of Ms. Black as having ADHD was not based upon a comprehensive evaluation of Ms. Black, did not consider all relevant diagnostic criteria for ADHD, and therefore is not a valid and reliable diagnosis.

**H.     Ms. Black's Re-Evaluation by the USF Psychological Services Center**

47.     In October 2014, while enrolled in medical school, Ms. Black was evaluated at the USF Psychological Services Center.  *See* JPS ¶¶ IX.BB, IX.CC.

48.     Ms. Black informed her evaluator that she was "seeking an ADHD evaluation to update her diagnosis documentation so that she may continue receiving her psychostimulant medication from the USF [Counseling Center]."  Def. Tr. Ex. 25 (Psychoeducational Evaluation report prepared by the Center).

49.     The evaluation was conducted by Megan McMurray, a "Clinical Psychology Trainee," under the supervision of Dr. Margaret Booth-Jones.  *Id*.

50.     Ms. Black told Ms. McMurray that she had a "lifetime history of difficulty with concentration and staying focused" and had been "diagnosed with ADHD by a psychiatrist in 2009." *Id.*  She also reported that she was taking Adderall "for her ADHD symptoms," and that she had "received academic accommodations for ADHD, including extended time on exams." *Id.*

51.     Ms. McMurray administered various assessments to Ms. Black as part of the evaluation. *Id.*  She administered the Wechsler Adult Intelligent Scale-4th Edition to "assess Ms. Black's general intellectual abilities."  Her performance ranged from "Average" to "Very Superior." *Id.*  This included a performance in Verbal Comprehension at the 98th percentile, and a 70th percentile performance in Processing Speed. *Id.*

52.     The Conners' Adult ADHD Rating Scales "were used to gather information about Ms. Black's reported inattention symptoms." *Id.*  The responses that Ms. Black provided "resulted in clinically significant" findings for "inattention, hyperactivity, and impulsivity." *Id.* Ms. Black took an "observer" version of the Rating Scales home to her roommate to complete, and her responses "closely mirrored Ms. Black's responses, confirming Ms. Black's self-reported difficulties with inattention, hyperactivity, and impulsivity." *Id.*

53.     The Conners' Continuous Performance Test-II was "administered to Ms. Black to assess her attention/focus." *Id.*  The CPT-II "presents individual letters at varying intervals on a computer screen and asks individuals to press a keyboard or mouse button in response to every letter presented except 'X.'" Ms. Black's performance on the CPT-II was "consistent with patterns typically observed in ADHD populations." *Id.*

54.     Stating that "Ms. Black reports symptoms indicative of ADHD symptomology," and that "the current assessment supports a diagnosis of ADHD," Ms. McMurray concluded that Ms. Black "meets DSM-5 criteria for ADHD with combined presentation (inattentive and

hyperactive/impulsive presentation)." *Id.*

55.     Ms. McMurray did not assign a level of severity as part of her diagnosis.[5] Nor did she provide any conclusions regarding Ms. Black's ability to read, learn, concentrate, or memorize information as compared to most people in the general population.

56.     Ms. Black's Psychological Evaluation report was signed by Ms. McMurray ("Clinical Psychology Trainee") and Dr. Margaret Booth-Jones ("Supervising Psychologist").

57.     Dr. Booth-Jones testified as follows regarding Ms. Black's Evaluation Report:

   a)   The USF Psychological Services Center is a training clinic

   b)   Individuals who come to the clinic are assessed by graduate students

   c)   A licensed clinical psychologist provides supervision but never sees the client

   d)   Ms. McMurray conducted the evaluation of Ms. Black

   e)   At the time of the evaluation, Ms. McMurray had not yet completed the academic training that clinical psychology students must take in advance of a one-year internship and a one- or two-year fellowship

   f)   Dr. Booth-Jones is employed by the H. Lee Moffitt Cancer Center and specializes in assessing and supporting cancer patients

   g)   Dr. Booth-Jones sometimes volunteers at the USF Psychological Services Center

   h)   Dr. Booth-Jones has not written any articles or done any research relating to ADHD and does not consider herself an expert in the diagnosis of ADHD

   i)   There is a distinction between a "comprehensive" ADHD evaluation and a "reevaluation"

---

[5] According to the ADHD diagnostic criteria in the DSM-5, the diagnosing professional should "Specify current severity: **Mild**: Few, if any, symptoms in excess of those required to make the diagnosis are present, and symptoms result in only minor functional impairments. **Moderate**: Symptoms or functional impairment between "mild" and "severe" are present. **Severe**: Many symptoms in excess of those required to make the diagnosis, or several symptoms that are particularly severe, are present, or the symptoms result in marked impairment in social or occupational functioning." *See* Def. Tr. Ex. 5.

