IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| ELIZABETH A. BLACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 8:16-cv-02117-SDM-TGW |
| | ) | |
| NATIONAL BOARD OF | ) | |
| MEDICAL EXAMINERS, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S TRIAL BRIEF

Defendant National Board of Medical Examiners ("NBME") respectfully submits the following trial brief.

## I.    STATEMENT OF FACTS

NBME is a non-profit corporation whose mission is to protect the health of the public by providing standardized, state-of-the-art assessments for health professionals.  Together with the Federation of State Medical Boards, another non-profit entity, NBME has established the United States Medical Licensing Examination, or "USMLE."  The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.

There are three "Steps" to the USMLE, all of which must be passed before a physician with an M.D. degree is eligible to apply for an unrestricted license to practice medicine in the United States.  This case involves the USMLE Step 1 exam.  Step 1 is a standardized, multiple-choice examination that assesses understanding and application of basic science concepts important to the practice of medicine.  Under standard testing conditions, the exam is administered in one eight-hour day, including break time.

Plaintiff Elizabeth Black is a medical student at the University of South Florida's Morsani College of Medicine, currently on a leave of absence and teaching in a local school.  After failing the USMLE Step 1 the first time she took it, Ms. Black applied to re-take the exam and submitted an application to NBME for an accommodation of 50% additional test time, purportedly on the basis of Attention Deficit Hyperactivity Disorder ("ADHD").  This was the first time she had ever requested any accommodation on any standardized test (for ADHD or anything else).  Ms. Black claimed she was diagnosed with ADHD in 2009 (at the age of 26) by Dr. Scott Fleischer in Pennsylvania, and in 2014 in an evaluation done by the USF Psychological Services Center.

NBME processed Ms. Black's accommodation request in accordance with its standard policies and procedures, including by obtaining input from an external professional with expertise in her claimed impairment, Dr. Kevin Murphy.  Dr. Murphy informed NBME that, in his opinion, Ms. Black's documentation did not adequately substantiate an ADHD diagnosis or the existence of a disability because, among other reasons, ADHD is a developmental disorder with a *childhood* onset that typically results in a chronic and pervasive pattern of functional impairment, and Ms. Black's documentation did not show any clinically significant academic or behavioral impairment in childhood.  He also noted that Ms. Black's ADHD diagnosis was based mostly on self-report and test scores that are not diagnostic of ADHD.

Based upon Dr. Murphy's input and its own review of Ms. Black's documentation, NBME concluded that no accommodations were warranted.  NBME notified Ms. Black of its decision in a letter dated March 2, 2015.  In its denial letter, NBME noted, among other things, that Ms. Black's application did "not demonstrate a record of chronic and pervasive problems . . . that impaired [her] functioning during development or currently," and did not contain "objective data or documentation … via formal faculty/supervisor feedback, job performance evaluations, or

- 2 -

through other sources of information verifying that [she] ha[d] shown pervasive problems managing daily demands for attention, organization, or executive functioning."

Ms. Black took the Step 1 exam without accommodations in April of 2015.  She received a score three points below the passing score.

Ms. Black took the Step 1 exam a third time in July 2015.  She did not request extra testing time.  She did not achieve a passing score.

On January 22, 2016, after registering to take Step 1 a fourth time, Ms. Black submitted a second application for accommodations to NBME, and again requested 50% additional testing time.  This time Ms. Black said that accommodations were warranted because she has two impairments:  ADHD, and "convergence insufficiency," which is a visual impairment.  Ms. Black submitted additional documentation in support of this application.

NBME reviewed all of the documentation that Ms. Black submitted in support of her second request for accommodations, and also sent all of her documentation to Dr. Murphy.  Dr. Murphy opined that the additional documentation did not show a history of developmentally deviant impairment consistent with ADHD or that she has a magnitude of current impairment that rises to the level of a disability, and recommended denial of the requested accommodations.

Based on Dr. Murphy's input and its own review of Ms. Black's documentation, NBME again denied Ms. Black's request for accommodations.  NBME notified Ms. Black in a letter from Dr. Farmer dated March 28, 2016.

Ms. Black alleges that NBME violated Section 12189 of the Americans with Disabilities Act by denying her requests for accommodations. *See* 42 U.S.C. § 12189. She contends that she is entitled to extra testing time because she has ADHD. She has abandoned her contention that she has a visual impairment that warrants extra testing time.

The facts in this, most of which are undisputed, refute Ms. Black's allegations and confirm that NBME did not violate her rights under the ADA. As discussed further below, Ms. Black is an extremely accomplished individual who, prior to medical school, never once requested accommodations in any academic, testing, or employment context. She took mostly Honors-level courses in high school, graduated 4th in a class of over 300 students, and performed extremely well on her college admissions test (top 20%) – all while participating in varsity sports, student government, and other extra-curricular activities. She was admitted to Princeton University, one of the top universities in the country, where she achieved mostly As and Bs while playing on Division I field hockey and achieving All American recognition. She subsequently decided to go to medical school. She was admitted to a rigorous pre-med Post-Baccalaureate program at another Ivy League university, the University of Pennsylvania, where she achieved a 4.0 GPA during two of her course sessions and finished with a 3.79 GPA. She then did extremely well on the Medical College Admission Test, scoring in the top 25% on that difficult, time-limited exam. She has had a series of challenging jobs that call for focus, attention to detail, and interpersonal skills. Her focus, concentration and drive have enabled her to succeed at the highest levels – academically, athletically and vocationally – without needing or requesting accommodations.

