UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ELIZABETH A. BLACK,

    Plaintiff,

v.                                                       CASE NO. 8:16-cv-2117-T-23TGW

NATIONAL BOARD OF
MEDICAL EXAMINERS,

    Defendant.
_____/

**ORDER**

The National Board of Medical Examiners administers to each prospective doctor of medicine in the United States a series of examinations (designated Steps One through Three) that test scientific knowledge and clinical ability. A graduate of Princeton University and a student at the University of South Florida's medical school, Elizabeth Black failed the Step One examination three times. Suing the Board under the Americans with Disabilities Act, Black alleges (Doc. 29) in a single-count complaint that an ADHD diagnosis requires the Board to allow Black time-and-a-half on a fourth sitting for the Step One examination. Arguing that the evidence fails to show that ADHD "substantially limits" Black's ability to read, to remember, to think, or to concentrate, the Board moves (Doc. 31) for summary judgment, and Black moves (Doc. 44) to amend the complaint.

**I. Black's motion to amend the complaint**

Eleven months after an order cautioned the parties that a motion to amend a pleading "is distinctly disfavored after issuance of this order" (Doc. 17 at 1), two months after the close of discovery, and a month after the Board's motion for summary judgment, Black moves (Doc. 44) to amend the complaint to assert that ADHD "substantially limits" Black's ability to "work" and to "take tests."  The motion warrants denial for three reasons.

First, Black unduly delayed moving for leave to amend.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that "undue delay" or the "repeated failure to cure deficiencies by amendments previously allowed" warrants denying leave to amend). Black variously attributes the delay to "diligent legal research," to new decisions cited by the Board, and to testimony from a recent deposition, but none of the proffered explanations excuses Black's tardiness.  Diagnosed with ADHD in 2009, Black undoubtedly knew about the purported limitations years before this action and could have alleged "working" and "test-taking" in the original complaint or in the May 31, 2017 amended complaint.  And every decision cited by the Board except one[1] preceded this action.  Additionally, Black argues that the deposition of Dr. Kevin Murphy revealed for the first time some new argument, but Black neither

---

[1] The Board cites *Doe v. Bibb Cty. Sch. Dist.*, 2017 WL 2240825 (11th Cir. May 22, 2017), for the proposition (established three decades earlier in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)) that defeating summary judgment requires more than a "mere scintilla" of evidence favorable to the non-moving party. (Doc. 31 at 3 (quoting *Doe*))

identifies the new argument nor explains why she waited several months after the deposition to move for leave to amend.

Second, amending the complaint at this time unduly prejudices the Board. The proposed complaint, which would likely require re-opening discovery, prolongs the resolution of this action by at least several months. *See Foman*, 371 U.S. at 182 (holding that "undue prejudice to the opposing party" warrants denying leave to amend); *Tech. Res. Serv., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1464 (11th Cir. 1998) (affirming the denial of leave to amend where the proposed amendment "probably would have required that discovery be reopened").

Third, the proposed complaint is futile. *See Foman*, 371 U.S. at 182 (holding that "futility of amendment" warrants denying leave to amend). As Section II of this order explains, the record reveals Black's long history of superlative performance in "working" and "test-taking" and militates mightily against the prospect that Black suffers from a "substantial limitation" in comparison to the average person. The motions (Docs. 43 and 44) to amend the complaint are **DENIED**.

## II. The Board's motion for summary judgment

Black alleges that the Board violated several regulations promulgated under the ADA. For example, Black alleges a violation of 36 C.F.R. § 36.309(b)(1), which requires that the Board "select[]" and "administer[]" the examination "so as to best ensure that, when the examination is administered to a person with a disability that

impairs sensory, manual, or speaking skills, the examination" measures the person's innate aptitude without artificial diminution attributable to a disability.

The Board argues that Black fails to qualify for accommodation under the ADA and the ADA regulations. Section 12102(1)(A) of the ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities" or a "record of such an impairment." Under 28 C.F.R. § 36.105(e)(1), qualifying for an accommodation through a "record of such an impairment" requires showing a "history of . . . mental or physical impairment that substantially limits one or more major life activities." Black identifies "learning," "reading," "memory," and "concentrating" as the major life activities substantially limited by Black's ADHD. (E.g., Doc. 39-15)

Although Black insists that the Board must compare Black's performance to her "medical-school peers" (E.g., Doc. 32 at 9), under 28 C.F.R. § 36.105(d)(1)(v) the substantial-limitation determination depends on a person's performance in comparison to "most people in the general population." Of course, average (or above-average) performance presumptively establishes the absence of a substantial limitation. In this action, Black's history of superlative academic performance refutes the claim that ADHD substantially limits Black's ability to learn, to read, to remember, or to concentrate in comparison to the average person.