j)  Reevaluations are very common at the USF Psychological Services Center because the USF Counseling Center requires brief testing that will enable the Counseling Center to continue prescribing psychostimulants

k)  The USF Psychological Services Center conducted a reevaluation of Ms. Black, not a comprehensive evaluation

l)  It did so with the understanding that Ms. Black had previously been diagnosed as having ADHD by a psychiatrist outside of the Psychological Services Center (Dr. Fleischer)

m) Because this was a reevaluation, they did not ask for any academic records or do anything to confirm childhood onset beyond getting Ms. Black's self-report, and the report did not discuss whether Ms. Black had experienced any issues in the employment setting

n)  Ms. Black did not report any level of impairment in her social life

o)  Ms. McMurray and Dr. Booth-Jones considered nothing other than Ms. Black's "self-report" when considering her history of presenting problems

p)  Dr. Booth-Jones has never met Ms. Black in person, nor has she ever spoken to anyone at the medical school regarding Ms. Black

q)  Neither Dr. Booth-Jones nor Ms. McMurray saw any documentation of the ADHD diagnosis that Ms. Black reported receiving in 2009 from Dr. Fleischer

r)  In Dr. Booth-Jones' view, Dr. Fleischer's half-hour interview with Ms. Black would not provide an adequate basis for diagnosing someone with ADHD

s)  Ms. McMurray and Dr. Booth-Jones did not attempt to evaluate the existence or extent of any functional limitations that Ms. Black claimed to be experiencing, or attempt to determine whether Ms. Black was substantially limited in her ability to perform any major life activities

t)  Instead, Ms. McMurray and Dr. Booth-Jones were supporting Ms. Black's request to stay on psychostimulants, as that was the referral question they were asked to address

*See* JPS ¶¶ IX.CC, IX.EE, IX.GG.

58.    The Court finds that the ADHD diagnosis that Ms. Black received from the USF Psychological Services Center was not based upon a comprehensive evaluation of Ms. Black, did

not consider all relevant diagnostic criteria for ADHD, and therefore cannot be considered a valid and reliable diagnosis for purposes of determining whether Ms. Black is disabled within the meaning of the Americans with Disabilities Act and entitled to accommodations on the USMLE Step 1 exam.

59.     The ultimate legal issue in this action is whether NBME violated the ADA by denying Ms. Black's second request for accommodations on the Step 1 exam.  That denial took place in March 2016.  Although Ms. Black has attempted to rely upon additional diagnoses to support her claim in this action, the only ADHD diagnoses that Ms. Black relied upon to support her request for accommodations from NBME were the diagnoses by Dr. Fleischer and the USF Psychological Services Center.  *See* JPS ¶¶ IX.BB.  The Court finds that neither diagnosis was valid under the applicable diagnostic criteria found in the DSM.

## I.     **Ms. Black's Therapy Sessions in Medical School**

60.     Ms. Black consulted numerous therapists while attending medical school, in connection with a range of issues that included a tendency towards perfectionism, difficulty achieving her desired life/school/work balance, a desire to improve her study skills, self-defeating thinking and behavior, inadequate motivation, and uncertainty about whether she really wants to become a doctor.

61.     One of the therapists was Dr. Bob Parrino, to whom she was referred by another psychologist for "counselling services relating to test anxiety that Ms. Black was experiencing in advance of taking Step 1…."  Decl. of Dr. Bob Parrino ¶ 3 (Def. Tr. Ex. 36).

62.     Dr. Parrino had numerous sessions with Ms. Black over a period of six months.  *Id.* at ¶ 4.  He prepared Progress Notes after each session, "to summarize information provided by Ms. Black" and to note the "studying and preparation strategies that we discussed."  *Id.* at ¶ 5.

63.    Dr. Parrino's Progress Notes included the following observations:

a)    "Some consideration of her sabotaging med. school exam and solving conflict of whether this is something she wishes to do as a profession."

b)    "CONFLICT OVER MED SCHOOL OR MORE honorable calling, including work in [Do]minican Republic…. Frequently drifts away from clear decision to finish what she started here at USF."

c)    "Elizabeth has opted (once again) to postpone STEP ONE exam…. Feels she can complete preparation and feel comfortable to sit for exam [in] August."

d)    "Elizabeth grading her work productivity past week as C+ with some B and even A- level work. Realizing she is down to final 7 days prior to Step exam…has not covered everything once but hopes to arrive at that point today."

e)    "Elizabeth has … decided to postpone Step exam another month…. Final practice exam … slight improvement but still falling short of 188 passing score. Realizes that quality of study, fund of knowledge, and interfering levels of anxiety are contributing factors."

f)    "Once again we have reviewed the hypothesis, now even more substantiated, that she deliberately does not study to fullest to preserve alibi about her abilities. If her prep is mediocre then her less than flawless outcome is not as threatening."

g)    "Brief phone contact session with Eliz….. [S]he has, once again, fallen short of intentions with study for this exam in twenty days."

h)    "Elizabeth will be taking her Step exam on the 27 of Dec…. Has drifted from flawless preparation and, once again, does not feel prepared enough to pass."