NBME is entitled to entry of judgment in its favor. The evidence demonstrates that Ms. Black does not have ADHD. It further shows that, even if one were to accept her ADHD diagnoses, she is not substantially limited in her ability to perform any of the major life activities

which she relies upon to support her claim, as compared to most people in the general population: learning, reading, memory and concentrating.  Because she is not disabled within the meaning of the ADA, NBME did not violate the ADA when it denied her request for additional testing time.

## II.     ISSUES TO BE RESOLVED

There are two broad questions for the Court to resolve:

1.      Is Ms. Black disabled within the meaning of the Americans with Disabilities Act, as amended (the "ADA")?

2.      If so, did NBME violate Section 12189 of the ADA by denying Ms. Black's application for an additional 50% testing time on Step 1 of the USMLE?

## III.    PLAINTIFF'S REQUIRED SHOWING

The parties agree that, in order to establish her failure-to-accommodate claim under Section 12189, Ms. Black must prove the following elements by a preponderance of the evidence, and that she retains the ultimate burden of proof on her claim:

1.      Plaintiff has a mental impairment, ADHD;

2.      Plaintiff's ADHD limits her ability to perform one or more major life activities;

3.      The resulting limitation is substantial, as compared to most people in the general population, thereby making her disabled within the meaning of the ADA;

4.      Because of the functional limitations resulting from her alleged disability, Plaintiff needs accommodations from Defendant in order to take the Step 1 exam in an accessible manner;

5.      Plaintiff's requested accommodations – 50% additional testing time, with testing over two days – were reasonable; and

6.      Defendant failed to provide reasonable accommodations.

*See* Joint Pretrial Statement at 24-25 (Dkt. 48).

## IV.   ARGUMENTS AND AUTHORITIES

Section 12189 of the ADA provides in relevant part as follows:

Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.  This provision is found in Title III of the ADA.  If a plaintiff establishes a violation of Title III, she may obtain declaratory and injunctive relief.  If a diagnosis is unwarranted, or if a diagnosed impairment does not result in substantial limitations as compared to most people, the individual is not disabled under the ADA and is not entitled to accommodations under Section 12189.

A person is disabled under the ADA if (1) she has a physical or mental impairment, that (2) substantially limits her ability to perform a major life activity, **as compared to most people in the general population**.  *See* 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v).

The evidence will show that the ADHD diagnoses relied upon by Ms. Black are not consistent with the applicable diagnostic criteria for ADHD and thus are insufficient to establish that Ms. Black has an impairment.  It will further show that, even if one accepts her ADHD diagnosis, her alleged impairment does not result in substantial limitations as compared to most people in the general population.  As a result, Ms. Black is not disabled under the ADA and NBME did not violate Section 12189 by denying her 50% more time on the Step 1 exam than other examinees receive.

**A.      Ms. Black Does Not Have an ADHD "Impairment" Because She Does Not Have a Valid ADHD Diagnosis**

ADHD can be an "impairment" under the ADA.  The current Diagnostic and Statistical Manual of Mental Disorders ("DSM-5")[1] sets forth the following diagnostic criteria for ADHD:

A. A **persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development**, as characterized by (1) and/or (2):

1. **Inattention**: Six (or more) … symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that **negatively impacts directly on social and academic/occupational activities**….  *Note:* …For older adolescents and adults (age 17 and older), at least five symptoms are required….

2. **Hyperactivity and impulsivity**: Six (or more) … symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that **negatively impacts directly on social and academic/occupational activities**…: *Note:* ….For older adolescents and adults (age 17 and older), at least five symptoms are required.

B.  Several inattentive or hyperactive-impulsive **symptoms were present prior to age 12 years**.

C.  Several inattentive or hyperactive-impulsive **symptoms are present in two or more settings (e.g., at home, school, or work; with friends or relatives; in other activities**).

D.  There is **clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning**.

E.  The symptoms do not occur exclusively during the course of schizophrenia or another psychotic disorder and are not better explained by another mental disorder (*e.g.*, mood disorder, anxiety disorder, dissociative disorder, personality disorder, substance intoxication or withdrawal).

*See* ADHD Diagnostic Criteria, DSM-5.

---

[1]   The DSM is commonly relied upon as the authoritative source for the diagnostic criteria for mental impairments.  *See, e.g., United States v. Long*, 562 F.3d 325, 334 n.22 (5th Cir. 2009).  The parties agree that the criteria set forth in the DSM-5 should be applied in this action.  *See* Join Pretrial Statement ¶ XI.A (Dkt. 48).