The results of standardized examinations administered to Black in primary school uniformly show average or above-average performance. In first grade, Black

scored in the 71st percentile (that is, Black scored better than seventy-one percent of children her age) on the Otis-Lemon School Ability Test; in fourth grade, the 79th percentile; in seventh grade, the 68th percentile. (Doc. 32-3) A series of "Metropolitan Achievement Tests" administered to Black in elementary and middle school consistently show her performing above the median (typically, far above the median). (Doc. 32-4) The results evidence no substantial limitation compared to the average person.

Again, Black's performance in high school vividly illustrates a superior ability and strongly suggests the absence of a substantial limitation. Despite a challenging schedule of Honors and Advanced Placement classes, Black graduated ninth in a class of two-hundred and ninety-five students. (Doc. 32-10 at 18) Black maintained an impressive 3.941 GPA while participating in the Student Council and competing in field hockey, lacrosse, and basketball. (Doc. 32-10 at 19) In each of three attempts on the SAT, Black, who requested no accommodation on the SAT, scored better than at least 80% of test-takers.

Black's high-school performance merited admission to Princeton University, where Black earned mostly As and Bs. (Doc. 32-7) Although some Cs and Ds appear on the Princeton transcript, Black attributes these outlying grades to the "normal adjustment" to college and to a busy schedule, which included a "rigorous course load" and "countless hours practicing" field hockey. (Doc. 32-10 at 13) Black's field-hockey coach, who interacted daily with Black for four years at

Princeton, writes that Black showed that "she can succeed at the highest level." (Doc. 32-10 at 39)

After graduating from Princeton, Black worked as a legal assistant at Shearman & Sterling in New York City, where she "reviewed, drafted, and organized legal documents, surveys, [and] title policies." (Doc. 32-1 at 2) Black's employment at Shearman & Sterling required attention to detail; Black reviewed documents for accuracy. (Doc. 32 at 25) In a recommendation to Columbia University, Shearman & Sterling commended Black's performance at the firm. (Doc. 32 at 26, stating that "I got good evaluations from [Shearman & Sterling] to go work at Columbia.")

After a brief time working at Columbia University, Black enrolled at the University of Pennsylvania, where she earned a "certificate of advanced studies." In four semesters at Penn, Black earned seven As and one B in a rigorous curriculum that included organic chemistry and physics. (Doc. 32-10 at 3 and 32)

Black graduated from the University of Pennsylvania and worked for several years in Haiti and the Dominican Republic. Among other jobs, Black worked for a not-for-profit organization and managed "logistics and procurement, particularly after the Haitian earthquake." (Doc. 32 at 20) Also, Black managed the organization's finances, another responsibility that required carefully reading and concentrating. (Doc. 32 at 21, at which Black testifies that she "was responsible for the financial books") Black never requested an accommodation during employment or during an internship. (Doc. 32 at 16)

From kindergarten through the University of Pennsylvania, Black neither requested nor received any accommodation from a school or a standardized-test administrator. (Doc. 32 at 16) Black states that she requested no accommodation on the MCAT because the test administrator "flags your score report." (Doc. 32 at 36) Although Black scored better than just 32% of test-takers on a first attempt at the MCAT, Black explains that she prepared for the examination in less than a month and studied intermittently with a tutor. (Doc. 32 at 48) After an "intensive Kaplan [review] course," on a second sitting Black scored better than 73% of MCAT test-takers despite receiving no additional time. (Doc. 32 at 35–36) Black's success on the MCAT counsels strongly against the claim that ADHD substantially impairs Black's ability to succeed on a timed and standardized examination.

Black's performance at Princeton, at the University of Pennsylvania, and on the MCAT earned Black a spot at the University of South Florida's Morsani College of Medicine, where Black enrolled in 2011. Among other items, a matriculating student must certify possessing the "perseverance, diligence, and consistency to complete the medical school curriculum and enter the independent practice of medicine." (Doc. 32-9) Black affirmed when she enrolled at USF that she suffered from no condition requiring accommodation.[2] (Doc. 32-9)

---

[2] Although Black's father signed the certification on her behalf, Black admits the accuracy of the certification. (Doc. 32 at 38)

Black passed her first- and second-year USF-administered examinations. On her first attempt at the Step 1 examination, Black requested no accommodation from the Board. On the second and third attempts at the Step 1 examination, Black requested but the Board denied for lack of supporting documentation time-and-a-half. After failing the examination a third time, Black discussed with a USF "student advocate" Black's sitting for the examination a fourth time. In a series of e-mails to the advocate, Black appears to disclaim the necessity of an accommodation. For example, Black states that she "would obviously like to take [the examination] with extra time" but "would also like to take [the examination] if I . . . think I'm ready to take it, whether or not I have the accommodations." (Doc. 32-14)

To evidence a substantial limitation in comparison to the average person, Black cites (Doc. 39) the reports or the diagnoses of four purportedly "qualified" professionals: Megan McMurray (a psychology student at USF), Dr. Booth-Jones, Dr. Vigil-Otero, and Dr. Saneholtz.[3] None of these providers' reports or diagnoses shows a "substantial" limitation in comparison to the average person.