*See generally* Parrino Decl. at Ex. A (Def. Tr. Ex. 36).

**J.    Ms. Black's Request for Extra Testing Time on the USMLE Step 1 Exam**

64.    In the ordinary course, Ms. Black would have taken the Step 1 exam in 2013, after completing her second year of medical school. However, she took a lengthy leave of absence from medical school and did not take Step 1 until 2014. *See* JPS ¶¶ IX.Y, IX.Z.

65.    Ms. Black took Step 1, for the first time, on July 3, 2014. She did ***not*** request extra testing time. She did not achieve a passing score. *See* JPS ¶ IX.Z.

66.     In an email to a school administrator, she said that her "problems with taking Step 1" related to "studying for the exam in a consistent manner."

67.     After extending her leave of absence from medical school several additional times,[6] Ms. Black registered to re-take the Step 1 exam.  This time, she submitted an application for testing accommodations, consisting of 50% additional testing test time.  JPS ¶ IX.AA.  She based her request on a single claimed impairment, ADHD, which she said was diagnosed in 2009 by Dr. Scott Fleischer in Pennsylvania, and in 2014 in the evaluation done by the USF Psychological Services Center.  JPS ¶ IX.BB.

68.     NBME processed Ms. Black's accommodation request in accordance with its standard policies and procedures.  This included obtaining input from an external professional with expertise in her claimed impairment.  *See* JPS ¶ IX.HH.

69.     NBME sent Ms. Black's accommodation request and all of her supporting documentation to Dr. Kevin Murphy.  *See* JPS ¶ IX.HH.  Dr. Murphy is a nationally recognized expert on diagnosing and treating ADHD.  *See* Def. Tr. Ex. 30 (Dr. Murphy's CV).  He has been the head of an adult ADHD clinic since 2003 and, prior to that, he ran a specialty clinic devoted to research, assessment, and treatment of adults with ADHD at the University of Massachusetts for almost a decade, where he was an Associate Professor.  *Id.*  He has done extensive research relating to ADHD; he has authored numerous books, book chapters, and journal articles on diagnosing and treating ADHD; he has given more than a hundred presentations on ADHD; and he has been inducted into the "ADHD Hall of Fame" by a non-profit organization that supports individuals with ADHD.  *See id.* at 1-14.

---

[6] Ms. Black requested at least 15 leaves of absence, or leave extensions.

70.     Dr. Murphy serves as an independent external reviewer for numerous organizations that receive requests for accommodations on licensing exams from individuals diagnosed with ADHD.  *See id*. at 1-2.  NBME is one such organization.  The Florida Board of Law Examiners is another.  *Id*.  According to Dr. Murphy, his role as an external reviewer is to "consistently, fairly and objectively" review the documentation and then advise on three issues:  (1) does the documentation substantiates the diagnosis; (2) if so, does the diagnosed impairment result in significant functional impairment; and (3) if so, is the requested accommodation reasonable and appropriate.

71.     The Court finds that Dr. Murphy is well qualified to provide expert opinions on whether the documentation submitted by Ms. Black in support of her request for extra testing time reflected a valid diagnosis of ADHD, and whether Ms. Black is substantially limited in her ability to perform any major life activities that are relevant to taking the Step 1 exam.  The Court further finds that Dr. Murphy may properly supplement his opinions on these issues based upon his consideration of other evidence presented in this case.

72.     In a report dated December 29, 2014, Dr. Murphy informed NBME that, in his opinion, Ms. Black's documentation "does not adequately substantiate an ADHD diagnosis or the existence of a disability and is therefore insufficient to warrant granting her requested accommodation."  *See* Def. Tr. Ex. 32.

73.     Dr. Murphy's report noted, among other things, that ADHD is "a developmental disorder with a *childhood* onset that typically results in a chronic and pervasive pattern of functional impairment in academic, social, and vocational arenas, and also in daily adaptive functioning."  *Id*. (original emphasis).  Ms. Black's "documentation and overall history," however, did not reflect "pervasive impairment."  *Id*.  There was no documentation showing that she had

experienced "a pattern of developmentally deviant historical ADHD-like impairment symptoms in school, work, social, or daily adaptive domains." *Id.* There was no documentation of "clinically significant academic or behavioral impairment in childhood." *Id.* Her ADHD diagnosis was based "mostly on self-report, symptom endorsements on a self-administered ADHD rating scale…, and test scores that are not diagnostic of ADHD;" did not "adequately establish a childhood onset;" "did not adequately explain how Ms. Black performed so well academically and behaviorally for so long if she was struggling with ADHD;" and did not "show any vocational impairment." *Id.*

74.     Based upon Dr. Murphy's input and its own review of Ms. Black's documentation, NBME concluded that accommodations were not warranted.  NBME notified Ms. Black of its decision in a letter dated March 2, 2015.  *See* JPS ¶ IX.HH.

75.     Ms. Black re-took the Step 1 exam on April 9, 2015, under standard conditions. She did not achieve a passing score.  JPS ¶ IX.II.

76.     Ms. Black took the Step 1 exam a third time in July 2015.  She did not request extra testing time.  She did not achieve a passing score.  JPS ¶ IX.JJ.

77.     On January 22, 2016, after registering to take Step 1 a fourth time, Ms. Black submitted a second application for accommodations and again requested 50% additional testing time.  This time, Ms. Black said that extra time was warranted based upon her claimed ADHD, and because of "convergence insufficiency," a visual condition.  *See* JPS ¶ IX.KK.[7]

78.     In support of her second request for accommodations, Ms. Black submitted additional educational records, letters of support from a high school teacher and her college

---

[7] Ms. Black's complaint does not assert that she is entitled to extra testing time because of a vision impairment.  *See* JPS ¶ IX.OO.  Accordingly, the Court will not address that claimed impairment.

roommate, records showing that she had been placed on academic probation by the medical school, records reflecting her numerous leaves of absence from medical school, and letters of support from Dr. Booth-Jones and the Director of USF's disability services program.

79.    Ms. Black also submitted a letter that she obtained from USF's Counseling Center. Dated August 19, 2015, the letter stated:  "Per your request …, this letter will confirm that you were seen at the USF Counseling Center for both counseling and psychiatric services on 83 office visits between September 6, 2011 and August 8, 2014 for anxiety related concerns and attentional and academic concerns."  Def. Tr. Ex. 26.  The letter also stated:  "***Please note***:  *This letter should not be construed to imply or indicate that the USF Counseling Center is recommending any academic or other accommodations be made for you in any student or other life role*."  *Id.* (original emphasis).

80.    NBME carefully reviewed all of the documentation that Ms. Black submitted in support of her second request for accommodations.  In addition, NBME sent all of her documentation to Dr. Murphy, the external professional who reviewed her initial request, and asked him to reevaluate her request in light of her supplemental documentation.  JPS ¶ IX.LL.

81.    In a report dated February 26, 2016, Dr. Murphy informed NBME that, in his opinion, the additional documentation did not show "a history of developmentally deviant impairment that is consistent with ADHD or that she has a magnitude of current impairment that rises to the level of a disability.  Therefore, I must continue to recommend denial of her requested accommodations."  Def. Tr. Ex. 34.

82.    Based on Dr. Murphy's input and its own review of Ms. Black's documentation, NBME again denied Ms. Black's request for additional testing time.  As a courtesy to Ms. Black, however, and in consideration of her newly reported "vision impairment," NBME approved Ms.

Black for additional break time.  NBME notified Ms. Black in a letter dated March 28, 2016.

83.     Ms. Black was issued a scheduling permit to test during the eligibility period of April 1, 2016 through June 30, 2016.  Ms. Black did not test, however.  JPS ¶ IX.MM.  Instead, she filed this action.

84.     Ms. Black is seeking injunctive relief only.

## CONCLUSIONS OF LAW

85.     Ms. Black alleges that NBME violated Section 12189 of the Americans with Disabilities Act, as amended (the "ADA"), by denying her request for extra testing time on the USMLE Step 1 exam.

86.     Section 12189 provides, in relevant part, as follows:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.

87.     Pursuant to Section 12819, persons who qualify as disabled under the ADA are entitled to receive reasonable accommodations during test-taking, if they need accommodations in order to take the examination in an accessible place and manner.

88.     In order to establish her failure-to-accommodate claim under Section 12189, Ms. Black must prove all of the following elements by the preponderance of evidence:

i.      She has a mental impairment, ADHD;

ii.     Her ADHD substantially limits her ability to perform one or more relevant major life activities, as compared to most people in the general population;

iii.    Because of the functional limitations resulting from her alleged ADHD, she

needs accommodations in order to take the Step 1 exam in an accessible manner;

   iv.  The accommodation she requested – 50% additional testing time – was reasonable; and

   v.  NBME failed to provide her requested accommodation.

*See* JPS ¶X.B; *see also Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 608 (S.D. Ind. 2012).

  89. If a violation of Title III is established, the Court may award injunctive and declaratory relief to the Plaintiff.  Damages may not be awarded.  *See* JPS ¶ X.C.

  90. Having a diagnosed impairment is not the same thing as being disabled within the meaning of the ADA.

  91. To be disabled under the ADA, a person must have a "a physical or mental impairment that substantially limits one or more major life activities …."  42 U.S.C. § 12102(1).  More specifically, a person must have an impairment that substantially limits his or her ability to perform a major life activity "***as compared to most people in the general population***."  28 C.F.R. § 36.105(d)(1)(v) (emphasis added).  If a diagnosis is unwarranted, or if a diagnosed impairment does not result in substantial limitations as compared to most people, the individual is not disabled under the ADA and is not entitled to accommodations under Section 12189.

  92. In the ADA Amendments Act of 2008 ("ADAAA"), Congress stated that the ADA should be construed to provide "broad coverage."  42 U.S.C. § 12102(4).  However, Congress did not remove the "substantial limitation" requirement:

> By retaining the essential elements of the definition of disability including the key term 'substantially limits' we reaffirm that not every individual with a physical or mental impairment is covered by the ... definition of disability in the ADA.  An impairment that does not substantially limit a major life activity is not a disability under [the definition's first prong].  That will not change after enactment of the ADA Amendments Act....

Statement of Mgrs. to Accompany S. 3406, ADA Amendments Act, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008); *see also Mann v. Louisiana High Sch. Ath. Ass'n*, 535 Fed. Appx. 405, 410 (5th Cir. 2013) ("Although the ADA Amendments Act … lowered the standard that plaintiffs must meet to show that they are disabled, ... a plaintiff must still show substantial limitation....").

93.    Ms. Black believes that, in determining whether she is disabled, the Court should compare her to her medical school peers, not to the general population.  She is mistaken.  Her claimed impairment must be measured against most people in the general population, not against other medical students.  *See Singh v. George Washington Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007) (relevant comparison is to the average person in the general population, not to other individuals attending medical school); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 2016 U.S. Dist. LEXIS 48181, *18 (E.D. Pa. 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population") (holding that plaintiff was not disabled within the meaning of the ADA, notwithstanding her dyslexia diagnosis, and therefore was not entitled to extra testing time on a medical licensing exam).[8]

94.    The record does not support a finding that Ms. Black has ADHD, or that the

---

[8] *See also Bach v. Law Sch. Adm. Council,* 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014) (holding that examinee with ADHD diagnosis needed to be compared "to the general population"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013) (relevant comparison group is "the general population"), *aff'd*, 582 Fed. App'x 114 (3d Cir. 2014) (judgment for defendant); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population.") (judgment for defendant); *Love v. Law Sch. Adm. Council*, 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and thus was not entitled to testing accommodations); *cf. Malone v. Dep't of the Air Force*, 2016 U.S. Dist. LEXIS 39345, *20 (M.D. Ala. 2016) ("The mere fact that Malone may have been diagnosed with ADD is insufficient under the [ADA] to establish that her impairment rises to the level of a disability.") (judgment for defendant employer).

functional limitations which she attributes to her alleged impairment are substantially limiting when she is compared to most people in the general population.  She has an exceptional academic record.  She did not receive any disability-related accommodations in elementary school, middle school, high school, college or her Post-Baccalaureate program.  She achieved scores that put her in the top 27% of all examinees on the SAT and on the MCAT, without extra testing time or any other accommodations.  She testified that she has many friends, is close with her family, and has never had issues in any of the numerous jobs she has held, many of which appear to have required a high degree of focus and attentiveness.

95.     In summary:  Ms. Black is a former All-American athlete in a Division I sport.  She was admitted to an Ivy League university after graduating 4th in a high school class with over 300 students and performing extremely well on her college admissions test.  She subsequently decided to attend medical school.  She was admitted to a pre-med Post-Baccalaureate program at another Ivy League university, where she achieved a 4.0 GPA for two sessions and finished with a 3.79 GPA.  She then performed extremely well on the Medical College Admission Test.  She has performed well in a series of challenging jobs.  Her focus, concentration and drive have enabled her to succeed at the highest levels, academically, athletically and vocationally -- without needing accommodations.  Such is not the profile of an individual who has ADHD or is substantially limited in any major life activities as compared to most people in the general population.

96.     The Court concludes that the ADHD diagnoses that Ms. Black relied upon to support her request for accommodations on the Step 1 exam were not sufficient to warrant extra testing time.  Neither diagnosis resulted from a comprehensive ADHD evaluation, and neither addressed all of the criteria necessary for a proper ADHD diagnosis under the DSM-5.  She presented no plausible evidence of childhood onset, no plausible evidence of impairment across

- 24 -

multiple domains of her life (academic, social, and vocational), and no plausible evidence of pervasive functional impairment in her daily living.

97.     Because Ms. Black has not shown that she has ADHD, she has not established that she has an impairment and thus cannot be found to be disabled under the ADA.

98.     However, even if the Court were to accept her diagnoses, NBME is still entitled to judgment in its favor.  The evidence conclusively demonstrates that Ms. Black's alleged ADHD does not substantially limit her ability to read, learn, concentrate, think or perform any other major life activity that is relevant to taking the Step 1 exam.[9]

99.     The "substantial limitation" inquiry requires consideration of the "'effect of [an] impairment on the life of the individual.'"  *Moore v. Hillsborough Cty. Bd. of Com'rs*, 544 F. Supp. 2d 1291, 1299 (M.D. Fla. 2008) (citation omitted).  Ms. Black's unaccommodated performance in elementary school, middle school, high school, college, and her Post-Baccalaureate Program; on the SAT and MCAT exams; and in the numerous jobs she has held confirm that Ms. Black is not substantially limited in any major life activity when compared to most people in the general population.

100.     Regardless of the "condition and manner in which she is able to perform" the major life activities at issue in this action (*see* Pl. Tr. Br. at 23) (Dkt. 53), objective evidence confirms

---

[9] Shortly before trial was scheduled to begin, and after the close of discovery, Ms. Black sought leave to file a second amended complaint in which she alleged that she is also limited in the major life activities of working and test taking.  However, "working" is not an activity that is relevant when taking a standardized examination, and the Court agrees with other courts which have concluded that test taking is not a major life activity.  *See Singh*, 508 F.3d at 1104; *Herzog v. Loyola College*, No. 07-2416, 2009 U.S. Dist. LEXIS 94454, at *16 n.4 (D. Md. Oct. 9, 2009); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F. Supp. 2d 42, 47 (D. Mass. 2005).  Moreover, even if test taking were a major life activity, Ms. Black has not shown that she is substantially limited in her ability to take tests as compared to most people in the general population.  To the contrary, she has performed extremely well on classroom tests and on standardized tests, without accommodations.

that Ms. Black  has not needed any accommodations to perform at the highest levels.  Ms. Black urges the Court not to focus on the "outcomes" she has been able to achieve, *id.* at 22, but courts routinely – and appropriately – consider such objective evidence in evaluating whether a person is substantially limited in his or her ability to perform major life activities as compared to most people in the general population.

101.    Individuals who perform at the level that Ms. Black has performed – with no extra testing time or other accommodations – do not have a disorder that rises to the level of a disability under the ADA.  *See, e.g., Bibber,* 2016 U.S. Dist. LEXIS 48181, at *25 (plaintiff who scored in the "average" range on the GRE (a graduate school admission test) and MCAT without accommodations was not substantially limited compared to most people and was not entitled to extra testing time on a licensing exam); *Bach v. LSAC*, No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632, at *4 (M.D.N.C. Feb. 4, 2014) ("Mr. Bach's long history of academic success weighs against a finding of disability") (denying preliminary injunction requested by LSAC examinee who claimed to have ADHD); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d at 621 ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, ... stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Rumbin v. Assoc. of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011) (rejecting ADA claim by MCAT examinee); *Love v. LSAC,* 513 F. Supp. 2d at 214 (holding that LSAT examinee had not shown that he was disabled, where he had unaccommodated ACT and SAT scores "within the average range" and a 3.16 high school GPA, and did well in college without accommodations).[10]

---

[10] *See also Hetherington v. Wal-Mart, Inc*., 511 Fed. App'x 909, 912 (11th Cir. 2013) (holding that plaintiff employee was not substantially limited in his ability to think, learn, or read, where he was able to read "at

102.   In this case, the extensive evidence regarding Ms. Black's actual ability to perform the activities in which she claims to be impaired compels a finding that she is not disabled within the meaning of the ADA.  This conclusion, however, has also been reinforced by the testimony of three eminently qualified experts with extensive experience diagnosing ADHD.  All three experts agreed that (a) Ms. Black does not meet the professional diagnostic criteria for ADHD, and (b) even if she did, she is not substantially limited in her ability to perform any relevant major life activities as compared to most people in the general population.  [*See* Expert Reports of Dr. Kevin Murphy, Dr. Michael Herkov, and Dr. Michael Gordon (Def. Trial Exs. 68, 69, 71).]

103.   The evidence in this case shows that any number of reasons, unrelated to a disability, may explain why Ms. Black has not yet achieved a passing score on the USMLE Step 1 exam.  Those possible reasons include poor study habits, inadequate preparation, uncertainty about whether she really wants to be a doctor, an unconscious desire to sabotage her medical career in favor of pursuits that she finds more rewarding, test anxiety, her medical school's purported failure to offer adequate academic support for Step 1 preparation, unhappiness about living in Tampa, or insufficient mastery of the underlying subject matter.

104.   Ms. Black may believe she had trouble finishing the Step 1 exam under standard time conditions because of ADHD, but subjective beliefs are not sufficient to show that she is

---

a junior high level" and had "completed 12 years of school"); *Collins v. Prudential Investment & Retirement Servs.*, 119 Fed. App'x 371, 378 (3d Cir. 2005) ("[Plaintiff's] testimony about her work, academic [background], and community involvement contradicts her claim that her ADHD/ADD substantially limits her abilities to think, learn, remember and concentrate"); *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 155 (1st Cir. 1998) ("[Plaintiff] never experienced significant academic difficulties, and in fact has excelled academically…."); *Steere v. George Wash. Univ. Sch. of Medicine*, 439 F. Supp. 2d 17, 21-22 ("Had he the disability he claims to have [(ADHD)], this Court might expect his achievement to have been more consistently impaired.  Instead, plaintiff's educational career demonstrates strong academic achievement and ability...."); *Herzog*, 2009 U.S. Dist. LEXIS 94454, at *19 ("Herzog's academic successes demonstrate her ability to perform at an above-average level both before and after being diagnosed with ADHD.").

substantially limited in her ability to concentrate, read, memorize or learn compared to most people in the general population. *See, e.g., Singh v. George Wash. Univ. Sch. of Medicine*, 667 F.3d 1, 5-6 (D.C. Cir. 2011) (affirming judgment in favor of GWU where plaintiff failed to prove that any limitation in learning was due to an impairment, because there were many other reasons to explain plaintiff's alleged difficulties, including anxiety, being over-extended in extra-curricular activities, and poor study habits); *Fuoco v. Lehigh Univ.*, 981 F. Supp. 2d 352, 365 (E.D. Pa. 2013) (granting summary judgment to defendant where plaintiff offered only speculative and subjective belief that her problems were due to ADHD or that she was substantially limited in her ability to think, learn, or work compared to most people).

105.    Citing informal "technical assistance" from the U.S. Department of Justice, Ms. Black has argued that, under the ADA, testing entities should defer to a diagnosis provided by a test taker's professional. *See* www.ada.gov/regs2014/testing_accommodations.html.  The Court disagrees.  In the first place, such informal guidance, which has not resulted from notice-and-comment rulemaking, does not have the force of law and is neither binding on the Court nor entitled to any special deference. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012).  Moreover, the guidance cannot reasonably be applied where – as here – the diagnosis relied upon by the test taker was not made in accordance with applicable diagnostic criteria, is contradicted by objective evidence relating to the test taker's ability to perform the major life activities in which she claims to be impaired, and the evaluator did not consider whether the test taker is substantially limited compared to most people in the general population. *See, e.g., Rhodes v. Langston Univ.*, 462 Fed. Appx. 773, 778 (10th Cir. 2011) ("Rhodes' neuropsychological evaluation does not answer the question of whether her impairment substantially limits Rhodes' ability to learn as a whole for

purposes of daily living, as compared to most people.").

106.     Contrary to what Ms. Black has argued, neither NBME nor the Court is required simply to defer to the conclusions reached by Ms. Black's evaluators in determining whether she is disabled within the meaning of the ADA or entitled to testing accommodations on the Step 1 exam.  Indeed, this case demonstrates precisely why such deference is ***not*** automatically or even generally warranted.[11]  Ms. Black's initial ADHD diagnosis resulted from an informal, 30-minute visit with a psychiatrist for which she was charged $132.  The professional did not conduct a comprehensive evaluation and did not consider all of the relevant diagnostic criteria for ADHD.  Likewise, although a clinical psychologist signed the evaluation report that Ms. Black obtained in 2014 from the USF Psychological Services Center, that psychologist (Dr. Booth-Jones) never met Ms. Black and does not consider herself an expert in diagnosing ADHD.  The evaluation was conducted, and the diagnosis was made, by a graduate student "trainee" who had not yet concluded her academic training, much less begun either the internship or the fellowship which are part of the preparation for becoming a clinical psychologist.  Further, the evaluation was actually a "reevaluation," limited in scope and intended primarily for managing Ms. Black's prescription medications – it was not a comprehensive evaluation.  Thus, it would not be reasonable to give deference to Dr. Fleischer's diagnosis, or to the diagnosis and accommodation recommendations that are reflected in the USF Psychological Services report.  Neither the ADA nor any ADA implementing regulations require such deference.  To the extent DOJ's "technical assistance" suggests otherwise, the Court rejects that guidance.

---

[11]     *See, e.g.*, J. Joy *et al.*, "Assessment of ADHD Documentation from Candidates Requesting [ADA] Accommodations for the National Board of Osteopathic Medical Examiners COMLEX Exam," 14(2) J. of Attention Deficit Disorders 104, 106 (2010) (independent professional review of requests for testing accommodations from 50 individuals who claimed to have ADHD; of the 50 files reviewed, "only 14% (7 out of 50) of applicants provided sufficient clinical information to meet the criteria for ADHD".).

107.    Nor are the diagnoses provided by Ms. Black's professionals entitled to more weight than the views of Dr. Murphy or NBME's other trial experts merely because NBME's experts have not personally examined Ms. Black.  As the Supreme Court noted in an analogous context, "the assumption that the opinions of a treating physician warrant greater credit than the opinions of [ERISA] plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003)(holding that ERISA does not require a plan administrator to accord special deference to a claimant's treating physician, as compared to experts consulted by the plan).  Here, for example, Dr. Fleischer saw Ms. Black for a half-hour to manage her prescription medications, while Dr. Booth-Jones has never met Ms. Black and disclaims any expertise in diagnosing ADHD; in contrast, Dr. Murphy is conceded by Ms. Black to be a "renowned expert" (Pl. Tr. Br. at 18) (Dkt. 53).

108.    The Court notes in this regard that the Step 1 exam is a licensing exam, relied upon jurisdictions across the country to help evaluate the competency of prospective physicians and thereby help protect the public welfare.  It would be inappropriate to require entities which administer such tests to defer to an examinee's supporting professional if doing so might result in unwarranted accommodations.  Such accommodations could affect the validity of the resulting scores or give an examinee an unfair advantage over other examinees.  As another court has noted, NBME's accommodation procedures "are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination.  As administrator of the national exam

used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it."  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004).

109.    Similarly, NBME was not required simply to follow the decision that Ms. Black's medical school made to allow Ms. Black extra testing time on certain of her medical school tests. Being approved for accommodations in an academic context is very different from receiving accommodations on a standardized test.  It was entirely appropriate for NBME to conduct its own assessment of Ms. Black's documentation and determine whether she is entitled to accommodations on the Step 1 exam.  *Cf. Ware v. Wyoming Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Although information regarding past accommodations may be helpful ..., the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumptively reasonable.  Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.*, 161 F.3d 19 (10th Cir. 1998).  Indeed, it appears that USF authorized Ms. Black to receive accommodations based on Dr. Fleischer's ADHD diagnosis, and that diagnosis has since been shown to be unwarranted under the applicable ADHD diagnostic criteria.  The far more relevant accommodation history for Ms. Black is her history of not receiving extra testing time on other standardized tests, including the SAT and MCAT, and still performing extremely well.

110.    Based upon the evidence presented and the applicable law, the Court concludes that Ms. Black has not shown that she has a disability as defined under the ADA.  Her request for injunctive and declaratory relief is therefore denied, and judgment is to be entered in favor of NBME.

Respectfully Submitted:

*/s/ Gregory A. Hearing*
GREGORY A. HEARING
Florida Bar No. 817790
ghearing@tsghlaw.com
BENJAMIN BARD
Florida Bar No. 95514
bbard@tsghlaw.com
Thompson, Sizemore, Gonzalez & Hearing, P.A.
201 N. Franklin Street, Suite 1600
Post Office Box 639 (33601)
Tampa, Florida  33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072

ROBERT A. BURGOYNE
D.C. Bar No. 366757 (*Appearing Pro Hac Vice*)
robert.burgoyne@nortonrosefulbright.com
Norton Rose Fulbright US LLP
799 9th Street, NW, Suite 1000
Washington, DC 20001-4501
Telephone: (202) 662-4513
Facsimile: (202) 662-4643

Attorneys for NBME

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the 31st day of August, 2017, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of

electronic filing to the following:

> Curtis Filaroski
> Megan Collins
> Disability Rights of Florida
> 2473 Care Drive, Suite #200
> Tallahassee, Florida  32308
>
> curtisf@disabilityrightsflorida.org
> meganc@diabilityrightsflorida.org
>
> Attorneys for Plaintiff

Defendant's counsel has also emailed copies of the foregoing to plaintiff's attorneys.


/s/  Gregory A. Hearing