The ultimate issue in this case is whether NBME violated the ADA by denying Ms. Black's second request for accommodations on the Step 1 exam.  That denial took place in March 2016.  Although she now purports to have been diagnosed with ADHD by multiple professionals,[2] Ms. Black relied upon two ADHD diagnoses to support her request for accommodations from NBME.  The first was provided by Dr. Scott Fleischer, and the other was provided in a report signed by Dr. Margaret Booth-Jones.  Neither diagnosis was valid under the applicable diagnostic criteria found in the DSM.  *See* Joint Pretrial Statement ¶ IX.BB (Dkt. 48).

As to Dr. Fleischer's "diagnosis," Dr. Fleischer "conducted a consultation and brief psychiatric evaluation" of Ms. Black in March of 2009, when she was 26 years old.  *See* Decl. of Scott A. Fleischer, M.D. ¶¶ 2, 5.  Dr. Fleischer "did not administer any screening tests, ratings scales, continuous performance tests, or neuropsychological measures to Ms. Black during [his] evaluation…." *Id.* ¶ 8.  He did not "review any of her educational or employment records," or "seek information about Ms. Black from third parties."  *Id.*  He did not "attempt to measure the extent of the functional limitations that she reported" experiencing.  *Id.*  He simply conducted "an

---

[2] *See* Joint Pretrial Statement at 3-6 ("Plaintiff's Case") (asserting that Ms. Black has been diagnosed with ADHD "at least four times by variety of professionals") (Dkt. 48).  One of the professionals relied upon by Ms. Black – Dr. Charles Golden – evaluated Ms. Black only last month, in connection with this lawsuit.  The evaluation took place after the close of expert discovery, and after NBME had moved for summary judgment, with NBME's summary judgment papers explaining why the two diagnoses that Ms. Black relied upon in seeking accommodations from NBME were plainly deficient.  Further, Ms. Black did not provide NBME with an expert witness report setting forth the opinions that she now purports to rely upon, contrary to the requirements of Fed. R. of Civ. P. 26(a).  Accordingly, NBME has filed a motion *in limine* to exclude any testimony from Dr. Golden that relates to his last-minute evaluation of Ms. Black.  *See* Dkt. 47.  The motion remains pending.

The other additional professional who purportedly diagnosed Ms. Black as having ADHD was Dr. Vigil-Otero.  Dr. Vigil-Otero is a therapist who Ms. Black saw for several sessions in 2013, based upon a "desire to maintain a work/life balance & stress w/school."  Ms. Black's stated goal for her therapy sessions with Dr. Vigil-Otero was "reducing anxiety & get[ting] back to positive thinking."  Although Dr. Vigil-Otero testified in her deposition that she diagnosed Ms. Black with ADHD, she also testified that a person cannot properly be diagnosed as having ADHD based on an informal interview and that she made her diagnosis of Ms. Black after a half-hour interview.  Ms. Black did not provide an expert witness report for Dr. Vigil-Otero as required by Rule 26(a), so Dr. Vigil-Otero cannot offer any testimony at trial as an expert witness.

informal interview of Ms. Black in order to determine whether she was experiencing symptoms that are consistent with ADD, and that might respond positively to appropriate medications." *Id.* ¶ 7.   Ms. Black has acknowledged that Dr. Fleischer's evaluation consisted of an informal evaluation and interview, with no testing.

Such an "examination" is not sufficient for a valid ADHD diagnosis. *See generally* Expert Report of Dr. Kevin Murphy at ¶¶ 13-14 (Def. Tr. Ex. 68); Expert Report of Dr. Michael Herkov at ¶ 5 (Def. Tr. Ex. 71).   The evaluation was not a comprehensive ADHD evaluation and it did not address all of the criteria necessary for a proper diagnosis.   Among other things, it did not elicit plausible evidence of childhood onset, impairment across multiple domains of her life (academic, social, and vocational), or pervasive functional impairment in her daily living.   According to at least two of Ms. Black's own purported experts, a half-hour interview would not provide an adequate basis for diagnosing someone with ADHD.

Ms. Black's second "diagnosis" -- from the USF Psychological Services Center -- is likewise deficient.   First, the evaluation was performed by a graduate student "trainee," Ms. McMurray, not by a licensed professional.   While Dr. Margaret Booth-Jones signed Ms. Black's report as the "Supervising Psychologist," she never saw Ms. Black and does not consider herself an expert in diagnosing ADHD; rather, she specializes in assessing and supporting cancer patients and volunteers periodically at the USF Psychological Services Center.

Second, as Dr. Booth-Jones testified in her deposition, the USF evaluation was not a "comprehensive" ADHD evaluation, but rather a "reevaluation."   Such reevaluations are "very common" at the Psychological Services Center, according to Dr. Booth-Jones, because "the counseling center, which is also part of USF, … [has a] protocol [that] requires we do brief testing just to maintain their ability to prescribe psychostimulants."

During this "re-evaluation," Ms. Black was not asked for any academic records and nothing was done to confirm childhood onset beyond getting Ms. Black's self-report.  Dr. Booth-Jones acknowledged that the Evaluation Report did not discuss whether Ms. Black experienced any impairment in the employment setting; that she had only limited information about how Ms. Black had performed academically; and that Ms. Black did not report any level of impairment in her social life.  Ms. McMurray and Dr. Booth-Jones did not attempt to determine whether Ms. Black was substantially limited within the meaning of the ADA. Instead, they were merely supporting Ms. Black's request to stay on psychostimulants, because that was the referral question.  Ms. McMurray did not provide any conclusions regarding Ms. Black's ability to read or process information as compared to most people in the general population (however, Ms. Black's results on the Wechsler Adult Intelligent Scale-4th Edition showed Verbal Comprehension at the 96th percentile – *i.e.*, better than 96% of everyone in the normed population –  and Processing Speed at the 70th percentile).  Finally, Ms. McMurray did not assign a level of severity as part of her diagnosis, as recommended by the DSM-5.[3]

The deficiencies in the diagnosis made in the USF Psychological Services Center's Evaluation Report are explained in the Expert Reports of Dr. Murphy, Dr. Gordon and Dr. Herkov. In short, the diagnosis was not based upon a comprehensive ADHD evaluation, did not consider and address all relevant diagnostic criteria, and did not rule out other possible explanations for the symptoms Ms. Black described.  *See* Expert Report of Dr. Kevin Murphy at ¶ 12 (Def. Tr. Ex. 68); Expert Report of Dr. Michael Herkov at ¶ 6 (Def. Tr. Ex. 71).

---

[3]  *See* ADHD Diagnostic Criteria, DSM-5 (Def. Tr. Ex. 5) (stating that the diagnosing professional should "Specify current severity:  **Mild**:  Few, if any, symptoms in excess of those required to make the diagnosis are present, and symptoms result in only minor functional impairments.  **Moderate**:  Symptoms or functional impairment between "mild" and "severe" are present.  **Severe**:  Many symptoms in excess of those required to make the diagnosis, or several symptoms that are particularly severe, are present, or the symptoms result in marked impairment in social or occupational functioning.").

Thus, while actual ADHD can be an ADA "impairment," Ms. Black cannot get beyond the preliminary step in an ADA analysis, because she does not have a valid diagnosis of ADHD. Contrary to what Ms. Black has argued, NBME is not inappropriately asking the Court to "scrutinize[e] the methods" by which her professionals arrived at their diagnoses, in a context where "reasonable expert opinions may differ." Pl. Trial Br. at 17 (Dkt. 53). The question is whether the opinions of her professionals are consistent with the diagnostic criteria found in the DSM. They clearly are not. Ms. Black cannot simply say that she obtained her diagnoses from "qualified professionals" and then insist that neither NBME nor the Court can question those diagnoses.

Likewise, the diagnoses provided by her professionals are not entitled to more weight than the views of Dr. Murphy or NBME's other trial experts simply because NBME's experts have not personally examined Ms. Black. *See* Pl. Trial Br. at 4 ("Plaintiff can establish that … she has been diagnosed with the impairment of ADHD a minimum of four times by qualified professionals who have personally examined Plaintiff – in contrast to the qualified experts employed by Defendant….") (Dkt. 53). As evidence at trial will show, Ms. Black is significantly overstating the extent to which she was "personally examined" by her professionals. Dr. Booth-Jones has never even met Ms. Black, Dr. Fleischer met with her for a half-hour in order to help manage her prescription medications, Dr. Vigil-Otero assigned her an ADHD diagnosis after talking with her for a half-hour, and Dr. Golden evaluated her only last month, after having been belatedly retained as a potential trial witness.

As the Supreme Court noted in an analogous context, any "assumption that the opinions of a treating physician warrant greater credit than the opinions of [ERISA] plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician

has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003)(holding that ERISA does not require a plan administrator to accord special deference to a claimant's treating physician, as compared to experts consulted by the plan).  Here, with the arguable exception of Dr. Vigil-Otero (who provided therapy sessions and did not perform a comprehensive ADHD evaluation of Ms. Black), the relationship between Ms. Black and all of her professionals was of a very short duration.   Dr. Booth-Jones never even met Ms. Black.       Further, Ms. Black acknowledges that Dr. Booth-Jones is *not* an expert in diagnosing ADHD, Pl. Tr. Br. at 9, whereas Dr. Murphy is a "renowned expert," *id*. at 18.

As one of NBME's other experts will explain at trial, it is a common and "professionally sound" practice for entities such as NBME, state boards of law examiners, and other testing entities to call upon "external experts to review documentation submitted in support of a request for accommodations and to provide an opinion on whether the diagnosis assigned is supported by the documentation, the level and type of functional impairment demonstrated by the applicant, and the appropriateness of specific accommodations in a given case if accommodations are warranted." Expert Report of Dr. Michael Gordon at ¶ 4 (Def. Tr. Ex. 69).   "The practice of reviewing documentation and providing an opinion based upon that documentation … is especially appropriate in the case of ADHD, given that so much of the diagnosis relies on clinical and academic history, not behavior in a clinician's office."  *Id*.

## B.     Ms. Black Is Not Substantially Limited In Any Major Life Activity

Even if Ms. Black had a valid ADHD diagnosis, that does not mean she is "disabled" under the ADA.  "[T]he other half of the definition requires that the impairment substantially limit one or more major life activities."  *Collado v. UPS*, 419 F.3d 1143, 1155 (11th Cir. 2005).  To be disabled under the ADA, a person must have a "a physical or mental impairment that substantially

limits one or more major life activities ….”  42 U.S.C. § 12102(1).  More specifically, the person must have an impairment that substantially limits the person’s ability to perform a major life activity “*as compared to most people in the general population*.”  28 C.F.R. § 36.105(d)(1)(v) (emphasis added).

Ms. Black alleges that she is limited in the major life activities of learning, reading, concentrating, and memory.  *See* Joint Pretrial Statement at 3 (Dkt. 48).  However, far from being substantially limited in these activities, Ms. Black has performed exceedingly well in all facets of her life – academic, personal and professional – all of which implicate her ability to learn, read, concentrate and memorize.  This includes her performance on other high-stakes standardized exams, which she has without extra testing time and done exceedingly well.

In elementary and middle school, Ms. Black performed very well on standardized tests without receiving extra testing time.  Her scores on Otis-Lemon School Ability Test were consistently in the Average or Above Average range in both the verbal and nonverbal categories, and her performance on Metropolitan Achievement Tests was “well above average,” with scores on all subtests in the 90th percentile or better nationally (*i.e.*, the top 10%), including in Reading Comprehension.

In high school, Ms. Black took 19 Honors classes, graduated with a cumulative GPA of 3.941, and finished 4th in a class of roughly 320 students.  She did not receive any accommodations.  Ms. Black achieved these exemplary grades while playing varsity field hockey, lacrosse, and basketball, running track, being on the Student Council, and being a member of several clubs.

Ms. Black took the SAT college admissions test three times in high school.  Her combined scores for Verbal and Math on this standardized, multiple-choice exam ranged from 1240 to 1260,

with her highest score being a 650 in Verbal.  Those scores put her in the top 20% (*i.e.*, 80th percentile or better) of students who took the SAT in calendar year 2000.  She did not request extra testing time on the SAT.

On the strength of her academic record, Ms. Black was admitted to Princeton University.  She graduated in four years and achieved mostly As and Bs.  She achieved those grades while participating all four years as an NCAA Division I athlete on Princeton's nationally-ranked women's field hockey team, where she was an All American in 2002 and 2003.  She devoted "many hours to the Princeton Field Hockey team," developed "lasting friendships," and confirmed that she is able to "perform successfully … in a pressure situation."  Ms. Black did not request any accommodations at  Princeton.

After graduating from Princeton in May 2005, Ms. Black became a Legal Assistant at the law firm Shearman & Sterling in New York City, working on large, commercial real estate transactions.  For roughly a year, she "[r]eviewed, drafted, revised and organized legal documents, surveys, title policies and general files."  Working at Shearman & Sterling taught her the "intricate details of real estate law" and confirmed that she has "the ability to manage multiple projects at one time."  She did not receive accommodations while working at Shearman & Sterling (or in any other job she has ever held).

In May 2007, Ms. Black enrolled in a pre-med Post-Baccalaureate program at another Ivy League school, the University of Pennsylvania ("UPenn").  Over the course of a year, Ms. Black took nine courses in Biology, Chemistry and Physics and achieved a 4.0 GPA during two of her sessions.  The Pre-Health Programs Adviser at UPenn described Ms. Black as a "superb student" who "earned an outstanding 3.79 cumulative GPA in our rigorous program," while maintaining

"part time research and volunteer positions."  He also noted her "outstanding interpersonal skills" and described her as "focused."  Ms. Black did not receive any accommodations at UPenn.

After completing her program at UPenn, Ms. Black moved to the Dominican Republic. She was employed in various jobs for approximately three years, all of which called for strong communication skills, attention to detail, and focus.  She was as an intern for an International Family Aids Program, where she taught classes and developed the curriculum for a school outreach program.  She was a high school science teacher and served as Advisor to the school's National Honor Society members.  And she did "Logistics and Procurement" work for two international relief organizations, while also maintaining project finances.  She did not receive accommodations in any of these jobs, nor did she experience any performance issues.

Ms. Black took the Medical College Admission Test ("MCAT") twice in 2009, after completing her Post-Baccalaureate program.  She did extremely well the second time she tested (73rd percentile), putting her score was in the top 27% of all examinees.  She did not receive extra time on the MCAT.  Like the Step 1 exam, the MCAT is a time-limited standardized examination, administered by computer over several hours.  It is an extremely challenging test, taken by a highly select group of individuals with exceptional academic credentials.

Ms. Black enrolled in the University of South Florida's Morsani College of Medicine in August 2011.  Before she began classes, her father completed a form on her behalf which confirmed that Ms. Black does not have "any condition(s) that would require reasonable accommodation" in order for her to satisfy the school's technical standards.  Those standards include having the ability to "analyze, synthesize, extrapolate, solve problems, and reach diagnostic and therapeutic judgments;" to "communicate the results of [an] examination to the patient and to [one's] colleagues with accuracy, clarity and efficiency;" and to "perform with

precise, quick and appropriate actions in emergency situations."  Ms. Black has confirmed the accuracy of the information provided by her father.  According to Ms. Black, she will be able to practice medicine without receiving any accommodations.

Ms. Black took written, time-limited exams during her first year of medical school.  She passed all her courses, without receiving extra testing time.

Since August 2016, Ms. Black has been employed as a 6th grade teacher.  She took and passed a qualifying subject-matter exam and did not seek extra testing time.

As this evidence shows, Ms. Black has not been substantially limited in learning, reading, concentrating, and thinking, or in her ability to memorize information.  Her unaccommodated performance in elementary school, middle school, high school, college, and her Post-Baccalaureate program; on the SAT and the MCAT exams; in her year of medical school; and in the numerous jobs she has held, all confirm that Ms. Black is not substantially limited in any major life activity when compared to most people in the general population.

Regardless of the "condition and manner in which she is able to perform" the major life activities at issue in this case (*see* Pl. Tr. Br. at 23) (Dkt. 53), objective evidence confirms that Ms. Black  has not needed any accommodations to perform at the highest levels.  While Ms. Black urges the Court not to focus on the "outcomes" she has been able to achieve, *id.* at 22, courts routinely – and appropriately – consider such objective evidence in evaluating whether a person is substantially limited in his or her ability to perform major life activities as compared to most people in the general population.  Individuals who perform at the level that Ms. Black has performed – with no extra testing time or other accommodations – do not have a disorder that rises to the level of a disability under the ADA.  *See, e.g., Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 155 (1st Cir. 1998) ("[Plaintiff] never experienced significant academic difficulties, and in fact has excelled

academically for most of his years at the Baldwin School."); *Bibber,* 2016 U.S. Dist. LEXIS 48181, at *25 (plaintiff who scored in the "average" range on the GRE (a graduate school admission test) and MCAT without accommodations was not substantially limited compared to most people); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Love,* 513 F. Supp. 2d at 214 (holding that plaintiff had not shown that he was disabled under the ADA and denying testing accommodations on the LSAT, where plaintiff had ACT and SAT scores "within the average range" with no accommodations and a 3.16 high school GPA, and did well in college without accommodations); *cf. Hetherington v. Wal-Mart, Inc.*, No. 12-13684, 511 Fed. App'x 909, 912 (11th Cir. Mar. 5, 2013) (holding that plaintiff was not substantially limited in his ability to think, learn, or read, where he was able to read "at a junior high level" and had "completed 12 years of school") (affirming summary judgment for defendant employer); *Collins v. Prudential Investment & Retirement Servs.*, No: 03-2356, 119 Fed. App'x 371, 378 (3d Cir. Jan. 4, 2005) ("[plaintiff's] testimony about her work, academic [background], and community involvement contradicts her claim that her ADHD/ADD substantially limits her abilities to think, learn, remember and concentrate") (summary judgment for defendant affirmed).

Ms. Black asserted in her deposition that she should be compared to her medical school peers.  She is mistaken.  Her claimed impairment must be measured against most people in the general population, not against other college graduates or other medical students.  *See Singh v. George Washington Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007) (relevant comparison is to the average person in the general population, not to other individuals attending medical school);

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 U.S. Dist. LEXIS 48181, *18 (E.D. Pa. 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population") (holding that plaintiff was not disabled within the meaning of the ADA, notwithstanding her dyslexia diagnosis, and therefore was not entitled to extra testing time on a medical licensing exam).[4]

    In this case, the extensive evidence regarding Ms. Black's actual ability to perform the activities in which she claims to be impaired is sufficient to supporting a finding that she is not disabled within the meaning of the ADA. This conclusion, however, has also been supported by the testimony of three eminently qualified experts with extensive experience diagnosing ADHD. All three experts agreed that (a) Ms. Black does not meet the professional diagnostic criteria for ADHD, and (b) even if she did, she is not substantially limited in her ability to perform any relevant major life activities as compared to most people in the general population. *See generally* Expert Reports of Dr. Kevin Murphy, Dr. Michael Herkov, and Dr. Michael Gordon (Def. Tr. Exs. 68, 69 and 71).

    Citing informal "technical assistance" from the U.S. Department of Justice, Ms. Black has argued that, under the ADA, testing entities should defer to a diagnosis provided by a test taker's

---

[4] *See also Bach v. Law Sch. Adm. Council,* 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014) (holding that examinee with ADHD diagnosis needed to be compared "to the general population"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013) (relevant comparison group is "the general population"), *aff'd*, 582 Fed. App'x 114 (3d Cir. 2014) (judgment for defendant); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population.") (judgment for defendant); *Love v. Law Sch. Adm. Council*, 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and thus was not entitled to testing accommodations); *cf. Malone v. Dep't of the Air Force*, 2016 U.S. Dist. LEXIS 39345, *20 (M.D. Ala. 2016) ("The mere fact that Malone may have been diagnosed with ADD is insufficient under the [ADA] to establish that her impairment rises to the level of a disability.") (summary judgment for employer).

professional. *See* www.ada.gov/regs2014/testing_accommodations.html. She is wrong.   In the first place, such informal guidance, which does not result from notice-and-comment rulemaking, does not have the force of law and is neither binding on the Court nor entitled to any special deference. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012). Moreover, that guidance cannot reasonably be applied where – as here – the diagnosis relied upon by the test taker was not made in accordance with applicable diagnostic criteria, is contradicted by objective evidence relating to the test taker's ability to perform the major life activities in which she claims to be impaired, and the evaluator did not consider whether the test taker is substantially limited compared to most people in the general population. *See, e.g., Rhodes v. Langston Univ.*, 462 Fed. Appx. 773, 778 (10th Cir. 2011) ("Rhodes' neuropsychological evaluation does not answer the question of whether her impairment substantially limits Rhodes' ability to learn as a whole for purposes of daily living, as compared to most people.").

Neither NBME nor the Court is required simply to defer to the conclusions reached by Ms. Black's evaluators in determining whether she is disabled within the meaning of the ADA or entitled to testing accommodations on the Step 1 exam.  Indeed, this case demonstrates precisely why such deference is not automatically or even generally warranted.  Discovery revealed that Ms. Black's initial ADHD diagnosis resulted from an informal, 30-minute visit with a psychiatrist for which she was charged $132.  The professional did not conduct a comprehensive evaluation and did not consider all of the relevant diagnostic criteria for ADHD.  Discovery further revealed that, although a clinical psychologist signed the evaluation report that Ms. Black obtained in 2014 from the USF Psychological Services Center, that psychologist (Dr. Booth-Jones) never met Ms. Black and does not consider herself an expert in diagnosing ADHD.  The evaluation was conducted, and

the diagnosis was made, by a graduate student "trainee" who had not yet concluded her academic training, much less begun either the internship or the fellowship that are part of the preparation for becoming a clinical psychologist.  Further, the evaluation was actually a "reevaluation," limited in scope and intended primarily for managing Ms. Black's prescription medications – it was not a comprehensive evaluation.  Thus, it is not reasonable to suggest that any deference should be given to Dr. Fleischer's diagnosis, or to the diagnosis and accommodation recommendations that are reflected in the USF Psychological Services report.  Neither the ADA nor any ADA implementing regulations require such deference.  To the extent DOJ's "technical assistance" suggests otherwise, the Court should reject that guidance.

The Step 1 exam is a licensing exam, relied upon jurisdictions across the country to help evaluate the competency of prospective physicians and thereby help protect the public welfare.  It would be inappropriate to require entities that administer such tests to defer to an examinee's supporting professional if doing so might result in unwarranted accommodations that could affect the validity of the resulting scores or give one examinee an unfair advantage over other examinees.  As another court has noted, NBME's accommodation procedures "are designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination.  As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it."  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004).

Similarly, NBME was not required to simply follow the decision that Ms. Black's medical school made to allow Ms. Black extra testing time on certain of her medical school tests.  It was

entirely appropriate for NBME to conduct its own assessment of Ms. Black's documentation and determine whether she is entitled to extra testing time on the Step 1 exam. *Cf. Ware v. Wyoming Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Although information regarding past accommodations may be helpful ..., the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumptively reasonable.  Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.*, 161 F.3d 19 (10th Cir. 1998).  Indeed, it appears that USF authorized Ms. Black to receive  accommodations based on Dr. Fleischer's ADHD diagnosis, and that diagnosis has since been shown to be unwarranted under the applicable ADHD diagnostic criteria.  The far more relevant accommodation history for Ms. Black is her history of not receiving extra testing time on other standardized tests, including the SAT and MCAT, and performing extremely well.

Ms. Black does not have a disability within the meaning of the ADA.  Because she does not have a disability, NBME did not violate her rights by denying her extra testing time.

C. **Even If Ms. Black Could Show That She Is Disabled Under The ADA, She Would Still Have To Show That She Needs Extra Testing Time To Prevail On Her Claim**

Ms. Black acknowledges that, in addition to showing that she is disabled within the meaning of the ADA, she must also show that she "needs accommodations from Defendant in order to take the Step 1 exam in an accessible manner," and that her requested accommodation of 50% additional testing time was "reasonable."  *See* Joint Pretrial Stipulation at 24-25 (Dkt. 48).  Ms. Black cannot make that showing.

In the first place, she takes prescription medications to treat her alleged ADHD symptoms, and she has informed one or more of her therapists that she responds positively to the medications.

If the medications address her symptoms (*i.e.*, if they address the limitations that she claims to experience), then she does not need extra testing time to accommodate those limitations.[5]

In addition, she cannot show that her need for extra testing time has prevented her from passing the Step 1 exam, as opposed to other possible causes.  Any number of reasons, unrelated to a disability, may explain why Ms. Black did not answer all of the questions on her Step 1 exams (if that in fact occurred), or why she has not yet achieved a passing score.  The record reflects at least the following possible reasons:  poor time management while testing, poor study habits or inadequate preparation, uncertainty about whether she really wants to be a doctor, test anxiety, a desire to sabotage her medical school career by not passing Step 1, her medical school's purported failure to "offer adequate academic support for Step 1 preparation (both prior to [her] first attempt or after [she] didn't succeed)," unhappiness about living in Tampa, which is "not [her] favorite place," or insufficient knowledge of the underlying subject matter.  She cannot show, however, that her failure was attributable to her alleged disability and her claimed need for extra testing time. *See Singh v. George Wash. Univ. Sch. of Medicine*, 667 F.3d 1, 5-6 (D.C. Cir. 2011) (affirming judgment in favor of GWU where plaintiff failed to prove that any limitation in learning was due to her alleged impairment, because there were many other reasons to explain her alleged difficulties, including anxiety, being over-extended in extra-curricular activities, and poor study

---

[5] Following enactment of the ADA Amendments Act in 2008, mitigating measures – such as medications – may not be considered when determining whether a person is disabled under the ADA.  *See* 42 U.S.C. § 12102(4)(E)(i)(I) and (III).  Mitigating measures may be considered, however, in determining whether a disabled individual needs any accommodations.  The purpose of accommodations is to address the functional limitations that result from a disability.  If those limitations are addressed by medication or other mitigating measures, no accommodations are needed or required.  *See, e.g.*, EEOC Questions and Answers on the Final Rule Implementing the ADA Amendments Act of 2008, Q&A 16 ("The ADAAA's prohibition on assessing the positive effects of mitigating measures applies only to the determination of whether an individual meets the definition of 'disability.' All other determinations – including the need for a reasonable accommodation … – can take into account … the positive … effects of a mitigating measure…. [I]f an individual with a disability uses a mitigating measure that … eliminates the need for a reasonable accommodation, a covered entity will have no obligation to provide one.") (available at https://www.eeoc.gov/laws/regulations/ada_qa_final_rule.cfm).

habits); *Fuoco v. Lehigh Univ.*, 981 F. Supp. 2d 352, 365 (E.D. Pa. 2013) (granting summary judgment to defendant where plaintiff offered only speculative and subjective belief that her problems were due to ADHD or that she was substantially limited in her ability to think, learn, or work compared to most people).

      This failure of proof on the issue of causation would preclude Ms. Black from establishing that NBME violated the ADA by denying her extra testing time, even if she had ADHD and even if her ADHD substantially limited any major life activities. *See Singh*, 667 F.3d at 5-6 ("We need not decide whether Singh had an impairment within the meaning of the ADA, or whether that alleged impairment substantially limited a major life activity. The district court's factual finding on causation is not clearly erroneous and that finding alone dooms her case. The district court identified 'many reasons aside from [Singh's] impairment that might explain why [she] has done relatively poorly on extremely time-limited tests.' For example, the district court listed anxiety from the difficulty of the medical school academic environment, 'her involvement in extracurricular activities,' … and poor study habits as possible causes of her poor performance.") (citations omitted).

V.       **CONCLUSION**

NBME is entitled to judgment in its favor.

Dated:  August 31, 2017                       Respectfully submitted,

                                              /s/ Gregory A. Hearing
                                              GREGORY A. HEARING
                                              Florida Bar No. 817790
                                              ghearing@tsghlaw.com
                                              Thompson, Sizemore, Gonzalez &
                                              Hearing, P.A.
                                              201 N. Franklin Street, Suite 1600
                                              Tampa, Florida 33602
                                              Tel:  (813) 273-0050
                                              Fax:  (813) 273-0072

                                              ROBERT A. BURGOYNE
                                              Admitted *pro hac vice*
                                              robert.burgoyne@nortonrosefulbright.com
                                              Norton Rose Fulbright US LLP
                                              799 9th Street, NW, Suite 1000
                                              Washington, DC 20001-4501
                                              Tel:  (202) 662-4513
                                              Fax:  (202) 662-4643

                                              Attorneys for National Board of Medical
                                              Examiners

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the 31st day of August, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Curtis Filaroski
Megan Collins
Disability Rights of Florida
2473 Care Drive, Suite #200
Tallahassee, Florida  32308

curtisf@disabilityrightsflorida.org
meganc@diabilityrightsflorida.org

Attorneys for Plaintiff

Defendant's counsel has also emailed copies of the foregoing to plaintiff's attorneys.

/s/  Gregory A. Hearing