First, Megan McMurray administered several "scales" or "examinations," which mostly involved Black's self-reporting of her perceived symptoms. The results

---

[3] The Board correctly questions the validity of the ADHD diagnoses, which suffer from a pronounced lack of methodological rigor. Except for the diagnosis by the graduate student (which showed a "54% chance" that Black suffers from ADHD), the diagnoses typically involved only a brief, informal interview with Black. The psychologists, at least one of whom admits that the purpose of Black's examination for ADHD was to allow Black to continue a Vyvanse prescription, failed to review Black's history, failed to confirm with a third party Black's self-reported symptoms, and failed to administer clinical tests in accord with the accepted protocol for diagnosing ADHD.

- 8 -

led McMurray to conclude that Black's "memory" and "processing speed" are "average when compared to that of her same-aged peers." (Doc. 32-15 at 5) If anything, McMurray's conclusions counsel against a substantial limitation in comparison to the average person.[4]

Second, Dr. Booth-Jones offers no opinion about a substantial limitation. Even if Dr. Booth-Jones opines that ADHD substantially impairs Black, the record reveals that Dr. Booth-Jones, whose name appears on a report produced by McMurray, lacks an informed basis to identify a substantial limitation resulting from Black's ADHD. An employee of the Moffitt Cancer Center, Dr. Booth-Jones volunteered to "supervise" McMurray's interaction with Black, but Dr. Booth-Jones never met Black, never reviewed Black's records, and neither conducted nor oversaw the administration of any test to establish the extent to which ADHD purportedly impairs Black in comparison to the average person.

Third, Dr. Vigil-Otero conducted a "global assessment of functioning" and assigned Black a "GAF" score of 80, which Dr. Vigil-Otero testifies evidences Black's "occasional struggles[,] but obviously [Black's ADHD is] not severe." (Doc. 39-7 at 52) The Diagnostic and Statistical Manual of Mental Disorders confirms Dr. Vigil-Otero's conclusion that a score of 80 evidences no substantial

---

[4] The testimony of Dr. Booth-Jones, who "supervised" McMurray, severely undermines the validity of McMurray's diagnosis. Rather than administer a thorough evaluation, McMurray conducted a brief "reevaluation" "just to maintain" Black's Vyvanse prescription. (Doc. 35 at 15)

limitation. Under the manual, a score of 80 signifies some "difficulty concentrating" but "no more than a slight impairment."[5] (Doc. 39-7 at 53)

Fourth, Black submits no evidence or argument that Dr. Saneholtz, who saw Black for nine brief "general counseling sessions," concluded that ADHD substantially limits Black in comparison to the average person.

## CONCLUSION

To qualify for accommodation under the ADA, a person must demonstrate that a disorder "substantially" limits her in comparison to "most people in the general population." Black alleges that ADHD substantially limits her ability to read, to remember, to think, and to concentrate, but Black's biographical record consistently reveals average or above-average performance. After graduating at the top of her high-school class and excelling on the SAT, Black graduated from Princeton University, where she earned respectable grades while competing in Division I field hockey. After working at Shearman & Sterling, Black enrolled at the University of Pennsylvania, and Black's performance earned her an award reserved for the top 20% of the Penn program. From kindergarten through the University of

---

[5] Although Dr. Vigil-Otero assigned Black a score of 80, Dr. Vigil-Otero states during this litigation that Black's score "was going down into the 40s." (Doc. 39-7 at 69) A score in the range typically results, for example, in "suicidal ideation, severe obsessional rituals, [or] frequent shoplifting," but Dr. Vigil-Otero agrees that Black manifested none of these behaviors. (Doc. 39-7 at 73) Nevertheless, Dr. Vigil-Otero states that Black's "specific difficulties were seriously impairing her in her occupational, or in this case school functioning." (Doc. 39-7 at 73) But Dr. Vigil-Otero fails to compare Black's "impair[ed]" performance to the performance of an average person.

Pennsylvania, Black neither requested nor received an accommodation from a school or a standardized-test administrator.

The psychologists' opinions provide little or no evidence that ADHD substantially impairs Black's ability to learn, to read, to remember, or to concentrate in comparison to the average person. In any event, defeating summary judgment requires more than a mere "scintilla of evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Considered in contrast to more than two decades of above-average performance, the superficial, equivocal, or unqualified opinions create no genuine dispute of material fact. Even viewing the record favorably to Black, no reasonable finder of fact could conclude that ADHD substantially limits Black in comparison to most people in the general population. The Board's motion (Doc. 31) for summary judgment is **GRANTED**, and the clerk is directed (1) to enter judgment for the National Board of Medical Examiners and against Elizabeth A. Black, (2) to terminate any pending motion, and (3) to close the case.

ORDERED in Tampa, Florida, on September 1, 2017.

/s/ Steven D. Merryday
_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE